UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>CCS Medical, Inc. et al.,<br><br>              Debtors. | Chapter 11<br><br>Case No. 09-12390 (CSS)<br><br>Jointly Administered |

**DECLARATION OF JOHN F. CRAMER IN SUPPORT OF OBJECTION OF THE SECOND LIEN GROUP TO DISCLOSURE STATEMENT AND SOLICITATION PROCEDURES AND MOTION FOR APPOINTMENT OF AN OFFICIAL COMMITTEE OF SECOND LIEN LENDERS**

**JOHN F. CRAMER**, declares under the penalty of perjury, pursuant to 28 U.S.C. section 1746, as follows:

1. I am a Managing Director at Broadpoint Capital, Inc. ("Broadpoint"), a financial advisory services firm having an office at 12 East 49th Street, 31st Floor, New York, NY 10017. Broadpoint is the financial advisor to an informal group of lenders (the "Second Lien Group") holding a majority of the approximately $110 million of claims under the Second Lien Credit Agreement, dated September 30, 2005, of the above-captioned Debtors and Debtors in Possession.

2. As the Second Lien Group's financial advisor, Broadpoint has undertaken a preliminary review of the summary of the valuation performed by the Debtors and their financial advisors, which is set forth in the Debtors' Disclosure Statement With Respect To Joint Chapter 11 Plan Of Reorganization For CCS Medical, Inc. And Its Affiliated Debtors (the "Disclosure Statement," Docket No. 67) submitted in connection with the Debtors' Joint Chapter 11 Plan Of Reorganization For CCS Medical, Inc. And Its Affiliated Debtors (the "Plan," Docket No. 66). I

submit this Declaration in support of the objection of the Second Lien Group to the Disclosure Statement and proposed solicitation procedures (Docket No. 143) as well as its motion for appointment of an official committee of second lien lenders (Docket No. 144).

3. The facts set forth in this Declaration are based only upon my industry knowledge, information learned from documents publicly filed in these cases and otherwise publicly available information. Broadpoint has entered into a Confidentiality Agreement with the Debtors dated July 24, 2009, and in making the statements herein, I did not rely on or incorporate any confidential information furnished to Broadpoint by the Debtors under such Confidentiality Agreement. I am authorized to submit this Declaration and, if called as a witness, I could and would testify thereto.

## **Broadpoint's Capabilities in Restructuring**

1. Broadpoint is a wholly owned subsidiary of Broadpoint Gleacher Securities Group, Inc. ("BPSG"), and is an independent investment bank that serves the institutional market and corporate middle market by providing clients with various advisory and financial services as well as strategic and research-based investment opportunities. Specifically, Broadpoint offers a diverse range of products and services, including, without limitation: financial advisory and investment banking services, institutional equity research, sales and trading, fixed income services and broker-dealer services. In addition, BPSG, through its various subsidiaries, provides venture capital services and mortgage-backed security/asset-backed securities trading assistance.

2. I am a member of Broadpoint's restructuring group, which focuses on assisting companies in distress, through new financing, mergers and acquisitions and the bankruptcy process. The members of Broadpoint's restructuring group have significant

experience in recapitalization and restructuring transactions, including engagements involving in and out of court restructurings, chapter 11 reorganizations, company, creditor and board advisory services, distressed asset sales and exchange offers.

3. Notably, Broadpoint has been retained as a financial advisor and investment banker in other large and complex chapter 11 cases, including, among others, In re Merisant Worldwide, Inc., No. 09-10059 (PJW) (Bankr. D. Del. Mar. 24, 2009), In re Internet Corp., No. 08-11589 (KG) (Bankr. D. Del. Oct. 1, 2008) and In re Lyondell Chemical Co., et al., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009).

4. I joined Broadpoint in 2002 as a Vice President in the New York office focused on Health Care Investment Banking. Prior to joining Broadpoint, I was a Vice President in the Health Care Investment Banking Group at Robertson Stephens in New York. I began my career at Dewey Ballantine LLP (now Dewey & LeBoeuf) as an associate focused on Health Care Corporation Finance. I received a J.D. from the University of Michigan Law School and B.A. in Economics and History from Albion College.

### Broadpoint's Engagement by the Second Lien Group

5. Broadpoint began assisting the Second Lien Group in evaluating the Debtors' proposed plan of reorganization in July 2009, and continues to provide financial advisory services to the Second Lien Group in accordance with an Engagement Letter.

### Broadpoint's Preliminary View of the Debtors' Valuation

6. In assessing the summary of the Debtors' valuation prepared by Goldman, Sachs & Co., LLC ("Goldman"), more fully set forth in the Disclosure Statement, Broadpoint (i) reviewed the limited publicly-available historical and projected financial information of the Debtors filed on August 10, 2009 as Exhibits 4 and 5 to the Debtors' Disclosure Statement (the "Debtors' Projections"), (ii) considered the prevailing trading multiples of certain publicly-

traded companies that Broadpoint deemed to be reasonably comparable to the Debtors, (iii) considered the multiples in recent change-in-control transactions involving public and private companies that Broadpoint deemed to be reasonably comparable to the Debtors, and (iv) prepared discounted cash flow analyses based on the publicly-available Debtors' Projections, utilizing various discount rates and terminal value multiples.

7. Broadpoint believes that the information contained in the Disclosure Statement and Debtors' Projections annexed thereto is inadequate to consider, analyze or make a sufficiently informed decision as to the bases, support and accuracy of the Debtors' valuation conclusions set forth in the Disclosure Statement. For example, the Disclosure Statement contains only a summary of the valuation prepared by Goldman, without supporting documentation as to the valuation offered. The limited summary makes it impossible to assess the basis for the Debtors' valuation conclusion or even the underlying inputs used to form that conclusion. For example, the Debtors state that they "predominately relied on comparable companies in the home health industry" without naming a single one. Disclosure Statement at 69. Moreover, Debtors' fail to explain and support why only the "home health industry" (Disclosure Statement at 69) is the appropriate industry sector to use for their comparable public company analysis. In point of fact, Broadpoint believes that the choice of comparable companies only from the "home health industry" is unnecessarily narrow, and has the effect of inappropriately lowering the Debtors' valuation conclusions in the Disclosure Statement.

8. Similarly, the Debtors arbitrarily "limited the comparable transactions to those having occurred following the announcement in January 2008 of the enactment of competitive bidding for diabetes products" without further explanation as to their rationale for excluding these transactions. Disclosure Statement at 69. The rationale for excluding these

transactions becomes even more questionable given that the Medicare Prescription Drug, Improvement and Modernization Act of 2003 directed the Secretary of Health and Human Services to implement competitive bidding among suppliers of certain items to Medicare beneficiaries. "Competitive bidding" was intended as a cost-saving measure established to require suppliers of durable medical equipment, prosthetics, orthotics and supplies (including mail-order diabetic supplies) to submit competing bids to supply Medicare beneficiaries. By 2007, the Department of Health and Human Services Center for Medicare and Medicaid Services had specified ten categories of items that would be the subject of future competitive bidding, including mail-order diabetic supplies. See General Overview of the Final Rule for Competitive Acquisition for Certain Durable Medical Equipment, Prosthetics, Orthotics and Supplies (Apr. 10, 2007), available at http://www.cms.hhs.gov/DMEPOS CompetitiveBid/Downloads/DMEPOSRegSumm.pdf. Therefore, the prospect of competitive bidding for diabetic supplies had already been widely disclosed well prior to January 2008 and was already considered a risk factor for companies operating in the mail-order diabetes industry. By excluding numerous transactions prior to January 2008, certain of which were executed at significantly higher multiples despite the well-known, imminent implementation of competitive bidding, this arbitrary cutoff artificially and materially deflates the Debtors' value.

9. Based on Broadpoint's preliminary review of the limited publicly-available information and Debtors' Projections referred to herein, Broadpoint estimates the valuation of the Debtors to be sufficiently in excess of the combined face value of first lien debt and DIP financing commitment, which valuation would provide meaningful recoveries to the Second Lien Lenders.

## The Debtors' M&A Process

10.  As part of the Debtors' evaluation of strategic options to address their business constraints, on or about January 20, 2009 the Debtors hired Goldman to assist the Debtors with, among other things, a potential sale. See Affidavit of Stephen M. Saft in Support of Chapter 11 Petitions and First Day Pleadings ("Saft Affidavit") at ¶ 43. The first quarter of 2009 was a period of virtually unprecedented turmoil in the credit and equity markets that slowed M&A activity significantly. Not surprisingly, Goldman's efforts during this period "ultimately were futile." Saft Affidavit ¶ 27.

11.  However, it is absolutely critical to note that the capital markets environment has undergone a dramatic and significant improvement since the first quarter of 2009. For example, the share prices of the comparable public companies surveyed by Broadpoint in assessing the Debtors' summary of valuation in the Disclosure Statement increased approximately 42% from March 1, 2009 through August 17, 2009.

12.  In addition, subsequent to Broadpoint's involvement as financial advisor to the Second Lien Group, in August 2009 Broadpoint was independently approached on an unsolicited basis by two potential strategic buyers of the Debtors. Both parties have indicated to Broadpoint that they were interested in a potential acquisition of the Debtors, that they had not been contacted by Goldman earlier in 2009, and that they had experienced frustration and delay at various times since the commencement of these cases in negotiating with the Debtors in an effort to execute confidentiality agreements to facilitate due diligence with respect to a potential acquisition.

13.  In Broadpoint's professional view, the failure to contact certain potential acquirers such as those noted above, and the Debtors' apparent inability to expeditiously invite

additional parties interested in performing due diligence into the marketing process, suggest that the Debtors' marketing process has been inappropriately limited in scope. As such, we believe that the Debtors' marketing process is not a reliable indicator of the true value of the Debtors, and that a broader, more inclusive process undertaken in an improving market environment would be more likely to result in consummation of a transaction to maximize value in these cases.

Dated: New York, New York
August 18, 2009

_____
JOHN F. CRAMER