## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| CCS Medical, Inc., et al., | ) | Case No. 09-12390 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

## DISCLOSURE STATEMENT WITH RESPECT TO THE
## FIRST AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## FOR CCS MEDICAL, INC. AND ITS AFFILIATED DEBTORS

Dated: Wilmington, Delaware
August 20, 2009

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

**Young Conaway Stargatt & Taylor, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801-1037
(302) 571-6600

*Co-Counsel to the Debtors and Debtors in Possession*

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR WILL THERE BE ANY DISTRIBUTION OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL THE SECURITIES DESCRIBED HEREIN AND IS NOT A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES IN ANY STATE WHERE SUCH OFFER OR SALE IS NOT PERMITTED.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS **4:00 P.M. PREVAILING EASTERN TIME ON SEPTEMBER 15, 2009,** UNLESS EXTENDED BY THE DEBTORS (THE "**VOTING DEADLINE**"). TO BE COUNTED, BALLOTS (AS DEFINED IN ARTICLE IX OF THIS DISCLOSURE STATEMENT) MUST BE RECEIVED BY THE VOTING AGENT (AS DEFINED HEREIN) ON OR BEFORE THE VOTING DEADLINE.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE IS NO ASSURANCE THAT THESE CONDITIONS WILL BE SATISFIED OR WAIVED.

HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE PLAN SECURITIES (AS DEFINED HEREIN) TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER OR SOLICITATION IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTIONS PROVIDED BY SECURITIES ACT SECTIONS 3(a)(9) AND 4(2), OR OTHER APPLICABLE EXEMPTIONS, AND EXPECT THAT THE ISSUANCE OF THE NEW

SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF BANKRUPTCY CODE SECTIONS 1145(a)(1) AND (2) AND SECURITIES ACT SECTION 4(2), OR OTHER APPLICABLE EXEMPTIONS.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS. ALL HOLDERS OF CLAIMS AND INTERESTS ARE ENCOURAGED TO REVIEW THE FULL TEXT OF THE PLAN AND THE PLAN DOCUMENTS, AND TO READ CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING ALL EXHIBITS HERETO.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

**THE DEBTORS SUPPORT CONFIRMATION OF THE PLAN. THE DEBTORS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

- ii -

**THE CONSENTING HOLDERS SUPPORT CONFIRMATION OF THE PLAN. THE CONSENTING HOLDERS URGE ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.**

**THE AD HOC GROUP OF SECOND LIEN LENDERS HAS DISPUTED THE VALUATION AND ALLEGES THAT THE TOTAL ENTERPRISE VALUE OF THE COMPANY IS MATERIALLY GREATER THAN AS PROVIDED HEREIN. THE AD HOC GROUP OF SECOND LIEN LENDERS RESERVES ALL OF ITS RIGHTS TO OBJECT TO CONFIRMATION OF THE PLAN BASED ON THE VALUATION. THE DEBTORS DISPUTE SUCH ALLEGATIONS AND DO NOT BELIEVE THAT THE TOTAL ENTERPRISE VALUE OF THE COMPANY IS GREATER THAN $350 MILLION--THE MINIMUM AMOUNT NECESSARY TO SATISFY THE FIRST LIEN LENDER CLAIMS IN FULL.**

# TABLE OF CONTENTS

Page

ARTICLE I. INTRODUCTION .................................................................................1
    1.1    General. ........................................................................................1
    1.2    The Confirmation Hearing. ..........................................................3
    1.3    Classification of Claims and Interests. .........................................3
    1.4    Voting; Holders of Claims Entitled to Vote. .................................4
    1.5    Projections and Forward-Looking Statements. ..............................6

ARTICLE II. SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
        OF CLAIMS AND INTERESTS THEREUNDER ............................................6

ARTICLE III. BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO
        THESE REORGANIZATION CASES ............................................14
    3.1    The Debtors' Businesses. ...........................................................14
    3.2    Facilities and Offices. ................................................................16
    3.3    Employees. ...............................................................................17
    3.4    Prepetition Indebtedness and Capital Structure. ..........................17

ARTICLE IV. EVENTS LEADING TO CHAPTER 11 FILING .................................18
    4.1    The Debtors' Financial Position. .................................................18
    4.2    Events Leading Up to the Formulation of the Plan. ......................19

ARTICLE V. REASONS FOR THE SOLICITATION; RECOMMENDATION .......................20

ARTICLE VI. THE PLAN ......................................................................................21
    6.1    Overview of Chapter 11. .............................................................21
    6.2    Settlement of Certain Inter-Creditor / Intercompany Issues. .............22
    6.3    Separate Plans/Non-Consolidation. ............................................22
    6.4    Limitations of Plan Distributions to Interests. .............................22
    6.5    Separate Classification of Other Secured Claims. .........................22
    6.6    Overview of the Plan. ................................................................23
    6.7    Summary of Capital Structure of Reorganized Debtors. ...............31
    6.8    Acceptance or Rejection of the Plan; Effect of Rejection by One or
        More Classes of Claims or Interests. ..........................................38
    6.9    Means for Implementation. .........................................................39
    6.10   Distributions. ............................................................................42
    6.11   Procedures for Resolving Claims. ...............................................47
    6.12   Executory Contracts and Unexpired Leases. ................................49
    6.13   Conditions Precedent to Confirmation and Consummation of the Plan. ..........51
    6.14   Effect of Confirmation. .............................................................53
    6.15   Releases. ..................................................................................55
    6.16   Retention of Jurisdiction. ...........................................................59
    6.17   Miscellaneous Provisions. ..........................................................60

ARTICLE VII. CONFIRMATION OF THE PLAN OF REORGANIZATION ..........................64
    7.1    Confirmation Hearing. ...............................................................64

| 7.2 | Confirmation. | 65 |
| 7.3 | Classification of Claims and Interests | 74 |
| 7.4 | Consummation. | 74 |

ARTICLE VIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ... 74

| 8.1 | Liquidation Under the Bankruptcy Code. | 75 |
| 8.2 | Alternative Plan(s) of Reorganization. | 75 |
| 8.3 | Dismissal of the Debtors' Reorganization Cases. | 75 |

ARTICLE IX. SUMMARY OF VOTING PROCEDURES ... 76

ARTICLE X. DESCRIPTION AND HISTORY OF REORGANIZATION CASES ... 77

| 10.1 | General Case Background. | 77 |
| 10.2 | Retention of Professionals. | 77 |
| 10.3 | Employment Obligations. | 78 |
| 10.4 | Continuing Supplier Relations. | 78 |
| 10.5 | Common Carrier and Warehousing Relations. | 78 |
| 10.6 | Stabilization of Debtors' Business Operations. | 79 |
| 10.7 | Utilities. | 79 |
| 10.8 | Schedules, Statements and Bar Date. | 80 |

ARTICLE XI. GOVERNANCE OF REORGANIZED DEBTORS ... 80

| 11.1 | Board of Directors and Management. | 80 |
| 11.2 | Indemnification of Directors and Officers. | 81 |
| 11.3 | New Stockholder and Registration Rights Agreement. | 82 |
| 11.4 | Warrants. | 82 |
| 11.5 | The Credit Agreements. | 82 |

ARTICLE XII. CERTAIN RISK FACTORS TO BE CONSIDERED ... 82

| 12.1 | Certain Bankruptcy Considerations. | 82 |
| 12.2 | Risks Relating to the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility, the New Common Stock and the Warrants. | 84 |
| 12.3 | Risks Relating to Tax and Accounting Consequences of the Plan. | 89 |
| 12.4 | Risks Associated with the Business. | 90 |

ARTICLE XIII. SECURITIES LAW MATTERS ... 97

| 13.1 | Plan Securities. | 97 |
| 13.2 | Issuance and Resale of Plan Securities Under the Plan. | 97 |

ARTICLE XIV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ... 99

| 14.1 | Introduction. | 99 |
| 14.2 | Federal Income Tax Consequences to the Debtors. | 101 |
| 14.3 | Federal Income Tax Consequences to Holders of Certain Claims. | 104 |

ARTICLE XV. CONCLUSION ... 112

DB02:8632234.1

068347.1001

# ARTICLE I.

# INTRODUCTION

**1.1** *General.*

CCS Medical, Inc. ("**CCS**") and the other debtors and debtors-in-possession, as set forth on Schedule 1.1 hereto (collectively, the "**Debtors**") hereby transmit this disclosure statement (as it may be amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), in connection with the Debtors' solicitation of votes (the "**Solicitation**") to confirm the Joint Chapter 11 Plan of Reorganization of CCS Medical, Inc. and its Affiliated Debtors, dated as of August 20, 2009 (the "**Plan**," a copy of which is attached to this Disclosure Statement as Exhibit 1).[1]

The purpose of this Disclosure Statement is to set forth information: (i) regarding the history of the Debtors and their businesses; (ii) describing the Reorganization Cases; (iii) concerning the Plan and alternatives to the Plan; (iv) advising the holders of Claims and Interests of their rights under the Plan; and (v) assisting the holders of Claims entitled to vote on the Plan in making an informed judgment regarding whether they should vote to accept or reject the Plan.

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1);

- Plan Support Agreement (Exhibit 2);

- Prepetition Corporate Organizational Chart (Exhibit 3);

- Liquidation Analysis (Exhibit 4);

- Reorganized Debtors' Projected Financial Information (Exhibit 5); and

- Disclosure Statement Order (Exhibit 6).

On August 20, 2009, after notice and a hearing, the Bankruptcy Court (i) entered an order approving this Disclosure Statement (the "**Disclosure Statement Order**") as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan and (ii) authorized the Debtors to use this Disclosure Statement in connection with the Solicitation. **The Disclosure Statement Order establishes September 15, 2009 at 4:00 p.m. (Prevailing Eastern Time) as the Voting Deadline. APPROVAL OF THIS**

---

[1] All capitalized terms used but not defined herein shall have the meanings ascribed in the Plan.

**DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in this Disclosure Statement, the Plan and all exhibits hereto and thereto. **PURSUANT TO THE PLAN SUPPORT AGREEMENT, APPROXIMATELY 72% IN AMOUNT OF CLASS 2 CLAIMS HAVE AGREED TO SUPPORT AND NOT OBJECT TO THE PLAN.**

**THE DEBTORS BELIEVE THAT THE PLAN PROVIDES FOR THE BEST AVAILABLE RECOVERY TO THEIR STAKEHOLDERS. THE DEBTORS RECOMMEND THAT HOLDERS OF CLAIMS VOTE TO ACCEPT THE PLAN.**

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement (including the Exhibits hereto) can be accessed free of charge from the following website: http://chapter11.epiqsystems.com/CCSMedical. Additional copies of this Disclosure Statement (including the Exhibits hereto) are also available upon request made to the office of the Debtors' co-counsel, at Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: Michael J. Kelly, Esq. and Lauren C. Cohen, Esq. (212) 728-8000 (phone) or (212) 728-8111 (facsimile), or at Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801-1037, Attention: Robert Brady, Esq. and Matthew B. Lunn, Esq. (302) 571-6600 (phone) or (302) 571-1253 (facsimile).

In addition, a Ballot for voting to accept or reject the Plan with respect to each Debtor is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan. If you are a holder of a Claim entitled to vote on the Plan and

- 2 -

did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call: Angharad Bowdler at (646) 282-2400, or send your written inquiry to:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: Angharad Bowdler

Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the other Exhibits attached hereto and the instructions accompanying the Ballots in their entirety before voting on the Plan. These documents contain important information concerning the classification of Claims and Interests for voting purposes and the tabulation of votes.

## 1.2    *The Confirmation Hearing.*

In accordance with the Disclosure Statement Order and section 1128 of the Bankruptcy Code, a hearing will be held before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge for the District of Delaware, United States Bankruptcy Court, 5th Floor Courtroom 6, 824 North Market Street, Wilmington, DE 19801 on **September 29, 2009, at 2:00 p.m. (Prevailing Eastern Time)**, to consider confirmation of the Plan. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **September 22, 2009, at 4:00 p.m. (Prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order. The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

## 1.3    *Classification of Claims and Interests.*

The Plan is a plan of reorganization with respect to each of the Debtors and does not seek substantive consolidation for any purposes under the Plan. Each Class of Claims and Interests is a Class of Claims, if applicable, for each respective Debtor. The following table designates the Classes of Claims against and Interests in each of the Debtors, and specifies which Classes are (a) Impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan. Notwithstanding the foregoing, if the Bankruptcy Court determines that Classes 1 and/or 4 are unimpaired within the meaning of section 1124 of the Bankruptcy Code, the holders of the Claims within such Class(es) shall be deemed to have accepted the Plan with respect thereto.

- 3 -

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Impaired | Yes |
| Class 2 | First Lien Lender Claims | Impaired | Yes |
| Class 3 | Second Lien Lender Claims | Impaired | Yes |
| Class 4 | Other Secured Claims | Impaired | Yes |
| Class 5 | Trade Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | PIK Lender Claims | Impaired | No (deemed to reject) |
| Class 8 | Existing Stock Interests | Impaired | No (deemed to reject) |
| Class 9 | Other Existing Interests | Impaired | No (deemed to reject) |
| Class 10 | Existing Securities Law Claims | Impaired | No (deemed to reject) |

**1.4** *Voting; Holders of Claims Entitled to Vote.*

Pursuant to the provisions of the Bankruptcy Code, only holders of claims or equity interests in classes of claims or equity interests that are Impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan. In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan.

In connection with the Plan:

- Holders of Claims in Classes 1 – 6 are Impaired and the holders of such Allowed Claims may be entitled to receive a Plan Distribution. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan;

- Holders of Claims and Interests in Classes 7 – 10 are Impaired and are deemed to have rejected the Plan. As a result, their votes are not being solicited.

- The Debtors serve over 400,000 individual customer-patients. The Debtors believe that if any such individuals hold Claims, they will be satisfied in the ordinary course of the Debtors' business pursuant to orders of the Bankruptcy Court. Accordingly, the Debtors are not soliciting such holders' votes.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of

- 4 -

a plan of reorganization that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept the plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement, the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete, execute and return your Ballot(s) to the Debtors' claims and voting agent (the "**Voting Agent**") at the address below:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Tel. (646) 282-2400
Attn: Angharad Bowdler

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY <u>RECEIVED</u> BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON SEPTEMBER 15, 2009,** UNLESS EXTENDED BY THE DEBTORS. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER. ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Debtors' Voting Agent.

The Debtors have fixed **4:00 P.M., PREVAILING EASTERN TIME, ON AUGUST 20, 2009** (the "<u>Voting Record Date</u>") as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept the Plan. Accordingly, only holders of record of Claims or Interests as of August 20, 2009, that are otherwise entitled to vote on the Plan, will receive a Ballot and may vote on the Plan.

All properly completed Ballots received prior to the Voting Deadline will be counted for purposes of determining whether each voting Class of Impaired Claims has accepted the Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the

- 5 -

results of the balloting with respect to the Plan on a Class-by-Class basis with respect to the Classes entitled to vote.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## 1.5    *Projections and Forward-Looking Statements.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Consequently, actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements. The projected financial information contained herein and in the Exhibits annexed hereto is, therefore, not necessarily indicative of the future financial condition or results of operations of the Debtors, which in each case may vary significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements contained herein should not be regarded as representations by any of the Debtors, their advisors, or any other Person that the projected financial conditions or results of operations can or will be achieved.

## ARTICLE II.

## SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

The overall purpose of the Plan is to provide for the restructuring of the Debtors' liabilities in a manner designed to maximize recovery to all stakeholders and to enhance the financial viability of the Reorganized Debtors. Generally, the Plan provides for a balance sheet restructuring that swaps the Debtors' current debt evidenced by the First Lien Lender Claims for $200 million in New Notes and 100% of the new equity. Other secured and certain unsecured creditors will receive Cash or Warrants, as applicable. Based on the Valuation, as more fully set forth in Section 7.2(b) hereof, it is not expected that there will be any recovery available for Classes other than Administrative Expenses Claims, U.S. Trustee Fees, Fee Claims, Priority Tax Claims, Priority Non-Tax Claims, DIP Lender Claims and First Lien Lender Claims. However, as a result of the settlements and compromises embodied in the Plan, the First Lien Lenders have agreed to provide a portion of their recovery on account of the First Lien Lender Claims in the form of Warrants and Cash, as applicable, as a "gift" to certain holders of Allowed Second Lien Lender Claims, Allowed Trade Claims and Allowed General Unsecured Claims, all as set forth in greater detail in Article VI hereof, provided certain conditions are met. All of the Debtors' existing common stock and preferred shares (other than stock held by other Debtors) will be cancelled and the holders of such stock shall not be entitled to any recovery under the Plan. The

restructuring transactions contemplated by the Plan will substantially de-lever the Debtors and provide additional needed liquidity.

The following table classifies the Claims against, and Interests in, the Debtors into separate Classes and summarizes the treatment of each Class under the Plan. The table also identifies which Classes are entitled to vote on the Plan based on rules set forth in the Bankruptcy Code. Finally, the table indicates the estimated recovery for each Class. **As described in Article XII below, the Debtors' businesses are subject to a number of risks. The uncertainties and risks related to the Reorganized Debtors make it difficult to determine a precise value for the Reorganized Debtors, the New Common Stock and other distributions under the Plan. The recoveries and estimates described in the following tables represent the Debtors' estimates given the information available on the date of this Disclosure Statement. All statements in this Disclosure Statement regarding the amount of Claims and Interests are estimates only and are based on information known to the Debtors at the date hereof. The final amounts of Claims Allowed by the Bankruptcy Court may vary significantly from these estimates.**

In connection with preparing the estimation of recoveries set forth herein, the Debtors have assumed that the ongoing enterprise value of the Reorganized Debtors for purposes of the Plan, based on the valuation prepared by Goldman Sachs & Co., LLC ("**Goldman**"), the Debtors' financial advisors, is approximately $230 million to $286 million.

The following table summarizes the classification and treatment of Claims and Interests under the Plan. The summaries in this table are qualified in their entirety by the description of the treatment of such Claims in Articles III and V of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, U.S. Trustee Fees, Fee Claims and Priority Tax Claims have not been classified. Except as specifically noted therein, the Plan does not provide for payment of postpetition interest with respect to Allowed Claims.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|-------|-------------|-----------|------------------|-----------------------------------------------------------------------------------|--------------------|
| Unclassified | DIP Lender Claims | Unless such holder agrees to different treatment, each holder of a DIP Lender Claim shall be paid 100% of the then | No. | $12,095,000[2] | 100% |

---

[2]      This amount includes certain fees and expenses authorized to be paid to the First Lien Lenders in connection with the Final DIP Order and the DIP Credit Agreement.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|---|---|---|---|---|---|
| | | outstanding amount, if any, of such DIP Lender Claim and the permitted outstanding and unpaid fees and expenses of such holder in Cash. | | | |
| Unclassified | Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim, unless such holder agrees to different treatment. | No. | $300,000[3] | 100% |
| Unclassified | U.S. Trustee Fees | On the Effective Date or as soon as practicable thereafter, the Debtors shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date. | No. | $60,000 | 100% |
| Unclassified | Fee Claims | Each holder of an Allowed Fee Claim for which a final fee application has been properly and timely filed and served shall be paid to the extent approved by order of the Bankruptcy Court. | No. | $2,725,000[4] | 100% |
| Unclassified | Priority Tax Claims | Unless such holder agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in the applicable Debtor's discretion, either (a) Cash in an amount | No. | $350,000 | 100% |

---

[3]    This amount does not include approximately $9 million of payments on account of 503(b)(9) Claims expected to be satisfied pursuant to the Order Authorizing Debtors to Pay Prepetition Obligations of Certain Critical Vendors, dated July 9, 2009 [Docket No. 39] (the "**Critical Vendors Order**").

[4]    This amount includes professional fees and expenses that are expected to be unpaid as of the Effective Date.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|-------|-------------|-----------|------------------|-----------------------------------------------------------------------------------|--------------------|
| | | equal to the amount of such Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Commencement Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim. | | | |
| Class 1 | Priority Non-Tax Claims | Claims in this Class are Impaired. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, each holder of an Allowed Claim in Class 1 shall receive Cash in an amount equal to the amount of such Claim. | Yes. | $500,000[5] | 100% |
| Class 2 | First Lien Lender Claims | Claims in this Class are Impaired. Except to the extent that a holder of an Allowed First Lien Lender Claim agrees to less favorable treatment on account of such Claim, each holder of an Allowed Claim in Class 2 shall receive, in full and final satisfaction of such Allowed First Lien Lender Claim, its Pro Rata Share of: (a) | Yes. | $350,297,000 | 73.4%[6] |

---

[5]    The Debtors received authority to satisfy prepetition employee wages and benefits subject to priority pursuant to sections 507(a)(4) and (a)(5). Accordingly, it is anticipated that prepetition wages and benefits will be satisfied in the ordinary course.

[6]    The First Lien Lenders' estimated recovery rate was calculated using the mid-point ($257.9) of the Valuation (described more fully below) net of the payment of Trade Claims and the value of Warrants and Lump Sum Payments, as applicable, available under certain circumstances to the holders of Second Lien Lender Claims and General Unsecured Claims.

DB02:8632234.1

068347.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|---|---|---|---|---|---|
| | | the New Notes, and (b) 100% of the New Common Stock; _provided_, _however_, to the extent that any L/C issued under the First Lien Credit Agreement remains undrawn as of the Effective Date, the Debtors shall either (w) cause such L/C to be replaced with a letter of credit issued under the New Revolving Credit Facility, (x) collateralize such L/C with Cash in an amount equal to 103.0% of the face amount thereof, (y) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (z) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion. | | | |
| Class 3 | Second Lien Lender Claims | Claims in this Class are Impaired. The holders of Second Lien Lender Claims, shall not receive any distribution or retain any property on account of their Second Lien Lender Claims; _provided_, _however_, as part of the settlements and compromises contained herein, if Class 3 votes to accept the Plan with respect to each Debtor Obligor, then the Second Lien Lender Claims shall be deemed | Yes. | $112,774,000 | 0.8%[7] |

---

[7]     The estimated recovery for the holders of Second Lien Lender Claims was calculated using the Black-Scholes' value of the Warrants.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|---|---|---|---|---|---|
| | | Allowed Claims against the Debtor Obligors as of the Effective Date in the aggregate amount of $112,774,000 (the outstanding principal under the Second Lien Credit Agreement *plus* the outstanding interest accrued thereunder prior to the Commencement Date) for the purposes of the Plan and these Reorganization Cases and each holder of an Allowed Second Lien Lender Claim shall receive their Pro Rata Share of the Warrant Pool. | | | |
| Class 4 | Other Secured Claims | Claims in this Class are Impaired. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, the holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors, on account of such Claims: (i) Cash in an amount equal to such Claim; (ii) treatment on such other terms such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (iii) deferred Cash payments to the extent permissible under the Bankruptcy Code. | Yes. | $0 | 100% |
| Class 5 | Trade Claims | Claims in this Class are Impaired. Holders of Allowed Trade Claims shall not receive | Yes. | $1,110,000[8] | 100% |

---

[8] This amount does not include $13 million in Trade Claims expected to be satisfied pursuant to the Critical Vendors Order.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|---|---|---|---|---|---|
| | | any distribution or retain any property on account of such Claims; _provided, however,_ that as part of the settlements and compromises contained herein, each holder of a Trade Claim shall receive the Trade Payment as soon as reasonably practicable after the latest of (x) the Effective Date, (y) the date such Claim becomes an Allowed Claim, and (z) unless otherwise agreed by the Reorganized Debtors, the date on which such holder has agreed to provide the Reorganized Debtors with trade credit on customary ordinary course terms. | | | |
| Class 6 | General Unsecured Claims | Claims in this Class are Impaired. Holders of General Unsecured Claims shall not receive any distribution or retain any property on account of such Claims; _provided, however,_ if Class 6 votes to accept the Plan with respect to each Debtor on account of such Claims, then each holder of an Allowed General Unsecured Claim shall receive on, or as soon thereafter as reasonably practicable, the later of the Effective Date and the first Quarterly Distribution | Yes. | $10,186,000[9] | 2.5% |

---

[9]    This amount does not include contingent customer claims on account of customer programs authorized to be performed in the ordinary course, including payment of any refunds or other Claims held by the Debtors' patients. This amount also does not include certain employee bonus obligations that the Debtors have obtained, or will seek, Bankruptcy Court approval to pay.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|---|---|---|---|---|---|
| | | Date after such General Unsecured Claim becomes an Allowed General Unsecured Claim: (i) Cash in the amount of the Lump Sum Payment, or (ii) alternatively, if such holder has elected on such holders' Ballot, its Pro Rata Share of the Warrant Pool on account of such Claim. | | | |
| Class 7 | PIK Lender Claims | Claims in this Class are Impaired. Holders of PIK Lender Claims shall not receive any distribution or retain any rights to any property on account of such Claims. | No; Deemed to have rejected the Plan. | $83,300,000 | 0% |
| Class 8 | Existing Stock Interests | Interests in this Class are Impaired. Existing Stock Interests shall be cancelled and holders of Existing Stock Interests shall not receive any distribution or retain any rights to any property on account of such Interests. | No; Deemed to have rejected the Plan. | Not Applicable | 0% |
| Class 9 | Other Existing Interests | Interests in this Class are Impaired. Other Existing Interests shall be cancelled and holders of Other Existing Interests shall not receive or retain any distribution under the Plan on account of such Other Existing Interests, *provided, however,* that any Debtor that owns Other Existing Interests in another Debtor may, at the discretion of the Debtors, retain such Other Existing Interests. | No; Deemed to have rejected the Plan. | Not Applicable | 0% |

DB02:8632234.1

068347.1001

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) | Estimated Recovery |
|-------|-------------|-----------|------------------|-----------------------------------------------------------------------------------|--------------------|
| Class 10 | Existing Securities Law Claims | Claims in this Class are Impaired. Holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims. | No; Deemed to have rejected the Plan. | $0 | 0% |

The recoveries set forth above are estimates that are contingent upon approval of the Plan as proposed.

## ARTICLE III.

## BUSINESS DESCRIPTION AND CIRCUMSTANCES THAT LED TO THESE REORGANIZATION CASES

**3.1** *The Debtors' Businesses.*

    (a)    Overview.

    CCS Medical Holdings, Inc. (the "**Parent**"), the direct and indirect parent to the other Debtors, began operations in September 2005 when it acquired Chronic Care Solutions, Inc. and MPTC Holdings, Inc., two of the leading chronic care and diabetes supply companies in the United States. The Debtors are national companies based in Clearwater, Florida that serve patients with chronic diseases throughout the United States and Puerto Rico. The Debtors deliver products and value-added services to individuals living with select chronic medical conditions, including diabetes, urological, and ostomy-related disorders, chronic wounds, incontinence, respiratory conditions and other illnesses. The Debtors' primary product focus is on diabetes, a large and fast growing component of the chronic care market. In an effort to promote proper patient compliance with physician prescribed protocols, the Debtors' medical supply programs: (i) educate and counsel patients on disease states and complex clinical regimens, (ii) assume responsibility for the patients' billing and collection from government programs and third-party payors, and (iii) deliver products to patients' homes through the mail.

    (b)    Operations.

    The Debtors operate in two business units – diabetes and chronic care. The operating, selling, general and administrative resources of these business units are combined to

- 14 -

achieve economies across the Debtors' businesses. The diabetes business unit provides testing and insulin pump supplies and related products to patients suffering from diabetes both through the direct mailing of such supplies to patient homes, as well as on a wholesale basis to providers and distributors. The chronic care business unit also includes the direct mailing of product supplies for urology, ostomy, incontinence, wound and respiratory care. The Debtors' business units are based in large part on their patient enrollment and support processes, which deliver patient-focused services to customers. These key areas are patient enrollment, patient support, shipping and billing.

(1)     New Patient Enrollment.

A majority of the patients that the Debtors serve enroll in their programs by completing forms obtained from their physician or after being contacted directly by the Debtors at the request of their physician or managed care organization. Typically, new patients are enrolled by one of the Debtors' patient enrollment representatives, who begin the process by qualifying the patient for the program. Based on patient needs, insurance coverage and any instructions from the healthcare professional, the patient enrollment representative will guide the patient to the most appropriate choice of products. This education phase of the enrollment process is crucial to furthering the patient's understanding of his or her condition. A critical step in the set-up process is to establish the patient's regular order and shipping schedule based on his or her medical needs and the specifications of his or her insurance plan.

(2)     Patient Support.

After enrollment, ongoing management of the patient's needs is typically handled by specialized representatives. These specialized representatives are organized into various teams in order to: handle inbound calls from patients; conduct outbound call campaigns for patient reorders; collect required documentation from physicians (certificate of medical necessity for Medicare patients); process reorder cards when applicable; and provide product and disease education.

(3)     Shipping.

The Debtors service their patient base through seven distribution centers that currently ship a total of approximately 175,000 packages each month. Shipping volume can be allocated between centers to maximize throughput, meet deadlines or take advantage of geographic variances in shipping rates. Because the Debtors manage their inventories based on the anticipated shipping schedules of their patients, the Debtors are able to rapidly turn their inventory and minimize excess supply levels. Three of the Debtors' distribution centers contain full service pharmacies. The Debtors' computer database automatically determines which products are required to be dispensed by each pharmacy. The Debtors generally ship their products via the U.S. Postal Priority Mail and United Parcel Service, which allows them to track and verify patient shipment status automatically.

(4)     Billing and Collection.

The Debtors' billing and collection systems are designed to address the needs of several payor types, from cash purchases by private patients to commercial, Medicaid and Medicare billing.  Additionally, the systems and processes are designed to adhere to Medicare and commercial insurance documentation and approval standards in order to manage compliance and maximize efficiency.  The Debtors also handle the medical claims process for patients.  To that end, the Debtors have a dedicated staff of collection representatives that obtain necessary information from healthcare professionals and efficiently process medical claims on behalf of patients.  The Debtors assume responsibility for the patients' billing and collecting from government programs and third-party payors, which substantially simplifies the claims submission process for patients.  The Debtors process medical claims with over 4,500 payors, including Medicare, state Medicaid programs and private insurance plans.  As a result, the Debtors' customers, which are primarily patients, benefit from timely home delivery of their prescribed medical products.

(c)     Sales and Marketing.

In addition to their direct-to-consumer marketing, direct mail and TV advertising, the Debtors market their products through a nationwide field-based sales force focused on healthcare professionals, primarily physicians and certified diabetic educators, and managed care accounts for new patient referrals.  The Debtors have over 400,000 patients through 17,000 referring healthcare professionals.

(d)     Products.

The Debtors offer a line of products targeted at the chronic care patient population.  The Debtors have contracts with most major manufacturers of medical supplies and pharmaceutical products used by individuals living with select medical conditions.  Such supplies and products include test strips, insulin pumps and related supplies, ostomy supplies, wound care products and urological and incontinence products.  The Debtors offer diabetic patients a wide variety of products, including products manufactured by industry leaders such as LifeScan, Inc., Medtronic MiniMed, Inc. ("**Medtronic**"), Roche Diagnostics Corporation and Bayer Corporation.  The breadth of their product offering is a significant competitive advantage in serving healthcare professionals and managed care accounts.  The Debtors currently distribute approximately 7,800 products to patients.

**3.2     *Facilities and Offices.***

The Debtors' principal executive offices are located in Clearwater, Florida and consist of approximately 127,463 square feet of office space, a call center and distribution facilities.  The Debtors also own approximately 32,000 square feet of space in Tampa, Florida, which consists of office space, a call center and distribution facilities.  The Debtors' other distribution facilities, call centers and office space, which are located in Roanoke, Virginia, Anaheim, California, Denver, Colorado, Lawrenceville, Georgia, and Forest Hill, Texas are leased.  The Debtors also lease an additional 37 properties in 17 states, which consist of offices and sales facilities.

- 16 -

### 3.3    *Employees.*

As of March 31, 2009, the Debtors had a total of 1,612 employees, with the majority of such employees operating the Debtors' call centers. None of the Debtors' employees are covered by a collective bargaining agreement.

### 3.4    *Prepetition Indebtedness and Capital Structure.*

The Parent is the direct and indirect parent of each of the other Debtors. A corporate organizational chart is annexed hereto as <u>Exhibit 3</u>.

As of March 31, 2009, the Debtor Obligors had approximately $519 million of outstanding financing. $329 million represents principal outstanding under a first lien revolver and first lien term loan pursuant to that certain First Lien Credit Agreement. The obligations under the First Lien Credit Agreement are guaranteed by each of the Debtor Obligors and are secured by a first priority security interest in substantially all of the assets of the Debtor Obligors and mature on September 30, 2012.

The Debtor Obligors are also party to that certain Second Lien Credit Agreement with a principal amount outstanding of $110 million. The obligations under the Second Lien Credit Agreement are guaranteed by each of the Debtor Obligors (other than CCS, the borrower), are secured by a second priority security interest in substantially all of the Debtor Obligors' assets and mature on March 30, 2013.

In connection with the Debtor Obligors' interest payments under the First Lien Credit Agreement and Second Lien Credit Agreement, the Debtor Obligors are party to the Swap Agreements. The Debtors believe that the outstanding obligations under the Swap Agreements are approximately $14.1 million. Such obligations are secured *pari passu* with the Debtor Obligors' obligations under the First Lien Credit Agreement. On July 9, 2009, the Swap Counterparties delivered notice to the Debtors of their termination of the Swap Agreements.

CCS Acquisition Holding-Sub Corporation also has approximately $80 million in outstanding principal obligations under the PIK Credit Agreement. The obligations under the PIK Credit Agreement are unsecured and mature on September 30, 2015.

For the year ending December 31, 2008, the Debtors reported total gross revenue of approximately $487,791,000. As of March 31, 2009, the Debtors' unaudited consolidated balance sheet reflected total assets of approximately $259,122,000 and total liabilities of approximately $583,478,200.

DB02:8632234.1

068347.1001

# ARTICLE IV.

## EVENTS LEADING TO CHAPTER 11 FILING

**4.1**    *The Debtors' Financial Position.*

The Parent was formed in the last quarter of 2005 as a vehicle for the acquisition of the number-two and number-three businesses in the diabetes and chronic care supply industries, MPTC Holdings Enterprises (U.S.), Inc. and Chronic Care Solutions, Inc., which were both located in and around Clearwater, Florida (the "**Acquisition**"). The acquisition of both businesses was expected to deliver synergies of great proportions to both businesses.

The Debtors' expectations were not realized. There are several primary drivers behind the Debtors' disappointing financial performance. Among other things, the reimbursement rates for nebulized respiratory medications have been significantly modified and reduced by Medicare since 2005 and have impacted the EBITDA results from 2006 to date. Additionally, reimbursement rates for diabetes supplies have been continuously reduced by Medicaid and Medicare and commercial payors, primarily as a result of Medicare Competitive Bidding. Section 302 of the Medicare Modernization Act of 2003 ("**MMA**") established requirements for a new competitive bidding program for certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("**DMEPOS**"). The MMA requires that competitive bid payment amounts be used to replace the current Medicare DMEPOS fee schedule payment amounts for reimbursement of selected medical supplies in selected areas across the United States. The Medicare Improvements for Patients and Providers Act of 2008 ("**MIPPA**"), enacted on July 15, 2008, made limited changes to the Medicare DMEPOS Competitive Bidding Program, including a requirement that suppliers seeking to participate in the Competitive Bidding Program submit their initial bids for participation in 2009. Medicare reimbursement rates for diabetes supplies were reduced by 9.5% on January 1, 2009, in exchange for this delay in the start of round one of the Competitive Bidding Program. Further, bad debt expense levels that were expected at the time of the Acquisition were never realized, which has impacted EBITDA results from 2005 to date.

In 2006, the Debtors believed they had acquired an additional source of revenue with the acquisition by Sanvita, Inc. ("**Sanvita**") of the inventory and other assets (the "**BGM Assets**") and assumed liabilities of the blood glucose monitoring division of Becton, Dickinson Company ("**BD**"), upon BD's announcement that it would be exiting the diabetic supply business. Nova Biomedical Corporation ("**Nova**"), the third-party OEM for BD products also had a contract with the Debtors to supply blood glucose monitoring products to the Debtors. After Sanvita's acquisition of the BGM Assets and the subsequent launch of the NovaMax product line, Sanvita operated as the exclusive distributor in the United States of the NovaMax products—both to the Debtors' patient-consumers and to retail distributors. At the time of the BGM Asset acquisition, the BD/Nova products were unique in that they had a marketing relationship with Medtronic, in which the BD blood glucose meter, which communicated directly with Medtronic's insulin pump and was placed into the insulin pump kits and delivered directly to insulin pump patients. This technology was a significant contributor to the Sanvita business. In late 2007, Medtronic announced a new marketing relationship with Johnson & Johnson's

- 18 -

LifeScan Division ("**LifeScan**") and Sanvita has since suffered greatly from competition from LifeScan.

Prior to Medtronic's launch of its marketing agreement with LifeScan, the Sanvita business increased the Debtors' EBITDA by over fifty percent (50%), and by early 2007, the Debtors were considering a restructuring through an initial public offering of their stock. The Debtors' road show coincided with the precipitous downturn in the United States' credit markets during the summer of 2007. Unable to fill its book at an even lower price than the Debtors had initially gone out with, the Debtors were required to abandon the concept of an initial public offering.

While the Debtors' businesses continue to grow from a patient standpoint, the impact of the unexpected and unprecedented events of the past three-to-four years have left the Debtors with insufficient EBITDA to support their debt structure. These structural problems continue to be compounded by changes in Medicare reimbursements, which with the introduction of Competitive Bidding, have increasingly forced the Debtors to reduce their rates and have resulted in decreased revenues.

**4.2    *Events Leading Up to the Formulation of the Plan.***

In early March 2009, the Debtors informed the First Lien Administrative Agent and certain of the First Lien Lenders that they would be unable to deliver certain financial reports that were due under the First Lien Credit Agreement on March 31, 2009. The First Lien Lenders subsequently agreed to an amendment of the First Lien Credit Agreement that waived the requirements to deliver the Debtors' financial results for 30 days (the "**First Lien Amendment**"). The Debtors also subsequently delivered a notice to the Second Lien Administrative Agent informing it that they had obtained the First Lien Amendment. On April 9, 2009, the Debtors received a notice from the PIK Lenders regarding the default under the PIK Credit Agreement resulting from the Debtors' failure to timely deliver their year-end financial reports. Over the course of the next 90-day period, the Debtors engaged the holders of the majority of the outstanding obligations under the First Lien Credit Agreement and the First Lien Administrative Agent in discussions regarding restructuring alternatives, including the possibilities of a third-party sale to either a strategic or financial investor. The Debtors actively pursued a sale for several months, but their efforts ultimately were futile. As talks among the Debtors and potential third-party investors quieted, the Debtors and their advisors approached the Consenting Holders regarding the terms of a potential balance sheet restructuring pursuant to a consensual chapter 11 plan of reorganization. In connection therewith, the Debtors sought an extension of the First Lien Lenders' waiver of the requirements to deliver the Debtors' year-end financial results, as well as other potential defaults arising under the First Lien Credit Agreement, including cross-defaults arising in connection with the Second Lien Credit Agreement and PIK Credit Agreement (the "**First Lien Second Amendment**") through the period ending May 31, 2009. Such First Lien Second Amendment was further extended through and including July 8, 2009 (the "**Waiver Period**").

During the Waiver Period, the Consenting Holders and the First Lien Administrative Agent continued to engage in negotiations over the terms of a consensual

- 19 -

restructuring. Several term sheets were exchanged during this time and several different proposals were discussed and vetted by the Debtors. The Debtors also continued to examine the possibility of a third-party sale to either a strategic or financial investor. On July 7, 2009, the Consenting Holders delivered a revised restructuring proposal (as the same may be amended or modified from time to time, the "**Plan Term Sheet**") regarding the terms of the Plan. The Debtors determined that such term sheet provided the best opportunity to maximize value for the Debtors' stakeholders.

Following extensive negotiations with certain holders of Claims under the First Lien Credit Agreement representing over 70% in amount of the outstanding obligations under the First Lien Credit Agreement, the Debtors announced that they had entered into a plan support agreement (the "**Plan Support Agreement**") with the Consenting Holders. (A copy of the Plan Support Agreement is attached hereto as <u>Exhibit 2</u>). Pursuant to the terms of the Plan Support Agreement, the Consenting Holders have agreed to support the Plan upon the satisfaction of certain conditions, including satisfying certain milestones with respect to the Disclosure Statement and the Plan. Based on the amount of outstanding obligations under the First Lien Credit Agreement held by the Consenting Holders, the Debtors believe that a sufficient number of holders of the First Lien Lender Claims have committed to support the Plan such that the Class of holders of the First Lien Lender Claims will vote in favor of the Plan. Moreover, the Debtors believe that the Plan provides for appropriate treatment of all Classes of Claims and Interests, taking into account the Valuation (as defined in Section 7.2(b) herein) of the Debtors, and the differing natures and priorities of the Claims and Interests.

Notwithstanding the existence of the Plan Support Agreement and the Plan, the Debtors, in the exercise of their fiduciary duties, will continue to consider all other restructuring alternatives, including any proposed sale of the Debtors. In addition, the Debtors continue to explore the disposition of one or more lines of business. It is possible that any one or more of the foregoing transactions could occur prior to the Effective Date or be effectuated by the Reorganized Debtors after the Effective Date.

## ARTICLE V.

## REASONS FOR THE SOLICITATION; RECOMMENDATION

Chapter 11 of the Bankruptcy Code provides that unless the terms of section 1129(b) of the Bankruptcy Code are satisfied, for the Bankruptcy Court to confirm the Plan as a consensual plan, the holders of Impaired Claims against the Debtors in each Class of Impaired Claims must accept the Plan by the requisite majorities set forth in the Bankruptcy Code. An Impaired Class of Claims shall have accepted the Plan if (a) the holders of at least two-thirds in amount of the Claims in such Class actually voting on the Plan have voted to accept it, and (b) more than one-half in number of the holders in such Class actually voting on the Plan have voted to accept it (such votes, the "**Requisite Acceptances**").

In light of the significant benefits to be attained by the Debtors and the Debtors' creditors pursuant to the consummation of the transactions contemplated by the Plan, the Debtors recommend that all holders of Claims in those Classes entitled to vote to accept the Plan. The

boards of directors (the "**Boards**") of the Debtors have reached this decision after considering available alternatives to the Plan and their likely effect on the Debtors' business operations, creditors and shareholders. These alternatives include liquidation of the Debtors under chapter 7 or 11 of the Bankruptcy Code or an alternative reorganization under chapter 11 of the Bankruptcy Code. The Debtors determined, after consulting with their legal and financial advisors, that the Plan, if consummated, will maximize the value of these estates for stakeholders as a result of the compromises and settlements embodied therein, more so than would any other out-of-court refinancing scenario reasonably available, any other chapter 11 reorganization strategy or a liquidation under chapter 7 or 11. For all of these reasons, the Debtors' officers and directors support the Plan and urge the holders of Claims entitled to vote on the Plan to accept and support it.

**ARTICLE VI.**

**THE PLAN**

**6.1**  *Overview of Chapter 11.*

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In general, a chapter 11 plan of reorganization (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor and required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of the Reorganization Cases until such time as the court has approved a disclosure statement as containing adequate information. Pursuant to

- 21 -

section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy applicable disclosure requirements, the Debtors are submitting this Disclosure Statement to holders of Claims that are Impaired and not deemed to have rejected the Plan.

**6.2     *Settlement of Certain Inter-Creditor / Intercompany Issues.***

The treatment of Claims against and Interests in the Debtors under the Plan represents, among other things, the settlement and compromise of certain inter-creditor disputes.

Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged as determined appropriate by the Reorganized Debtors in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

**6.3     *Separate Plans/Non-Consolidation.***

The Plan is a joint plan of each of the Debtors and constitutes a separate plan of reorganization for each such Debtor. Each Class of Claims or Interests shall be deemed a separate Class with respect to each Debtor. Except as specifically set forth in the Plan, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate Claim against each Debtor's estate; *provided*, *however*, that no holder shall be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan. For the avoidance of doubt, notwithstanding anything in the Plan to the contrary, a holder of a Second Lien Lender Claim shall only be entitled to receive a single Pro Rata Share of the Warrant Pool on account of such Claims held against the Debtor Obligors.

**6.4     *Limitations of Plan Distributions to Interests.***

No Plan Distributions shall be made on account of any Interests in any Debtor regardless of whether such Interests are held by a Person which is not a Debtor; *provided*, *however*, that any Debtor that owns Interests in another Debtor may at the election of the Reorganized Debtors retain such Interests.

**6.5     *Separate Classification of Other Secured Claims.***

Although all Other Secured Claims against the Debtors have been placed in one category for purposes of nomenclature, each such Other Secured Claim, to the extent secured by Liens or security interests separate from those Liens or security interests securing Other Secured

- 22 -

Claims, shall be treated as being in a separate Class from such Other Secured Claims for purposes of voting on the Plan and receiving Plan Distributions.

**6.6** *Overview of the Plan.*

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND THE EXHIBITS AND SCHEDULES THERETO AND THE PLAN SUPPLEMENT.

The Plan is a joint plan of each of the Debtors and constitutes a separate plan of reorganization for each such Debtor. Each Class of Claims or Interests shall be deemed a separate Class with respect to each Debtor. The Plan classifies Claims and Interests separately in accordance with the Bankruptcy Code and provides different treatment for different Classes of Claims and Interests. Claims and Interests shall be included in a particular Class only to the extent such Claims or Interests qualify for inclusion within such Class. The Plan separates the various Claims and Interests (other than those that do not need to be classified) into ten (10) separate Classes. These Classes take into account the differing nature and priority of Claims against, and Interests in, the Debtors. Unless otherwise indicated, the characteristics and amounts of the Claims or Interests in the following Classes are based on the books and records of the Debtors. Except as otherwise determined by a Debtor in its sole discretion and with the consent of the Required Consenting Holders, the Plan shall not be deemed to have been confirmed as to each Debtor, unless and until the Plan has been confirmed as to all of the Debtors. If the Plan is not confirmed as to one or more of the Debtors but the other Debtors determine to proceed with the Plan, then the Debtors as to which the Plan may not be confirmed shall be severed from, and the Plan shall not apply to, such Debtors.

This section summarizes the treatment of each of the Classes of Claims and Interests under the Plan, describes the capital structure of the Reorganized Debtors, and describes other provisions of the Plan. Only holders of Allowed Claims—Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to objection or estimation—may be entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Disputed Claim or Interest becomes Allowed, no distribution of Cash, securities and/or other instruments or property otherwise available to the holder of such Claim or Interest will be made.

The Plan is intended to enable the Debtors to continue present operations without the likelihood of a subsequent liquidation or the need for further financial reorganization. The Debtors believe that they will be able to perform their obligations under the Plan and meet their expenses after the Effective Date without further financial reorganization. Also, the Debtors believe that the Plan permits fair and equitable recoveries, while expediting the reorganization of the Debtors.

The Confirmation Date will be the date that the Confirmation Order is entered by the Clerk of the Bankruptcy Court. The Effective Date will be the first Business Day on or as soon thereafter as reasonably practicable after the Confirmation Date on which all of the

DB02:8632234.1 068347.1001

conditions to the Effective Date specified in Section 11.2 of the Plan have been satisfied or waived and the parties have consummated the transactions contemplated by the Plan.

The Debtors anticipate that the Effective Date will occur during the fall of 2009. Resolution of any challenges to the Plan may take time and, therefore, the actual Effective Date cannot be predicted with certainty.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. The Reorganized Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

All Claims and Interests, except DIP Lender Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV of the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Lender Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims of the Debtors have not been classified, and the holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

(a)     Unclassified Claims.

(1)     DIP Lender Claims.

Except to the extent the DIP Lenders agree to less favorable treatment, on the Effective Date, the DIP Lenders shall release any and all liens against and security interests in the Debtors' (and the Estates') property held by the DIP Lenders and shall be paid 100% of the then outstanding amount, if any, of the DIP Lender Claims and the permitted outstanding and unpaid fees and expenses of the DIP Lenders in Cash. Notwithstanding anything in the Plan to the contrary, upon payment in full of the DIP Lender Claims, any and all liens against and security interests in the Debtors' (and the Estates') property held by the DIP Lenders shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person, the DIP Credit Agreement shall be deemed terminated and the Debtors' (and the Reorganized Debtors') obligations thereunder shall be canceled.

(2)     Administrative Expense Claims.

Time for Filing Administrative Expense Claims: Each holder of an Administrative Expense Claim, other than the holder of:

- a Fee Claim;

- a 503(b)(9) Claim;

- 24 -

- an Administrative Expense Claim that has been Allowed on or before the Effective Date, including pursuant to the Plan;

- an Administrative Expense Claim on account of fees and expenses incurred on or after the Commencement Date by ordinary course professionals retained by the Debtors pursuant to an order of the Bankruptcy Court;

- an Administrative Expense Claim held by a current officer, director or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to (A) any Debtor's certificate of incorporation, by-laws, or similar organizational document or (B) any indemnification or contribution agreement approved by the Bankruptcy Court;

- an Administrative Expense Claim arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Commencement Date, but only to the extent that such Administrative Expense Claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses; and/or

- U.S. Trustee Fees;

must file with the Claims Agent at one of the following addresses:

| If Delivered by Mail: | If Delivered by Overnight or Hand Delivery: |
|---|---|
| CCS Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5015<br>New York, NY 10150-5015 | CCS Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

and serve on the Debtors or the Reorganized Debtors in accordance with Section 14.14 of the Plan, proof of such Administrative Expense Claim by the Administrative Expense Bar Date. Such proof of Administrative Expense Claim must include at a minimum (i) the name of each Debtor that is purported to be liable for the Administrative Expense Claim, (ii) the name of the holder of the Administrative Expense Claim, (iii) the amount of the Administrative Expense Claim, (iv) the basis of the Administrative Expense Claim, and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

DB02:8632234.1

068347.1001

<u>Treatment of Administrative Expense Claims.</u>

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the Debtors or Reorganized Debtors in the ordinary course of business consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such transactions.

(3)     Fee Claims.

<u>Time for Filing Fee Claims.</u>

All Fee Claims must be filed with the Bankruptcy Court and served on the Reorganized Debtors no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Reorganization Cases, the allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court. **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND DISCHARGED.**

Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Bankruptcy Court.

<u>Treatment of Fee Claims.</u>

A Fee Claim in respect of which a final fee application has been properly filed and served pursuant to Section 3.3(a) of the Plan shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all allowed Professional Fees (including estimated fees through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the Debtors and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Professional Fees for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the allowed Professional Fees of such Professional, the difference shall be promptly paid to the Professional.

- 26 -

On the Effective Date, the Reorganized Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Professional Fees, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, *less* any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

(4)     U.S. Trustee Fees.

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

(5)     Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in the applicable Debtor's discretion, either (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Commencement Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim.

(b)     Classification of Claims and Interests.

(1)     Priority Non-Tax Claims (Class 1).

Treatment.

Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date that a Priority Non-Tax Claim becomes an Allowed Claim, the holder of such Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Claim.

Voting.

Priority Non-Tax Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(2)     First Lien Lender Claims (Class 2).

Allowance.

On the Effective Date, the First Lien Lender Claims shall be deemed Allowed Claims in the aggregate amount of $350,297,000, plus the amount of any L/Cs drawn after the Commencement Date and prior to the Effective Date, for the purposes of the Plan and these Reorganization Cases.

- 27 -

<u>Treatment.</u>

On the Effective Date, except to the extent that a holder of a First Lien Lender Claim agrees to less favorable treatment on account of such Claims, each holder of an Allowed First Lien Lender Claim shall receive, in full and final satisfaction of such Allowed First Lien Lender Claim, its Pro Rata Share of: (i) the New Notes and (ii) 100% of the New Common Stock; *provided, however,* to the extent that any L/C issued under the First Lien Credit Agreement remains undrawn as of the Effective Date, the Debtors shall either (w) cause such L/C to be replaced with a letter of credit issued under the New Revolving Credit Facility, (x) collateralize such L/C with Cash in an amount equal to 103.0% of the face amount thereof, (y) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (z) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion. The Disbursing Agent shall have the authority to withhold any Distribution pursuant to Section 5.2 of the Plan to any First Lien Lender, until it is in receipt of the required signatures to each of the Plan Documents to which such First Lien Lender shall be a party. Each holder of a First Lien Lender Claim shall be deemed to have waived the right to receive any Plan Distribution or Plan Consideration on account of its Deficiency Claim.

<u>Voting.</u>

The First Lien Lender Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(3)     Second Lien Lenders Claims (Class 3).

<u>Treatment.</u>

The holders of Second Lien Lender Claims shall not receive any distribution or retain any property on account of their Second Lien Lender Claims; *provided, however,* as part of the settlements and compromises contained herein, if Class 3 votes to accept the Plan with respect to each Debtor Obligor, then the Second Lien Lender Claims shall be deemed Allowed Claims against the Debtor Obligors as of the Effective Date in the aggregate amount of $112,774,000 (the outstanding principal under the Second Lien Credit Agreement *plus* the outstanding interest accrued thereunder prior to the Commencement Date) for the purposes of the Plan and these Reorganization Cases and each holder of an Allowed Second Lien Lender Claim shall receive their Pro Rata Share of the Warrant Pool.

<u>Voting.</u>

The Second Lien Lender Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(4)     Other Secured Claims (Class 4).

Treatment.

Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment on account of such Claims, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date that an Other Secured Claim becomes an Allowed Claim, the holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors on account of such Claims: (i) Cash in an amount equal to such Claim; (ii) treatment on such other terms such that the holder of such Other Secured Claim will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (iii) deferred Cash payments, to the extent permissible under the Bankruptcy Code; *provided, however,* that Class 4 Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor or Reorganized Debtor and with the consent of the Required Consenting Holders, without further notice to or order of the Bankruptcy Court. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

Voting.

Other Secured Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(5)     Trade Claims (Class 5).

Treatment.

Holders of Allowed Trade Claims shall not receive any distribution or retain any property on account of such Claims; *provided, however,* that as part of the settlements and compromises contained herein, each holder of a Trade Claim shall receive the Trade Payment as soon as reasonably practicable after the latest of (x) the Effective Date, (y) the date such Claim becomes an Allowed Claim, and (z) unless otherwise agreed by the Reorganized Debtors, the date on which such holder has agreed to provide the Reorganized Debtors with trade credit on customary ordinary course terms.

Voting.

The Trade Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

DB02:8632234.1                                                                 068347.1001

(6)     General Unsecured Claims (Class 6).

_Treatment._

Holders of General Unsecured Claims shall not receive any distribution or retain any property on account of such Claims, _provided, however,_ if Class 6 votes to accept the Plan with respect to each Debtor on account of such Claims, then each holder of an Allowed General Unsecured Claim shall receive on, or as soon thereafter as reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after such General Unsecured Claim becomes an Allowed General Unsecured Claim: (i) Cash in the amount of the Lump Sum Payment, or (ii) alternatively, if such holder has elected on such holders' Ballot, its Pro Rata Share of the Warrant Pool on account of such Claim.

_Voting._

The General Unsecured Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(7)     PIK Lender Claims (Class 7).

_Treatment._

The holders of PIK Lender Claims shall not receive any distribution or retain any rights to any property on account of such PIK Lender Claim.

_Voting._

In accordance with section 1126(g) of the Bankruptcy Code, the holders of PIK Lender Claims are conclusively presumed to reject the Plan on account of such Claims.

(8)     Existing Stock Interests (Class 8).

_Treatment._

Existing Stock Interests shall be cancelled and holders of Existing Stock Interests shall receive no distribution or retain any rights to any property on account of such Interests.

_Voting._

In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Stock Interests are conclusively presumed to reject the Plan on account of such Interests.

(9)     Other Existing Interests (Class 9).

_Treatment._

Other Existing Interests shall be cancelled and holders of Other Existing Interests

shall not receive or retain any distribution under the Plan on account of such Other Existing Interests, *provided, however,* that any Debtor that owns Other Existing Interests in another Debtor may, at the discretion of the Debtors, retain such Other Existing Interests.

### Voting.

In accordance with section 1126(g) of the Bankruptcy Code, the holders of Other Existing Interests are conclusively presumed to reject the Plan on account of such Other Existing Interests.

(10)    Existing Securities Law Claims (Class 10).

### Treatment.

Holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims.

### Voting.

In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Securities Law Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan on account of such Claims.

**6.7**    *Summary of Capital Structure of Reorganized Debtors.*

The following table summarizes the capital structure of the Reorganized Debtors, including the post-Effective Date financing arrangements that the Reorganized Debtor Obligors expect to enter into to fund their obligations under the Plan and provide for their post-Effective Date working capital needs. The anticipated principal terms of the following instruments are described in more detail below. The summaries of the Reorganized Debtors' capital structure are qualified in their entirety by reference to the Plan and the applicable Plan Documents.

DB02:8632234.1

068347.1001

| Instrument | Description |
|---|---|
| *Reorganized First Lien Term Loan Facility* | The Reorganized First Lien Term Loan Facility will provide for a term loan in an aggregate principal amount of $150 million and, subject to certain exceptions, will be secured by a first priority lien on substantially all of the assets of the Reorganized Debtor Obligors, whether now existing or subsequently acquired (excluding the New Revolving Credit Facility Collateral (as defined below)), and a second priority lien on the New Revolving Credit Facility Collateral. Borrowings under the Reorganized First Lien Term Loan Facility will bear interest at a rate of LIBOR plus 6% per annum (with a 3% LIBOR floor) or the base rate plus 5% per annum (with a base rate floor equal to 3-month LIBOR plus 1%), at the option of Reorganized CCS, payable quarterly in cash and will mature on the fifth anniversary of the Effective Date. |
| *Reorganized Second Lien Term Loan Facility* | The Reorganized Second Lien Term Loan Facility will provide for a term loan in an aggregate principal amount of $50 million and, subject to certain exceptions, will be secured by a second priority lien on substantially all of the assets of the Reorganized Debtor Obligors, whether now existing or subsequently acquired (excluding the New Revolving Credit Facility Collateral) and a third priority lien on the New Revolving Credit Facility Collateral. Borrowings under the Reorganized Second Lien Term Loan Facility will bear interest at a rate of LIBOR plus 8% per annum (with a 3% LIBOR floor) or the base rate plus 7% per annum (with a base rate floor equal to 3-month LIBOR plus 1%), at the option of Reorganized CCS, payable quarterly. Reorganized CCS will be required to pay, in Cash, the amount of interest accrued at LIBOR (with a floor of 3%) (the "**Cash Pay Amount**"). Any interest above the Cash Pay Amount shall be added, on the relevant interest payment date, to the amount outstanding under the Reorganized Second Lien Term Loan Facility (any amount so added, a "**PIK Payment**") and shall thereafter bear interest as set forth above; *provided, however*, that Reorganized CCS may elect, subject to the restrictions on making such election contained in the Reorganized First Lien Term Loan Facility, to pay a portion of the interest above the Cash Pay Amount in Cash; *provided, further*, that on or prior to the Effective Date, the Reorganized Debtors will determine whether the exception |

- 32 -

| Instrument | Description |
|---|---|
| | to the application of IRC (defined below) Section 163(e)(5) contained in IRC Section 163(e)(5)(F) applies to the Reorganized Second Lien Term Loan Facility, and if they determine that such exception may not apply in whole or in part for any reason, including the Reorganized Second Lien Term Loan Facility being held by a party related (within the meaning of IRC Section 108(e)(4)) to the issuer, a sufficient amount of the accrued PIK Payment shall be paid in cash at the end of the first quarter after the fifth anniversary of the Effective Date and on each quarter thereafter so that the Reorganized Second Lien Term Loan Facility is not an applicable high yield discount obligation within the meaning of IRC Section 163(i). The Reorganized Debtors shall provide notice to the holders of the First Lien Lender Claims and the holders of the New Notes under the Reorganized Second Lien Term Loan Facility as soon as is practicable stating whether the terms of the Reorganized Second Lien Term Loan Facility have been revised as above, or whether the terms remain as outlined on <u>Exhibit C</u> to the Plan. |
| *New Revolving Credit Facility* | The New Revolving Credit Facility will provide for revolving borrowings in an aggregate amount outstanding at any time of up to approximately $25 million (or such other amount as the Debtors and the Required Consenting Holders reasonably agree) and will provide for letters of credit to be issued up to an aggregate amount of $10 million. The proceeds of the New Revolving Credit Facility will be used to refinance borrowings under the DIP Credit Agreement and provide liquidity for general corporate purposes and letters of credit. Subject to certain exceptions, the New Revolving Credit Facility will be secured by a first priority lien on substantially all of the accounts receivable, inventory and other related assets of the Reorganized Debtor Obligors (the "**New Revolving Credit Facility Collateral**"). The New Revolving Credit Facility will mature on the fourth anniversary of the Effective Date. |
| *New Common Stock* | On the Effective Date, Reorganized Issuer will be authorized to issue 1,000,000 shares of New Common Stock, with par value of $0.01 per share, to be issued to the holders of First Lien Lender Claims, in accordance with Sections 5.2 and 7.10 of the Plan. |

- 33 -

| Instrument | Description |
|---|---|
| *Warrants* | As a result of the settlements and compromises embodied in the Plan, the First Lien Lenders have agreed to provide a portion of their recovery on account of the First Lien Lender Claims as a gift to certain holders of Allowed Second Lien Lender Claims and Allowed General Unsecured Claims. If the Class of holders of Second Lien Lender Claims or the Class of holders of General Unsecured Claims vote to accept the Plan, each holder, respectively, of an Allowed Second Lien Lender Claim or an Allowed Electing General Unsecured Claim shall be entitled to receive, subject to Section 5.3 and Section 5.6 of the Plan (as applicable), its Pro Rata Share of the Warrant Pool. |

(a)     Description of Reorganized First Lien Term Loan Facility.

The Reorganized First Lien Term Loan Facility will provide for a term loan in an aggregate principal amount of $150 million and, subject to certain exceptions, will be secured by a first priority lien on substantially all of the assets of the Reorganized Debtor Obligors, whether now existing or subsequently acquired (excluding the New Revolving Credit Facility Collateral), and a second priority lien on the New Revolving Credit Facility Collateral. Borrowings under the Reorganized First Lien Term Loan Facility will bear interest at a rate of LIBOR plus 6% per annum (with a 3% LIBOR floor) or the base rate plus 5% per annum (with a base rate floor equal to 3-month LIBOR + 1.0%), at the option of Reorganized CCS, payable quarterly in cash and will mature on the fifth anniversary of the Effective Date.

The Reorganized First Lien Term Loan Facility will include various affirmative, negative and financial covenants that require the Reorganized Debtor Obligors to comply with ongoing obligations and restrict their businesses in various ways, until the obligations thereunder are satisfied. Affirmative covenants contained in the Reorganized First Lien Term Loan Facility will be customary and typical of those contained in similar financings. Negative covenants contained in the Reorganized First Lien Term Loan Facility will include certain limitations on indebtedness, liens, investments, acquisitions, cash dividends, stock repurchases, prepayments of subordinated indebtedness and sales, transfers, leases and other dispositions of assets. Financial covenants contained in the Reorganized First Lien Term Loan Facility will include a net total leverage ratio, an interest coverage ratio and a limitation on capital expenditures. The Reorganized First Lien Term Loan Facility will also be subject to certain mandatory prepayment requirements and to prepayment premiums if certain voluntary prepayments are made within the first three years following the Effective Date.

This summary is subject to and is qualified in its entirety by reference to the provisions of the Reorganized First Lien Term Loan Facility, in form and substance as may be acceptable to the Debtors and the Required Consenting Holders.

- 34 -

(b)     Description of Reorganized Second Lien Term Loan Facility.

The Reorganized Second Lien Term Loan Facility will provide for a term loan in an aggregate principal amount of $50 million and, subject to certain exceptions, will be secured by a second priority lien on substantially all of the assets of the Reorganized Debtor Obligors, whether now existing or subsequently acquired (excluding the New Revolving Credit Facility Collateral) and a third priority lien on the New Revolving Credit Facility Collateral. Borrowings under the Reorganized Second Lien Term Loan Facility will bear interest at a rate of LIBOR plus 8% per annum (with a 3% LIBOR floor) or the base rate plus 7% per annum (with a base rate floor of 3-month LIBOR plus 1%), at the option of Reorganized CCS, payable quarterly. Reorganized CCS will be required to pay in Cash the Cash Pay Amount. Additionally, there shall be a PIK Payment which shall bear interest as set forth above; *provided, however,* that Reorganized CCS may elect, subject to the restrictions of making such election contained in the First Lien Term Loan Facility, to pay a portion of the PIK Payment in Cash; *provided, further,* that on or prior to the Effective Date, the Reorganized Debtors will determine whether the exception to the application of IRC (defined below) Section 163(e)(5) contained in IRC Section 163(e)(5)(F) applies to the Reorganized Second Lien Term Loan Facility, and if they determine that such exception may not apply in whole or in part for any reason, including the Reorganized Second Lien Term Loan Facility being held by a party related (within the meaning of IRC Section 108(e)(4)) to the issuer, a sufficient amount of the accrued PIK Payment shall be paid in cash at the end of the first quarter after the fifth anniversary of the Effective Date and on each quarter thereafter so that the Reorganized Second Lien Term Loan Facility is not an applicable high yield discount obligation within the meaning of IRC Section 163(i). The Reorganized Debtors shall provide notice to the holders of the First Lien Lender Claims and the holders of the New Notes under the Reorganized Second Lien Term Loan as soon as is practicable stating whether the terms of the Reorganized Second Lien Term Loan have been revised as above, or whether the terms remain as outlined on Exhibit C to the Plan.

The Reorganized Second Lien Term Loan Facility will include various affirmative and negative covenants that require the Reorganized Debtor Obligors to comply with ongoing obligations and restrict their businesses in various ways, until the obligations thereunder are satisfied. Affirmative covenants contained in the Reorganized Second Lien Term Loan Facility will be customary and typical of those contained in similar financings. Negative covenants contained in the Reorganized Second Lien Term Loan Facility will include certain limitations on indebtedness, liens, investments, acquisitions, cash dividends, stock repurchases and non-ordinary course sales, transfers, leases and other dispositions of assets. The Reorganized Second Lien Term Loan Facility will also be subject to certain mandatory prepayment requirements and to prepayment premiums if certain voluntary prepayments are made within the first three years following the Effective Date.

This summary is subject to and is qualified in its entirety by reference to the provisions of the Reorganized Second Lien Term Loan Facility, in form and substance as may be acceptable to the Debtors and the Required Consenting Holders.

(c)     Description of New Revolving Credit Facility.

The New Revolving Credit Facility will provide for revolving borrowings in an aggregate amount outstanding at any time of up to approximately $25 million (or such other amount as the Debtors and the Required Consenting Holders shall agree), subject to expansion to $35 million, and will provide for letters of credit to be issued up to an aggregate amount of $10 million. The proceeds of the New Revolving Credit Facility will be used to refinance borrowings under the DIP Credit Agreement and to provide liquidity for general corporate purposes and letters of credit. Subject to certain exceptions, the New Revolving Credit Facility will be secured by a first priority lien on all of the New Revolving Credit Facility Collateral. The New Revolving Credit Facility will mature no earlier than the fourth anniversary of the Effective Date.

The New Revolving Credit Facility will include various affirmative and negative covenants that will require the Reorganized Debtor Obligors to comply with ongoing obligations and restrict their businesses in various ways, until the obligations thereunder are satisfied.

This summary is subject to and is qualified in its entirety by reference to the provisions of the New Revolving Credit Facility (including the amounts thereof), in form and substance as may be acceptable to the Debtors, the Required Consenting Holders and the lenders under the New Revolving Credit Facility.

(d)     Description of New Common Stock.

1.      <u>Issuance.</u>

The Debtors currently expect that the issuer of the New Common Stock will be Reorganized Holdings. Subject to the consent of the Required Consenting Holders, the Debtors have the right under the Plan to designate another Reorganized Debtor to be the issuer of the New Common Stock. The Debtors will exercise such designation right if, among other things, the Plan is not confirmed as to Holdings or if any tax or other benefits warrant such designation. Any such issuer shall be, on and after the Effective Date, the parent entity of the other Reorganized Debtors. Consistent with the foregoing, and as provided in Section 7.3 of the Plan, in connection with the Effective Date, one or more of the Debtors or the Reorganized Debtors may be dissolved or merged with another Debtor or Reorganized Debtor.

Reorganized Issuer will be authorized to issue 1,000,000 shares of New Common Stock, with par value of $0.01 per share, to be issued to the holders of First Lien Lender Claims, in accordance with Section 7.10 of the Plan.

2.      <u>New Stockholder and Registration Rights Agreement Restrictions on Transfer.</u>

In order to avoid the expense and administrative burden of complying with the reporting obligations under the U.S. Securities Exchange Act of 1934, as amended, the Amended Certificate will contain restrictions on transfer of the New Common Stock and any option,

warrant or other right to purchase or otherwise acquire shares of New Common Stock, designed to ensure that there will be fewer than 500 holders of New Common Stock (determined pursuant to the Exchange Act). These transfer restrictions will remain in place until (a) the board of directors of Reorganized Issuer determines otherwise, or (b) the Amended Certificate is amended to provide otherwise by the affirmative vote of 66 2/3 of the issued and outstanding New Common Stock. As such, the New Stockholder and Registration Rights Agreement, the New Warrant Agreement and the Amended Certificate will require notice to Reorganized Issuer of any proposed transfer of New Common Stock or Warrants to a third party and will restrict such transfer if Reorganized Issuer's board of directors reasonably determines that the transfer would, if effected, result in Reorganized Issuer having 500 or more holders of record (determined pursuant to the Exchange Act). In addition, the New Stockholder and Registration Rights Agreement will provide for: (a) "piggyback" registration rights for the New Common Stock (with customary exceptions); (b) following the initial public offering of Reorganized Issuer, customary demand registration rights; (c) customary information rights; and (d) preemptive rights (with customary exceptions).

      (e)     Description of Warrants.

As a result of the settlements and compromises embodied in the Plan, the First Lien Lenders have agreed to provide a portion of their recovery on account of the First Lien Lenders Claims as a gift to certain holders of Allowed Second Lien Lender Claims and Allowed General Unsecured Claims, respectively. If the Class of holders of Second Lien Lender Claims or the Class of holders of General Unsecured Claims votes to accept the Plan, each holder, respectively, of an Allowed Second Lien Lender Claim or an Allowed Electing General Unsecured Claim shall be entitled to receive its Pro Rata Share of the Warrant Pool. The Warrants entitle their holders to purchase a specified number of shares of New Common Stock at a strike price corresponding to an implied equity value that would result in payment in full to the holders of First Lien Claims (currently estimated as approximately $150 per share). The Warrants will expire on the third anniversary of the Effective Date. The Debtors currently expect that the issuer of the Warrants will be the same as the issuer of the New Common Stock, as described in Section 6.7(d) hereto.

      (f)     Corporate Structure of Reorganized Issuer.

      1.     <u>Reorganized Issuer.</u>

On the Effective Date, Reorganized Issuer's amended certificate of incorporation (the "**Certificate**") and amended by-laws (the "**By-laws**"), both in the forms as may be acceptable to the Debtors, will be automatically authorized and approved and Reorganized Issuer will file the Certificate with the Secretary of State of Delaware on the Effective Date. The Certificate and By-laws will be included in the Plan Supplement. The Certificate will, among other things: (a) authorize issuance of 1,000,000 shares of New Common Stock (par value $0.01), which shall be issued to the holders of Allowed First Lien Lender Claims in Class 2, in accordance with Section 7.10 of the Plan; (b) include, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities; (c) to the extent necessary or appropriate, include any restrictions on the transfer of the New Common

Stock; and (d) to the extent necessary or appropriate, include such provisions as may be necessary to effectuate the Plan.

**6.8** *Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Interests.*

(a) Class Acceptance Requirement.

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) of the Interests in such Class that actually vote on the Plan.

(b) Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown".

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

(c) Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(d) Voting Classes.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

(e) Confirmation of All Cases.

Except as otherwise determined by a Debtor in its sole discretion and with the consent of the Required Consenting Holders, the Plan shall not be deemed to have been confirmed as to each Debtor, unless and until the Plan has been confirmed as to all of the Debtors. If the Plan is not confirmed as to one or more of the Debtors but the other Debtors determine to proceed with the Plan, then the Debtor(s) as to which the Plan may not be confirmed shall be severed from, and the Plan shall not apply to, such Debtor(s).

**6.9    *Means for Implementation.***

(a)    Distribution of the Warrants and Lump Sum Payment.

The Disbursing Agent shall develop procedures for the distribution of the Lump Sum Payment and Warrants to the holders of Allowed General Unsecured Claims and Allowed Second Lien Lender Claims, as applicable, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date, and the first Quarterly Distribution Date after the date such General Unsecured Claim or Second Lien Lender Claim becomes an Allowed Claim.

(b)    New Notes.

On the Effective Date, the Reorganized First Lien Term Loan Facility and the Reorganized Second Lien Term Loan Facility shall be valid, binding, and enforceable in accordance with their terms and each First Lien Lender shall be bound thereby without the need for any further action including the execution of such agreements by the First Lien Lenders.

(c)    Continued Corporate Existence.

Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors, for the purposes of satisfying their obligations under the Plan and the continuation of their businesses.

In connection with the Effective Date and at any time thereafter, each Debtor or Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law as such Debtor or Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, causing (i) a Debtor or Reorganized Debtor to be merged into another Debtor or Reorganized Debtor, or its Subsidiary and/or affiliate, (ii) a Debtor or Reorganized Debtor to be dissolved, (iii) the legal name of a Debtor or Reorganized Debtor to be changed, (iv) the conversion of a Debtor or Reorganized Debtor to another form of entity, including from a corporation to a limited liability corporation, or (v) the closure of a Debtor or Reorganized Debtor's case on the Effective Date or any time thereafter.

(d)    Plan Documents.

On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents, including but not limited to, the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility, the New Stockholder and Registration Rights Agreement, and the New Warrant Agreement, and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further court, corporate, board or shareholder action or approval.

(e)    Cancellation of Existing Securities and Agreements.

Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments and

- 39 -

certificates evidencing any Claim, any Existing Stock Interest, or any Other Existing Interest and any rights of any holder in respect thereof, shall be deemed cancelled, discharged and of no force or effect.

Notwithstanding Section 7.5(a) of the Plan, the applicable provisions of the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect solely for the purposes of permitting the Disbursing Agent to: (i) make the distributions to be made to holders of Allowed First Lien Lender Claims, as contemplated by Article V of the Plan and (ii) make any distributions from the Warrant Pool to the holders of Allowed Second Lien Lender Claims, pursuant to the settlements and compromises set forth in the Plan. The holders of or parties to such cancelled (or converted, as applicable) instruments, securities and other documentation will have no rights arising from or relating to such instruments, securities and other documentation or the cancellation (or conversion, as applicable) thereof, except the rights provided pursuant to the Plan and shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*, and shall be deemed to have authorized the Debtors and the Reorganized Debtors, as applicable, to file any termination statements, instruments of satisfactions, or releases of all such security interests with respect to such Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.

(f)     Cancellation of Certain Existing Security Interests.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors (as applicable) any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*. Upon the full payment or other satisfaction of an Allowed Other Secured Claims, the holders of such Allowed Other Secured Claims shall be deemed to have authorized the Debtors and the Reorganized Debtors, as applicable, to file any termination statements, instruments of satisfactions, or releases of all such security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanic's liens, or *lis pendens*.

(g)     Officers and Boards of Directors.

On the Effective Date, the boards of directors of the Reorganized Debtors shall consist of those individuals identified in the Plan Supplement. Except as set forth in the Plan, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date. Following the occurrence of the Effective Date, the board of directors of each Reorganized Debtor may be replaced by such individuals as are selected in accordance with the organizational documents of such Reorganized Debtor and the New Stockholder and Registration Rights Agreement.

- 40 -

On the Effective Date, the officers of the Reorganized Debtors shall consist of those individuals identified in the Plan Supplement.

      (h)    Management Agreements, Management Equity Plan and Post-Emergence Incentive Plan.

On the Effective Date, the Reorganized Debtors shall execute the Management Agreements.

On the Effective Date, the applicable boards of directors of the Reorganized Debtors shall be deemed to have adopted the Management Equity Plan.

      (i)    Corporate Action.

On the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended and restated in substantially the forms set forth in the Plan Supplement.

Any action under the Plan to be taken by or required of the Debtors, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws or the issuance of securities and instruments, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or Reorganized Debtors' boards of directors, as applicable.

The Debtors and Reorganized Debtors shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan. In addition, the selection of the persons who will serve as the initial directors and officers of the Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on the Effective Date without any requirement of further action by the board of directors or stockholders of the applicable Reorganized Debtor. On the Effective Date, the New Common Stock and the Warrants will be transferred to the Disbursing Agent and the Disbursing Agent will hold the New Common Stock and Warrants until distributions of the same are made.

      (j)    Authorization, Issuance and Delivery of New Common Stock and Warrants.

On the Effective Date, Reorganized Issuer shall be authorized to issue or cause to be issued the New Common Stock and Warrants in accordance with the terms of the Plan and the Amended Certificates, without the need for any further corporate or shareholder action. The New Common Stock and Warrants shall be made by book entry or delivery of one or more certificates representing such shares or warrants, as described herein, as and to the extent practicable. Any certificates of New Common Stock or Warrants shall bear a legend restricting the sale, transfer, assignment or other disposal of such shares, which restrictions shall be more fully set forth in the Amended Certificates, the New Stockholder and Registration Rights Agreement and the New Warrant Agreement, as applicable. On the Effective Date, the New Common Stock and Warrants shall not be registered under the Securities Act of 1933, as

amended, and shall not be listed for public trading on any securities exchange.

On the Effective Date, Reorganized Issuer shall issue and cause to be delivered 100% of the New Common Stock to the Disbursing Agent for distribution to the holders of the First Lien Lender Claims in accordance with the terms of the Plan.

On the Effective Date, Reorganized Issuer shall issue and cause to be delivered to the Disbursing Agent (a) the Second Lien Lenders' Pro Rata Share of the Warrant Pool for distribution to the holders of the Allowed Second Lien Lender Claims and (b) the holders of Electing General Unsecured Claims' Pro Rata Share of the Warrant Pool for distribution to the holders of the Electing General Unsecured Claims in accordance with the terms of the Plan, _provided_, _however_ that neither the Reorganized Debtors nor the Disbursing Agent will distribute Warrants on behalf of Disputed General Unsecured Claims unless and until such Claims are Allowed in accordance with Section 9.2 of the Plan. Upon issuance, the Warrants will be held by the Disbursing Agent, in a segregated trust account or accounts, pending allocation and distribution by the Disbursing Agent to all Persons entitled to receive such Warrants pursuant to and in accordance with the terms of the Plan.

Upon receipt of its respective Pro Rata Share of the New Common Stock under the Plan, each holder of the First Lien Lender Claims shall be deemed to have executed, as of the Effective Date, the New Stockholder and Registration Rights Agreement and such agreement shall be valid, binding and enforceable in accordance with its terms and each holder deemed party thereto shall be bound thereby without the need for any further actions, including the execution of such agreement by such party. If pursuant to the Management Equity Plan any officers or directors of the Reorganized Debtors receive any portion of the New Common Stock on the Effective Date, each such officer and/or director shall be deemed, as of such date, to have executed the New Stockholder and Registration Rights Agreement.

Upon receipt of its respective Pro Rata Share of the Warrants, each holder of an Allowed Electing General Unsecured Claim and each holder of an Allowed Second Lien Lender Claim shall be deemed to have executed, as of the Effective Date, the New Warrant Agreement and the New Stockholder and Registration Rights Agreement.

**6.10** _Distributions._

(a)     Distributions.

The Disbursing Agent shall make all distributions to the appropriate holders of Allowed Claims, free and clear of all Liens, claims and encumbrances, except as otherwise set forth in the Plan.

(b)     No Postpetition Interest on Claims.

Unless otherwise specifically provided for in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Commencement Date.

(c)     Date of Distributions.

Unless otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is practicable, provided that the Debtors may utilize periodic distribution dates to the extent appropriate. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

(d)     Distribution Record Date.

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, the DIP Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent, or their respective agents, shall be deemed closed. The Debtors shall have no obligation to (but may in their sole discretion) recognize any transfer of Claims occurring after the close of business on the applicable Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and leases, the Debtors shall have no obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

(e)     Disbursing Agent.

All distributions under the Plan shall be made by the Reorganized Debtors or the Disbursing Agent on and after the Effective Date as provided in the Plan. A Reorganized Debtor acting as the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

(f)     Surrender of Cancelled Instruments or Securities.

As a condition precedent to any holder of an Allowed Claim receiving any Plan Distribution on account of such Allowed Claim, unless waived in writing by the Reorganized Debtors, the holder of such Allowed Claim shall have properly tendered to the Reorganized Debtors or the Disbursing Agent, as applicable, any notes or other form of securities evidencing the right to payment, to be cancelled pursuant to the Plan.

(g)     Failure to Surrender Cancelled Instruments.

Except as may otherwise be agreed by the applicable Reorganized Debtor, if the holder of a Claim has not surrendered, or been deemed to have surrendered, any securities required to be tendered pursuant to Section 8.6 of the Plan within one year after the Effective Date, such holder of a Claim shall have its Claim or Interest discharged and shall be forever barred from asserting any such Claim against the Debtors or their property. In such cases, any

- 43 -

distribution on account of such Claim or Interest shall be disposed of pursuant to the provisions set forth in Section 8.8 of the Plan.

        (h)     Delivery of Distribution.

        On or as promptly as practicable after the Effective Date, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, except as provided in Section 8.1 of the Plan, make all distributions or payments to any holder of an Allowed Claim at (a) the address of such holder on the books and records of the Debtors or their agents, or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest, *provided*, *however*, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from (a) the Effective Date and (b) the date such holder's Claim is Allowed.

        (i)     Unclaimed Property.

        One year from the later of (a) the Effective Date, and (b) the date a Claim is first Allowed, all unclaimed property or interests in property on account of such Claim shall revert to the applicable Reorganized Debtor, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. The Reorganized Debtors and the Disbursing Agents shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, or proofs of Claim filed against the Debtors.

        (j)     Satisfaction of Claims.

        Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

        (k)     Manner of Payment Under Plan.

        Except as specifically provided in the Plan, at the option of the Debtors or Reorganized Debtors (as applicable), any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

        (l)     Fractional Shares.

        No fractional shares of New Common Stock or Warrants shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock or Warrants that is not a whole number, the shares of the New Common Stock or Warrants subject to such distribution will be rounded to the next lower whole number. The total

number of shares of New Common Stock or Warrants to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agents shall have any obligation to make a distribution that is less than one (1) share of New Common Stock or one (1) Warrant. Fractional shares of New Common Stock or Warrants that are not distributed in accordance with Section 8.12 of the Plan shall be returned to the applicable Reorganized Debtor and cancelled.

> (m)     De Minimis Payments and Distributions.

Notwithstanding any other provision of the Plan, neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution less than $100 on account of any Allowed Claim; such amounts not distributed shall be returned to, and become the proceeds of, the Reorganized Debtors.

> (n)     No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth in the Plan) in excess of the Allowed amount of such Claim plus postpetition interest on such Claim, to the extent provided in Section 8.2 of the Plan. Further, notwithstanding anything in the Plan to the contrary, the holder of an Allowed Claim shall only be entitled to a single recovery or such other Plan Distribution as provided in the Plan on account of such Claim, such that upon satisfaction of such Claim against one Debtor all guarantees or co-liability of another Debtor of the payment, performance or collection against the first Debtor with respect to such Claim shall be deemed eliminated and cancelled and shall not entitle the holder of such Claim to a recovery or Plan Distribution as against any other Debtor.

> (o)     Exemption from Securities Laws.

The issuance of the New Common Stock and Warrants pursuant to the Plan shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the maximum extent permitted thereunder, and subject to the transfer restrictions contained in the Amended Certificates, the New Stockholder and Registration Rights Agreement, and the New Warrant Agreement, such New Common Stock or Warrants, as applicable, may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable U.S. federal securities laws shall not be a condition to occurrence of the Effective Date of the Plan.

> (p)     Setoffs and Recoupments.

Each Reorganized Debtor, or such entity's designee as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights and Causes of Action that a Reorganized Debtor or its successors may hold against the holder of such

- 45 -

Allowed Claim after the Effective Date; *provided, however,* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by a Debtor, Reorganized Debtor or its successor of any and all claims, rights and Causes of Action that a Debtor, Reorganized Debtor or its successor may possess against such holder.

(q)     Rights and Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all applicable distributions or payments contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(r)     Expenses Incurred by the Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent, on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors.

(s)     Withholding and Reporting Requirements.

In connection with the Plan and all distributions thereunder, the Reorganized Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions, including with respect to the Trade Payments, the Warrants, and the Lump Sum Payments thereunder shall be subject to any such withholding and reporting requirements. The Reorganized Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, Reorganized Debtors or the Disbursing Agent believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations or has, to the Reorganized Debtors' satisfaction, established an exemption therefrom.

(t)     Cooperation with Disbursing Agent.

The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or Reorganized Debtors' books and records. The Reorganized Debtors will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 8.19 of the Plan.

(u)     Hart-Scott Rodino Antitrust Improvements Act.

Any New Common Stock to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. In the event any applicable notification and waiting periods do not expire without objection, the Debtors or their agent shall, in their sole discretion, be entitled to sell such entity's shares of New Common Stock that were to be distributed under the Plan to such entity, and thereafter shall distribute the proceeds of the sale to such entity.

**6.11    *Procedures for Resolving Claims.***

(a)     Objections to Claims.

Other than with respect to Fee Claims, only the Reorganized Debtors shall be entitled to object to Claims after the Effective Date. Any objections to those Claims (other than Administrative Expense Claims) that have been filed on or before the Confirmation Date, shall be served and filed on or before the later of: (a) forty-five (45) days after the Effective Date; or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof. Any Claims filed after the Bar Date or Administrative Expense Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the Reorganized Debtors, unless the Person or entity wishing to file such untimely Claim has received prior Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Within 15 days of the end of each calendar quarter, an authorized representative of the Reorganized Debtors shall provide the Disbursing Agent with, and file with the Bankruptcy Court, a written report identifying all Disputed Claims that have been settled and become Allowed Claims during the preceding quarter. Such report will identify the Claim with specificity, the amount of the Disputed Claim as asserted and the

- 47 -

amount of the Claim as Allowed. Upon request of the applicable Disbursing Agent, the Reorganized Debtors shall provide documentation, if any, supporting the settlement.

(b)     Disputed Claims.

1.     No Distributions or Payments Pending Allowance.

Except as provided in Section 9.2 of the Plan, Disputed Claims shall not be entitled to any Plan Distributions unless and until such Claims become Allowed Claims.

2.     Plan Distributions to Holders of Subsequently Allowed Claims.

On each Quarterly Distribution Date, the Disbursing Agent will make distributions or payments (i) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (ii) on account of previously Allowed Claims of property that would have been distributed or paid to the holders of such Claims on the dates distributions previously were made to holders of Allowed Claims in such Class had the Disputed Claims that have become Disallowed Claims been Disallowed Claims on such dates. The Disbursing Agent shall distribute in respect of such newly Allowed Claims, the Plan Consideration as to which holders of such Claims would have been entitled under the Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims.

(c)     Estimation of Claims.

Any Debtor, Reorganized Debtor or holder of a Claim may request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, any objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.

(d)     No Recourse.

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no holder of a Claim shall have recourse against the

- 48 -

Disbursing Agent the Debtors, the Consenting Holders, the Reorganized Debtors, or any of their respective professionals, consultants, attorneys, advisors, officers, directors, or members or their successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code. THE BANKRUPTCY COURT'S ENTRY OF AN ORDER ESTIMATING CLAIMS MAY LIMIT THE DISTRIBUTION TO BE MADE ON SUCH DISPUTED CLAIM, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIM.

        (e)      Preservation of Insurance.

The discharge and release of the Debtors as provided in the Plan shall not diminish or impair the enforceability of any insurance policies that may cover Claims against any Debtor or other Person.

### 6.12 *Executory Contracts and Unexpired Leases.*

        (a)      General Treatment.

As of and subject to the occurrence of the Effective Date and the payment of the applicable Cure Amount, all executory contracts and unexpired leases to which any Debtor is a party shall be deemed assumed, except for any executory contracts or unexpired leases that: (a) previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (b) are designated specifically or by category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, if any; or (c) are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date. As of and subject to the occurrence of the Effective Date, all contracts identified on the Schedule of Rejected Contracts and Leases shall be deemed rejected. Subject to the occurrence of the Effective Date and payment of any Cure Amount, if applicable, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Subject to the occurrence of the Effective Date and payment of any Cure Amount, if applicable, each executory contract and unexpired lease assumed pursuant to Section 10.1 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

        (b)      Claims Based on Rejection of Executory Contracts or Unexpired Leases.

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Pursuant to Section 5.6 of the Plan, all such Claims shall be discharged on the Effective Date, and shall not be enforceable against the Debtors, the Reorganized Debtors, or their respective properties or interests in property.

On or before five (5) days prior to the Confirmation Hearing, the Debtors shall file the Schedule of Rejected Contracts and Leases setting forth each executory contract or unexpired lease to be rejected pursuant to Section 10.1 of the Plan. Any party that fails to object to the rejection of its executory contract within twenty (20) days after the filing thereof, or file a

- 49 -

          

proof of claim with respect any Claims arising in connection with such rejection within the later of thirty (30) days after the filing of the Schedule of Rejected Contracts and Leases and the Bar Date, shall be forever barred, estopped and enjoined from disputing the rejection and/or from asserting any claim against such applicable Debtor arising under section 365 of the Bankruptcy Code.

(c)     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

1.     Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Section 10.1 of the Plan, any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default for the period prior to the Effective Date, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of such default amount (the "**Cure Amount**") in Cash (1) within thirty (30) days after the later of (i) the Effective Date or (ii) the date on which the Cure Amount has been resolved (either consensually or through judicial decision); or (2) on such other less favorable terms to the non-Debtor party as the parties to such executory contracts or unexpired leases may otherwise agree.

2.     On or before five (5) days prior to the Confirmation Hearing, the Debtors shall file a schedule, as may be amended from time to time on or before the Effective Date (the "**Cure Schedule**") setting forth the Cure Amount, if any, for each executory contract or unexpired lease to be assumed pursuant to Section 10.1 of the Plan. Any party that fails to object to the applicable Cure Amount listed on the Cure Schedule within twenty (20) days after the filing thereof, shall be forever barred, estopped and enjoined from disputing the Cure Amount set forth on the Cure Schedule (including a Cure Amount of $0.00) and/or from asserting any claim against the Debtors arising under section 365(b)(1) of the Bankruptcy Code except as set forth on the Cure Schedule.

3.     In the event of a dispute (each, a "**Cure Dispute**") regarding: (i) the Cure Amount; (ii) the ability of the applicable Debtor or the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (iii) any other matter pertaining to assumption, the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the Cure Dispute and approving the assumption. To the extent a Cure Dispute relates solely to the Cure Amount, the applicable Debtor may, in its sole discretion, assume and/or assume and assign the subject contract prior to resolution of the Cure Dispute provided that the Debtors reserve, or otherwise have on hand, Cash in an amount sufficient to pay the full amount asserted by the non-Debtor party to the subject contract (or such other amount as may be fixed or estimated by the Bankruptcy Court).

4.     Notwithstanding anything in Article X of the Plan to the contrary, the applicable Debtor or Reorganized Debtor shall have five (5) Business Days from the entry of a Final Order in resolution of a Cure Dispute in connection with the assumption of an executory contract or unexpired lease to reject such executory contract or unexpired lease pursuant to Section 10.1 of the Plan.

- 50 -

(d)     Indemnification of Certain Directors, Officers and Employees.

For purposes of the Plan, the obligation of a Debtor to indemnify and reimburse any Person or entity serving at any time on or after the Commencement Date as one of its directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any other corporation or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing (each, an "**Indemnification Agreement**") shall: (a) survive confirmation of the Plan and the Effective Date; (b) become obligations of the Reorganized Debtors, and such obligations shall continue in full force and effect (and not be modified, amended or terminated in any manner adverse to any Indemnitee without the written consent of the affected Indemnitee) for a period of not less than six years following the Effective Date; and (c) not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date. Notwithstanding anything to the contrary in the Plan, the Indemnification Agreements shall not be subject to the requirements of Section 10.3 of the Plan, and failure to include the Indemnification Agreements on any schedule of executory contracts to be assumed by the Reorganized Debtors shall not affect the rights of Indemnitees provided by Section 10.4 of the Plan.

Notwithstanding the foregoing, the indemnification described in paragraph (a) of Section 10.4 of the Plan shall not apply to any Claims or Entities to the extent described on the Indemnification Exclusion Schedule.

**6.13    *Conditions Precedent to Confirmation and Consummation of the Plan.***

(a)     Conditions Precedent to Confirmation.

Confirmation of the Plan is subject to:

1.     reasonable, customary and appropriate severance and other compensation agreements covering the period commencing on the Effective Date of the Plan, and lasting for a period of not less than one year, being negotiated and agreed upon among CCS and those current officers of CCS that will continue with Reorganized CCS, and each such agreement being satisfactory to the Required Consenting Holders;

2.     this Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code;

3.     entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Required Consenting Holders; and

4.     the material Plan Documents having been filed in substantially final form prior to the Confirmation Hearing.

(b)     Conditions Precedent to the Effective Date.

The occurrence of the Effective Date is subject to:

1.     subject to Section 6.5 of the Plan, the Confirmation Order with respect to each Debtor having been entered by the Bankruptcy Court, being in full force and effect and not subject to any stay or injunction, and being in form and substance satisfactory to the Debtors and to the Required Consenting Holders.

2.     the Plan Documents in form and substance satisfactory to the Required Consenting Holders being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith, including, but not limited to:

- the New Revolving Credit Facility (A) shall have closed on substantially the terms and conditions set forth on Exhibit D to the Plan and/or such other terms as shall be mutually acceptable to the Debtors and the Required Consenting Holders; (B) shall be in full force and effect, and (C) the extension of credit thereunder shall be available upon (and subject to) the Effective Date;

- the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, and all documents ancillary thereto, each in form and substance reasonably satisfactory to the Required Consenting Holders and the Debtors;

- the amended and restated certificate of incorporation and by-laws of the Reorganized Debtors (which documents shall comply with the requirements of Plan confirmation under the Bankruptcy Code), each in form and substance reasonably satisfactory to the Required Consenting Holders and the Debtors; and

- the New Stockholder and Registration Rights Agreement, each in form and substance satisfactory to the Required Consenting Holders and the Debtors;

3.     all material governmental, regulatory and third party approvals, waivers and/or consents in connection with the restructuring contemplated by the Plan, if any, shall have been obtained and shall remain in full force and effect, and there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated herein;

4.     no law or order shall be in effect which has the effect of making illegal or otherwise restricting, preventing or prohibiting consummation of the Plan; and

5.    the Debtors shall have Cash on hand and availability under the New Revolving Credit Agreement as of the Effective Date of at least $25 million.

(c)    Waiver of Conditions Precedent and Bankruptcy Rule 3020(e).

The Debtors and the Required Consenting Holders shall have the right to jointly waive one or more of the conditions precedent set forth in Sections 11.1(a) and (d) of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with confirmation of the Plan.

The Debtors and the Required Consenting Holders shall have the right to jointly waive one or more of the conditions precedent set forth in Sections 11.2(a)-(e) of the Plan at any time with respect to any Debtor without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of the Plan. Further, the Plan shall be deemed a request for a waiver of the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), and such stay shall be waived by the Confirmation Order.

If any condition precedent to the Effective Date is waived pursuant to Section 11.3 of the Plan and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court.

(d)    Effect of Failure of Conditions.

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 60 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then upon motion by the Debtors made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order shall be vacated by the Bankruptcy Court. It is further provided that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 11.4 of the Plan, the Plan shall be null and void in all respects, and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim or Interest in the Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by the Debtors or any other entity with respect to any matter set forth in the Plan.

**6.14    *Effect of Confirmation.***

(a)    Binding Effect.

The Plan shall be binding and inure to the benefit of the Debtors, all holders of Claims and Interests, and their respective successors and assigns.

(b)     Vesting of Assets.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, and except as otherwise provided in the Plan, the property of each Estate shall vest in the applicable Reorganized Debtor, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided herein or in the Confirmation Order. Each Debtor shall have the right to have any of its assets vest on the Effective Date in another Reorganized Debtor. The Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and causes of action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in the Plan. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for Professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c)     Discharge of Claims Against and Interests in the Debtors.

Upon the Effective Date and in consideration of the distributions to be made hereunder, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524 and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor.

(d)     Term of Pre-Confirmation Injunctions or Stays.

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date and thereafter to the extent permitted under applicable law.

(e)     Injunction Against Interference With Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

(f)     Injunction.

1.     *Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from:  (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Estates or any of their property, the Consenting Holders, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or the Estates or any of their property, the Consenting Holders, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, or the Estates or any of their property, the Consenting Holders or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the fullest extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that nothing contained in the Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.*

2.     *Each holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in the Plan.*

**6.15  Releases.**

(a)     ***Releases by the Debtors.*** *Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases, credit facilities and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the parties released pursuant to Section 12.7 of the Plan, the Reorganization Cases, the Plan or this Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Released Party; provided, however, that (i) the releases set forth in Section 12.7(a) of the Plan shall not*

- 55 -

release any Debtor's claims, rights, or causes of action for money borrowed from or owed to a Debtor or its Subsidiary by any of its directors, officers or former employees as set forth in such Debtors' or Subsidiary's books and records, and (ii) in no event shall anything in Section 12.7(a) of the Plan be construed as a release of any Person's fraud, gross negligence or willful misconduct for matters with respect to the Debtors and their Subsidiaries and/or affiliates.

(b)  *Releases by Holders of Claims and Interests.* Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors under the Plan, the Plan Consideration, the Plan Securities and other contracts, instruments, releases, agreements or documents executed and delivered in connection with the Plan, and each entity (other than a Debtor) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to the Plan for all purposes and the restructuring embodied in the Plan and deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including, without limitation, any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtors commencing the Reorganization Cases or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, the Plan or this Disclosure Statement against any Released Party; *provided, however,* that in no event shall anything in Section 12.7(b) of the Plan be construed as a release of any Person's fraud or willful misconduct for matters with respect to the Debtors and their Subsidiaries and/or affiliates (the "***Third Party Release***").

Notwithstanding the foregoing, the releases contained in paragraph (a) and (b) of this Section 6.15 shall not apply to any Claims or Entities to the extent described in the Release and Claim Exclusion Schedule.

The Debtors believe that the releases by each of the Debtors and the holders of Claims and Interests of each of the Released Parties as described in this Section 6.15 and Sections 12.7(a) and 12.7(b) of the Plan (the "**Releases**"), are integral to the Plan. Moreover, the Debtors have received substantial contributions to the Plan from the Released Parties. In addition to the significant gifting by the First Lien Lenders, the Released Parties have played a critical role in the formulation of the Debtors' Plan and have expended an immense amount of time and resources analyzing and negotiating the complex issues presented by the Debtors' capital structure. The Plan reflects the settlement and resolution of several of these complex issues.

Absent the tireless efforts of the various constituencies who came together to work out the terms of a Plan, supported by approximately 72% in amount of the First Lien Lenders, aimed at resolving these cases, the Debtors and their creditors would likely remain

mired in complex and contentious litigation for years to come, threatening to materially delay and reduce distributions to all creditors. Further, the Consenting Holders are agreeing to continue to carry up to $200 million in additional indebtedness and provide for certain consideration to be provided under the Plan to the holders of Second Lien Lender Claims, Trade Claims, and General Unsecured Claims that vote to accept the Plan. The willingness of these creditors to take such risks and provide such benefits to the other holders of Claims against the Estates is a substantial contribution to the Plan and to these cases; absent such willingness, the Plan would not have been possible, and the Debtors may have been unable to reorganize. The substantial and extensive contributions by the Released Parties — both monetary and non-monetary — further justify the non-Debtor releases set forth in the Plan.

Additionally, an identity of interest may exist between the Debtors and certain non-Debtor Released Parties, such that the non-Debtor releases are appropriate in that they eliminate effectively additional unknown claims against the estates. The Debtors' directors and officers are parties to and beneficiaries of certain indemnification provisions, whereby the Debtors are obligated to indemnify them. Under these agreements, any claim asserted against a Released Party who the Debtors are obligated to indemnify may essentially be a claim against the Debtors. Any such claim, even if ultimately unsuccessful, could further deplete finite estate resources. As of the date hereof, the Debtors are not aware of any claims against a Released Party.

*3. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is (i) in exchange for the good and valuable consideration provided by the Debtors and the other Released Parties, representing good faith settlement and compromise of the claims released herein; (ii) in the best interests of the Debtors and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the holders of Claims and Interests against or in the Debtors asserting any claim released pursuant to Section 12.7 of the Plan.*

(c)     **Exculpation and Limitation of Liability.**

*None of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation the negotiation and execution of the Plan, the Reorganization Cases, the Disclosure Statement, the solicitation of votes for and the pursuit of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, gross negligence, or willful misconduct as determined by a Final Order of the Bankruptcy Court. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

(d) *Injunction Related to Releases and Exculpation.*

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released or exculpated pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 12.7, 12.8 and 12.12 of the Plan.*

(e) Termination of Subordination Rights and Settlement of Related Claims.

1. Except as provided in the Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and Entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan.

2. Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to the Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their Estates, and holders of Claims and Interests, and is fair, equitable and reasonable.

(f) Retention of Causes of Action/Reservation of Rights.

Subject to Sections 12.7 and 12.12 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 of the Plan, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced. For the avoidance of doubt, nothing in Section 12.11 of the Plan shall modify or affect the obligations of the Reorganized Debtors set forth in Section 10.4 of the Plan.

- 58 -

(g)     Avoidance Actions.

Subject to the occurrence of the Effective Date and except as provided on Schedule 12.12 of the Plan, neither the Debtors nor any other party in interest shall assert any Avoidance Action not asserted by a Debtor prior to the Effective Date, *provided, however*, that nothing in the Plan shall prohibit the Debtors or the Reorganized Debtors from challenging the validity, priority, perfection or extent of any lien, mortgage or security agreement or, subject to Section 9.1 of the Plan, objecting to any Claim. All such rights, Claims and Causes of Action shall be released and waived by the Debtors and their Estates under the Plan on the Effective Date. Notwithstanding anything to the contrary contained in the Plan, nothing contained in the Plan shall prejudice any rights or defenses the Debtors may have under section 502(d) of the Bankruptcy Code or from otherwise retaining such Claims and/or Causes of Action for the purposes of defending any Claim brought against the Debtors or their Estates.

**6.16    *Retention of Jurisdiction.***

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Reorganization Cases for, among other things, the following purposes:

a.     To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

b.     To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

c.     To ensure that distributions to holders of Allowed Claims or Allowed Interests are accomplished as provided in the Plan;

d.     To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

e.     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

f.     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

g.     To hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, this Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

h.     To hear and determine all Fee Claims;

i.  To resolve disputes concerning any reserves with respect to Disputed Claims, Cure Disputes, or the administration thereof;

j.  To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments contemplated by the Plan, or any agreement, instrument, or other document governing or relating to any of the foregoing;

k.  To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following consummation;

l.  To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

m.  To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

n.  To hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

o.  To resolve any disputes concerning whether a Person or entity had sufficient notice of the Reorganization Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged under the Plan, or for any other purpose;

p.  To recover all Assets of the Debtors and property of the Estates, wherever located; and

q.  To enter a final decree closing the Reorganization Cases.

### 6.17  *Miscellaneous Provisions.*

(a)  Critical Vendor and Other Payments.

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by one or more of the Debtors pursuant to an order of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules are hereby amended and reduced to reflect that such payments were made. Nothing in the Plan shall preclude the Reorganized Debtors from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

- 60 -

(b)     Exemption from Certain Transfer Taxes.

To the fullest extent permitted by applicable law, any transfer or encumbrance of assets or any portion(s) of assets pursuant to, or in furtherance of, or in connection with the Plan shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes.

(c)     Disallowance of PIK Lender Claims, Existing Stock Interests, and Other Existing Interests

All PIK Lender Claims, Existing Stock Interests, and Other Existing Interests shall be deemed disallowed and expunged in their entirety under and pursuant to the Plan without further order of the Bankruptcy Court or any action being required on the part of the Debtors.

(d)     Dissolution of Committee.

The Creditors' Committee shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Reorganization Cases.

(e)     Termination of Professionals.

On the Effective Date, the engagement of each Professional retained by the Debtors and the Creditors' Committee shall be terminated without further order of the Bankruptcy Court or act of the parties.

(f)     Access.

From and after the Effective Date, the Reorganized Debtors shall cooperate with any Person that served as a director or officer of a Debtor at any time prior to the Effective Date, and any Consenting Holder (collectively, the "**Accessing Parties**"), and make available to any Accessing Party such documents, books, records or information relating to the Debtors' activities prior to the Effective Date that such Accessing Party may reasonably require relating to any action taken in connection with such Accessing Party's role as a director or officer of a Debtor or, in the case of a Consenting Holder, any action taken in connection with the negotiation, execution and implementation of the Plan, and the Reorganization Cases.

(g)     Amendments.

1.     *Plan Modifications.* The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code, or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests pursuant to the Plan, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any

- 61 -

inconsistencies in the Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

2. _Other Amendments._ Prior to the Effective Date the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, _provided, however,_ that, such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

(h) Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date in their sole and absolute discretion. If the Debtors take such action, the Plan shall be deemed null and void.

(i) Confirmation Order.

The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtors during the period commencing on the Commencement Date and ending on the Confirmation Date.

(j) Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated pursuant to section 1101 of the Bankruptcy Code.

(k) Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

(l) Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

DB02:8632234.1

068347.1001

(m) Governing Law.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

(n) Section 1125(e) of the Bankruptcy Code.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors (and their affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

(o) Time.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth therein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

(p) Notices.

In order to be effective, all notices, requests, and demands to or upon the Debtors or Reorganized Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

CCS Medical, Inc.
14255 49th Street North, Suite 301
Clearwater, Florida 33762
Attn:   Stephen M. Saft, Chief Financial Officer
Telephone:   (727) 507-2756
Facsimile:   (727) 507-2757

-and-

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019-6099
Attn: Michael J. Kelly, Esq.
      Lauren C. Cohen, Esq.
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

-and-

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attn: Robert Brady, Esq.
      Matthew B. Lunn, Esq.
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

(q)     Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, due and payable through the Effective Date shall be paid by the Debtors on or in connection with the Effective Date and amounts due thereafter shall be paid by the Debtors in the ordinary course until the entry of a final decree closing the Reorganization Cases. Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

(r)     Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Interests prior to the Effective Date.

## ARTICLE VII.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

**7.1**     *Confirmation Hearing.*

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. The Bankruptcy Court held the Disclosure Statement Hearing on August 20, 2009, at which, among other things, the Bankruptcy Court established the date and time of the Confirmation Hearing with respect to the Plan. The Confirmation Hearing may be adjourned or continued from time to

- 64 -

time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon: (a) Willkie Farr & Gallagher LLP, co-counsel for the Debtors, 787 Seventh Avenue, New York, NY 10019, Attn: Michael J. Kelly, Esq., and Lauren C. Cohen, Esq.; (b) Young Conaway Stargatt & Taylor, LLP, co-counsel for the Debtors, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801-1037, Attn: Robert J. Brady, Esq. and Matthew B. Lunn, Esq.; (c) The Office of the United States Trustee, 844 King St., Suite 2207, Wilmington, DE 19801, Attn: Richard Schepacarter; (d) Moore and Van Allen PLLC, counsel for the First Lien Agent, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202-4003, Attn: David S. Walls; and (e) Wachtell, Lipton, Rosen & Katz, counsel for certain Consenting Holders, 51 West 52nd Street, New York, NY 10019, Attn: Scott K. Charles and Joshua A. Feltman.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**7.2    *Confirmation.***

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan as it relates to each Debtor.

(a)    Confirmation Requirements.

Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been

- 65 -

approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes deemed to reject the Plan, the Debtors believe that:

DB02:8632234.1                                    068347.1001

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

(1)     Acceptance

Classes 1 – 6 are Impaired under the Plan and are entitled to vote to accept or reject the Plan. Classes 7 – 10 are Impaired and are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit or schedules thereto or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary. The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 7 – 10. The Debtors will also seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class. However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

(2)     Unfair Discrimination and Fair and Equitable Test.

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class. The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests, which are as follows:

- Secured Creditors. Either: (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value equal to the amount of its allowed secured claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- General Unsecured Creditors. Either: (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such claims and equity interests.

- 67 -

- Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of such interest.

A plan of reorganization does not "discriminate unfairly" with respect to a non-accepting class if the value of the cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

(3)    Feasibility; Financial Projections; Valuation.

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the Reorganized Debtors for each of the four fiscal years from 2009 through 2013 (the "**Financial Projections**"). The Financial Projections, and the assumptions on which they are based, are set forth in the Reorganized Debtors' projected financial information contained in Exhibit 5 hereto. Based upon these projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan while conducting ongoing business operations and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, the effective date will be September 30, 2009.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

The Debtors have prepared these financial projections based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in Exhibit 5. The financial projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and

- 68 -

circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the 4-year period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the financial projections are based in connection with their evaluation of the Plan.

      (b)    Valuation of the Reorganized Debtors.

THE AD HOC GROUP OF SECOND LIEN LENDERS HAS DISPUTED THE VALUATION AND ALLEGES THAT THE TOTAL ENTERPRISE VALUE OF THE COMPANY IS MATERIALLY GREATER THAN AS PROVIDED HEREIN. THE AD HOC GROUP OF SECOND LIEN LENDERS RESERVES ALL OF ITS RIGHTS TO OBJECT TO CONFIRMATION OF THE PLAN BASED ON THE VALUATION. THE DEBTORS DISPUTE SUCH ALLEGATIONS AND DO NOT BELIEVE THAT THE TOTAL ENTERPRISE VALUE OF THE COMPANY IS GREATER THAN $350 MILLION--THE MINIMUM AMOUNT NECESSARY TO SATISFY THE FIRST LIEN LENDER CLAIMS IN FULL.

      (1)    Introduction.

      In conjunction with formulating the Plan and satisfying the standards and criteria for confirmation as set forth in section 1129 of the Bankruptcy Code, the Debtors engaged Goldman as their financial advisor to prepare a reorganization valuation analysis of the Debtors on a going concern basis (the "**Valuation**") and develop the range of post-confirmation going concern total enterprise value for the Reorganized Debtors (the "**TEV**").

      The estimated TEV of the Reorganized Debtors is based upon information made available to, and analyses separately undertaken by, Goldman. This reorganization enterprise value (ascribed as of July 7, 2009) reflects, among other factors discussed below, current financial market conditions and the inherent uncertainty of the Financial Projections set forth on Exhibit 5 hereto.

      In preparing the Valuation, Goldman has, among other things, (i) reviewed certain internal financial and operating data of the Debtors; (ii) discussed with certain of the Debtors' senior executives the current operations and prospects of the Debtors; (iii) reviewed certain operating and financial forecasts prepared by the Debtors, including the Financial Projections; (iv) discussed with certain senior executives of the Debtors key assumptions related to the Financial Projections; (v) prepared discounted cash flow analyses based on the Financial Projections, utilizing various discount rates and terminal value multiples; (vi) considered the prevailing trading multiples of certain publicly-traded companies in businesses reasonably comparable to the Debtors; (vii) considered the multiples in recent change-of-control transactions involving public companies in businesses that Goldman deemed to be reasonably comparable to the Debtors and having occurred after January 2008; and (viii) considered such other factors as Goldman deemed appropriate under the circumstances.

      Goldman has not conducted or assumed any responsibility for any independent evaluation or appraisal of the respective assets or liabilities of the Debtors or any other party.

- 69 -

Goldman relied upon and assumed, without independent verification, the accuracy and completeness of the financial, accounting, tax and other information provided to or discussed with it by the Debtors or obtained by it from public sources. Goldman has not assumed any responsibility for the independent verification of any such information, including without limitation, the Financial Projections and has further relied upon the assurances of the senior management of the Debtors that they are unaware of any facts that would make the information and the Financial Projections incomplete or misleading in any respect. Goldman has not audited, reviewed or compiled the accompanying information in accordance with Generally Accepted Accounting Principles ("**GAAP**") or otherwise. With respect to the Financial Projections furnished by the Debtors, Goldman has assumed that such Financial Projections have been reasonably prepared and reflect the best currently available estimates and judgments of the senior management of the Debtors as to the expected future performance of the Debtors. Goldman did not undertake, and has no responsibility to update, revise or reaffirm the Valuation, including as a result of data, circumstances, developments or events occurring after July 7, 2009, the date of the Valuation.

In preparing the Valuation, Goldman relied upon the Financial Projections and the assumptions upon which the Financial Projections were prepared, including: (i) the Effective Date occurs on or about September 30, 2009; (ii) the Debtors are able to recapitalize and have adequate liquidity as of the Effective Date and for the foreseeable future; (iii) the Debtors are able to implement the Plan in the manner described herein; (iv) the impact on value of any Net Operating Losses ("**NOLs**") surviving as of the Effective Date is negligible, because of the lack of taxable income in the foreseeable future; (v) the applicable cash tax rate will be equal to the accounting tax rate of 37.55% for the Reorganized Debtors; and (vi) general financial and market conditions and the financial and market outlook specifically for the "Chronic Care" and "Home Medical Supply" industries in which the Debtors operate as of the Effective Date will not differ, in any way meaningful to the Valuation, from the conditions prevailing as of July 7, 2009, the date of Goldman's analysis.

Goldman has employed generally accepted valuation techniques in estimating the TEV of the Reorganized Debtors. Goldman primarily relied upon a comparable public company analysis ("**Comparable Public Company Analysis**"), transaction comparable analysis ("**Transaction Comparable Analysis**") and a discounted cash flow ("**DCF**") analysis to value the Debtors. Goldman believes that these valuation methodologies reflect both the market's current view, as well as a longer term focus, on the value of the Debtors.

1. Comparable Public Company Analysis

In a Comparable Public Company Analysis, a subject company is valued by comparing it with selected publicly held companies in reasonably similar lines of business. The comparable public companies are chosen based on, among other attributes and factors, their similarity to the subject company's size, profitability, competitive and reimbursement pressures and market presence. The price that investors are willing to pay in the public markets for each company's publicly traded securities represents the market's value of that company's current and future prospects as well as the rate of return required on the investment.

In selecting comparable public companies for the Debtors, Goldman considered multiple factors, including, among other things, the focus of the comparable companies' businesses as well as such companies' current and projected operating performance. Goldman predominantly relied on comparable companies in the home health industry. Numerous financial multiples and ratios were developed to measure each company's valuation and relative performance. Some of the specific analyses entailed comparing the enterprise value (defined as market value of equity plus market value of debt, market value of preferred stock and minority interest minus excess cash) for each of the comparable public companies to their projected EBITDA. These multiples were calculated and were then applied to the Financial Projections to determine the range of enterprise value and equity value for the Reorganized Debtors using this methodology. In performing the Comparable Public Company Analysis, Goldman relied upon the Financial Projections as they relate to the Reorganized Debtors and various publicly available analyst reports relating to the current and projected operating performance, including projected EBITDA, of the comparable public companies.

2.    Transaction Comparable Analysis

Goldman also utilized a Transaction Comparable Analysis to determine the TEV of the Reorganized Debtors. The Transaction Comparable Analysis approach entails calculating EBITDA multiples based upon implied values (including any debt assumed and equity purchased) in change of control transactions of companies determined to be similar to a particular subject company. These multiples are then applied to the subject company projections to determine an implied range of enterprise values. In performing the Transaction Comparable Analysis, Goldman evaluated various public merger and acquisition transactions that have occurred in the "Chronic Care" and "Home Health" industries over the past several years. In determining the appropriate transactions to use in the analysis, Goldman limited the comparable transactions to those having occurred following the announcement in January 2008 of the enactment of competitive bidding for diabetes products.

3.    DCF Analysis

Goldman also utilized a DCF analysis to determine the TEV of the Reorganized Debtors. The discounted cash flow of an enterprise represents the present value of unleveraged, after-tax cash flows available to all providers of capital using an appropriate set of discount rates. The DCF analysis takes into account the projected operating cash flows of the subject company by using company projections as the basis for the financial model. The underlying concept of the DCF analysis is that debt-free, after-tax cash flows are estimated for a projection period and a terminal value is estimated to determine the going concern value of the subject company at the end of the projection period. These cash flows and terminal value are then discounted at an assumed weighted average cost of capital, which is determined pursuant to the capital asset pricing model (the "**CAPM**"), a financial theory which assumes a linear relationship between risk and return, widely used in estimating cost of capital for DCF valuation purposes.

In performing the calculation, Goldman made assumptions in order to determine: (i) a range of estimates for the Reorganized Debtors weighted average cost of capital (the "**WACC**"), which is used to discount projected unlevered cash flows; and (ii) a range of

EBITDA exit multiples, which is used to determine a range of "terminal" values for the enterprise after the end of the projection period and is equivalent to assuming a range of perpetuity growth rates for the unlevered free cash flow in the last year of the projections. In performing this WACC analysis, Goldman used a range of discount rates (the "**Discount Rates**") that reflect a number of company and market-specific factors utilized under the CAPM, including business execution risk and the nature and derivation of the Financial Projections, as well as the cost of equity and current cost of debt at the target capitalization for companies that Goldman deemed comparable. Goldman used a range of Discount Rates between 10% and 12% and assumed a debt to capitalization rate of 33.

(2)    Valuation.

As a result of such analyses, review, discussions, considerations and assumptions (all as of July 7, 2009), Goldman provided to the Debtors an estimate that, as of the Effective Date, the TEV range (the "**TEV Range**") of the Debtors is approximately $230 million to $286 million.

The above estimated TEV Range represents hypothetical values that reflect the estimated intrinsic values of the Debtors derived through the application of the above-described valuation methodologies. Upon consideration of the aforementioned valuation methodologies, Goldman estimates that, upon confirmation of the Plan and the occurrence of the Effective Date, estimated net debt of the Debtors will not exceed TEV, and accordingly, there will be equity value for the Debtors. Goldman's estimates are based on economic, market, financial and other conditions as they existed, and on the information made available to Goldman, as of July 7, 2009.

The summary set forth above does not purport to be a complete description of the valuation analyses performed by Goldman. The preparation of an estimated TEV Range involves various determinations as to the most appropriate and relevant methods of financial analysis and the application of these methods in the particular circumstances and, therefore, such an estimate is not readily susceptible to summary description. The value of an operating business is subject to uncertainties and contingencies that are difficult to predict and will fluctuate with changes in factors affecting the financial results, financial condition and prospects of such a business. As a result, any estimates of TEV Range and/or implied equity values set forth herein are not necessarily indicative of actual outcomes. In addition, estimates of TEV Range and implied equity value do not purport to be appraisals, nor do they necessarily reflect the values that might be realized if assets were sold. The estimates prepared by Goldman assume that, upon confirmation of the Plan and occurrence of the Effective Date, the Reorganized Debtors and their subsidiaries will own and operate all or substantially all of the Debtors' businesses and assets and will continue as the owners and operators of such businesses and assets. Depending on the results of such operations or changes in the financial markets, actual TEV and/or actual equity value may differ significantly from the Valuation. Because such estimates are inherently subject to uncertainties, neither the Debtors, Goldman nor any other party assumes responsibility for their accuracy.

- 72 -

In addition, the valuation of newly issued securities is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities also may be affected by the Reorganization Cases or by other factors not possible to predict. The enterprise value ascribed in the analysis does not purport to be an estimate of the post reorganization market trading value.

(c)     Best Interests Test.

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Claims in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the assets and properties of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the liquidation case. Such Cash amount would be reduced by the costs and expenses of liquidation and such additional administrative claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts (including vendor and customer contracts) assumed or entered into by the Debtors prior to the filing of the chapter 7 case.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties that each such Class would receive, after subtracting the amounts attributable to the above, must be compared with the value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Debtors' Reorganization Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in claims that would arise from a discontinuation of the Debtors' business, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Debtors under chapter 7. It is likely that distribution of the proceeds of the liquidation could be delayed for at least two years after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

- 73 -

Alvarez & Marsal Healthcare Industry Group, LLC, with the assistance of the Debtors, has prepared a liquidation analysis which is annexed hereto as <u>Exhibit 4</u> (the "**Liquidation Analysis**"). The information set forth in <u>Exhibit 4</u> provides (a) a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates, (b) the allocation to each Class of such value in a liquidation, and (c) the expected recoveries of the Debtors' creditors and equity interest holders under the Plan.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors', are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated. The chapter 7 liquidation period is assumed to average six to nine months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

**7.3** *Classification of Claims and Interests.*

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code.

**7.4** *Consummation.*

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in the Plan, have been satisfied or waived pursuant to the Plan. For a more detailed discussion of such conditions precedent and the consequences of the failure to meet such conditions, see Article VI herein.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

**ARTICLE VIII.**

**<u>ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN</u>**

If the Plan is not consummated, the Debtors' capital structure will remain over leveraged and the Debtors will remain unable to service their debt obligations or to cure the

alleged defaults thereunder. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

## 8.1 Liquidation Under the Bankruptcy Code.

The Debtors could be liquidated under chapter 7 or 11 of the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VII of this Disclosure Statement. The Debtors believe that liquidation would result in lower aggregate distributions being made to creditors than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article VII and attached as Exhibit 4 of this Disclosure Statement.

## 8.2 Alternative Plan(s) of Reorganization.

The Debtors believe that failure to confirm the Plan will lead inevitably to expensive and protracted Reorganization Cases. In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process involving many different parties with widely disparate interests. The Debtors will continue to consider any proposal for the sale of the Debtors' assets that provides the best opportunity to maximize value for the Debtors.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of holders of Claims and enable the stakeholders to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## 8.3 Dismissal of the Debtors' Reorganization Cases.

Dismissal of the Debtors' Reorganization Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Debtors' Reorganization Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Debtors' Reorganization Cases may permit acceleration of the obligations of certain of the Debtors under the First Lien Credit Agreement, the Second Lien Credit Agreement and the PIK Credit Agreement in accordance with their respective terms. Moreover, the First Lien Lenders and the Second Lien Lenders may be

permitted to foreclose upon the assets that are subject to their Liens, which is a substantial portion of the Debtors' assets and almost all of their Cash. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to obtain financing and could lead ultimately to the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Reorganization Cases is not a viable alternative to the Plan.

## ARTICLE IX.

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all Exhibits hereto, together with the related materials included herewith, is being furnished to the holders of Claims in Classes 1 – 6, which Classes are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the ballot (the "**Ballot**") enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed August 20, 2009 at 4:00 p.m. (Prevailing Eastern Time) as the Voting Record Date. Ballots must be RECEIVED by the Voting Agent no later than 4:00 p.m. (Prevailing Eastern Time) on September 15, 2009, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (Prevailing Eastern Time) on such extended date.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot. A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to the Voting Agent.

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to the Voting Agent. To be effective, notice of revocation or withdrawal must: (i) be received on or before the Voting Deadline by the Voting Agent at its address specified on the back cover of this Disclosure Statement; (ii) specify the name of the holder of the Claim whose vote on the Plan is being withdrawn or revoked; (iii) contain the description of the Claim as to which a vote on the Plan is being withdrawn or revoked; and (iv) be signed by the holder of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot. The foregoing procedures should also be followed with respect to a person entitled to vote on the Plan who wishes to change (rather than revoke or withdraw) its vote.

# ARTICLE X.

## DESCRIPTION AND HISTORY OF REORGANIZATION CASES

**10.1**   *General Case Background.*

On July 8, 2009, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  On July 9, 2009, the Bankruptcy Court entered an order (Docket No. 33) authorizing the joint administration of the Reorganization Cases, for procedural purposes only, under Case No. 09-12390 (CSS).  The Honorable Christopher S. Sontchi is presiding over the Reorganization Cases.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no request has been made for the appointment of a trustee or examiner in these cases.

The following is a brief description of certain significant events that have occurred during the pendency of the Reorganization Cases.

**10.2**   *Retention of Professionals.*

(a)   Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP.

To assist them in carrying out their duties as debtors in possession, and to otherwise represent their interests in the Reorganization Cases, the Debtors, on the Commencement Date, filed with the Bankruptcy Court applications [Docket Nos. 20 and 47 (respectively)] seeking entry of an order authorizing the Debtors to retain Willkie Farr & Gallagher LLP and Young Conaway Stargatt & Taylor, LLP as their bankruptcy co-counsel.  On July 24, 2009, the Bankruptcy Court entered orders [Docket Nos. 96 and 94 (respectively)] approving these retentions.

(b)   Goldman Sachs & Co., LLC.

To assist them in carrying out their duties as debtors in possession, and to provide certain analyses in connection with this Disclosure Statement and confirmation of the Plan, the Debtors filed with the Bankruptcy Court an application [Docket No. 104] seeking entry of an order authorizing the Debtors to retain Goldman Sachs & Co., LLC as their financial advisors.  On August 12, 2009, the Bankruptcy Court entered an order [Docket No. 140] approving the retention of Goldman Sachs.

(c)   Alvarez & Marsal Healthcare Industry Group, LLC.

In addition, the Debtors, on the Commencement Date, filed with the Bankruptcy Court an application [Docket No. 22] seeking entry of an order authorizing the Debtors to engage Alvarez & Marsal Healthcare Industry Group, LLC as restructuring advisors to the Debtors.  On July 24, 2009, the Bankruptcy Court entered an order [Docket No. 95] approving the retention of Alvarez & Marsal Healthcare Industry Group, LLC.

- 77 -

(d)    Epiq Bankruptcy Solutions, LLC.

On the Commencement Date, the Debtors filed with the Bankruptcy Court an application [Docket No. 6] seeking entry of an order pursuant to 28 U.S.C. § 156(c) authorizing the Debtors to retain Epiq Bankruptcy Solutions, LLC as the Bankruptcy Court's claims, noticing, and balloting agent, which was approved by court order, dated July 9, 2009 [Docket No. 43].

(e)    Ordinary Course Professionals.

In addition, the Debtors, on the Commencement Date, filed with the Bankruptcy Court a motion [Docket No. 19] seeking authority to employ approximately 34 professionals, utilized in the ordinary course of the Debtors' business, to assist the Debtors in their day-to-day business operations.  On July 24, 2009, the Bankruptcy Court entered an order [Docket No. 97] authorizing the Debtors to employ 34 professionals utilized in the ordinary course of the Debtors' business.

**10.3    *Employment Obligations.***

The Debtors believe they have a valuable asset in their workforce, and that the efforts of the Debtors' employees are critical to a successful reorganization.  On the Commencement Date, July 8, 2009, the Debtors filed with the Bankruptcy Court a motion [Docket No. 11] for an order authorizing the Debtors to pay certain prepetition employee wage and benefit obligations, which was approved by the Bankruptcy Court on July 9, 2009 [Docket No. 34].

**10.4    *Continuing Supplier Relations.***

The Debtors believe that good relationships with their vendors, suppliers and customers are necessary to the continuity of the Debtors' business operations during the Reorganization Cases.  On the Commencement Date, the Debtors filed with the Bankruptcy Court a motion [Docket No. 14] seeking entry of an order authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain suppliers that are critical to the Debtors' ongoing business operations and certain priority vendors of goods entitled to administrative priority pursuant to section 503(b) of the Bankruptcy Code, which was approved by the Bankruptcy Court on July 9, 2009 [Docket No. 39].

In addition, on the Commencement Date, the Debtors filed with the Bankruptcy Court a motion [Docket No. 13] seeking entry of an order authorizing the Debtors to continue certain prepetition customer and advertising programs, and satisfy, in the ordinary course of business, certain prepetition claims arising from such programs, which was approved by Bankruptcy Court order, dated July 9, 2009 [Docket No. 40].

**10.5    *Common Carrier and Warehousing Relations.***

The Debtors believe that it is essential for their continuing business viability and the success of their restructuring efforts that they maintain a reliable and efficient flow of

- 78 -

supplies and inventory, and that they have the means to continue their marketing and sales procedures in the ordinary course. On the Commencement Date, the Debtors filed with the Bankruptcy Court a motion [Docket No. 12] seeking entry of an order authorizing the Debtors to pay, in the ordinary course of business, prepetition claims of certain warehouse operators and common carriers that are critical to the Debtors' ongoing business operations, which was approved by Bankruptcy Court order, dated July 9, 2009 [Docket No. 41].

**10.6   *Stabilization of Debtors' Business Operations.***

(a)   Cash Management.

The Debtors believed it would be disruptive to their operations if they were forced to change significantly their cash management system upon the commencement of the Reorganization Cases. Accordingly, on the Commencement Date, the Debtors filed with the Bankruptcy Court a motion (Docket No. 8) seeking entry of an order authorizing the Debtors to maintain their current cash management system, which was approved by Bankruptcy Court order, dated July 10, 2009 [Docket No. 48].

(b)   Debtor in Possession Financing.

The Debtors believed that they may not have been able to meet their ongoing postpetition obligations unless they were authorized to obtain Debtor in Possession Financing and use cash claimed as part of their collateral by the First Lien Lenders and Second Lien Lenders (the "**DIP Motion**"). On the Commencement Date, the Debtors filed with the Bankruptcy Court a motion seeking approval of a proposed interim final order authorizing the Debtors to obtain Debtor in Possession Financing and use cash claimed as part of their collateral by the First Lien Lenders and Second Lien Lenders Docket No. 16, which was approved by an interim court order, dated July 9, 2009 [Docket No. 36]. A final order [Docket No. 108] approving the relief requested in the DIP Motion was entered by the Bankruptcy Court on July 27, 2009.

(c)   Certain Insurance Matters.

In connection with the operation of their businesses, the Debtors maintain various workers' compensation and other insurance programs. The Debtors believed that their estates could be irreparably harmed if they were not permitted to make certain finance, premium, deductible and other payments in connection with their insurance policies. Accordingly, on the Commencement Date, the Debtors filed with the Bankruptcy Court a motion seeking entry of an order authorizing the Debtors to maintain certain insurance policies and to make certain related finance, premium, deductible and other payments in their discretion on an uninterrupted basis, in accordance with the Debtors' prepetition practices [Docket No. 15],which was approved by court order, dated July 9, 2009 [Docket No. 38].

**10.7   *Utilities.***

On the Commencement Date, the Debtors filed with the Bankruptcy Court a motion [Docket No. 9] for interim and final orders: (a) prohibiting utilities from altering or

- 79 -

discontinuing services; (b) establishing procedures for establishing reserves for utility payments; (c) deeming utility companies to have adequate assurance of payment; and (d) establishing procedures for resolving requests for additional assurance of payment (the "**Utilities Motion**"), which was approved by interim court order, dated July 9, 2009 [Docket No. 35]. A final order [Docket No. 107] approving the relief requested in the Utilities Motion was entered by the Bankruptcy Court on July 27, 2009.

**10.8** *Schedules, Statements and Bar Date.*

      (a)    Schedules and Statements.

      On the Commencement Date the Debtors filed a motion seeking to extend the deadline by which whey were required to file with the Bankruptcy Court their Schedules of Assets and Liabilities (collectively, the "**Schedules**") and Statement of Financial Affairs (collectively, the "**SOFAS**"), which request was approved by the Bankruptcy Court on July 9, 2009 [Docket No. 42]. On August 18, 2009, each of the Debtors filed their Schedules and SOFAS in their respective Cases. The Schedules and SOFAS for CCS Medical Inc. were filed as Docket No. 169.

      (b)    Bar Date.

      The Debtors also intend to shortly file with the Bankruptcy Court a motion requesting that the Bankruptcy Court fix a date as the date by which proofs of claim are required to be filed in the Reorganization Cases for all creditors other than governmental units (the "**General Bar Date**"), and a date for the filing of proofs of claim by a governmental unit.

## ARTICLE XI.

## GOVERNANCE OF REORGANIZED DEBTORS

**11.1** *Board of Directors and Management.*

      (a)    Reorganized Issuer's Board.

      On the Effective Date, the Board of Reorganized Issuer shall have seven (7) members, to be appointed as follows:

      (a) the Chief Executive Officer of Reorganized Issuer shall be a director; (b) two directors shall be appointed by certain institutional funds affiliated with Highland Capital Management, L.P. (collectively, "**Highland Institutional**"); (c) two directors shall be appointed by certain retail funds affiliated with Highland Capital Management, L.P. (collectively, "**Highland Retail**"); (d) one director shall be appointed by a fund affiliated with Eos Partners, L.P. ("**Eos**"); and (e) one independent director shall be appointed by the majority vote of the First Lien Lenders other than Highland Institutional, Highland Retail, Eos and their respective affiliates.

Thereafter, if at any time (i) either Highland Institutional or Highland Retail individually own New Common Stock constituting less than 10% but more than or equal to 5% of the aggregate amount of New Common Stock issued on the Effective Date, then Highland Institutional or Highland Retail, as the case may be, shall thereafter be entitled to appoint only one director and the vacancy created thereby shall be filled as set forth below; or (ii) either Highland Institutional, Highland Retail or Eos individually own New Common Stock constituting less than 5% of the aggregate amount of New Common Stock issued on the Effective Date, then Highland Institutional, Highland Retail or Eos, as the case may be, shall thereafter no longer be entitled to appoint any directors and the vacancy created thereby shall be filled as set forth below (but Highland Institutional, Highland Retail and/or Eos, as the case may be, will be entitled to vote for directors otherwise subject to majority vote of all holders of New Common Stock).

Directors appointed to fill vacancies created as a result of the immediately preceding paragraph shall be appointed by a majority of the holders of the new Common Stock.

The members of the Board and initial officers of Reorganized Issuer and the other Reorganized Debtors shall be the individuals identified in the Plan Supplement. The existing Board of CCS shall be deemed to have resigned on and as of the Effective Date.

(b)     Post-Effective Date Management Equity Plan.

Pursuant to the Management Equity Plan, up to 10% of the equity of Reorganized Issuer shall be reserved for the Board of Reorganized Issuer to grant options to purchase New Common Stock or restricted stock (in each case to the extent permitted by applicable law) to members of the Board of Reorganized Issuer and to the management of the Reorganized Debtors. The Management Equity Plan will contain terms and conditions (including the form of equity grant) as determined by the Reorganized Board.

(c)     Post-Effective Date Management Agreements.

On the Effective Date, the Reorganized Debtors shall execute the Management Agreements, the substantially final forms of which shall be included in the Plan Supplement, which shall be filed at least five (5) Business Days prior to the Confirmation Hearing. The Management Agreements will cover the period commencing on the Effective Date of the Plan, and shall include the reasonable, customary and appropriate severance and other compensation of the management of the Reorganized Debtors.

## 11.2   *Indemnification of Directors and Officers.*

The Amended Certificate of Incorporation and the certificates or articles of incorporation or organization of the Reorganized Debtors will authorize the Reorganized Debtors to indemnify and exculpate their respective officers, directors or managers and agents to the fullest extent permitted under applicable law.

**11.3    *New Stockholder and Registration Rights Agreement.***

Reorganized Issuer shall be authorized and directed to enter into and consummate the transactions contemplated by the New Stockholder and Registration Rights Agreement and such documents, and any agreement or document entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by the New Stockholder and Registration Rights Agreement).

**11.4    *Warrants.***

Reorganized Issuer shall be authorized and directed to enter into and consummate the transactions contemplated by the New Warrant Agreement (as shall be set forth in the Plan Supplement) and such documents, and any agreement or document entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by the New Warrant Agreement).

**11.5    *The Credit Agreements.***

On the Effective Date, the Reorganized Debtors shall be authorized to enter into the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility, the terms of which will be no less favorable to the Reorganized Debtors than those that are set forth on the exhibits to the Plan, as well as execute, deliver, file, record and issue any notes, documents, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility or the New Revolving Credit Facility).

## ARTICLE XII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

**12.1    *Certain Bankruptcy Considerations.***

(a)    General.

While the Debtors believe that the Reorganization Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed.

- 82 -

Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' businesses. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors and suppliers, customers and employees. The proceedings will also involve additional expenses and may divert some of the attention of the Debtors' management away from the operation of the businesses.

The extent to which bankruptcy proceedings disrupt the Debtors' businesses will likely be directly related to the length of time it takes to complete the proceedings. If one or more of the Debtors is unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, it may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

(b)     Failure to Receive Requisite Acceptances.

If the Requisite Acceptances are not received, one or more of the Debtors may not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one Impaired class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. If the Requisite Acceptances are not received, one or more of the Debtors may seek to accomplish an alternative restructuring of its capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization, or otherwise, that may not have the overwhelming support of the Consenting Holders and/or may be required to liquidate these estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

(c)     Failure to Confirm the Plan.

Even if the Requisite Acceptances are received, the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may decide not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors, and that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan meets such test, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the Solicitation must comply with the requirements of section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period and the adequacy of the information contained in this Disclosure Statement.

(d)     Failure to Consummate the Plan.

One condition to consummation of the Plan is the entry of the Confirmation Order which will approve, among other things, the assumption of the majority of the Debtors'

- 83 -

executory contracts and unexpired leases and the execution of the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility. There can be no assurance that these or other conditions to consummation will be satisfied (or waived). Even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

(e)    Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(f)    Size and Amount of Allowed Claims and Interests.

While the Debtors believe that they have accurately estimated the size and amount of the claims that may be asserted against the Debtors, there may be Claims and Interests that the Debtors may not be aware of or that may not be discharged as a result of these Reorganization Cases. To that end, to the extent the size and amount of the Allowed Claims and Allowed Interests are greater than the Debtors estimated, recoveries on such Claims and Interests may be different than the estimates proposed herein. There can be no assurance that the size and amount of Allowed Claims and Interests will not be less than or greater than the size and amounts estimated herein.

**12.2    *Risks Relating to the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility, the New Common Stock and the Warrants.***

(a)    Variances from Financial Projections.

The Financial Projections included as <u>Exhibit 5</u> to this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the Reorganized Debtors, and which may not materialize. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the actual financial results of the Debtors and the Reorganized Debtors. Therefore, the actual results achieved throughout the projection period necessarily will vary from the projected results, and these variations may be material and adverse. Moreover, the Debtors continue to explore the sale of one or more lines of business. The occurrence of such sale (whether prior to or after the Effective Date) could have a material impact on the Financial Projections.

- 84 -

(b)     Substantial Leverage; Ability to Service Debt.

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have substantial indebtedness. On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will, on a consolidated basis, have (i) approximately $150 million in secured indebtedness under the Reorganized First Lien Term Loan Facility, (ii) approximately $50 million in secured indebtedness under the Reorganized Second Lien Term Loan Facility, and (iii) up to $35 million in secured indebtedness under the New Revolving Credit Facility.

**The degree to which the Reorganized Debtors will be leveraged could have important consequences because:**

- it could affect the Reorganized Debtors' ability to satisfy their obligations under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility and the Reorganized Debtors' other obligations;

- a substantial portion of the Reorganized Debtors' cash flow from operations will be dedicated to debt service and unavailable to support operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- the Reorganized Debtors' ability to obtain additional financing in the future may be limited;

- the Reorganized Debtors may be more highly leveraged than some of their competitors, which may place the Reorganized Debtors at a competitive disadvantage;

- the Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business may be limited; and

- it may make the Reorganized Debtors more vulnerable in the event of a downturn in their business or the economy in general.

The Reorganized Debtors' ability to make payments on and to refinance their debt, including the obligations under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility and the Reorganized Debtors' other obligations, will depend on their ability to generate cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

There can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations, including, among other obligations, the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility. The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the

- 85 -

Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

### (c) Identity of Issuer of New Common Stock and Warrants.

The identity of the issuer of the New Common Stock and the Warrants has yet to be determined. Although the Debtors currently expect that the issuer of the New Common Stock and the Warrants will be Reorganized Holdings, subject to the consent of the Required Consenting Holders, the Debtors have the right under the Plan to designate another Reorganized Debtor to be the issuer of the New Common Stock and the Warrants. The Debtors will exercise such designation right if, among other things, the Plan is not confirmed as to Holdings or if any tax or other benefits warrant such designation.

### (d) Significant Holders.

Under the Plan, it is contemplated that the First Lien Lenders will receive one hundred percent (100%) of the New Common Stock. The First Lien Lenders will be in a position to control the outcome of actions requiring stockholder approval, including the election of directors, and their interests might conflict with interests of other constituents of the Reorganized Debtors.

### (e) Obligations Under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility.

The Reorganized Debtors' obligations under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility will be secured by substantially all of the assets of the Reorganized Debtors. If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility or the New Revolving Credit Facility, and payment on any obligation thereunder is accelerated, the lenders under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility would be entitled to exercise the remedies available to a secured lender under applicable law, and they would have a claim on the assets securing the obligations that would be superior to any claim of the holders of unsecured debt.

### (f) Restrictive Covenants.

The Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility will contain various covenants which may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, make certain investments or acquisitions, pay dividends or sell, transfer, lease or otherwise dispose of certain assets. In addition, it is expected that the Reorganized First Lien Term Loan Facility will require the Reorganized Debtors to meet certain financial covenants set forth in the Plan.

Any failure to comply with the restrictions of the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility or any other subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the Reorganized Debtors are unable to repay amounts outstanding under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility or the New Revolving Credit Facility when due, the lenders thereunder could, subject to the terms of the relevant agreements, seek to foreclose on the collateral which is pledged to secure the indebtedness outstanding under such facilities. Substantially all of the assets of the Reorganized Debtors will be pledged as security under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility.

(g)     Lack of Trading Market.

It is anticipated that there will be no active trading market for the New Common Stock. Reorganized Issuer has no present intention to register any of the Plan Securities (as defined below) under the Securities Act, nor to apply to list any of the foregoing on any national securities exchange. Accordingly, there can be no assurance that any market will develop or as to the liquidity of any market that may develop for any such Plan Securities. In addition, Reorganized Issuer will not be required to file reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

(h)     Restrictions on Transfer.

Holders of Plan Securities (as defined below) who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell such Plan Securities. These Persons will be permitted to transfer or sell such Plan Securities only pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration statement under the Securities Act, or (c) the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. Reorganized Issuer has no current plans to register any of the Plan Securities under the Securities Act or under equivalent state securities laws such that the recipients of the New Common Stock would be able to resell their securities pursuant to an effective registration statement. Moreover, Reorganized Issuer does not currently intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of Plan Securities to avail themselves of Rule 144.

The New Stockholder and Registration Rights Agreement, the New Warrant Agreement, and the Amended Certificate of Incorporation will contain restrictions on stockholders' ability to transfer the New Common Stock. The summary of these documents contained herein is qualified in its entirety by the Plan and the applicable Plan Documents. The New Stockholder and Registration Rights Agreement and the Amended Certificate of Incorporation may restrict certain transfers of New Common Stock. Furthermore, these documents may restrict transfers that would result in the New Common Stock of Reorganized

Issuer being held of record by more than 500 persons, unless such transfer is otherwise approved by the board of directors. The New Stockholder and Registration Rights Agreement shall provide for customary rights and obligations, including without limitation, pre-emptive rights, rights of first refusal and co-sale rights (drag and tag), demand, and piggyback registration rights, independent director approval on affiliate transactions, modifications of the reorganized Debtors' organizational documents (including the New Stockholder Agreement and Registration Rights Agreement), and other such terms and conditions as mutually agreed upon by the Debtors and the Required Consenting Holders.

All certificates for shares of the New Common Stock shall conspicuously bear the following legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES LAWS AND MAY NOT BE SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT OF 1933, AS AMENDED, OR AN EXEMPTION THEREFROM AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

In addition, all certificates for shares of New Common Stock shall conspicuously bear the following legend:

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VARIOUS CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE CORPORATION'S CERTIFICATE OF INCORPORATION, AS AMENDED (THE "CERTIFICATE OF INCORPORATION"), AND THE STOCKHOLDERS' AGREEMENT DATED AS OF [_____], 2009 AMONG THE CORPORATION AND THE STOCKHOLDERS NAMED THEREIN, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS' AGREEMENT"). NO REGISTRATION OR TRANSFER OF THESE SHARES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF THE SHARES REPRESENTED BY THIS CERTIFICATE A COPY OF THE CERTIFICATE OF INCORPORATION AND STOCKHOLDERS' AGREEMENT, CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF

STOCK, UPON WRITTEN REQUEST TO THE
CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS.

*See* Article XIII *"Securities Law Matters"* for additional information regarding restrictions on resales of the Plan Securities (as defined below).

    (i)    The Valuation of New Common Stock is Not Intended to Represent the Trading Value of the New Common Stock.

The Valuation of the Reorganized Debtors, set forth in Section 7.2(b) herein prepared by Goldman based on the Financial Projections, is based on the assumption that the First Lien Lenders will receive one hundred percent (100%) of the issued New Common Stock in Reorganized Issuer in full and final satisfaction of their Claims and is not intended to represent the trading values of New Common Stock in public or private markets.

    (j)    Dividend Policies.

All of the Reorganized Debtors' cash flow will be required to be used in the foreseeable future (a) to make payments under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility, (b) to fund the Reorganized Debtors' other obligations under the Plan, and (c) for working capital and capital expenditure purposes. Accordingly, Reorganized Issuer does not anticipate paying cash dividends on the New Common Stock in the foreseeable future.

    (k)    Registration Implications.

By virtue of the treatment accorded to holders of Allowed General Unsecured Claims and depending on the number of such holders who elect to receive their Pro Rata Share of the Warrant Pool in lieu of Cash, there is the risk that there may be 500 or more holders of New Common Stock at the Effective Date or at any point thereafter (determined pursuant to the Exchange Act). Accordingly, Reorganized Issuer would be required to register and comply with the reporting obligations under the Exchange Act. Such obligations are costly and would impose an administrative burden on Reorganized Issuer.

**12.3**     *Risks Relating to Tax and Accounting Consequences of the Plan.*

    (a)    Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the Internal Revenue Service (the "**IRS**") on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. *Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors*

                                                                          

*have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.*

(b)     Use of Historical Financial Information.

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors believe they will be subject to the fresh-start accounting rules. Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued. This process is guided by purchase price allocation standards under GAAP.

**12.4     *Risks Associated with the Business.***

(a)     The Debtors' Reorganization Cases May Negatively Impact Their Future Operations.

While the Debtors believe they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtors' emergence from chapter 11. Additionally, notwithstanding the support of their largest creditors, the Reorganization Cases may adversely affect the Debtors' ability to retain existing customers, attract new customers and maintain contracts that are critical to its operations.

(b)     The Debtors Operate in an Industry that is Subject to Price Competition.

In all of the Debtors' product and service lines, the Debtors face strong competition from companies both large and small, located in the United States and abroad, on factors including quality of care and service, reputation within the healthcare community, scope of products and services, geographical scope and price. The Debtors operate in an industry that is subject to price competition, which has created downward pressure on pricing that may adversely affect the Debtors' business or their ability to meet their financial obligations. If price competition continues, the Debtors may have to change their practices or modify their services in order to reduce costs. In addition, in the event that the Debtors change their practices or modify their services, the Debtors' relationships with healthcare professionals and the patients they serve may suffer or their results of operations may be adversely affected.

(c)     Medicare Competitive Bidding for Durable Medical Equipment Suppliers May Adversely Affect the Debtors' Business.

MMA provides for a national phased-in program for competitive bidding of certain durable medical equipment items, which may include mail-order diabetes testing supplies such as those sold by the Debtors. MIPPA, temporarily delayed the implementation of Round 1 of the program and also decreased reimbursement for the competitively bid product categories, including mail-order diabetes testing supplies, by 9.5% starting January 1, 2009. In January 2009, The Centers for Medicare and Medicaid Services ("**CMS**") published a regulation implementing the provisions of the MIPPA regarding competitive bidding. These regulations became final on April 18, 2009 and on June 4, 2009, CMS announce a "tentative" timeline for a new Round 1 Rebid. Bidding is expected to begin in late 2009, although implementation of the

- 90 -

Round 1 Rebid may not begin until January 2011. The MMA also contemplates a Round 2 of the program but a timeline has yet to be announced. A competitive bidding program such as the program contemplated by the MMA could negatively affect the Debtors' operating results as a result of lower reimbursement rates for competitively bid items and/or the Debtors' failure to secure status as contracted suppliers.

The MMA also gave CMS the additional authority, beginning in 2009, to use pricing information that it gathers during the initial competitive bidding phases for the purposes of establishing reimbursement rates in geographic areas that are not subject to competitive bidding. The MIPPA requires CMS to issue further guidance on whether and how it intends to use this authority through the formal rulemaking process, and delays the earliest implementation date to 2011. The Debtors' operating results may be negatively affected if CMS uses this authority to impose lower reimbursement rates in geographic areas that would otherwise not have been impacted by competitive bidding. In addition, many non-Medicare private and governmental insurance plans base their reimbursement rates on Medicare rates. Accordingly, a decrease in Medicare reimbursement rates may lead to a corresponding decrease in the reimbursement rates of non-Medicare private and governmental insurance plans, which, in turn, may adversely affect the Debtors' business.

> (d) The Debtors are Highly Dependent on Payments from Third-Party Healthcare Payors, Including Medicare, Medicaid and Other Government Sponsored Programs, and the Uncertainty of Third-Party Reimbursement May Adversely Affect the Debtors' Business.

A substantial portion of the Debtors' revenue is derived from third-party private and governmental payors including Medicare, Medicaid and other government sponsored programs. These third-party payors exercise significant control over patient access and increasingly use their enhanced bargaining power to secure discounted rates and other requirements that may increase the cost of service. If third-party payors do not approve the Debtors' products for reimbursement or fail to reimburse them adequately, sales will suffer as some physicians or their patients will opt for a competing product that is covered for reimbursement or has a lower patient responsibility payment. Even if third-party payors make reimbursement available, such reimbursement may not be adequate or these payors' reimbursement policies may adversely affect the Debtors' ability to achieve profitability. The Debtors' sales will continue to depend, in part, upon the extent to which coverage of and reimbursement for their products will be available from government health administration authorities, private health insurers, health maintenance organizations and other third-party payors.

In addition, certain estimates are required to record the Debtors' net revenues and accounts receivable at their net realizable values as a result of the nature of the industry and reimbursement environment in which the Debtors operate. Due to the continuing changes in this industry and reimbursement environment, the Debtors' estimates could change by a material amount in the near term, which could have an impact on their operations and cash flows.

DB02:8632234.1

068347.1001

(e)    Reductions in Reimbursement Rates for the Debtors' Products Could Adversely Affect Their Business and Results of Operations.

Sales of a significant portion of the Debtors' diabetes products and medical supplies depend largely on whether levels of reimbursement from government healthcare programs, such as Medicare and Medicaid, and private payors will be adequate. Healthcare professionals may not use or prescribe the Debtors' products, and patients may not purchase the Debtors' products, if these third-party payors do not provide reimbursement for the costs of the Debtors' products. Consequently, the Debtors may be unable to sell their products on a profitable basis if third-party payors deny coverage or reduce their current levels of reimbursement. Third-party payors continually review their coverage policies carefully for existing and new therapies and can, without notice, deny coverage for treatments that include the use of the Debtors' products or if the patient responsibility is excessive. For example, Medicare frequently engages in efforts to contain costs, which may result in a reduction of coverage of, and reimbursement for, the Debtors' products. Because many private payors model their coverage and reimbursement policies on Medicare policies, third-party payors' coverage of, and reimbursement for, the Debtors' products could be negatively impacted by legislative, regulatory or other measures that reduce Medicare coverage and reimbursement generally. Furthermore, the Centers for Medicare & Medicaid Services could invoke its inherent reasonableness authority to reduce reimbursement levels for Medicare covered products, which could have an adverse effect on the Debtors' results of operations. A reduction in payments received from, or a loss of coverage under, Medicare could result in similar actions being taken by private payors, which could have an adverse effect on the Debtors' results of operations.

(f)    The Success of the Debtors' Business Depends Heavily on their Relationships with Healthcare Professionals who Prescribe the Debtors' Products, and the Debtors' Failure to Maintain or Develop these Relationships Could Adversely Affect their Results of Operations.

The Debtors' sales force has developed and maintains close relationships with a number of healthcare professionals. The Debtors' sales of the products they offer depend significantly on such professionals' recommendations of the services that the Debtors provide. The Debtors' failure to maintain these relationships and develop similar relationships with other leading healthcare professionals could result in a decrease in the recommendation of the Debtors' services, which may adversely affect the Debtors' results of operations.

(g)    The Debtors' Business and their Industry are Highly Regulated and, if Government Regulations are Interpreted or Enforced in a Manner Adverse to the Debtors or their Business, the Debtors May be Subject to Enforcement Actions, Penalties, Exclusion and Other Material Limitations on their Operations.

The Debtors and their suppliers are extensively regulated by federal, state and local government agencies. The Debtors are required to register their business for permits and/or licenses with, and comply with certain operating and security standards of, the U.S. Drug Enforcement Administration or the Food and Drug Administration state boards of pharmacy,

state health departments and other state agencies. In addition, the Debtors are subject to federal and state laws and regulations that govern financial and other arrangements among healthcare providers, including federal and state anti-kickback statutes, federal and state false claims laws and regulations, beneficiary inducement laws and regulations and other fraud and abuse laws and regulations. The Debtors are also subject to federal and state laws governing the confidentiality of patient information. In addition, federal legislation has resulted in new national standards for the protection of patient information in electronic health information transactions.

Because the healthcare industry will continue to be subject to substantial regulations, the Debtors cannot guarantee that their activities will not be reviewed or challenged by regulatory agencies in the future. Failure to have the necessary clearances, approvals, permits and licenses, the loss of such clearances, approvals, permits and licenses, or the failure to comply with these laws, regulations and administrative requirements could subject the Debtors to significant civil and criminal sanctions, and could result in suspension of their operations or exclusion of their business from participation in Medicare, Medicaid and other federal and state healthcare programs.

(h)     The Debtors' Promotional Materials and Practices to Promote the Sale of Medical Supplies and Products they Distribute are Subject to Extensive Government Regulation.

Promotional materials and practices to promote the sale of medical products are subject to federal and state laws and regulations that require claims and statements not to be false or misleading and to be consistent with any legal and regulatory conditions for clearance or approval to market such products. Promotional claims for medical products typically must be within the bounds of labeling that has been approved or cleared by regulatory authorities, while unapproved or off-label claims are prohibited. Although the Debtors' marketing and sales force receive initial and periodic training to ensure that all marketing and sales practices are conducted within regulatory requirements, the interpretation of such requirements and the enforcement discretion policies of regulatory authorities may change, or regulatory authorities may conclude that the Debtors' practices are not in compliance with such requirements. Failure to comply with laws and regulations as interpreted and enforced by regulatory authorities could have a material adverse effect on the Debtors' business, financial condition or results of operations.

(i)     The Debtors' Marketing and Sales Practices may Contain Risks that could have an Adverse Impact on them.

The Debtors' marketing and sales practices directed toward existing and potential referral sources have included certain modest provision of goods and services that the Debtors believe is standard in the industry. Under applicable federal and state healthcare fraud and abuse, anti-kickback, false claims and self-referral laws, it could be determined that the Debtors' marketing and sales practices fall outside permitted compensation arrangements, thereby subjecting them to possible civil and/or criminal sanctions (including exclusion from the Medicare and Medicaid programs) which could have an adverse effect on the Debtors' business. Although the Debtors believe that they maintain a satisfactory compliance program, it may not be adequate in the detection or prevention of violations.

- 93 -

Certain federal and state laws and regulations regarding reimbursement and coverage of products and services by Medicare and Medicaid, as well as federal and state laws addressing healthcare fraud and abuse, are broad in scope and apply to the Debtors' relationships with healthcare providers and entities that may prescribe or recommend the Debtors' products, and who may assist the Debtors in the development and promotion of their products. These laws and regulations are also complex, and even minor, inadvertent irregularities in claim submissions can potentially give rise to a charge that the law has been violated. Any violations of these laws or regulations could result in a material adverse effect on the Debtors' business, financial condition and results of operations. If there is a change in law, regulation or administrative or judicial interpretations, the Debtors may have to change one or more of their business practices to be in compliance with these laws. Required changes could be costly and time consuming. Any failure to make required changes could result in the Debtors losing business or their existing business practices being challenged as unlawful.

     (j)    Audits or Denials of the Debtors' Claims by Government Agencies Could Reduce the Debtors' Revenues and Have an Adverse Affect on the Debtors' Results of Operations.

As part of the Debtors' business operations, the Debtors submit claims on behalf of patients directly to, and receive payments from, Medicare, Medicaid and other third-party payors. The Debtors are subject to extensive government regulation, including requirements for submitting reimbursement claims under appropriate codes and maintaining certain documentation to support their claims. Medicare contractors and Medicaid agencies periodically conduct pre- and post-payment reviews and other audits of claims and are under increasing pressure to more closely scrutinize healthcare claims and supporting documentation. The Debtors have periodically been subject to pre- and post-payment reviews as well as audits of claims and may experience such reviews and audits of claims in the future. Such reviews and similar audits of the Debtors' claims could result in material delays in payment, as well as material recoupments or denials, which would reduce the Debtors' net sales and profitability, or result in the Debtors' exclusion from participation in the Medicare or Medicaid programs. Private payors may from time to time conduct similar reviews and audits.

     (k)    The Development of New Technologies that Reduce the Need for Consumable Testing Supplies or the Other Products that the Debtors Distribute Could Adversely Affect the Debtors' Business.

The majority of the Debtors' diabetes supply products sales are of consumable testing supplies used to draw and test small quantities of blood for the purpose of measuring and monitoring glucose levels. The commercialization and widespread acceptance of new technologies may eliminate or reduce the need for consumable testing supplies or other products that the Debtors' distribute, reduce the Debtors' sales, and adversely affect the Debtors' results of operations.

- 94 -

(l)    The Debtors Could Lose Patients and Revenues to New or Existing Competitors who have Greater Financial or Operating Resources.

The profitability of the Debtors' business depends on their ability to retain as customers the patients they serve and to receive recurring and sustained reorders from such patients. Reorder rates are inherently uncertain due to several factors, many of which are outside of the Debtors' control, including changing patient preferences, changes in payor coverage and reimbursement requirements, patient transition to extended care facilities, patient mortality and general economic conditions. Reorder rates are also affected by the Debtors' ability to compete with retail pharmacies, direct-to-consumer distributors of medical supplies, healthcare product distributors, pharmacy benefit management companies and prescription drug plans with in-house pharmacies. The loss of patients and revenues would negatively affect the Debtors' operating results and financial condition.

(m)    If the Debtors are Unable to Effectively Adapt to Changes in the Healthcare Industry, Their Continued Success Could be Adversely Affected.

In recent years, the healthcare industry has experienced significant change driven by efforts to reduce costs and improve standards of care. In addition to reduction in Medicare, Medicaid and third-party reimbursement, these efforts include potential national healthcare reform, increased and restrictive pharmacy benefit management, and horizontal and vertical consolidation within the healthcare industry. The result of these efforts will likely put downward pressure on product pricing, which may adversely affect the Debtors' sales and profitability. The Debtors' inability to react effectively to these and other changes in the healthcare industry could adversely affect the Debtors' operating results. Due to uncertainties regarding the ultimate features of reform initiatives and their enactment and implementation, the Debtors cannot predict which, if any, of such reforms will be adopted, when they may be adopted or what impact they may have on the Debtors' product sales.

(n)    If the Debtors' Costs of Providing Products or Services Increase, the Debtors May not be Able to Pass these Cost Increases on to their Customers.

In many of the Debtors' markets, due to competitive pressures or the fact that reimbursement rates are set by law, the Debtors have very little control over the price at which they sell their products and services. If the Debtors' costs increase, the Debtors may not be able to increase their prices, which would adversely affect their results of operations. Accordingly, any increase in the cost of such products and services could adversely affect the Debtors' results of operations and impair their financial condition.

(o)    The Debtors' Business is Dependent on Sophisticated Information Systems that may Impact Business Operations if they Fail to Operate Properly or Not as Anticipated.

The success of the Debtors' business depends on the ability to obtain, process, analyze, maintain and manage data. The Debtors have become more reliant on their information

systems due to the consolidation and centralization of administrative functions. Management relies on these information systems because:

- third-party ancillary billing services require proper tracking and reporting;

- customer orders must be received and shipped on a timely basis;

- billings and collections for all customers must be managed efficiently and accurately;

- product cost information, net of rebates, is needed by the sales force in a timely manner to conduct business;

- product reporting, such as product sales by vendor and vendor incentives earned, is a requirement;

- centralized procurement and inventory management systems are required for effective inventory management;

- regulatory compliance on certain products requires proper tracking and reporting;

- rebates are received from manufacturers when certain products are sold and sophisticated systems are required to track, apply and collect such rebates;

- data and information systems must be converted after acquisitions are consummated and during operating system conversions; and

- proper employee compensation and recordkeeping is required.

The Debtors' business, financial condition and results of operations may be materially adversely affected if, among other things:

- the Debtors' information systems are interrupted or fail for any extended length of time;

- services relating to the Debtors' information systems are not kept current;

- the Debtors' information systems become unable to support expanded business;

- information is lost or unable to be restored or processed; or

- information security is breached.

(p) Legal Matters.

Like other participants in the healthcare market, the Debtors may be subject to lawsuits alleging negligence, product liability or other similar legal claims, many of which involve large claims and significant defense costs. Any of these claims, whether with or without merit, could result in costly litigation and divert the time, attention and resources of the Debtors'

- 96 -

management. Although the Debtors currently maintain liability insurance intended to cover such claims, the coverage limits of such insurance policies may not be adequate or all such claims may not be covered by the insurance. In addition, these insurance policies must be renewed annually. Although the Debtors have been able to obtain liability insurance, such insurance may not be available in the future on acceptable terms, if at all. It is not anticipated that any current or pending lawsuit, either individually or in the aggregate, is likely to have a material adverse effect on the Debtors' financial condition. However, no assurances can be provided that the Debtors will be able to successfully defend or settle all pending or future purported claims, and the Debtors' failure to do so may have a material adverse effect on the Reorganized Debtors.

## ARTICLE XIII.

## SECURITIES LAW MATTERS

**13.1** *Plan Securities.*

The Plan provides for Reorganized Issuer to issue to the First Lien Lenders shares of New Common Stock. The Plan further provides for the Reorganized Debtors to issue to the holders of Allowed Second Lien Holder Claims and Allowed General Unsecured Claims Warrants to purchase shares of New Common Stock. As used herein, the term "**Plan Securities**" shall refer collectively to the New Common Stock and the Warrants.

The Debtors believe that all of the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws. The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and state securities laws.

The New Stockholder and Registration Rights Agreement, the New Warrant Agreement, and the Amended Certificate of Incorporation contain restrictions on stockholders' ability to transfer the New Common Stock and the Warrants, as described more fully in Section 12.2(g) hereto.

**13.2** *Issuance and Resale of Plan Securities Under the Plan.*

(a) Exemption from Registration.

Section 3(a)(9) of the Securities Act provides that Section 5 of the Securities Act and, by virtue of Section 18 of the Securities Act, any state law requirements for the offer and sale of a security do not apply to any security exchanged by an issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange. Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a

claim against, an interest in, or claim for administrative expense against the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property. In reliance upon these exemptions and Section 4(2) of the Securities Act and Regulation D promulgated thereunder, the Plan Securities will not be registered under the Securities Act or any state securities laws. To the extent that the Plan Securities are issued under the Plan and are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as that term is defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

(b)     Resales of Plan Securities; Definition of Underwriter.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under a plan for the holders of such securities, or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten

percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling person") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Reorganized Debtors do not presently intend to make publicly available the requisite current information regarding the Reorganized Debtors and, as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtors make no representations concerning the right of any Person to freely resell Plan Securities. **Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning whether they may freely trade such securities without compliance with the federal and state securities laws.**

## ARTICLE XIV.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**14.1    *Introduction.***

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders of claims entitled to vote on the Plan that are receiving distributions of stock, debt or Warrants (each, a "**Holder**"). It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences

resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

For purposes of this discussion, the terms "**Old First Lien Loans**" and "**Old Second Lien Loans**" are used to refer to the loans under the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively, the Old First Lien Loan and Old Second Lien Loan together referred to as the "**Old Loans**" and the terms "**New First Lien Loan**" and "**New Second Lien Loan**" are used to refer to the Reorganized First Lien Term Loan and the Reorganized Second Lien Term Loan, respectively, the New First Lien Loan and the New Second Lien Loan together referred to as the "**New Loans**." This discussion assumes that Holders of the Old Loans have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and Holders will hold the New Loans, the New Common Stock, and the New Warrants as capital assets. In addition, this discussion assumes that the Debtors' obligations under the Old Loans and New Loans will be treated as debt for federal income tax purposes.

This discussion does not address all federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, Holders who are not citizens or residents of the U.S., Holders subject to the alternative minimum tax, Holders holding the Old Loans, New Loans, New Common Stock, or New Warrants as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who have a functional currency other than the U.S. dollar and Holders that acquired the Old Loans in connection with the performance of services.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW NOTES AND NEW COMMON STOCK RECEIVED PURSUANT TO THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**14.2** *Federal Income Tax Consequences to the Debtors.*

      (a)     Cancellation of Indebtedness and Reduction of Tax Attributes.

      The Debtors generally should realize cancellation of indebtedness ("**COD**") income to the extent the sum of (i) cash and the fair market value of any property (including New Common Stock and New Warrants) and (ii) the issue prices of the New Loans received by Holders is less than the sum of (x) the adjusted issue prices of the Old Loans, (y) the adjusted issue price of any other debt exchanged for property pursuant to the Plan and (z) the amount of any unpaid accrued interest on the Old Loans and such other debt to the extent previously deducted by the Debtors.

      The Debtors currently estimate that the amount of COD income realized upon consummation of the Plan could range from approximately $250 million to approximately $350 million; however, the ultimate amount of COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of the New Common Stock and New Warrants and the issue price of the New Loans on the Effective Date. COD income realized by a debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors will not be required to recognize any COD income realized as a result of the implementation of the Plan.

      A debtor that does not recognize COD income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under IRC Section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If the debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply. The Debtors have not yet determined whether they will make the Section 108(b)(5) Election.

      At December 31, 2008, the Debtors had NOLs for federal income tax purposes of approximately $34 million expiring in the years 2004 through 2028. None of these NOLs are subject to pre-existing usage limitations under IRC Section 382. The Debtors believe that, for federal income tax purposes, the Debtors' consolidated group generated approximately $16

- 101 -

million of consolidated NOLs in the 2008 tax year, and likely will generate additional NOLs during the 2009 tax year. However, the amount of the Debtors' 2008 and 2009 NOLs will not be determined until the Debtors prepare their consolidated federal income tax returns for such periods. Moreover, the Debtors' NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above.

The Debtors currently anticipate that the application of IRC Section 108(b) (assuming no Section 108(b)(5) Election is made) will likely result in the elimination of the Debtors' consolidated NOLs and a reduction of a portion of the tax basis in their assets. However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors and the extent to which the Debtors are required to reduce other tax attributes.

Instead of taking advantage of the Bankruptcy Exception, under the provisions of the American Recovery and Reinvestment Act of 2009, the Debtors may make an election to defer the inclusion of any COD income recognized in connection with the Plan (the "**Deferral Election**"). If the Debtors make the Deferral Election, such COD income would be included in income by the Debtors ratably over a 5-year period beginning in 2014. The Debtors may decide to make the Deferral Election if they determine that the effect of such election is less costly than the tax attribute reduction that would result from the application of the Bankruptcy Exception.

(b)     Section 382 Limitation on NOLs.

Under IRC Section 382, if a corporation or a consolidated group with NOLs (a "**Loss Corporation**") undergoes an "ownership change," the Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the Loss Corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions). If a Loss Corporation has a net unrealized built-in gain ("**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased during the subsequent five-year period (the "**Recognition Period**"). If a Loss Corporation has a net unrealized built-in loss ("**NUBIL**") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus

- 102 -

would reduce the amount of pre-change NOLs that could be used by the Loss Corporation during the five-year period.

The Debtors expect the consummation of the Plan will result in an Ownership Change of the Debtors' consolidated group. The remainder of this discussion assumes that the expected Ownership Change will occur on the Effective Date, though it is possible the IRS could take the position that the Ownership Change occurred on the date the Plan is confirmed by the Bankruptcy Court. If the IRS took the position that the ownership change occurred on the Confirmation Date, the consequences of such change could be other than as described below. Because the Ownership Change that occurs on the Effective Date will occur in a case brought under the Bankruptcy Code, one of the following two special rules will apply in determining the Debtors' ability to utilize NOLs attributable to tax periods preceding the Effective Date in post-Effective Date tax periods.

Under IRC Section 382(l)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's pre-change NOLs if the stockholders or "qualified creditors" of the debtor receive at least fifty percent (50%) of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the effective date of the bankruptcy reorganization. However, if any pre-change NOLs of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(l)(5), those NOLs will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor continuously during the period beginning at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" at all times since it has been outstanding. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt exchanged for stock for purposes of determining whether such creditor is a qualified creditor unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period. The Debtors believe that the Ownership Change expected to result from the consummation of the Plan may satisfy the requirements of IRC Section 382(l)(5), though no assurance can be given in this regard.

If IRC Section 382(l)(5) applies to an Ownership Change, any subsequent Ownership Change of the debtor within a two-year period will result in the debtor being unable to use any pre-change losses following such subsequent Ownership Change. A debtor may elect not to apply IRC Section 382(l)(5) to an Ownership Change that otherwise satisfies its requirements. This election must be made on the debtor's federal income tax return for the taxable year in which the Ownership Change occurs. The Debtors have not yet determined whether to elect out of the application of IRC Section 382(l)(5) if it is determined they otherwise qualify. If the Effective Date occurs in 2009, assuming the Ownership Change resulting from implementation of the Plan satisfies the requirements of IRC Section 382(l)(5), the Debtors

would have until as late as September 15, 2010, to determine whether to elect not to apply IRC Section 382(l)(5).

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of IRC Section 382(l)(5), or if a debtor elects not to apply IRC Section 382(l)(5), the debtor's use of its pre-change NOLs will be subject to an annual limitation as determined under IRC Section 382(l)(6). In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (4.58% for July 2009) and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. Depending on whether the debtor has a NUBIG or NUBIL immediately prior to the Ownership Change, the annual limitation may be increased or decreased during the Recognition Period. However, if any pre-change NOLs of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(l)(6), those NOLs will be subject to the lower of the two annual limitations.

NOLs not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates. To the extent the Reorganized Debtors' annual limitation exceeds the consolidated group's taxable income in a given year, the excess will increase the annual limitation in future taxable years.

     (c)    Alternative Minimum Tax.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE. In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, under current law only 90% of its AMTI generally may be offset by available NOL carryforwards. Accordingly, for tax periods after the Effective Date, the Reorganized Debtors may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods. In addition, if a corporation undergoes an Ownership Change and is in a NUBIL position on the date of the Ownership Change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

**14.3**   *Federal Income Tax Consequences to Holders of Certain Claims.*

     (a)    Tax Securities

The tax consequences of the Plan to a Holder of a Claim may depend in part upon (1) whether such Claim is based on an obligation that constitutes a "security" for federal income

- 104 -

tax purposes and (2) whether all or a portion of the consideration received for such Claim is stock or an obligation that constitutes a "security" for federal income tax purposes. The determination of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors. Debt obligations with a term of less than five years generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer. Generally, the more senior the debt obligation, the less likely it is to be a security. It is uncertain whether the Old First Lien Loans, the Old Second Lien Loans or the New Loans will be considered securities for federal tax purposes and Holders are advised to consult their tax advisors with respect to this issue.

      (b)     Holders of Old First Lien Loans (Class 2).

            (1)     Exchange of Old First Lien Loans for New Loans and Common Stock.

Under applicable Treasury Regulations, the significant modification of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument and will be a taxable event upon which gain or loss may be recognized in certain circumstances. A modification of a debt instrument is significant if the modified instrument differs materially either in kind or extent from the original debt instrument. Pursuant to the Plan, the terms of the Old First Lien Loans will be amended or otherwise modified as set forth in the New Loans. The adoption of the amendments to the New Loans will likely result in a significant modification of the Old First Lien Loans and the Debtors intend to take such position for federal income tax purposes. The remainder of this discussion assumes that the adoption of the proposed amendments constitutes a significant modification.

The federal income tax consequences of the consummation of the Plan to Holders of Old First Lien Loans depend, in part, on whether the Old First Lien Loans and the New Loans constitute "securities" for purposes of the "reorganization" provisions of the IRC, as described above under "Tax Securities." If the Old First Lien Loans and the New Loans constitute securities for federal income tax purposes, subject to the "Other Considerations—Accrued Interest" discussion below, the exchange would generally qualify as a tax deferred exchange and the Holders of Old First Lien Loans would not recognize gain or loss upon the exchange of the Old First Lien Loans for the New Loans and New Common Stock. A Holder's adjusted tax basis in the Old First Lien Loans will be allocated between the New Loans and New Common Stock in accordance with their respective fair market values on the Effective Date, and the Holder's holding period in the New Loans and New Common Stock will include the Holder's holding period in the Old First Lien Loans. The tax-deferred receipt of the New Common Stock is not free from doubt if the issuer of the New Common Stock is Reorganized Holdings and not Reorganized CCS. However, a published IRS Revenue Ruling (Revenue Ruling 59-222) indicates that the receipt of New Common Stock should be part of the tax-deferred exchange in these circumstances, provided that the Old First Lien Loans constitute securities for tax purposes.

DB02:8632234.1                    068347.1001

If the Old First Lien Loans are treated as securities for federal income tax purposes and the exchange for New Common Stock is tax-deferred as described in the preceding paragraph, but the New Loans are not treated as securities, each Holder will recognize gain, but not loss, in an amount equal to the lesser of (i) the issue price of the New Loans and (ii) the excess, if any, of (A) the sum of fair market value of the New Common Stock plus the issue price of the New Loans over (B) the adjusted basis of the Holder in the Old First Lien Loans. A Holder's holding period in the New Common Stock would include the Holder's holding period in its Old First Lien Loans, while the Holder would start a new holding period in the New Loans. The Holder's basis in the New Loans would equal their issue price, and the Holder's basis in the New Common Stock would equal the Holder's basis in its First Lien Lender Claim less the issue price of the New Loans plus the amount of gain, if any, recognized on the exchange.

If the Old First Lien Loans do not qualify as securities, the exchange of the Old First Lien Loans for the New Loans and New Common Stock would be a fully taxable exchange. If the exchange is fully taxable, subject to the "Other Considerations—Accrued Interest" and "Other Considerations—Market Discount" discussions below, a Holder of Old First Lien Loans would recognize gain or loss on the exchange of Old First Lien Loans for the New Loans and Common Stock. The amount of gain or loss recognized by a Holder would be equal to the difference between (i) the sum of the issue price of the New Loans (see "New Loans" discussion below) and the fair market value of the New Common Stock received in the exchange and (ii) the Holder's adjusted tax basis in the Old First Lien Loans exchanged therefor. In that case, a Holder's holding period in the New Common Stock and in the New Loans would begin on the day after the Effective Date.

Holders should consult their tax advisors regarding the tax treatment of the exchange of Old First Lien Loans for the New Loans and New Common Stock, the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether the Old First Lien Loans constitute a capital asset in the Holder's hands, whether the Old First Lien Loans have been held for more than one year, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the Old First Lien Loans. Holders also should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(2)     New First Lien Loans: Interest and Original Issue Discount.

Payments of stated interest under the New First Lien Loans will constitute payments of "qualified stated interest" and generally will be taxable to Holders as ordinary income at the time the payments are received or accrued, in accordance with the Holder's method of tax accounting.

The preceding paragraph assumes the amount of the New First Lien Loans will not be issued with original issue discount ("**OID**"). The New First Lien Loans generally would be treated as issued with OID if the principal amount of the New First Lien Loans plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the

issue price of the loan by more than a de minimis amount. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. Because the relevant trading period is generally in the future, it is impossible to predict whether the Old First Lien Loans or the New First Lien Loans will be publicly traded during the relevant period. However, the Debtors anticipate that the Old First Lien Loans and New First Lien Loans will not be treated as publicly traded and, therefore, that the issue price of the New First Lien Loans will be its stated principal amount.

(3)     New Second Lien Loans: Interest and Original Issue Discount.

The New Second Lien Loans will be treated as issued with OID. In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. The "stated redemption price at maturity" on a New Second Lien Loan is the sum of all payments provided by the debt instrument other than "qualified stated interest." Because a portion of the interest payments in respect of the New Second Lien Loans will be added to the amount outstanding under the New Second Lien Loan ("**PIK Payment**"), the Debtors do not intend to treat such interest paid in respect of such notes as qualified stated interest.

The PIK Payment is large enough to cause the New Second Lien Loans to be treated as issued with OID. However, the exact amount of OID will depend on the New Second Lien Loan's issue price. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (i.e., interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old

- 107 -

debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. Because the relevant trading period is generally in the future, it is impossible to predict whether the Old First Lien Loans or the New Second Lien Loans will be publicly traded during the relevant period. However, the Debtors anticipate that the Old First Lien Loans and New Second Lien Loans will not be treated as publicly traded and, therefore, that the issue price of the New Second Lien Loans will be its stated principal amount.

Because the New Second Lien Loan is issued with OID, the Holder generally will be required to accrue the OID in respect of the New Second Lien Loan and include such amount in gross income as interest over the term of such note based on the constant yield method. Accordingly, a Holder generally will be required to include amounts in gross income in advance of the payment of cash in respect of such income. A Holder's tax basis in a New Second Lien Loan will be increased by the amount of any OID included in income and reduced by any cash received (other than payments of qualified stated interest) with respect to such note.

(4)     New Loans: Sale, Retirement or Other Taxable Disposition.

A Holder of the New Loans will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the New Loans equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the Holder's adjusted tax basis in the New Loans. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New Loans for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(5)     New Common Stock.

Distributions. A Holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a Holder's adjusted tax basis in the New Common Stock, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Stock. Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

Sale or Other Taxable Disposition. A Holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the Holder's adjusted tax

- 108 -

basis in the New Common Stock. Subject to the rules discussed below in "Other Considerations—Market Discount" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New Common Stock for more than one year as of the date of disposition. Under the IRC Section 108(e)(7) recapture rules, a Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the Holder took a bad debt deduction with respect to the Old First Lien Loans or recognized an ordinary loss on the exchange of the Old First Lien Loans for New Common Stock. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

      (c)      Holders of Old Second Lien Loans (Class 3).

      (1)      Exchange of Old Second Lien Loans for New Warrants.

      The exchange of Old Second Lien Loans for New Warrants will be a fully taxable exchange.

      Subject to the "Other Considerations—Accrued Interest" and "Other Considerations—Market Discount" discussion below, a Holder of Old Second Lien Loans will recognize gain or loss upon the exchange of the Old Second Lien Loans for the Warrants. The amount of gain or loss recognized by a Holder will be equal to the difference between (i) the sum of the fair market value of the New Warrants received in the exchange and (ii) the Holder's adjusted tax basis in the Old Second Lien Loans exchanged therefor.

      Holders should consult their tax advisors regarding the tax treatment of the exchange of Old Second Lien Loans for the New Warrants, the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether the Old Second Lien Loans constitute a capital asset in the Holder's hands, whether the Old Second Lien Loans have been held for more than one year, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the Old Second Lien Loans. Holders also should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

      (d)      Holders of General Unsecured Claims (Class 6).

      Holders of General Unsecured Claims should consult "Holders of Old Second Lien Loans -- Exchange of Old Second Lien Loans for New Warrants" above for the tax consequences of owning New Warrants.

      (e)      Other Considerations.

      Accrued Interest. There is general uncertainty regarding the extent to which the receipt of cash or other property should be treated as attributable to unpaid accrued interest. The

- 109 -

Reorganized Debtors intend to take the position that cash or property distributed pursuant to the Plan will first be allocable to the principal amount of a Holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

Market Discount. A Holder will be considered to have acquired an Old Loan at a market discount if its tax basis in the loan immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, subject to a statutorily defined de minimis exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the Holder's election, under a constant yield method. A Holder that acquired an Old Loan at a market discount previously may have elected to include the market discount in income as it accrued over the term of the note.

A Holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the Holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization. Under these rules, a Holder that acquired an Old Loan at a market discount generally should not be required to recognize any accrued market discount as income at the time of the exchange of Old Loans for New Loans and, if applicable, New Common Stock and New Warrants to the extent it receives stock or securities in exchange for the Old Loan. Rather, on a subsequent taxable disposition of the stock or securities received in the exchange, any gain realized by the Holder on a disposition of the stock will be ordinary income to extent of the market discount accrued on the Old Loan prior to the exchange that is allocable to the stock, and any gain realized by the Holder on a disposition of the securities will be ordinary income to the extent of the allocable amount of market discount accrued on the Old Loan prior to the exchange and the amount of market discount accrued on the securities after the exchange. The method of allocating accrued market discount to stock and securities when both are received in exchange for a market discount obligation in a recapitalization is uncertain. Accordingly, Holders that acquired the Old Loans with market discount should consult their tax advisors regarding this issue.

- 110 -

(f)     Information Reporting and Backup Withholding.

The Reorganized Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by Holders (other than corporations and other exempt Holders) pursuant to the Plan. In addition, the Reorganized Debtors will be required to report annually to the IRS with respect to each Holder (other than corporations and other exempt Holders) the amount of interest paid and OID, if any, accrued on the New Loans, the amount of dividends paid on the New Common Stock, and the amount of any tax withheld from payment thereof.

Holders may be subject to backup withholding (currently, at a rate of 28%) on the consideration received pursuant to the Plan. Backup withholding may also apply to interest, OID and principal payments on the New Loans, dividends paid on the New Common Stock and proceeds received upon sale or other disposition of the New Loans or New Common Stock. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the Reorganized Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.

- 111 -

## ARTICLE XV.

## <u>CONCLUSION</u>

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce if not eliminate any return to unsecured creditors who hold Claims. Moreover, under such alternatives, holders of Interests are highly unlikely to receive any recovery on account of their Interests or otherwise. The Debtors urge the holders of Impaired Claims in Classes 1 – 6 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m., Prevailing Eastern Time, on September 15, 2009.

Dated: August 20, 2009
       Wilmington, Delaware

Respectfully submitted,

CCS MEDICAL, INC., on behalf of itself and its
affiliated debtors and debtors-in-possession

By: *Stephen Saft*
      Stephen Saft
      Chief Financial Officer

**Willkie Farr & Gallagher LLP**      **Young Conaway Stargatt & Taylor, LLP**
787 Seventh Avenue      The Brandywine Building
New York, New York 10019-6099      1000 West Street, 17th Floor
(212) 728-8000      Wilmington, Delaware 19801-1037
      (302) 571-6600

*Co-Counsel to the Debtors and Debtors in Possession*

## SCHEDULE 1.1

### LIST OF DEBTORS AND DEBTORS IN POSSESSION

1. CCS Medical, Inc.

2. CCS Medical Holdings, Inc.

3. CCS Acquisition Holding-Sub Corporation

4. CCS Star LLC

5. Chronic Care Solutions, Inc.

6. DEGC Enterprises (U.S.), Inc.

7. KeyMed, Inc.

8. Medical Express Depot, Inc.

9. Medical Holdings, Inc.

10. MedShip Direct, Inc.

11. MedStar Diabetic Supply Limited Partnership

12. MPTC Holdings, Inc.

13. MP TotalCare, Inc.

14. MP TotalCare Medical, Inc.

15. MP TotalCare Services, Inc.

16. MP TotalCare Supply, Inc

17. Sanvita, Inc.

18. Secure Care Medical, Inc.

19. TotalCare Wholesale, Inc.

**Exhibits**

- Exhibit 1-- Plan

- Exhibit 2-- Plan Support Agreement

- Exhibit 3-- Prepetition Corporate Organizational Chart

- Exhibit 4-- Liquidation Analysis

- Exhibit 5-- Reorganized Debtors' Projected Financial Information

- Exhibit 6-- Disclosure Statement Order

DB02:8632234.1                                         068347.1001