# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------ x
                                                  :
In re:                                            :   Chapter 11
                                                  :
CCS Medical, Inc., et al.,                        :   Case No. 09-12390
                                                  :
        Debtors.                                  :   Jointly Administered
                                                  :
                                                  :
                                                  :
                                                  :   Hearing Date: February 17, 2010 at 9:30 A.M.
                                                  :   Objection Deadline: February 12, 2010 at 12:00 P.M.
------------------------------------------------ x
```

**DEBTORS' MOTION FOR ENTRY OF AN ORDER
(I) EITHER (A) AUTHORIZING AND APPROVING SALE OF
SUBSTANTIALLY ALL OF DEBTORS' ASSETS FREE AND CLEAR
OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES PURSUANT
TO SECTION 363 OF THE BANKRUPTCY CODE AND AUTHORIZING AND
APPROVING THE ASSUMPTION AND ASSIGNMENT AND SALE OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN
CONNECTION WITH SUCH SALE; OR (B) AUTHORIZING AND
APPROVING THE DEBTORS' ENTRY INTO A STOCK PURCHASE
AGREEMENT PROVIDING FOR THE SALE OF THE NEW COMMON
STOCK OF THE REORGANIZED DEBTORS TO PURCHASER
PURSUANT TO A PLAN; AND (II) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the

"Debtors," or "CCS"),[1] hereby submit this motion (the "Motion") for entry of an order, pursuant

to sections 105(a), 363, 365 (as applicable) and 1146 of title 11 of the United States Code (the

"Bankruptcy Code"), Rules 2002, 6004, 6006, 9014, and 9019 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local

---

[1] If applicable, the last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) CCS Acquisition Holding-Sub Corporation (6272); (ii) CCS Medical Holdings, Inc. (6268); (iii) CCS Medical, Inc. (6264); (iv) CCS Star, LLC (N/A); (v) Chronic Care Solutions, Inc. (7604); (vi) DEGC Enterprises (U.S.), Inc. (1823); (vii) KeyMed, Inc. (1442); (viii) Medical Express Depot, Inc. (3507); (ix) Medical Holdings, Inc. (2975); (x) Medship Direct, Inc. (6328); (xi) MedStar Diabetic Supply, LP (5060); (xii) MP TotalCare, Inc. (6364); (xiii) MP TotalCare Medical, Inc. (7392); (xiv) MP TotalCare Services, Inc. (4513); (xv) MP TotalCare Supply, Inc. (2983); (xvi) MPTC Holdings, Inc. (1467); (xvii) Sanvita, Inc. (1766); (xviii) Secure Care Medical, Inc. (0803); (xix) TotalCare Wholesale, Inc. (1760). The Debtors' executive headquarters are located at 14255 49th Street North, Suite 301, Clearwater, FL 33762.

Rules for the United States Bankruptcy Court District of Delaware (the "Local Rules"): (a) either (i) authorizing and approving the sale of all or substantially all of the Debtors' assets, free and clear of liens, claims, encumbrances and interests (the "Encumbrances") under section 363 of the Bankruptcy Code (the "Asset Sale"), to the party submitting the highest and/or best bid for the purchase of Debtors' business or the party submitting the next highest and/or best bid for the purchase of the Debtors' business, as applicable (the "Purchaser"),[2] pursuant to the terms and conditions of the Asset Purchase Agreement by and between the Debtors and the Purchaser substantially in the form attached hereto as Exhibit A and as may be modified by the terms of the Successful Bid (as defined below) (the "APA"), and authorizing and approving the assumption and assignment and sale of certain executory contracts and unexpired leases (the "Assumed Contracts and Leases") in connection with such Asset Sale; or (ii) authorizing and approving the sale (the "Stock Sale," and the Stock Sale or Asset Sale, as applicable, the "Sale") of 100% of the new equity (the "New Common Stock") of the reorganized Debtors (the "Reorganized Debtors") subject to confirmation of the Second Joint Chapter 11 Plan of Reorganization for CCS Medical, Inc. and Its Affiliated Debtors, filed on January 26, 2010 [Docket No. 727] (as may be amended, modified, and/or supplemented from time to time, the "Plan") and pursuant to the terms and conditions of the Investment Agreement by and between the Debtors and the Purchaser substantially in the form attached hereto as Exhibit B and as may be modified by the

---

[2] Pursuant to the Bidding Procedures (as defined below), in the event the Debtors are unable to consummate the Sale with the party submitting the highest or best offer for the Debtors' business (the "Successful Bidder "), the next highest and/or best offer received by the Debtors (the "Next Highest Bid") at the conclusion of the Auction (defined in the Bidding Procedures) shall remain open and the Debtors' may consummate the Sale with such bidder submitting the Next Highest Bid (the "Next Highest Bidder"). Accordingly, by this Motion, the Debtors are seeking authority and approval to enter into and consummate the Sale with the Successful Bidder or Next Highest Bidder as the case may be.

terms of the Successful Bid, (the "SPA");[3] and (b) granting related relief. In support of the

Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT[4]

1.      As the Court is aware, from the beginning of these cases the Debtors have

emphasized the need to emerge from chapter 11 quickly. Upon denial of confirmation of the

Debtors' previously submitted plan of reorganization (the "Original Plan"), the Debtors were

faced with a difficult situation: an inability to confirm an alternative plan without the support of

the majority of the lenders under the First Lien Credit Agreement (the "First Lien Lenders"), or

the ability to otherwise "cram up" their claims with either cash and/or new debt. Accordingly, in

need of an exit strategy, the Debtors sought and obtained approval of a marketing process for the

sale of all or substantially all of their assets in accordance with bidding procedures (the "Bidding

Procedures")[5] approved by the Court pursuant to the Order (A) Approving Bidding Procedures in

Connection with Marketing and Proposed Sale of Substantially All of the Debtors' Assets, and

(B) Granting Related Relief, filed by the Debtors on November 24, 2009 [Docket No. 596] (the

"Bidding Procedures Order"). The Debtors believe that the sale process contemplated by the

Bidding Procedures and approved by the Court will conclusively establish the value of the

Debtors and be a significant step towards bringing these cases to a close.

2.      The Bidding Procedures provide for a three-step bid process. The first

phase encompassed the solicitation of parties interested in performing due diligence and

potentially purchasing the Debtors. The Debtors, through their financial advisors, Goldman

---

[3]    The final APA or SPA, as applicable, submitted in connection with the Successful Bid, shall be filed with the Court prior to the Sale Hearing.

[4]    Capitalized terms used in the Preliminary Statement shall have the meanings ascribed to such terms hereafter.

[5]    Except as otherwise noted herein capitalized terms used but not otherwise defined in the Motion, shall have the meanings ascribed to such terms in the Bidding Procedures.

3

Sachs & Co. ("Goldman"), and with input from the Second Lien Group and the First Lien Lenders (together, the "Lenders"), were in contact with over 186 financial and strategic investors. The Debtors negotiated 36 confidentiality agreements, substantially in the form annexed as an Exhibit to the Bidding Procedures. Upon signing, the Debtors delivered to the interested party a confidential information memorandum regarding the Debtors' business and granted preliminary access to the data room, which contained additional preliminary diligence, including the Debtors' financial model. Prior to the LOI Deadline, the Debtors informed the Lenders and the Court that the Debtors intended to notify interested parties that they would also entertain offers for the sale of the Debtors' business through a plan of reorganization (i.e., the sale of the New Common Stock of the Reorganized Debtors) (the "Plan Option"). The Debtors subsequently informed all interested parties that signed confidentiality agreements of this option.

3. The second phase of the Bidding Procedures required interested parties to submit an LOI and be deemed Qualified Bidders. A Qualified Bidder is one who in the Debtors' view demonstrates the financial capability to consummate a transaction for the Debtors' assets. The LOI Deadline was established as January 11, 2010. The Debtors have received a number of LOI's and ultimately determined that all but one Potential Bidder[6] are Qualified Bidders. The Debtors notified the Required Parties of the same in accordance with the Bidding Procedures. Upon submission of an LOI, the Qualified Bidders were granted additional access to diligence, including fully opening the data room, management presentations and meetings, on-site visits, and responses to numerous other diligence requests.

4. Throughout the first two phases of the process, the Debtors have engaged the Lenders in open discussions regarding the sale process, the Bidding Procedures, the LOI's

---

[6] The Debtors continue to work with this Potential Bidder to determine whether they are a Qualified Bidder for purposes of submitting a Qualified Bid by the Bid Deadline.

received, and issues that have arisen during the course of implementing the sale process or from questions received by the Debtors from the bidders. Throughout this process, the parties have been able to resolve issues and respond to bidder inquiries quickly, and when necessary sought guidance from the Court. The Debtors believe that as a result of these measures, the sale process has been robust and will be the best indication of the value of the Debtors' business.

5.     The third phase of the sale process will commence on February 8, 2010, the date established in the Bidding Procedures as the Bid Deadline. Given the interest in the Debtors' assets at this time and the amount of diligence being conducted by the Potential Bidders, the Debtors expect that they will receive at least one Qualified Bid for the Debtors' Assets or the New Common Stock of the Reorganized Debtors upon emergence. If the Debtors receive more than one Qualified Bid for the sale of the Debtors' business, the Debtors intend to hold an Auction on February 15, 2010. At the conclusion of the Auction, the Debtors will select the highest and/or best offer received for the Assets or the New Common Stock and the next highest and/or best offer received for the Assets or the New Common Stock. If the Successful Bid is not in the form of a credit bid by the First Lien Lenders, the Debtors expect to seek entry of an order approving the Sale to the Purchaser in accordance with the terms of the APA or SPA, as applicable, and take such other actions as reasonably necessary to consummate the Sale. If the Successful Bid at the conclusion of the Auction is the credit bid submitted by the First Lien Lenders, the Debtors intend to seek confirmation of the Plan and the stand-alone transactions contemplated therein.

6.     The Debtors have filed the Plan and the related disclosure statement (the "Disclosure Statement"). The Plan is a "toggle" plan inasmuch as it contemplates the following alternatives: (a) the sale of the Reorganized Debtors' New Common Stock and distribution of the

068347.1001

proceeds thereof pursuant to the Plan, (b) the sale of the Debtors' assets pursuant to section 363 of the Bankruptcy Code prior to confirmation of the Plan, in which case the proceeds of such sale will be distributed pursuant to the Plan, or (c) if a sale is not consummated, a stand alone reorganization whereby the First Lien Lenders will "swap" their debt for $200 million of new notes and 100% of the equity in the Reorganized Debtors.

7.      Accordingly, if the Sale is consummated with a Qualified Bidder other than through a credit bid by the First Lien Lenders, the Sale will either occur pursuant to the terms of the APA and under section 363 of the Bankruptcy Code, which the Debtors expect will be followed by confirmation of the Plan, or in connection with confirmation of the Plan and pursuant to the terms of the SPA and the Confirmation Order. The Debtors believe that by dual tracking the process of the Sale and confirmation of the Plan, and by seeking approval of the Sale, if any, pursuant to the APA or SPA, as may ultimately be applicable to the transaction, the Debtors will be most likely to yield the highest and/or best offer for the Debtors' assets and maximize value for the estates. The Debtors believe that the Sale is in the best interest of their estates and creditors and is supported by sound business judgment.

## JURISDICTION

8.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are sections 105(a), 363, 365, and 1146(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9014 and 9019, and Local Rules 2002-1 and 6004-1.

# BACKGROUND

## A.    General

9.    On July 8, 2009 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

10.    The Debtors intend to continue in the possession of their respective properties and the management of their respective businesses as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  By order dated July 9, 2009, the Debtors' cases were consolidated for procedural purposes only.

11.    As of the date hereof, no official committee of unsecured creditors has been appointed.

12.    On January 11, 2010, the Court ordered the appointment of an Official Committee of Second Lien Lenders (the "Second Lien Committee").  As of the date hereof, the members of the Second Lien Committee have not yet been appointed.

13.    CCS began operations in September 2005, when CCS Medical Holdings, Inc. acquired Chronic Care Solutions, Inc. and MPTC Holdings, Inc., two of the leading chronic care and diabetes supply companies in the United States.  CCS is a national company based in Clearwater, Florida, that serves patients with chronic diseases throughout the United States and Puerto Rico.  CCS delivers products and value-added services to individuals living with select chronic medical conditions, including diabetes, urological, and ostomy-related disorders, chronic wounds, incontinence, respiratory conditions and other illnesses.  The Debtors operate in two business units—chronic care and diabetes.  The Debtors' primary product focus is on diabetes, a large and fast growing component of the chronic care market.  The Debtors' business is grounded in its ability to provide value-added services, direct mail distribution of supplies to patients, and business-to-business relationships.

## B.    Prior Confirmation Proceedings

14.    On the Petition Date, the Debtors filed an agreement (the "Plan Support Agreement"), executed by the Debtors on the one hand, and certain holders, in excess of seventy percent (70%) in amount, of the outstanding obligations under that certain First Lien Credit Agreement, dated as of September 30, 2005 (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements, the "First Lien Credit Agreement") and the Debtors' interest rate swap agreements (the "Swap Agreements") on the other hand, to support the terms of a plan of reorganization as outlined in the term sheet annexed thereto.

15.    On August 20, 2009, the Debtors obtained approval of their Disclosure Statement with Respect to the First Amended Joint Chapter 11 Plan of Reorganization for CCS Medical, Inc. [Docket No. 200]. On August 25, 2009, the Debtors commenced solicitation of the Original Plan. Two lenders under the Second Lien Credit Agreement (as reconstituted from time to time, the "Second Lien Group") objected to confirmation of the Original Plan on the grounds that the Original Plan undervalued the Debtors' business.

16.    A confirmation hearing commenced on October 8, 2009 and concluded on October 23, 2009, at which time the Court denied confirmation of the Original Plan on the grounds that the Debtors had failed to meet their burden of proving that the Original Plan was fair and equitable with respect to the lenders under the Debtors' prepetition Second Lien Credit Agreement, dated September 30, 2005 (as amended, the "Second Lien Credit Agreement") by and among, certain of the Debtors and the lenders party thereto from time to time (the "Second Lien Lenders").

DB02:9196769.2                                                                                    068347.1001

## C.   Post- Confirmation Hearing Sale Processes and Efforts

17.   Since this Court's ruling on the Original Plan, the Debtors have taken the necessary steps to reach a definitive answer on the issue of the Debtors' total enterprise value by initiating the requisite procedures for a sale of the Debtors' assets. On October 30, 2009, the Debtors filed a motion seeking approval of the Bidding Procedures. The Court approved the Bidding Procedures, as modified. Over a period of over 6 weeks, the Debtors solicited interest from over 186 potentially interested parties. Of the 186, 36 signed confidentiality agreements, resulting in the submission of several LOI's. The Potential Bidders and the Debtors are actively engaged in providing additional diligence access to each of the Qualified Bidders.

## D.   Credit Bid by the First Lien Lenders

18.   Pursuant to the Bidding Procedures, the First Lien Lenders are entitled to "credit bid" their claims for the purchase of Debtors' assets pursuant to section 363(k) of the Bankruptcy Code. The Bidding Procedures identify the First Lien Lenders as Qualified Bidders and any credit bid of all or a portion of their debt submitted by the First Lien Lenders shall be deemed a Qualified Bid; provided, however, that the First Lien Lenders shall not credit bid in the event that another Qualified Bid is submitted that includes at least $295 million of cash consideration. The outstanding amount of the First Lien Lender claims is approximately $348 million (excluding amounts outstanding for issued but undrawn letters of credit). Additionally, if the First Lien Lenders claims are oversecured, the First Lien Lenders may be entitled to additional claims for, among other things, postpetition interest.

## E.   Status of Debtor in Possession Financing

19.   Upon commencement of these cases, the Debtors entered into that certain $10,000,000 Debtor In Possession Credit Agreement, dated July 14, 2009 (the "DIP Credit

Agreement"), by and among certain of the Debtors and the lenders party thererto from time to time (the "DIP Lenders"), secured by a superpriority lien on substantially all of the assets of the Debtors. All amounts available for borrowing under the DIP Credit Agreement have been drawn as required thereunder. The Debtors currently have cash on their balance sheet in excess of such amounts.

20.     As amended, the DIP Credit Agreement will mature on February 26, 2010, unless either (a) an order approving the sale of the Debtors or (b) an order confirming a plan of reorganization, has been entered by Court. The First Lien Lenders have agreed to the Debtors' consensual use of cash claimed as collateral through February 17, 2010.

## RELIEF REQUESTED AND AUTHORITY THEREFOR

21.     By this Motion, the Debtors seek entry of an order (a) either (i) substantially in the form annexed hereto as Exhibit C (the "APA Sale Order"), authorizing and approving the Asset Sale free and clear of Encumbrances pursuant to the terms of the APA and approving and authorizing the assumption and assignment and sale of the Assumed Contracts and Leases; or (ii) substantially in the form annexed hereto as Exhibit D (the "SPA Sale Order"), authorizing and approving the Stock Sale including the assumption of the SPA Assumed Liabilities, pursuant to the SPA and subject to entry of the order confirming the Plan (the "Confirmation Order"); and (b) granting related relief (Exhibits C and D, each, the "Sale Order").[7]

### A.     The Sale Pursuant to the APA or SPA

22.     The material terms of the APA or SPA will not be determined until the Debtors have identified the Successful Bidder and the Successful Bid after submission of the Qualified Bids, and to the extent more than one Qualified Bid is received, the conclusion of the

---

[7]     The final form of proposed Sale Order shall be field with the Court prior to the Sale Hearing.

068347.1001

Auction. Pursuant to the Bidding Procedures, a Qualified Bid must be accompanied by a good Faith Deposit in the amount of 10% of the Purchase Price to be returned in accordance with the terms of the Bidding Procedures and the Qualified Bid.

23.     If the Successful Bidder seeks to consummate the Asset Sale, the Debtors will submit to the Court for final approval the terms of the APA, as modified and agreed to between the Purchaser and the Debtors. The APA will generally provide for the Debtors sale of the Assets to the Purchaser free and clear of all Encumbrances, except as otherwise provided in the APA.[8] The Debtors anticipate that the Assets to be sold will include, among other things, (i) the Accounts Receivable;[9] (ii) the Equipment; (iii) the Assumed Contracts and Leases, (iv) the Purchased Inventory; (v) all Intellectual Property Rights owned by the Debtors or that the Debtors have the right to transfer or assign; and (vi) all Books and Records (collectively, the "Purchased Assets").[10] The total purchase price shall be determined at the conclusion of the Auction, and will likely include both cash and such other non-cash consideration as set forth in the Successful Bid, including the assumption of the Assumed Liabilities. The Debtors expect that the Purchaser will assume, among other things, substantially of (i) the postpetition accounts

---

[8] To the extent that the summary of the APA (the "APA Summary") differs in any way from the terms of the APA, the terms of the APA shall control.

[9] Capitalized terms used in the APA Summary, but not defined elsewhere in this Motion shall have the meanings ascribed to such terms in the APA.

[10] The Debtors expect that the Purchased Assets will not include, among other things: (i) all cash and cash equivalents; (ii) all shares of capital stock or other equity interests of any of the Debtors; (iii) certain excluded contracts and leases; (iv) all Permits; (v) all Retained Books and Records; (vi) any rights, claims or causes of action of Sellers under the APA, or any other contract or agreement to which Buyer and a Seller are party; (vii) all claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Sellers arising outside of the Ordinary Course of Business, including, but not limited to, causes of action arising out of or related to the Bankruptcy Case; (viii) all claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Sellers against, or receivable from, any Seller or any Affiliate thereof or against any director, officer, employee, representative or agent of the foregoing; (ix) all preference or avoidance claims and actions of Sellers under chapter 5 of the Bankruptcy Code, including any such claims and actions arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code.

payable and accrued expenses of the Debtors as of the Closing Date; (ii) any cure amounts and continuing obligations under the Assumed Contracts and Leases, (iii) all Trade Claims, and (iv) certain employee related obligations..

24.     To facilitate and effect the Sale pursuant to the APA,[11] the Debtors are also seeking to assume and assign to the Purchaser the Assumed Contracts and Leases (in accordance with the procedures described in the Order (A) Establishing Procedures to Determine Cure Amounts and Deadlines for Objections to the Assumption and Assignment of Certain of the Debtors Contracts and Leases and (B) Granting Related Relief, dated January 7, 2009 (the "Cure Procedures Order")). On January 13, 2010 and January 27, 2010, the Debtors provided notice of the required cure amounts in connection with the assumption and assignment of such contracts and leases (the "Cure Amounts").[12] Subject to satisfying the requirements of the Cure Procedures Order, the Debtors seek the Court's authority to assume and assign and sell the Assumed Contracts and Leases to the Purchaser in accordance with the APA.[13]

25.     If the Successful Bidder seeks to consummate the Stock Sale, the Debtors will submit to the Court for final approval the terms of the SPA, as modified and agreed to between the Purchaser and the Debtors. Pursuant to the SPA,[14] and subject to entry of the

---

[11]   If the Purchaser seeks to consummate the Sale through the Plan Option, the Debtors will seek to assume, assume and assign, or reject their executory contracts and unexpired leases in accordance with the provisions of the Plan.

[12]   Pursuant to the Bidding Procedures, the Purchaser is required to provide the Debtors with a preliminary list of the contracts and real property leases that it seeks to have assumed and assigned to it not later than the Bid Deadline. The Counterparty to any contract or lease that already received notice of the assumption or assumption and assignment of their respective contract or lease, and that the Purchaser excludes from the sale, shall be notified within one (1) business day of the Auction.

[13]   The Debtors reserve the right to modify, supplement and/or amend the list of Assumed Contracts and Leases and/or the applicable Cure Amounts at any time prior to the closing of the Sale.

[14]   To the extent that the summary of the SPA (the "SPA Summary") differs in any way from the terms of the SPA, the terms of the SPA shall control. Capitalized terms used in the SPA Summary, but not defined elsewhere in this Motion shall have the meanings ascribed to such terms in the SPA.

DB02:9196769.2                                                    068347.1001

Confirmation Order, the Debtors propose to issue and sell to the Purchaser, free and clear of any and all Encumbrances, other than Permitted Encumbrances (as defined in the SPA) and as may arise under applicable securities laws, 100% of the capital stock of the Reorganized Debtors in accordance with the terms of the Plan. In connection with the Stock Sale, it is anticipated that the cash Purchase Price and certain Excluded Assets will be transferred to and left behind with the Debtors' estates for distribution to the Debtors' creditors. The Debtors further anticipate that the Purchaser of the New Common Stock will agree to have the Reorganized Debtors pay certain liabilities of the Debtors, including (i) all accounts payable, accrued expenses and general overhead expenses (including, without limitation, rent, utilities, insurance and taxes), which have been incurred by the Debtors in the ordinary course of business in each case, arising from and after the Petition Date; (ii) all liabilities, obligations and duties to perform under the Assumed Contracts and Leases; (iii) all liabilities, obligations and duties to perform under the Issuer Benefit Plans; (iv) all Trade Claims; (v) all Cure Costs; and (vi) certain employee related obligations.

## C.     The Sale Should be Approved

26.     The relief requested by this Motion is appropriate and within the Court's equitable powers under section 105(a) of the Bankruptcy Code and authority to approve transactions under section 363(b) of the Bankruptcy Code.

27.     Section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under title 11. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [title 11]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of

its section 105(a) power is proper.  See In re Combustion Engineering, Inc., 391 F.3d 190, 236

(3d Cir. 2004); In re Fesco Plastics Corp., 996 F.2d 152, 154 (7th Cir. 1993).  Pursuant to section

105(a), a court may fashion an order or decree that helps preserve or protect the value of a

debtor's assets.  See, e.g., In re Continental Airlines, 203 F.3d 203, 211 (3d Cir. 2000) ("Section

105(a) of the Bankruptcy Code supplements courts' specifically enumerated bankruptcy powers

by authorizing orders necessary or appropriate to carry out provisions of the Bankruptcy Code.");

In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting

that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a

debtor may have in property for the benefit of its creditors as long as that protection is

implemented in a manner consistent with the bankruptcy laws.").

      28.     Section 363(b)(1) of the Bankruptcy Code provides:  "The trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1).  To approve the use, sale, or lease of property out

of the ordinary course of business, this Court must find some articulated business justification for

the proposed action.  See In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 145-47 (3d Cir. 1986)

(implicitly adopting the articulated business justification and good faith tests of Committee of

Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983));

see also In re Delaware & Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding

that the Third Circuit had adopted a "sound business purpose" test in Abbotts Dairies); Titusville

Country Club v. PennBank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa.

1991); In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc., 77 B.R. 15, 19

(Bankr. E.D. Pa. 1987).

29.    Generally, courts have applied four (4) factors in determining whether a sale of a debtor's assets should be approved: (a) whether a sound business reason exists for the proposed transaction; (b) whether fair and reasonable consideration is provided; (c) whether the transaction has been proposed and negotiated in good faith; and (d) whether adequate and reasonable notice is provided. See Lionel, 722 F.2d at 1071 (setting forth the "sound business purpose" test); Abbotts Dairies, 788 F.2d at 145-57 (implicitly adopting the articulated business justification test and adding the "good faith" requirement); Delaware & Hudson Ry., 124 B.R. at 176 ("Once a court is satisfied that there is a sound business reason or an emergency justifying the pre-confirmation sale, the court must also determine that the trustee has provided the interested parties with adequate and reasonable notice, that the sale price is fair and reasonable and that the purchaser is proceeding in good faith.").

     (i)     *The Sale Reflects an Exercise of the Debtors' Business Judgment*

30.    The Debtors submit that more than ample business justification exists to approve the Sale to the Purchaser. The Sale, if consummated, will be the result of careful consideration and analysis of the offers received by the Debtors from the Qualified Bidders to purchase the Debtors' Assets or the New Common Stock of the Reorganized Debtors. The Debtors are conducting a sale process in accordance with the terms of the Bidding Procedures Order. The Debtors believe that if the sale process produces a Successful Bid with a purchase price of $295 million or more, or a purchase price of less than $295 million and the First Lien Lenders and the Debtors otherwise accept such lesser bid, the Sale, pursuant to the terms of the APA or the SPA (as applicable) will be in the best interests, and will maximize the value, of the Debtors' estates and thus a sound business purpose justifies the Sale. The Sale, if consummated, will present the best opportunity to realize the value of the Debtors' on a going concern basis and

avoid decline and devaluation of the Debtors business. As described above, the Debtors continue to engage in extensive discussions with the Qualified Bidders for the Sale of the Debtors' business and accordingly, the Debtors believe that the Successful Bid at the Auction, even if in the form of a credit bid by the First Lien Lenders, will constitute the highest or otherwise best offer for the Debtors' assets.

*(ii)   The Purchase Price is Fair and Reasonable*

31.   The Sale of the Assets or the New Common Stock of the Reorganized Debtors will be in exchange for fair and reasonable value as the result of extensive negotiations between the Debtors and the Qualified Bidders and a competitive bidding process. Pursuant to the Bidding Procedures Order, all potentially interested bidders have received adequate and reasonable notice of the opportunity to submit a competing bid prior to the Bid Deadline, and the Bidding Procedures have facilitated and will continue to facilitate an open and competitive bidding process in which all parties are expected to participate in good faith. Accordingly, the Debtors will realize consideration for the Assets or the New Common Stock of the Reorganized Debtors (as applicable) that will be fair and reasonable.

*(iii)   The Sale is Proposed in Good Faith*

32.   Moreover, as will be demonstrated at the Sale Hearing, the APA or the SPA will be the product of good faith, arm's length negotiations between the Debtors and the Purchaser, and will be negotiated with the active involvement of the Debtors' officers and professionals. Based on the LOI's received to date, it is expected that the Purchaser will not share common ownership with any of the Debtors, will be independently controlled and operated, and will not otherwise be affiliated with the Debtors or their officers and directors. For these reasons, and as will be demonstrated at the Sale Hearing, the Debtors believe that the Sale

16

will satisfy the good faith element of the "sound business purpose" test.  Compare In re After Six, Inc., 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) (good faith found where officers, directors and employees of debtor had no apparent connection to purchasers) with Abbotts Dairies, 788 F.2d at 147-48 ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989) (good faith lacking where proposed settlement agreement benefited non-debtor insiders); In re Industrial Valley Refrigeration and Air Conditioning Supplies, Inc., 77 B.R. 15, 22 (Bankr. E.D. Pa. 1987) (evidence of inside dealing fatal to good faith requirement).

*(vi)    Adequate and Reasonable Notice of the Sale Has Been Provided*

33.    The Debtors intend to provide adequate notice of the proposed Sale to all parties-in-interest, as required by the applicable procedural rules.  See Fed. R. Bankr. P. 2002(c)(1); see also, Delaware & Hudson Ry., 124 B.R. at 180 (the disclosures necessary in such a sale notice need only include the terms of the sale and the reasons why such a sale is in the best interests of the estate and do not need to include the functional equivalent of a disclosure statement).  Concurrently herewith, the Debtors are serving a copy of an auction and sale notice, substantially in the form annexed hereto as Exhibit E (the "Auction and Sale Notice") on all of the Debtors known creditors and all parties reasonably believed to have an interest in the Debtors' assets or an interest in acquiring the Debtors' business.  The Debtors will also serve this Motion, including the APA and the SPA (without exhibits thereto), on all parties that have expressed interest, or the Debtors believe may have an interest, in purchasing the Debtors' business.

17

**D.** **The Sale of the Assets Should be Free and Clear of Liens, Claims and Interests**

34.    In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363(b) "free and clear of any interest in such property of an entity other than the estate" if any one of the following conditions is satisfied: (i) such a sale is permitted under applicable non-bankruptcy law; (ii) the party asserting such a lien, claim, or interest consents to such sale; (iii) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (iv) the interest is the subject of a *bona fide* dispute; or (v) the party asserting the lien, claim, or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  11 U.S.C. § 363(f); see Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (sale "free and clear" may be approved provided the requirements of at least one subsection are met).

35.    The Debtors believe that the administrative agents under both the DIP Credit Agreement (the "DIP Agent") and the Debtors' First Lien Credit Agreement (the "First Lien Agent"), will consent to the Sale pursuant to the terms set forth in the APA with the Purchaser and as set forth herein or will submit a credit bid.  Considering that any remaining objections to this Motion must be resolved by consent of the objecting party or by the Court, the Debtors expect that they can satisfy at least the second and fifth subsections of section 363(f) of the Bankruptcy Code.[15]

---

[15]    Pursuant to Section 6.1 of the Intercreditor Agreement, dated September 30, 2005 (the "Intercreditor Agreement"), by and between the agent under the First Lien Credit Agreement (the "First Lien Administrative Agent") and the agent under Second Lien Credit Agreement (the "Second Lien Administrative Agent"), the Second Lien Administrative Agent on behalf of the Second Lien Lenders, agreed to raise no objection or oppose a sale or other disposition of the assets securing its liens free and clear of its liens or other claims under section 363 of the Bankruptcy Code if the First Lien Lenders have consented to such sale or disposition of such assets and the Second Lien Agent and each of the Second Lien Lenders are deemed to have consented under section 363 of the Bankruptcy Code (and otherwise) to any sale supported by the First Lien Lenders and to have released their liens in such assets.  See §6.1 of the

36.     Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f) of the Bankruptcy Code. <u>See, e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL 1820325 at *3, 6 (Bankr. D. Del. March 27, 2001) (explaining that "courts have long had the authority to authorize the sale of estate assets free and clear even in the absence of §363(f)"); <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (authorizing sale free and clear of tort claims even if such claims are not covered specifically by the provisions of §363(f)). As the <u>Trans World Airlines</u> court explained, "[t]he authority to sell free and clear is broad. It reflects a compelling policy to encourage bankruptcy sales subject only to claims of a specific and recognized nature in the subject property." 2001 WL 1820325, at *3. Thus, even in the case of general unsecured claimants, including tort claimants, who arguably have no specific interest in a debtor's property and, therefore, section 363 of the Bankruptcy Code would not be applicable to such claims, courts have held that the authority to conduct sales free and clear of such claims is still within their equitable powers. <u>White Motor Credit Corp.</u>, 75 B.R. at 948.

37.     A sale of the Assets other than one free and clear of Encumbrances would impact materially and adversely on the Debtors' bankruptcy estates and will yield substantially less value for the Debtors' estates with less certainty than the proposed Sale and thus this alternative would be of substantially less benefit to the estates of the Debtors. In reaching this conclusion, the Debtors have taken into account both the consideration to be realized directly by the Debtors and the indirect benefits of the Sale for the Debtors' employees, vendors and

---

Intercreditor Agreement, a copy of which has been filed in these cases at Docket No. 194. The Second Lien Group has asserted that Section 6.1 of the Intercreditor Agreement, or any other applicable provision of the Intercreditor Agreement, does not relate to a plan of reorganization, including a sale under any such plan. The Second Lien Group has also reserved all their rights regarding the potential Sale as described in the Motion and has reserved the right to file a competing plan of reorganization."

DB02:9196769.2

068347.1001

suppliers and the public served, directly and indirectly, by the functions performed by the

Debtors' employees and the Business. Moreover, the Debtors believe that the Purchaser will not

enter into the APA and will not consummate the Sale, thus adversely affecting the Debtors, their

estates, and their creditors, if the sale of the Assets, and the assignment of the Assumed

Contracts and Leases, to the Purchaser are not free and clear of all Encumbrances, or if the

Purchaser would or in the future could, be liable for any such Encumbrance. Therefore, the Sale

of the Assets should be approved free and clear of Encumbrances, as contemplated by the APA

and is in the best interests of the Debtors, their estates and creditors, and all other parties in

interest

**E.     Assumption and Assignment of the Assumed
        Contracts and Leases Pursuant to the APA Should be Approved**

        38.     By this Motion, the Debtors also seek an order pursuant to sections 365(a)

and (f) of the Bankruptcy Code, authorizing the Debtors to assume and assign the Assumed

Contracts and Leases. A debtor's decision to assume or reject an executory contract or

unexpired lease must only satisfy the "business judgment rule" and will not be subject to review

unless such decision is clearly an unreasonable exercise of such judgment. Group of Institutional

Investors, 318 U.S. 523 (applying Bankr. Act section 77 subsection (b), the predecessor to

Bankruptcy Code section 365, and rejecting the test of whether the executory contract was

burdensome in favor of whether rejection is within the debtor's business judgment); Lubrizol

Enters., Inc. v. Richmond Metal Finishers, Inc., 756 F.2d 1043, 1046-47 (4th Cir. 1985)

(superceded by 11 U.S.C. § 365(n) on other grounds). If the debtor's business judgment has

been reasonably exercised, a court should approve the assumption or rejection of an unexpired

lease or executory contract. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d

36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor-

in-possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."
Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-Pittsburgh Steel
Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R.
594, 596 (Bankr. S.D.N.Y. 1984). Any more exacting scrutiny would slow the administration of
a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private
control of administration of the estate, and threaten the court's ability to control a case
impartially. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir.
1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume
an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly
cure," any default, including compensation for any "actual pecuniary loss" relating to such
default. 11 U.S.C. § 365(b)(1).

      39.    Once an executory contract is assumed, the trustee or debtor in possession
may elect to assign such contract. See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel
Home Ctrs., Inc.), 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free
assignability as a means to maximize the value of the debtor's estate"); see also Leonard v. Gen.
Motors Corp. (In re Headquarters Dodge), 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of
section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

      40.    Section 365(f) of the Bankruptcy Code provides that the "trustee may
assign an executory contract . . . only if the trustee assumes such contract . . . and adequate
assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate
assurance of future performance" depends on the facts and circumstances of each case, but
should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Azzari (In re
Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1989); see also In re Natco Indus., Inc.,

54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. Accord In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtors has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

41. The Assumed Contracts and Leases being assumed and assigned and sold to the Purchaser are an integral part of the Assets being purchased pursuant to the APA, and accordingly, such assumption and assignment and sale of the Assumed Contracts and Leases is reasonable and enhances the value of the Debtors' estates. The Debtors respectfully submit that the proposed assumption and assignment and sale of the Assumed Contracts and Leases pursuant to the terms of the Cure Procedures Order are appropriate and reasonably tailored to provide non-Debtor parties to the Assumed Contracts and Leases with adequate notice of the proposed assumption and assignment of their applicable contract, as well as proposed Cure Amounts. Additionally, the Debtors believe that they can and will demonstrate that all requirements for assumption and assignment of the Assumed Contracts and Leases will be satisfied at the hearing on this Motion. For the reasons stated throughout this Motion, the Debtors, in exercising their sound business judgment, believe that selling the Debtors' business and assuming and assigning and selling to the Purchaser the Assumed Contracts and Leases pursuant to the APA is in the best interests of their estates. Moreover, the Debtors have provided all reasonably known non-debtor counter-parties to the Assumed Contracts and Leases an opportunity to be heard. Finally, the

Debtors, as required by the Bidding Procedures Order, have evaluated the financial wherewithal of all potential bidders before qualifying such bidders to bid for the Assets.

42.     The Debtors assert that the procedures set forth in the Cure Procedures Order are reasonable and, that they ensure proper notice of the assumption and assignment of the Assumed Contracts and Leases, and sufficient opportunity to resolve any issues arising as to disputed Cure Amounts or other objections to the assumption and assignment of the Assumed Contracts and Leases.  Thus, the Debtors submit that the assumption and assignment of the Assumed Contracts and Leases to the Purchaser, subject to the Cure Procedures Order, should be approved.

**F.      Sale of the Assets and Assignment of Assumed Contracts and Leases Pursuant to the Terms of the APA are Proposed in "Good Faith" Under Section 363(m) of the Bankruptcy Code**

43.     The Debtors additionally request that the Court find that the Purchaser of the Assets pursuant to section 363 of the Bankruptcy Code be entitled to the protections provided by section 363(m) of the Bankruptcy Code in connection with the Sale of the Assets.

44.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

> The reversal or modification on appeal of an authorization under subsection (b) . . . of this section of a sale . . . of property does not affect the validity of a sale . . . under such authorization to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

45.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal.  By its terms, section 363(m) applies to sales of interests in tangible assets.  The Third Circuit has indicated that section 363(m) of the

DB02:9196769.2

068347.1001

Bankruptcy Code also protects the assignee of a debtor's interest in executory contracts under section 365 of the Bankruptcy Code. See Krebs Chrysler-Plymouth, Inc. v. Valley Motors, Inc., 141 F.3d 490, 497-98 (3rd. Cir. 1998).

46. Although the Bankruptcy Code does not define "good faith purchaser," the Third Circuit, construing section 363(m) of the Bankruptcy Code, has stated that "the phrase encompasses one who purchases in 'good faith' and for 'value'." Abbotts Dairies, 788 F.2d at 147. To constitute lack of good faith, a party's conduct in connection with the sale must usually amount to "fraud, collusion between the purchaser and other bidders or the trustee or an attempt to take grossly unfair advantage of other bidders." Id. (citing In re Rock Indus. Mach. Corp., 572 F.2d 1195, 1198 (7th Cir. 1978). See also In re Bedford Springs Hotel, Inc., 99 B.R. 302, 305 (Bankr. W.D. Pa. 1989); In re Perona Bros., Inc., 186 B.R. 833, 839 (D.N.J. 1995). Due to the absence of a bright line test for good faith, the determination is based on the facts of each case, concentrating on the "integrity of [an actor's] conduct during the sale proceedings." In re Pisces Leasing Corp., 66 B.R. 671, 673 (E.D.N.Y. 1986) (quoting Rock Indus. Machinery Corp., 572 F.2d at 1198 (7th Cir. 1978)).

47. As required by section 363(m) of the Bankruptcy Code, both the Debtors and each of the Qualified Bidders have acted, and will continue to act, in good faith in negotiating the sale of the Assets and the assignment of the Assumed Contracts and Leases. There is no evidence of fraud or collusion. To the contrary, as discussed throughout this Motion, the sale of the Assets will be the culmination of a lengthy negotiation process in which all parties are represented by sophisticated advisors. Based on the LOI's received to date, none of the Qualified Bidders are, nor will the Purchaser, be an insider of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations will be conducted on an arm's

length, good faith basis. The Bidding Procedures are designed to ensure that no party is able to exert undue influence over the process. Furthermore, the Bidding Procedures are designed to, and the Debtors through open and frank discussions with the Lenders have endeavored to create a process that will, prevent the Debtors or the Purchaser from engaging in any conduct that would cause or permit the sale of the Assets to the Purchaser to be avoided, or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.

48. All parties with an interest in the Assets, and as required by Bankruptcy Rule 2002, will receive notice of the Sale and will be provided an opportunity to be heard. Additionally, all non-Debtor counterparties to the Assumed Contracts and Leases will be provided with notice of the assumption and assignment and an opportunity to be heard. The Debtors submit that such notice is adequate for entry of the Order and satisfies the requisite notice provisions required under section 363(b) and 365 of the Bankruptcy Code. Under the circumstances, the Purchaser of the Assets pursuant to section 363 of the Bankruptcy Code should be afforded the benefits and protections that section 363(m) of the Bankruptcy Code provides to a good faith purchaser.

### G.  Authorizing the Exemption of the Sale Transaction from Stamp and Similar Taxes is Appropriate

49. Under section 1146(a) of the Bankruptcy Code, the "transfer. . . or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of this title, may not be taxed under any law imposing a stamp or similar tax." 11 U.S.C. § 1146(a).[16] Courts have broadly construed this provision to include sales and transfers that occur outside the corners of an actual chapter 11 plan of reorganization and before or after confirmation of that chapter 11 plan so long as the sales relate to a debtor's reorganization. See CCA P'ship v. Dir.

---

[16] Prior to the enactment of the Bankruptcy Abuse Prevention Consumer Protection Act ("BAPCPA") in 2005, section 1146(a) of the Bankruptcy Code was section 1146(c).

of Revenue, State of Del. (In re CCA P'ship), 70 B.R. 696 (Bankr. D. Del. 1987), aff'd 72 B.R. 765 (D. Del. 1987), aff'd, Dir. of Revenue, State of Del. v. CCA P'Ship, 833 F.2d 304 (3d Cir. 1987); See also City of New York v. Jacoby-Bender, Inc. (In re Jacoby-Bender. Inc.), 758 F.2d 840, 842 (2d Cir. 1985) (holding that section 1146(c) of the Bankruptcy Code applied when the "transfer, is necessary to the consummation of a plan"); In re United Press Int'l, Inc., Case No. 91-B-13955 (FSC), 1992 Bankr. LEXIS 842, at *4 (Bankr. S.D.N.Y. May 18, 1992) (section 1146(c) exemption applied to section 363 sale where "value of debtor's assets . . . likely to deteriorate [during] time necessary to . . . confirm a plan"); But see Baltimore County, Md. v. Hechinger Liquidation Trust (In re Hechinger Inv. Co. of Del., Inc.), 335 F.3d 243, 257 (3d Cir. 2003) (holding "that a real estate transaction is made 'under a plan confirmed under section 1129' [of the Bankruptcy Code] only where the sale is authorized by the terms of a previously confirmed Chapter 11 plan").

50.     Notwithstanding the Third Circuits' decision in Hechinger, the Third Circuit's approach in Hechinger, is generally viewed as too "restrictive [an] interpretation of transfers 'under a plan confirmed.'" In re Webster Classic Auctions, Inc., 318 B.R. 216, 218 (Bankr. M.D. Fla. 2004) (adopting an alternative to the holdings in the Second Circuit on the one hand, and the Third and Fourth Circuits on the other, that the only requirements to receive the safe harbors of § 1146(a) should be (1) a "plan of reorganization specifically contemplating a sale of property, and [(2)] the plan must ultimately be confirmed in order for a debtor to take advantage of § 1146(c)'s safe harbor." Id. at 219.). The court in Webster Classic Auctions, found that while the Hechinger bright-line interpretation is "appealing in its alleged simplicity, this temporal interpretation largely ignores the practical reality of Chapter 11 reorganization cases." Id. at 218. The seeds of a better reasoned approach are found in the Supreme Court's

holding in <u>Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.</u>, 128 S.Ct. 2326 (2008).

Notwithstanding the Supreme Court's holding that the Bankruptcy Code's stamp-tax exemption

does not apply to transfers made before a plan is confirmed under Chapter 11, "[t]he Supreme

Court did not, however, adopt <u>Hechinger's</u> interpretation that 'under a plan confirmed'

necessarily meant *authorized* by the plan. Interpreting the Supreme Court's ruling, the Court in

<u>In re New 118th, Inc.</u>, 398 B.R. 791, 797 (Bankr. S.D.N.Y. 2009), relied on the Fourth Circuit's

decision in <u>NVR Homes, Inc. v. Clerks of the Circuit Courts of Anne Arundel County (In re</u>

<u>NVR, LP )</u>, 189 F.3d 442 (4th Cir. 1999) which held that "[i]f a debtor is able to develop a

Chapter 11 reorganization and obtain confirmation, then the debtor is to be afforded relief from

certain taxation to facilitate the implementation of the reorganization plan. Before a debtor

reaches this point, however, the state and local tax systems may not be subjected to federal

interference." <u>In re New 118th, Inc.</u>, 398 B.R. 791, 797 (Bankr. S.D.N.Y. 2009) (internal

citations omitted). The court in <u>New 118th, Inc.</u>, went on to find that the Supreme Court "did not

address whether the exemption could apply to a pre-confirmation sale that closed post-

confirmation." <u>Id.</u> (finding that "the post-confirmation delivery of the deed, and hence, the

transfer, satisfies <u>Piccadilly's</u> 'simple, bright-line rule'"). "Furthermore, the Supreme Court's

adoption of the <u>NVR</u> standard, and by extension, the reasoning of <u>Jacoby-Bender</u>, suggests that

the § 1146(a) exemption applies to a post-confirmation *transfer* that follows a pre-confirmation

sale if the transfer facilitates the implementation of the plan, or in the words of <u>Jacoby-Bender</u>, is

necessary to the consummation of the plan." <u>New 118th, Inc.</u>, 398 B.R. at 797.

  51. Here, the Sale, if consummated, is an essential element of the Debtors'

reorganization efforts. Moreover, it is anticipated that the Debtors will confirm the Plan in short

order and/or in connection with the Sale contemplated by the APA or SPA. Therefore, the Sale should be deemed to be "under a plan" for purposes of section 1146(a) of the Bankruptcy Code.

### H. Relief from the Fourteen-Day Waiting Period Under Bankruptcy Rule 6004(h) and 6006(d) is Appropriate

52. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Bankruptcy Rule 6006(d) provides a similar fourteen-day stay of effectiveness for any order authorizing the assignment of an executory contract or lease.

53. Since promptly closing the Sale is of critical importance to any purchaser and the Debtors' efforts to preserve and maximize the value of the estates, the Debtors hereby request that the Court waive the fourteen-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

### PROCEDURE

54. Objections, if any, to the Sale, shall: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules of the Bankruptcy Court for the District of Delaware; (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 Market Street, Wilmington, Delaware 19801, on or before 4:00 p.m. (prevailing Eastern Time) on February 12, 2010 (the "Objection Deadline"), or such later date and time as the Debtors may agree; (d) shall set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estate or properties, the basis for the objection and the specific grounds therefor; and (e) be served so as to be received no later than the Objection Deadline, upon (i) (A) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019, Attn: Michael J. Kelly, Esq. and Lauren C. Cohen, Esq., and (B) Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington,

Delaware 19801, Attn: Robert S. Brady, Esq. and Matthew B. Lunn, Esq., Co-counsel for the Debtors; (ii) the Office of the United States Trustee for the District of Delaware, 844 King St., Suite 2207, Wilmington, DE 19801, Attn: Richard L. Schepacarter, Esq.; (iii) Moore & VanAllen, 100 North Tryon Street. Suite 4700, Charlotte, NC 28202-4003, Attn. David S. Walls, counsel to the First Lien Agent; (iv) Wachtell, Lipton, Rosen & Katz, 51 West 52nd Street, New York, NY 10019, Attn: Joshua Feltman, Esq., counsel to certain of the First Lien Lenders; and (v) counsel to the Second Lien Committee, or to the extent the Second Lien Committee has not yet been appointed, counsel to the Second Lien Group, Bracewell & Giuliani, LLP, 225 Asylum Street, Suite 2600, Hartford, Connecticut, 06103 (Attn: Kurt Mayr, Esq.).

## NOTICE

55.     Notice of this Motion will be given to: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to First Lien Agent; (iii) counsel to certain of the lenders under the Debtors' DIP Credit Agreement; (iv) counsel to the Second Lien Committee, or to the extent not yet appointed, the Second Lien Group; (v) all parties that have requested or are entitled to receive notice as of the date of service pursuant to Bankruptcy Rule 2002; (vi) all parties known to the Debtors to have an interest in or rights to the Assets; (vii) all parties reasonably believed to have an interest in acquiring the Debtors' Assets or the New Common Stock of the Reorganized Debtors; (viii) all non-Debtor parties to the Assumed Contracts and Leases; (ix) all taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; and (x) the Attorney(s) General in the State(s) where the Assets are located. The Debtors submit that, under the circumstances, no other or further notice is required.

**CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of the proposed order, substantially in the form attached hereto as <u>Exhibit C or D (as applicable)</u>, granting the relief requested herein and such other and further relief as the Court deems just and proper.

Dated:  Wilmington, Delaware
        January 27, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Robert S. Brady (No. 2847)
Matthew B. Lunn (No. 4119)
Ryan M. Bartley (No. 4985)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

-and-

WILLKIE FARR & GALLAGHER LLP
Michael J. Kelly
Lauren C. Cohen
787 Seventh Avenue
New York, New York  10019-6099
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

DB02:9196769.2

068347.1001