# EXHIBIT A

APA

# ASSET PURCHASE AGREEMENT

among

## CCS MEDICAL HOLDINGS, INC.,

## CERTAIN OF ITS SUBSIDIARIES NAMED HEREIN

and

## [BUYER]

**Dated as of _____ __, 2010**

# TABLE OF CONTENTS

ARTICLE I  DEFINITIONS ................................................................................1

 Section 1.1 Definitions ..................................................................................1

ARTICLE II  PURCHASE AND SALE ..................................................................9

 Section 2.1 Purchased Assets ........................................................................9
 Section 2.2 Excluded Assets ........................................................................10
 Section 2.3 Assumed Liabilities ...................................................................11
 Section 2.4 Excluded Liabilities ...................................................................12
 Section 2.5 Purchase Price. ..........................................................................12
 Section 2.6 Closing .......................................................................................12
 Section 2.7 Sellers' Closing Deliverables ....................................................13
 Section 2.8 Buyer's Closing Deliverables ....................................................13

ARTICLE III  REPRESENTATIONS AND WARRANTIES OF SELLERS ...........13

 Section 3.1 Corporate Organization .............................................................14
 Section 3.2 Authority; No Violation. ............................................................14
 Section 3.3 Consents and Approvals .............................................................14
 Section 3.4 Title to Assets ............................................................................14
 Section 3.5 All Assets Necessary to Conduct Business .................................15
 Section 3.6 Scheduled Agreements ...............................................................15
 Section 3.7 Compliance with Law ................................................................15
 Section 3.8 Broker's Fees .............................................................................15
 Section 3.9 Legal Proceedings ......................................................................15

ARTICLE IV  REPRESENTATIONS AND WARRANTIES OF BUYER ............15

 Section 4.1 Organization ..............................................................................16
 Section 4.2 Authority; No Violation. ............................................................16
 Section 4.3 Consents and Approvals .............................................................16
 Section 4.4 Financial Ability ........................................................................16
 Section 4.5 Brokers ......................................................................................17
 Section 4.6 Independent Investigation ..........................................................17

ARTICLE V  COVENANTS ................................................................................17

 Section 5.1 Conduct of Business Prior to the Closing Date ..........................17
 Section 5.2 Further Assurances .....................................................................17
 Section 5.3 Employees. ................................................................................17
 Section 5.4 Required Approvals ....................................................................19
 Section 5.5 Bankruptcy Matters; Other Covenants and Agreements .............20
 Section 5.6 Confidentiality ...........................................................................20

| Section 5.7 | Lease Deposits | 20 |
| Section 5.8 | Access to Information / Preservation of Books and Records | 21 |
| Section 5.9 | Publicity | 21 |
| Section 5.10 | Intellectual Property | 22 |
| Section 5.11 | Disclaimer of Warranties | 22 |

**ARTICLE VI CONDITIONS TO OBLIGATIONS OF BUYER** ..... 22

| Section 6.1 | Representations and Warranties of Sellers | 22 |
| Section 6.2 | Performance of Sellers' Obligations | 22 |
| Section 6.3 | Approval Order | 22 |
| Section 6.4 | No Violation of Orders | 22 |
| Section 6.5 | HSR Act | 23 |
| Section 6.6 | Documents | 23 |

**ARTICLE VII CONDITIONS TO OBLIGATIONS OF SELLERS** ..... 23

| Section 7.1 | Representations and Warranties of Buyer | 23 |
| Section 7.2 | Performance of Buyer's Obligations | 23 |
| Section 7.3 | Approval Order | 23 |
| Section 7.4 | Consents and Approvals | 23 |
| Section 7.5 | No Violation of Orders | 23 |
| Section 7.6 | HSR Act | 23 |
| Section 7.7 | Documents | 23 |

**ARTICLE VIII TERMINATION** ..... 24

| Section 8.1 | Termination | 24 |
| Section 8.2 | Effect of Termination | 25 |

**ARTICLE IX TAX MATTERS** ..... 25

| Section 9.1 | Transfer Taxes | 25 |
| Section 9.2 | Purchase Price Allocation | 25 |

**ARTICLE X MISCELLANEOUS** ..... 26

| Section 10.1 | Notices | 26 |
| Section 10.2 | Interpretation | 26 |
| Section 10.3 | Counterparts | 27 |
| Section 10.4 | Entire Agreement | 27 |
| Section 10.5 | Survival | 27 |
| Section 10.6 | Amendment; Waiver | 27 |
| Section 10.7 | Fees and Expenses | 28 |
| Section 10.8 | Governing Law; Jurisdiction | 28 |
| Section 10.9 | Assignment; Third Party Beneficiaries | 28 |
| Section 10.10 | Bulk Sales Laws | 28 |

DB02:9196872.1

068347.1001

Section 10.11  Specific Performance .......................................................................................29

List of Exhibits

Exhibit A – Form of Bill of Sale
Exhibit B – Form of Assignment and Assumption Agreement
Exhibit C – Form of Approval Order
Exhibit D – Form of Transition Services Agreement

DB02:9196872.1                                          068347.1001

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of [_____], 2010, is made and entered into by and among CCS Medical Holdings, Inc., a Delaware corporation ("Parent"), the subsidiaries of Parent listed on Annex I hereto (together with Parent, "Sellers"), and [_____], a [_____] ("Buyer").[1]

WHEREAS, on July 8, 2009 (the "Petition Date"), Sellers filed voluntary petitions for relief commencing cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, Sellers desire to sell to Buyer all of the Purchased Assets, and Buyer desires to purchase from Sellers the Purchased Assets and assume the Assumed Liabilities, upon the terms and conditions hereinafter set forth;

WHEREAS, the parties intend to effectuate the transactions contemplated by this Agreement through a sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code; and

WHEREAS, the execution and delivery of this Agreement and Sellers' ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Approval Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Definitions.   In this Agreement, the following terms have the meanings specified or referred to in this Section 1.1 and shall be equally applicable to both the singular and plural forms.

"Accounts Receivable" means all accounts and notes receivable of Sellers primarily related to the Business and outstanding as of the Closing Date, excluding any intercompany receivable from any Seller.

"Affiliate" means, with respect to any Person, any other Person which, at the time of determination, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under Common Control with such Person.

"Agreement" has the meaning set forth in the preamble.

---

[1]    **BUYER MUST BE A CREDITWORTHY ENTITY OR A CREDITWORTHY ENTITY MUST GUARANTEE BUYER'S OBLIGATIONS UNDER THIS AGREEMENT.**

"Allocation Schedule" has the meaning set forth in Section 9.2.

"Alternative Transaction" means (i) the direct or indirect sale, transfer or other disposition, in one or more transactions, of substantially all of the assets of Sellers, or all of the issued and outstanding capital stock of Sellers, to one or more third parties, or (ii) the consummation of the transactions contemplated by the Plan of Reorganization.

"Ancillary Documents" means, collectively, the Bill of Sale, Assignment and Assumption Agreement, Transition Services Agreement and each other agreement, instrument or document being executed and delivered under this Agreement or in connection herewith.

"Approval Order" means that certain Order, in form and substance reasonably acceptable to Buyer and to Sellers and substantially in the form annexed hereto as Exhibit C, approving, among other things, this Agreement and the transactions contemplated herein.

"Assignment and Assumption Agreement" means the Assignment and Assumption Agreement in the form attached hereto as Exhibit B.

"Assumed Contracts" means any and all contracts and agreements to which any Seller is a party and which relate primarily to the Business (other than Excluded Contracts), including, but not limited to:

(a)     the Scheduled Contracts;

(b)     contracts or purchase orders with any customer or supplier of the Business;

(c)     contracts or agreements with respect to services rendered or goods sold or leased to or from third parties;

(d)     contracts for the purchase by Sellers of supplies, components or equipment;

(e)     license agreements (other than any such agreement the subject matter of which is off-the-shelf, commercially available software);

(f)     contracts with employees of Sellers;

(g)     contracts containing covenants or provisions prohibiting employees of Sellers from engaging in any line or type of business that competes with the Business; and

(h)     marketing agreements.

"Assumed Leases" has the meaning set forth in Section 2.1(d).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

2

"Auction" means that certain auction held pursuant to the Bidding Procedures Order.

"Bankruptcy Case" means the chapter 11 cases of Sellers.

"Bankruptcy Code" means title 11 of the United States Code.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bankruptcy Estate" means the bankruptcy estate that exists by virtue of the Bankruptcy Case.

"Bidding Procedures Order" means the Order of the Bankruptcy Court entered on November 24, 2009, as may be amended from time to time, approving, among other things, the bidding procedures in connection with the proposed sale of substantially all of the assets of Sellers.

"Bill of Sale" means the Bill of Sale with respect to the Purchase Assets in the form attached hereto as Exhibit A.

"Books and Records" mean all documents used by Sellers in connection with, or relating to, the Purchased Assets or the Assumed Liabilities, including all files, data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), which, for the avoidance of doubt, shall exclude the Retained Books and Records.

"Business" means the business activities and operations of Sellers with respect to the medical supply management business of delivering products and services to individuals living with select chronic medical conditions.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks are not generally open for business in New York City.

"Buyer" has the meaning set forth in the preamble.

"Buyer Ancillary Documents" means all Ancillary Documents being or to be executed and delivered by Buyer or an Affiliate of Buyer.

"Buyer Disclosure Schedule" has the meaning set forth in Article IV.

"Cash Purchase Price" has the meaning set forth in Section 2.5(a).

"Closing" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.6.

"COBRA Continuation Coverage" has the meaning set forth in Section 5.3(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Confidentiality Agreement by and between Parent and Buyer, dated as of [_____].

"Control" means, as to any Person, the ownership or possession, directly or indirectly, through one or more intermediaries, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by" and "under Common Control with" have correlative meanings.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assumed Contracts to the extent required by section 365 of the Bankruptcy Code and any order of the Bankruptcy Court.

"Deposit Amount" has the meaning set forth in Section 2.5(b).

"DIP Credit Agreement" means that certain $10,000,000 Debtor in Possession Credit Agreement, dated as of July 14, 2009, by and among Sellers, Imperial Capital, LLC, as administrative agent and collateral agent, and the other lenders party thereto, as may be amended from time to time.

"Disclosure Schedules" means the Buyer Disclosure Schedule and the Sellers Disclosure Schedule.

"Employees" has the meaning set forth in Section 5.3(a).

"Encumbrances" means all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Purchased Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting title to the Purchased Assets or any part thereof or interest therein.

"Equipment" means (i) all of the equipment, machinery, furniture, computers, laptops, servers and related hardware, facsimile machines, duplicating machines, fixtures and improvements, supplies, tangible property and vehicles, in each case owned by Sellers and used primarily in the Business as of the Closing Date, (ii) any rights of Sellers to the warranties (to the extent assignable) and licenses received from the manufacturers of the aforesaid items, and (iii) any related claims, credits, rights of recovery and set-off with respect thereto.

4

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" has the meaning set forth in Section 2.2(c).

"Excluded Leases" has the meaning set forth in Section 2.2(d).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Existing Credit Facilities" means the First Lien Credit Agreement, the Second Lien Credit Agreement, the PIK Credit Agreement and the DIP Credit Agreement.

"First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of September 30, 2005, by and among CCS Acquisition Holding-Sub Corporation, CCS Medical, Inc., as borrower, the lenders party thereto, Wachovia Bank, National Association, as administrative agent, Bank of America, N.A., as syndication agent, and JPMorgan Chase Bank, N.A., as documentation agent.

"GAAP" means United States generally accepted accounting principles as in effect on the date of this Agreement.

"Governmental Entity" means any foreign, federal or state insurance or other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Intellectual Property Rights" means trade or brand names, business names, trade marks (including logos), trade mark registrations and applications, service marks, service mark registrations and applications, copyrights, copyright registrations and applications, internet domain names, issued patents and pending applications and other patent rights, industrial design registrations, pending applications and other industrial design rights, trade secrets, proprietary information and know how, equipment and parts lists and descriptions, instruction manuals, inventions, inventors' notes, research data, blue prints, drawings and designs, formulae, processes, computer software (including source code, executable code, firmware, data, databases and technical documentation), internal-use software, and technical manuals and documentation used in connection therewith, technology and other intellectual property, together with all rights under licenses, registered user agreements, technology transfer agreements, other agreements or instruments relating to any of the foregoing, and goodwill associated with any of the foregoing.

"Knowledge of Sellers" means, as to a particular matter, the actual knowledge of any of the individuals set forth in Schedule 1.1.

"Law" means applicable statutes, common laws, rules, ordinances, regulations, codes, orders, judgments, injunctions, writs, decrees, governmental guidelines or interpretations having the force of law or bylaws, in each case, of a Governmental Entity.

"Leased Real Property" means (i) all real property leased by Sellers and used in connection with the Business and (ii) all real property leased or subleased by Sellers and used in connection with the Business and used or occupied as lessor or sublessor to third parties.

"Leases" means all leases, licenses, subleases and other occupancy agreements and agreements relating thereto, together with any amendments or modifications thereto (including, without limitation, subordination, non-disturbance and attornment agreements).

"Lease Security Deposit" has the meaning set forth in Section 5.7(a).

"Material Adverse Effect" means any change, effect, event, occurrence or development that has a material adverse effect on the ability of Sellers to timely consummate the transactions contemplated by this Agreement; except that any such material adverse effect that results from or arises out of any of the following shall not be considered in determining whether a Material Adverse Effect has occurred: (A) the announcement of the execution and delivery of this Agreement; (B) with respect to Sellers, events relating to or resulting from the Bankruptcy Case; (C) changes in general economic or political conditions or the securities markets in general; (D) the taking of any action specifically required by this Agreement; (E) changes in Laws or changes in GAAP; (F) any outbreak or escalation of hostilities or war or any act of terrorism; (G) any weather-related or other force majeure event; (H) any outbreak of illness or other public health-related event; or (I) any facts, conditions, changes, violations, inaccuracies, circumstances, effects or events that are generally applicable to Persons engaged in the industry in which Sellers operate.

"Next-Highest Bidder" shall have the meaning given to such term in the Bidding Procedures Order.

"Order" means any order, decision, injunction, directive, judgment, decree, ruling, writ, assessment, award, decision, stipulation or verdict.

"Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Business through the date of this Agreement, consistent with past practice from and after the Petition Date.

"Outside Date" has the meaning set forth in Section 8.1(c).

"Parent" has the meaning set forth in the preamble.

"Permitted Encumbrance" means (a) Encumbrances for current Taxes, special assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP and are not material in amount or value in relation to the value of the associated property; (b) mechanics', materialmen's, carriers',

workers', repairers' and similar statutory liens arising or incurred in the Ordinary Course of Business; (c) deposits or pledges made in the Ordinary Course of Business in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable Law or other social security; (d) easements, covenants, conditions, claims, restrictions or other similar matters of record on real property, leasehold estates or personalty that would not be reasonably likely to have a material adverse effect on the use, title, value or possession of the property subject thereto; (e) Encumbrances that constitute Assumed Liabilities (including Encumbrances arising under the Assumed Contracts and the Assumed Leases); (f) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect which would not be reasonably likely to have a material adverse effect on the use, title, value or possession of the property subject thereto; and (vii) Encumbrances that will be released on or prior to the Closing whether pursuant to the Approval Order or otherwise.

"Permitted Recipient" has the meaning set forth in Section 5.6.

"Permits" mean all material licenses, franchises, permits, approvals and other authorizations from a Governmental Entity that are used by or held in the name of Sellers, including but not limited to, Medicaid billing numbers and Medicare supplier numbers.

"Person" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or other entity or Governmental Entity.

"Petition Date" has the meaning set forth in the recitals.

"PIK Credit Agreement" means that certain Credit Agreement, dated as of September 30, 2005, by and among CCS Acquisition Holding-Sub Corporation, the lenders party thereto and Bank of America, N.A., as administrative agent.

"Plan of Reorganization" means that certain Second Joint Chapter 11 Plan of Reorganization for CCS Medical, Inc. and its Affiliated Debtors to be filed with the Bankruptcy Court on [_____] and as may be amended or supplemented from time to time.

"PTO Liabilities" means all unused vacation time and paid time off accrued by the Transferred Employees prior to the Closing Date as provided under Sellers' applicable vacation and paid time off policies and guidelines.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Inventory" has the meaning set forth in Section 2.1(e).

"Purchased Lease Security Deposit" has the meaning set forth in Section 2.1(i).

"Purchase Price" has the meaning set forth in Section 2.5(a).

"Representative" means any Person's Affiliates, and such Person's and its Affiliates' respective directors, officers, employees, agents, advisors, attorneys, accountants, consultants and representatives.

"Retained Books and Records" means (A) any documents (including books and records) that any Seller is required by applicable Law to retain, (B) all of Sellers' organizational documents, taxpayer and other identification numbers, minute books, stock ledgers, corporate seals, stock certificates and other documents relating to the existence, organization, maintenance, actions of share capitalization of Sellers, and (C) any books and records or information related to any Excluded Asset or Excluded Liability, including with respect to Permits;

"Scheduled Agreements" has the meaning set forth in Section 3.6.

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of September 30, 2005, by and among CCS Acquisition Holding-Sub Corporation, CCS Medical, Inc., as borrower, the lenders party thereto, Wachovia Bank, National Association, as administrative agent, Bank of America, N.A., as syndication agent, and JPMorgan Chase Bank, N.A., as documentation agent.

"Security Deposit Payments" has the meaning set forth in Section 5.7(b).

"Seller Ancillary Documents" means all Ancillary Documents being or to be executed and delivered by Sellers.

"Seller Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and all other employee compensation and benefits plans, policies, programs, arrangements or payroll practices, including multiemployer plans within the meaning of Section 3(37) of ERISA, and each other stock purchase, stock option, restricted stock, severance, retention, employment, consulting, change-of-control, collective bargaining, bonus, incentive, deferred compensation, employee loan, fringe benefit and other benefit plan, agreement, program, policy, commitment or other arrangement, whether or not subject to ERISA (including any related funding mechanism now in effect or required in the future), whether formal or informal, oral or written, in each case sponsored, maintained, contributed or required to be contributed to by Sellers for the benefit of its employees or directors.

"Sellers" has the meaning set forth in the preamble.

"Sellers Disclosure Schedule" has the meaning set forth in Article III.

"Successful Bidder" has the meaning assigned to such term in the Bidding Procedures Order.

"Tax" means (i) all federal, state, local and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, payroll, employment, severance, withholding, duties, intangibles, franchise, backup withholding, value added and other taxes, charges, levies or like assessments together with all penalties and additions to tax and interest thereon and (ii) any liability for the payment of any amounts of the

8

type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor, by contract or otherwise.

"Tax Return" means any federal, state, local or foreign (including any other governmental subdivision or taxing authority) tax return, report or similar statement, and any declaration, statement, claim for refund, report, schedule, form, or information return, or any amendment to any of the foregoing, relating to Taxes and all attachments thereto, as well as any records or documents that are required to be kept or maintained by applicable Law.

"Trade Claim" means any unsecured claim arising prior to the Petition Date relating to the delivery of goods or services to a Seller from trade creditors or service providers in the ordinary course of a Seller's business which goods or services providers are designated by the Buyer in consultation with the Sellers as a provider from whom Buyer will require goods or services after the Closing Date.

"Transfer Taxes" means any real property transfer or gains, real property excise, sales, use, transfer, value added, stock transfer and stamp taxes, any transfer, recording, registration and other fees, and any similar Taxes which become payable in connection with the transactions contemplated by this Agreement, other than any such taxes imposed upon or relating to the income or gain of Sellers.

"Transferred Employees" has the meaning set forth in Section 5.3(a).

"Transition Services Agreement" means the Transition Services Agreement in the form attached hereto as Exhibit D.

## ARTICLE II
## PURCHASE AND SALE

Section 2.1    Purchased Assets.  On the Closing Date, subject to the terms and conditions of this Agreement, Sellers shall sell, transfer, assign, convey and deliver to Buyer, and Buyer shall purchase from Sellers, all of Sellers' rights, titles and interests in, to or under all of the following properties and assets of Sellers free and clear of any and all Encumbrances, other than Permitted Encumbrances and Assumed Liabilities (collectively, the "Purchased Assets"), and specifically excluding the Excluded Assets (as defined in Section 2.2):

(a)    the Accounts Receivable;

(b)    the Equipment;

(c)    the Assumed Contracts and all rights thereunder;

(d)    all Leases of Leased Real Property listed on or described in Schedule 2.1(d), including any improvements to such Leased Real Property (the "Assumed Leases"), excluding Lease Security Deposits and credit for prepaid rent associated with such Leases;

(e)    (i) all inventory listed on <u>Schedule 2.1(e)</u> (the "<u>Purchased Inventory</u>"), (ii) any rights of Sellers to the warranties (to the extent assignable) and licenses received from the manufacturers of the Purchased Inventory and (iii) any related claims, credits, rights of recovery and set-off with respect thereto, in each case, solely to the extent that the sale and transfer of such items set forth in items (i) – (iii) above to Buyer shall not violate applicable Law;

(f)    all Intellectual Property Rights owned by Sellers or which Sellers have the right to transfer or assign;

(g)    all assets under the Seller Benefit Plans set forth on <u>Schedule 2.1(g)</u>;

(h)    all Books and Records (<u>provided, that</u>, Sellers may retain one copy of all such Books and Records);

(i)    any Lease Security Deposit that has not been returned to Sellers as contemplated by <u>Section 5.7(b)</u> (each, a "<u>Purchased Lease Security Deposit</u>");

(j)    all rights to proceeds under insurance policies relating to claims arising from and after the date of this Agreement for losses related to any Purchased Asset or Assumed Liability; and

(k)    all other assets, properties and rights used or held for use by Sellers primarily related to the Business on the Closing Date.

Section 2.2    <u>Excluded Assets</u>.    Notwithstanding anything to the contrary contained herein, nothing herein shall be deemed to sell, transfer, assign, convey or deliver the Excluded Assets to Buyer, and Sellers shall retain all rights, titles and interests to, in and under the Excluded Assets.  For purposes of this Agreement, the term "<u>Excluded Assets</u>" shall mean:

(a)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, in each case, at or prior to 12:01 A.M., New York City time on the Closing Date;

(b)    all shares of capital stock or other equity interests of any Seller (and any subsidiary of any Seller) or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interests of any Seller (and any subsidiary of any Seller);

(c)    all contracts and agreements listed on or described in <u>Schedule 2.2(c)</u>, and any contracts, the assignment of which requires consent of the other party thereto pursuant to Section 365(c)(1) of the Bankruptcy Code, which consent has not been obtained as of the Closing Date (the "<u>Excluded Contracts</u>");

(d)    any Leases of Leased Real Property listed on or described in <u>Schedule 2.2(d)</u> (the "<u>Excluded Leases</u>");

(e)    any Lease Security Deposit that is not a Purchased Lease Security Deposit;

(f)     all Permits;

(g)     all Retained Books and Records;

(h)     all security, vendor, utility, and other similar deposits, prepaid expenses, prepaid rent, advances, advance payments, prepayments, deferred charges or rebates in favor of Sellers (other than the Lease Security Deposits), including workers' compensation collateral;

(i)     any asset of any Seller that would constitute Purchased Assets (if owned by such Seller on the Closing Date) that is conveyed or otherwise disposed of during the period from the date of this Agreement until the Closing Date (1) in the ordinary course of business consistent with past practices or (2) as otherwise permitted by the terms of this Agreement;

(j)     any rights, claims or causes of action of Sellers under this Agreement, the Ancillary Documents, or any other contract or agreement to which Buyer and a Seller are party;

(k)     all Tax Returns of any Seller and all claims or potential claims for refunds of Taxes due, or that may become due, to any Seller;

(l)     all bank accounts and safety deposit boxes;

(m)     all claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Sellers arising outside of the Ordinary Course of Business, including, but not limited to, causes of action arising out of or related to the Bankruptcy Case;

(n)     all claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Sellers against, or receivable from, any Seller or any Affiliate thereof or against any director, officer, employee, representative or agent of the foregoing;

(o)     all preference or avoidance claims and actions of Sellers under chapter 5 of the Bankruptcy Code, including any such claims and actions arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code;

(p)     all receivables, claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Sellers related to any Excluded Asset;

(q)     all rights to proceeds under insurance policies relating to claims arising prior to the date of this Agreement for losses related to any Excluded Asset or Excluded Liability; and

(r)     all assets of any Seller set forth on <u>Schedule 2.2(s)</u>.

Section 2.3     <u>Assumed Liabilities</u>. From and after the Closing Date, Buyer shall assume and Buyer hereby agrees to pay, perform and discharge when due, the following

liabilities and obligations of Sellers (such liabilities and obligations are hereinafter referred to as the "Assumed Liabilities"):

       (a)    all accounts payable and accrued expenses of Sellers as of the Closing Date related to the Business which have been incurred in the Ordinary Course of Business and Sellers' general overhead expenses (including, without limitation, rent, utilities, insurance and taxes);

       (b)    all liabilities, obligations and duties to perform under any of the Assumed Contracts and the Assumed Leases;

       (c)    all liabilities, obligations and duties to perform under the Seller Benefit Plans, subject to Section 5.3(b) below;

       (d)    all Trade Claims;

       (e)    all Cure Costs;

       (f)    the PTO Liabilities; and

       (g)    all liabilities and obligations with respect to or relating to the Purchased Assets.

       Section 2.4    Excluded Liabilities.   Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obligated to pay, perform or otherwise discharge any liabilities other than the Assumed Liabilities (collectively, the "Excluded Liabilities"), including, but not limited to any liability or obligation relating to or arising out of the ownership or operation of an Excluded Asset, and any liability or obligation of Sellers under the Existing Credit Facilities.

       Section 2.5    Purchase Price.

       (a)    The purchase price for the Purchased Assets (the "Purchase Price") shall be (i) $[_____] in cash, payable by wire transfer of immediately available funds (the "Cash Purchase Price") and (ii) the assumption by Buyer of the Assumed Liabilities.

       (b)    Prior to or simultaneously with the execution of this Agreement, Buyer shall have deposited with Seller, pursuant to the Bidding Procedures Order, an amount equal to $[10% OF THE CASH PURCHASE PRICE] (the "Deposit Amount"). The Deposit Amount shall be credited against the Purchase Price at the Closing. Sellers shall have the right to retain the Deposit Amount upon termination of this Agreement prior to the Closing if, at the time of such termination, Buyer is in breach of any provision of this Agreement. Buyer shall have the right to receive the Deposit Amount upon termination of this Agreement prior to Closing if, at the time of such termination, Buyer is not then in breach of any provision of this Agreement.

       Section 2.6    Closing.  The closing of the sale and purchase of the Purchased Assets (the "Closing") shall take place as promptly as practicable, and in any event no later than

the third (3rd) Business Day following the date on which the conditions set forth herein have been satisfied or waived (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and date as the parties hereto shall agree in writing (the "Closing Date"). The Closing shall take place at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, or at such other place as the parties hereto shall agree in writing.

Section 2.7    Sellers' Closing Deliverables.  At the Closing, Sellers shall deliver or cause to be delivered to Buyer:

(a)    a duly executed counterpart to the Bill of Sale;

(b)    a duly executed counterpart to the Assignment and Assumption Agreement;

(c)    a duly executed counterpart to the Transition Services Agreement; and

(d)    a certificate executed by a duly elected officer of Parent certifying that the conditions set forth in Sections 6.1 and 6.2 have been satisfied.

Section 2.8    Buyer's Closing Deliverables.  At the Closing, Buyer shall deliver or cause to be delivered to Sellers:

(a)    the Cash Purchase Price (less the Deposit Amount) by wire transfer of immediately available funds to the account(s) specified by Sellers prior to Closing;

(b)    a duly executed counterpart to the Assignment and Assumption Agreement;

(c)    a duly executed counterpart to the Transition Services Agreement; and

(d)    a certificate executed by a duly elected officer of Buyer certifying that the conditions set forth in Sections 7.1 and 7.2 have been satisfied.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Subject to and as qualified by items disclosed in (a) the Schedules of Assets and Liabilities or the Statement of Financial Affairs, each as filed with the Bankruptcy Court in connection with the Bankruptcy Cases, or (b) the disclosure schedule (the "Sellers Disclosure Schedule") delivered by Sellers to Buyer prior to the execution of this Agreement (it being understood that (x) disclosure in any section of such Sellers Disclosure Schedule shall be deemed to be disclosed in other sections of such Sellers Disclosure Schedule to the extent that it is reasonably discernible that such disclosure that such disclosure is relevant to another section of such Sellers Disclosure Schedule, and (y) notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such Sellers Disclosure Schedule shall not be deemed an admission that such item represents a material exception or material fact, event or

circumstance or that such item has had or would be reasonably likely to result in a Material Adverse Effect), Sellers hereby, jointly and severally, represent and warrant to Buyer as follows:

Section 3.1   Corporate Organization.   Each Seller is a corporation, limited liability company or limited partnership (as applicable) and is duly organized, validly existing and, as of the date of this Agreement, in good standing under the laws of the jurisdiction of its organization as set forth on Schedule 3.1. Each Seller has the requisite corporate or similar power and authority to own or lease all of its properties and assets and to carry on its business as it is presently being conducted (subject to the provisions of the Bankruptcy Code), and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by such Seller or the character or location of the properties and assets owned or leased by such Seller makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not reasonably be expected to result in a Material Adverse Effect.

Section 3.2   Authority; No Violation.

(a)   Each Seller has full corporate or similar power and authority to execute and deliver this Agreement and the Seller Ancillary Documents executed by such Seller and, subject to the entry of the Approval Order, to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Approval Order, the execution and delivery of this Agreement and the Seller Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by Sellers. This Agreement has been, and the Seller Ancillary Documents have been, or will at Closing be, duly and validly executed and delivered by Sellers and (assuming due authorization, execution and delivery by Buyer or the other parties thereto, as applicable and subject to the entry of the Approval Order) constitute the valid and binding obligations of Sellers, enforceable against Sellers in accordance with their respective terms (except as may be limited by bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws of general applicability relating to or affecting the rights of creditors generally and subject to general principles of equity).

(b)   Neither the execution and delivery of this Agreement or the Seller Ancillary Documents by Sellers, nor the consummation by Sellers of the transactions contemplated hereby or thereby, nor compliance by Sellers with any of the terms or provisions of this Agreement, will (i) violate any provision of the respective organizational documents of Sellers or (ii) violate in any material respect any Law, judgment, order, injunction or decree applicable to Sellers or any of their properties or assets.

Section 3.3   Consents and Approvals.   Other than the Approval Order and except as required by the HSR Act, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by Sellers of this Agreement or the consummation by Sellers of the transactions contemplated by this Agreement or the Seller Ancillary Documents.

Section 3.4   Title to Assets.   Sellers have good title to, or a valid and subsisting leasehold interest in or valid rights under contract to use, all of the Purchased Assets, and, by

14

virtue of the sale, transfer, conveyance, assignment and delivery of the Purchased Assets hereunder and subject to the Bankruptcy Court's approval of the transactions contemplated by this Agreement, including the approval of the assumption and assignment of such Purchased Assets, at the Closing, Buyer shall receive good title to the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances.

Section 3.5    All Assets Necessary to Conduct Business.  As of the date of this Agreement, the Purchased Assets (together with the Excluded Assets) comprise all of the assets, properties and rights of every type and description, real, personal, tangible and intangible, used by Sellers in the conduct of the Business as presently conducted.

Section 3.6    Scheduled Agreements.  Schedule 3.6 sets forth a complete and accurate list of the following agreements to which any Seller is a party (collectively, the "Scheduled Agreements"): (i) contracts with any employee of Sellers; and (ii) contracts for the purchase of, or payment for, supplies or products, or for the performance of services by a third party which supplies products or services, that are used in the conduct of the Business, which involves consideration paid by Sellers in excess of $10,000,000 per year.

Section 3.7    Compliance with Law.  As of the date of this Agreement, Sellers are not in material breach or violation of, or default under, any material requirement of Law applicable to Sellers.

Section 3.8    Broker's Fees.  Neither Sellers nor any Person acting on behalf of Sellers have incurred any liability for any broker's fees, commissions or finder's fees in connection with the transactions contemplated by this Agreement for which Buyer will be responsible.

Section 3.9    Legal Proceedings.  As of the date of this Agreement, there are no pending or, to the Knowledge of Sellers, threatened, legal, administrative, arbitral or other proceedings, claims, actions, suits or governmental or regulatory investigations of any nature to which any Seller is a party relating to the Purchased Assets or the transactions contemplated hereby, except, in each case, in connection with the Bankruptcy Cases or as would not reasonably be expected to result in a Material Adverse Effect.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Subject to and as qualified by items disclosed in the disclosure schedule (the "Buyer Disclosure Schedule") delivered by Buyer to Sellers prior to the execution of this Agreement (it being understood that (a) disclosure in any section of such Buyer Disclosure Schedule shall be deemed to be disclosed in other sections of such Buyer Disclosure Schedule to the extent that it is reasonably discernible that such disclosure that such disclosure is relevant to another section of such Buyer Disclosure Schedule, and (b) notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance), Buyer hereby represents and warrants to Sellers as follows:

15

Section 4.1 Organization. Buyer is a [_____] duly organized, validly existing and, as of the date of this Agreement, in good standing under the laws of the State of [___________]. Buyer has the requisite corporate or similar power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not reasonably be expected to impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

Section 4.2 Authority; No Violation.

(a) Buyer has full corporate or similar power and authority to execute and deliver this Agreement and the Buyer Ancillary Documents, and subject to the provisions of the Bankruptcy Code, to consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Buyer Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by Buyer and no other corporate or similar proceedings on the part of Buyer are necessary to approve this Agreement or the Buyer Ancillary Documents or to consummate the transactions contemplated hereby or thereby. This Agreement and the Buyer Ancillary Documents have been duly and validly executed and delivered by Buyer and (assuming due authorization, execution and delivery by Sellers) constitute the valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms (except as may be limited by bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws of general applicability relating to or affecting the rights of creditors generally and subject to general principles of equity).

(b) Neither the execution and delivery of this Agreement or the Buyer Ancillary Documents by Buyer, nor the consummation by Buyer of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the terms or provisions of this Agreement or the Buyer Ancillary Documents, will (i) violate any provision of the organizational documents of Buyer, or (ii) violate any Law, judgment, order, injunction or decree applicable to Buyer.

Section 4.3 Consents and Approvals. Other than the Approval Order and except as required by the HSR Act, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the transactions contemplated by this Agreement or the Buyer Ancillary Documents.

Section 4.4 Financial Ability. Buyer has, and will have at Closing, sufficient immediately available funds to pay the Purchase Price at Closing and perform its obligations hereunder.

Section 4.5     Brokers.   Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

Section 4.6     Independent Investigation.   Buyer hereby acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Purchased Assets and Assumed Liabilities, that it has made all such reviews and inspections of the Purchased Assets and Assumed Liabilities as it has deemed necessary or appropriate, and that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied on its own independent investigation, analysis and evaluation of Sellers' representations and warranties made in Article III.

ARTICLE V
COVENANTS

Section 5.1     Conduct of Business Prior to the Closing Date.   Except as (i) expressly permitted by this Agreement, (ii) approved by the Bankruptcy Court, (iii) contemplated by the Plan of Reorganization, or (iv) with the written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement to the Closing Date, Sellers shall conduct the Business in the Ordinary Course of Business and in compliance in all material respects with all applicable Laws.

Section 5.2     Further Assurances.   Upon the request of a party hereto at any time after the Closing, the other party will execute and deliver such further instruments of assignment, transfer, conveyance, endorsement, direction or authorization and other documents as the requesting party or its counsel may reasonably request in order to perfect title of Buyer to the Purchased Assets or otherwise effectuate the purposes of this Agreement.

Section 5.3     Employees.

(a)     Employee Offers.   At least five (5) days prior to the Closing Date, Buyer shall offer employment to each of the employees of Sellers (the "Employees"), in a comparable position and at the substantially same rate of base pay as they are currently employed.  Each Employee to whom Buyer has made an offer of employment pursuant to this Section 5.3 and that has accepted such offer and commences employment with Buyer is hereinafter referred to as a "Transferred Employee".

(b)     Benefits.   Buyer shall adopt and assume, as of the Closing Date, each of the Seller Benefit Plans with respect to all benefits to be provided under the provisions of such Seller Benefit Plans.  With respect to each Seller Benefit Plan, Buyer or any Person designated by Buyer, will be substituted for the applicable Seller as the plan sponsor under each such Seller Benefit Plan and Buyer shall have all rights of such Seller thereunder, including, without limitation, full authority to maintain, amend or terminate any such Seller Benefit Plan at any time, in Buyer's sole discretion.   Sellers agree to cooperate with Buyer in adopting and effectuating any plan amendments to the Seller Benefit Plans reasonably desired by Buyer, so long as such amendments are effective as of, or after, the Closing Date and are consistent with applicable Law.  The parties agree to cooperate in all respects and take any actions necessary to

17

implement the assumption by Buyer of the Seller Benefit Plans. Effective as of the Closing Date, the Transferred Employees shall cease to be covered by the Seller Benefit Plans. Expenses and benefits with respect to claims incurred by Transferred Employees or their covered dependents on or after the Closing Date shall be the responsibility of Buyer. For purposes of this paragraph, a claim is deemed incurred by a Transferred Employee (i) in the case of medical or dental benefits, when the services that are the subject of the claim are performed; (ii) in the case of life insurance, when the death occurs; (iii) in the case of long-term disability benefits, when the disability occurs; (iv) in the case of workers compensation benefits, when the event giving rise to the benefits occurs; and (v) otherwise, at the time the Transferred Employee or covered dependent becomes entitled to payment of a benefit (assuming that all procedural requirements are satisfied and claims applications properly and timely completed and submitted)

(c)     COBRA Coverage. Buyer shall be responsible for providing, and shall assume all liabilities in respect of, the provision of continued medical coverage pursuant to its group health plans for employees under Part 6, Title I of ERISA and Section 4980B of the Code ("COBRA Continuation Coverage"), for all current and former employees of Sellers and their dependents with respect to any "qualifying event" (within the meaning of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended) incurred on or prior to the Closing Date or otherwise arising as a result to the transactions described herein. Immediately prior to the Closing, Sellers will provide to Buyer a list of all Employees (i) terminated by Sellers within the ninety (90) days immediately preceding the Closing, and (ii) receiving COBRA Continuation Coverage on that date.

(d)     Eligibility; Service Credit. From and after the Closing Date, each Transferred Employee shall (to the extent permitted by applicable Laws) be credited under each of Buyer's employee benefit plans or programs in which such Transferred Employee participates, with his or her years of service with Sellers before the Closing Date for purposes of vesting, eligibility, and level of benefits (except for purposes of benefit accrual under a defined benefit pension plan or where such credit would result in a duplication of benefits) to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service with Sellers under any similar Seller Benefit Plan in which such Transferred Employee participated immediately prior to the Closing Date. In addition, and without limiting the generality of the foregoing, Buyer shall use its commercially reasonable efforts to (i) cause to be waived any eligibility requirements (to the extent such requirements were satisfied by the applicable Transferred Employee prior to the Closing Date with respect to the similar Seller Benefit Plan) or pre-existing condition limitations applicable to any Transferred Employee, and (ii) give effect, in determining any deductible maximum out of pocket limitations, to amounts paid by any Transferred Employee during the plan year in which the Closing Date occurs. Without limiting the generality of any of the foregoing, Buyer agrees to assume all PTO Liabilities.

(e)     No Third Party Beneficiaries. Notwithstanding anything set forth in this Section 5.3, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Seller Benefit Plan or (ii) shall limit the right of Buyer or any of its Affiliates to amend, terminate or otherwise modify any Seller Benefit Plan or any of Buyer's or any of its Affiliate's employee benefit plans or programs following the Closing Date.

Without limiting the generality of the preceding sentence, Sellers and Buyer acknowledge and agree that all provisions contained in this <u>Section 5.3</u> with respect to current and former employees of Sellers are included for the sole benefit of Sellers and Buyer, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (x) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of any Seller, any participant in any Seller Benefit Plan, or any dependent or beneficiary thereof, or (y) to continued employment with Buyer or any of its Affiliates.

(f)     Notwithstanding anything to the contrary contained herein, nothing in this <u>Section 5.3</u> shall be deemed to require Sellers to delay or otherwise alter the completion of the Bankruptcy Cases.

Section 5.4     <u>Required Approvals</u>.

(a)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the parties hereto shall use their best efforts to cooperate and take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any applicable Laws) to satisfy the conditions set forth in <u>Sections 6.5</u> and <u>7.6</u> hereof, including, the preparation and filing of all forms, registrations and notices required pursuant to applicable anti-trust Law to be filed to consummate the Closing. In furtherance of the foregoing, the parties shall as promptly as reasonably practicable following the execution of this Agreement, make all premerger notification filings required under (i) the HSR Act (which shall in no event be made more than ten (10) Business Days after the date of this Agreement), and (ii) the pre-merger notification rules in any other jurisdiction in which the parties agree applicable Law requires a premerger notification filing (which filing shall be made promptly following such determination). Buyer shall be responsible for and shall pay all fees and other costs in respect of any required premerger notification filings.

(b)     The parties shall use their best efforts to take all steps as may be necessary to obtain an approval from, or to resolve an action or proceeding by, any Governmental Entity, whether by judicial or administrative action, challenging this Agreement or the consummation of the transactions contemplated hereby or the performance of obligations hereunder under any antitrust law. Notwithstanding the foregoing, Buyer will, and will cause its Affiliates to, commit to and effect, by consent decree, hold separate orders, trust, and otherwise, the divestiture of any assets or business of Buyer (or its Affiliates) or any Purchased Assets, and permit and suffer to be imposed on it any other restrictions on any of its activities, assets, business or the Purchased Assets as may be necessary to avoid the entry of, or to effect the dissolution of or vacate or lift, any Order relating to any antitrust challenge by any Governmental Entity that would otherwise have the effect of preventing or materially delaying the consummation of the Closing.

(c)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the parties hereto shall use their reasonable best efforts to cooperate and take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any applicable Laws) necessary to satisfy the conditions to Closing set forth in this Agreement (other than those set forth in <u>Sections 6.5</u> and <u>7.6</u>, which shall be subject to <u>Section 5.4(a)</u> above), including, but not limited to the preparation and filing of all forms,

registrations and notices required pursuant to applicable Law (other than anti-trust Law, which shall be subject to Section 5.4(a) above).

      Section 5.5    Bankruptcy Matters; Other Covenants and Agreements.  Within two (2) Business Days following the date of completion of the Auction, Sellers shall file with the Bankruptcy Court a notice of filing of a successful bid and the form of the Approval Order. Buyer will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Approval Order, including furnishing affidavits or other documents or information reasonably requested by Sellers for filing with the Bankruptcy Court for the purposes of obtaining approval of this Agreement and entry of the Approval Order, including, but not limited to, demonstrating (x) adequate assurance of future performance by Buyer under this Agreement and (y) that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event that the entry of the Approval Order shall be appealed and until such time as this Agreement has been terminated, each of Sellers and Buyer shall use their best efforts to defend such appeal.  Other than as set forth in Section 8.2, none of Sellers nor their Affiliates or Representatives shall have any liability to Buyer, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of a definitive agreement for an Alternative Transaction.

      Section 5.6    Confidentiality.  The parties acknowledge that Parent and Buyer previously executed the Confidentiality Agreement, which Confidentiality Agreement shall continue in full force and effect in accordance with its terms; provided, that, upon Closing, Buyer's obligations pursuant thereto with respect to Confidential Information (as defined in the Confidentiality Agreement) relating solely to the Purchased Assets and Assumed Liabilities shall terminate.  Notwithstanding the foregoing, the parties acknowledge and understand that in connection with seeking the Approval Order and the implementation thereof, this Agreement (together with the Annexes, Exhibits and Schedules attached hereto) may be filed with the Bankruptcy Court and made publicly available, and, prior to the entry of the Approval Order, disclosures relating to the transactions contemplated by this Agreement may be made to Sellers' creditors, other potential bidders and their respective advisors and representatives, and the parties agree that such filing and disclosures will not be deemed to violate any confidentiality obligations owing to any party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise.  Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall in any way limit the disclosure of information by Sellers in connection with the administration of the Bankruptcy Case.

      Section 5.7    Lease Deposits.

      (a)    Buyer shall use its best efforts to cause the landlord under each Assumed Lease to return to Sellers, at or prior to the Closing, any and all amounts held as a security deposit under each such Assumed Lease (such amounts collectively, the "Lease Security Deposits"), including by depositing any amount with such landlord or securing a letter of credit or similar commitment for the benefit of such landlord, as required or contemplated by such Assumed Lease as a security deposit.

(b)     Buyer shall pay Sellers at the Closing by wire transfer of immediately available funds, in addition to the consideration required pursuant to <u>Section 2.5</u> of this Agreement, an amount in cash equal to the Purchased Lease Security Deposits (such payments, the "<u>Security Deposit Payments</u>").

Section 5.8     <u>Access to Information / Preservation of Books and Records.</u>

(a)     From the date of this Agreement until the earlier of (i) termination of this Agreement and (ii) the Closing, Sellers shall permit Buyer and its Representatives (including its legal advisors and accountants), to make such reasonable investigation of Sellers, the Purchased Assets and the Assumed Liabilities as Buyer reasonably requests, and shall provide Buyer reasonable access to the Books and Records as Buyer reasonably requests.  Any such investigation and access shall be during regular business hours upon reasonable advance notice in a manner that minimizes disruption to the business, operations and activities of Sellers.  In connection with Buyer's access, Buyer shall be accompanied at all times by a Representative of Sellers unless Sellers otherwise agrees, shall not interfere with the use and operation of the offices and other facilities of Sellers, and shall comply with all safety and security rules and regulations for such offices and other facilities.  Sellers shall use their reasonable efforts to cause their Representatives to cooperate with Buyer and its Representatives in connection with such investigation.  Notwithstanding anything to the contrary contained herein, Sellers shall be entitled to withhold access to, or investigation or examination of, any information which they determine (i) includes trade secrets or other proprietary information, (ii) is protected by attorney-client privilege, work-product or any other similar privilege or doctrine, (iii) the disclosure of which is prohibited pursuant to any agreement to which a Seller is a party, or applicable Law, or (iv) includes customer names or pricing information.  Any confidential information provided to Buyer shall be deemed Confidential Information under the Confidentiality Agreement and shall be subject to the terms thereof.

(b)     From and after the Closing until the date that is thirty-six (36) months after the Closing Date, Buyer shall provide Sellers with reasonable access to the Books and Records (and allow Sellers to make extracts and copies of such Books and Records during such access) in connection with the Bankruptcy Case or any other proceeding or action relating thereto. Any such access shall be during regular business hours upon reasonable advance notice and in a manner that minimizes disruption to the business, operations and activities of Buyer.

(c)     Buyer shall preserve and retain the Books and Records in place as of the Closing for a period of six (6) years following the Closing Date.

Section 5.9     <u>Publicity</u>.  Except (i) as required by applicable Law, including any Order by the Bankruptcy Court, (ii) in connection with any filings by Sellers or in any proceedings before the Bankruptcy Court, or (iii) in connection with the Auction, neither Sellers nor Buyer shall (and shall cause their Representatives not to) issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without having provided Sellers, or Buyer, as the case may be, at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by Sellers, or Buyer, as the case may be).

21

Section 5.10   Intellectual Property.  Notwithstanding any other provision in this Agreement, Buyer consents to the use by Sellers of the name "CCS Medical" or any other name or designation of a Seller following the consummation of the Closing for the use in connection with the Bankruptcy Cases and the winding down of the affairs of Sellers.

Section 5.11   Disclaimer of Warranties.   Notwithstanding anything in this Agreement to the contrary, it is the explicit intent of each party hereto that Sellers are not making any representations or warranties whatsoever, express or implied, beyond those expressly given in Article III of this Agreement, and it is understood that, except for the representations and warranties contained herein, Buyer takes the Purchased Assets and Assumed Liabilities "as is" and "where is."  Without limiting the generality of the foregoing, except for the representations and warranties specifically contained in Article III, Sellers hereby expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to (a) the condition of the Purchased Assets or Assumed Liabilities (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) or (b) any infringement by any Seller or any of its Affiliates of any patent or proprietary right of any third party; it being the intention of Sellers and Buyer that the Purchased Assets and Assumed Liabilities are to be accepted by Buyer in their present condition and state of repair.  It is understood that any cost estimates, projections or other predictions or other statements or information contained or referred to in the offering materials that have been provided to Buyer are not and shall not be deemed to be representations or warranties of Sellers or any of their Affiliates.

ARTICLE VI
CONDITIONS TO OBLIGATIONS OF BUYER

The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment or waiver, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

Section 6.1   Representations and Warranties of Sellers.  All representations and warranties made by Sellers in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) at and as of the Closing Date (except for such representations and warranties that are made as of a specific date, in which case they shall be true and correct as of such specific date), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 6.2   Performance of Sellers' Obligations.  Sellers shall have performed in all material respects all obligations required under this Agreement to be performed by Sellers on or before the Closing Date.

Section 6.3   Approval Order.  The Bankruptcy Court shall have entered the Approval Order, and such Approval Order shall not be stayed pending appeal.

Section 6.4   No Violation of Orders.  No preliminary or permanent injunction or other Order issued by any court or Governmental Entity, nor any statute, rule, regulation,

decree or executive order promulgated or enacted by any Governmental Entity shall be in effect which prevents or prohibits the consummation of any of the transactions contemplated by this Agreement or that makes it illegal for either party hereto to perform its obligations hereunder.

Section 6.5   HSR Act.  All waiting periods (and any extensions thereof) under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired or been terminated.

Section 6.6   Documents.  Each of the items required to be delivered to Buyer pursuant to Section 2.7 shall have been delivered.

ARTICLE VII
CONDITIONS TO OBLIGATIONS OF SELLERS

The obligation of Sellers to consummate the transactions contemplated by this Agreement is subject to the fulfillment or waiver, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Sellers in their sole discretion:

Section 7.1   Representations and Warranties of Buyer.  All representations and warranties made by Buyer in this Agreement shall be true and correct at and as of the date of this Agreement and at and as of the Closing Date as if again made by Buyer on and as of such date (except to the extent expressly made as of an earlier date, in which case as of such earlier date).

Section 7.2   Performance of Buyer's Obligations.  Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date.

Section 7.3   Approval Order.  The Bankruptcy Court shall have entered the Approval Order, and such Approval Order shall not be stayed pending appeal.

Section 7.4   Consents and Approvals.  Sellers shall have received all consents and approvals in respect of this Agreement and the transactions contemplated hereby pursuant to, or contemplated by, each of the Existing Credit Facilities.

Section 7.5   No Violation of Orders.  No preliminary or permanent injunction or other Order issued by any court or Governmental Entity, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any Governmental Entity shall be in effect which prevents or prohibits the consummation of any of the transactions contemplated by this Agreement or that makes it illegal for either party hereto to perform its obligations hereunder.

Section 7.6   HSR Act.  All waiting periods (and any extensions thereof) under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired or been terminated.

Section 7.7   Documents.  Each of the items required to be delivered to Sellers pursuant to Section 2.8 shall have been delivered.

23

## ARTICLE VIII
## TERMINATION

Section 8.1 <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing in the following manner:

(a) by mutual written consent of Sellers and Buyer;

(b) by either Sellers or Buyer, if any Governmental Entity with jurisdiction over such matters shall have issued an order or injunction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and non-appealable;

(c) (i) by Sellers, if the Closing shall not have occurred on or before the forty-fifth (45th) day after the date that the Auction is completed or (ii) by Buyer, if Buyer is the Next Highest Bidder, if the Closing shall not have occurred on or before the date on which Buyer's bid is no longer required to remain open pursuant to the Bidding Procedures Order (such date set forth in (i) and (ii) above, the "<u>Outside Date</u>"); <u>provided</u>, <u>that</u>, the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to Sellers or Buyer if the failure of the Closing to occur prior to the Outside Date is the result of the failure by such party to perform its obligations under this Agreement;

(d) by either Sellers or Buyer, if Sellers consummate an Alternative Transaction;

(e) by either Sellers or Buyer, at any time following the stay or reversal of the Approval Order by a court of competent jurisdiction (unless the Closing has occurred prior to the stay or reversal of the Approval Order), and such stay or reversal is not reversed, revoked, voided or vacated within ninety (90) days thereof; but the right to terminate this Agreement under this <u>Section 8.1(e)</u> shall not be available to Sellers or Buyer if the failure of any such Order not being entered is the result of the failure by such party to perform its obligations under this Agreement;

(f) by Buyer, in the event of any inaccuracy in any of Sellers' representations or warranties contained in this Agreement or any breach of any of Sellers' covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u>, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; <u>provided</u>, <u>that</u>, Buyer shall not have the right to terminate this Agreement under this <u>Section 8.1(f)</u> at a time when Sellers have (or would have after the passage of time) the right to terminate this Agreement under <u>Section 8.1(g)</u>;

(g) by Sellers, in the event of any inaccuracy in any of Buyer's representations or warranties contained in this Agreement or any breach of any of Buyer's covenants or agreements contained in this Agreement which, individually or in the aggregate

<div align="center">24</div>

with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in <u>Section 7.1</u> or <u>Section 7.2</u>, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; <u>provided, that</u>, Sellers shall not have the right to terminate this Agreement under this <u>Section 8.1(g)</u> at a time when Buyer has (or would have after the passage of time) the right to terminate this Agreement under <u>Section 8.1(f)</u>;

(h)   by Sellers or Buyer if the Auction is held and (i) Buyer is not the Successful Bidder or the Next-Highest Bidder, or (ii) Buyer is the Next-Highest Bidder but is no longer obligated to remain as the Next-Highest Bidder pursuant to the terms of the Bidding Procedures Order.

Section 8.2   <u>Effect of Termination</u>.   If a party terminates this Agreement under <u>Section 8.1</u>, this Agreement shall become void and have no further effect, except that the agreements contained in this <u>Article VIII</u>, the last two sentences of <u>Section 2.5(b)</u>, <u>Section 5.6</u> and <u>Article X</u> shall survive the termination hereof.   There shall be no liability or obligation after such termination on the part of any party except for fraud or intentional breach.   No termination of this Agreement shall affect the obligations of the parties pursuant to the Confidentiality Agreement, except to the extent specified in such Confidentiality Agreement.

ARTICLE IX
TAX MATTERS

Section 9.1   <u>Transfer Taxes</u>.   Notwithstanding any provision of this Agreement to the contrary, all Transfer Taxes shall be borne by Buyer.   Sellers will, at the sole cost and expense of Buyer, file all necessary Tax Returns and other documentation with respect to all Transfer Taxes and fees, and, if required by applicable Law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

Section 9.2   <u>Purchase Price Allocation</u>.   No later than ninety (90) days following the Closing Date, Sellers shall provide Buyer with a proposed allocation of the Purchase Price among the Purchased Assets.   If Buyer does not deliver a written notice disagreeing with Sellers' proposed allocation within thirty (30) days following Buyer's receipt thereof, the proposed allocation shall be final.   If Buyer delivers a written notice disagreeing with Sellers' proposed allocation within thirty (30) days following Buyer's receipt thereof, the parties shall use commercially reasonable efforts to resolve such dispute within thirty (30) days following the date of the dispute notice.   If Buyer and Sellers are unable to resolve such dispute within such 30-day period, they shall refer such dispute to an independent accounting firm or appraisal firm jointly selected by the parties, whose determination shall be final and binding on the parties for all purposes of this Agreement.   The final allocation of the Purchase Price among the Purchased Assets, determined in accordance with this <u>Section 9.2</u>, shall be set forth on a written schedule (the "<u>Allocation Schedule</u>").   Buyer and Sellers agree to timely file, or to cause to be timely filed, Internal Revenue Service Form 8594 (or any comparable form under state, local or foreign Tax law) and any required attachments thereto in accordance with the Allocation Schedule.   Except to the extent otherwise required pursuant to a "determination" within the meaning of IRC Section 1313(a) (or any comparable provision of state, local or foreign law),

25

neither Buyer nor Sellers shall take, or shall permit any of their respective Affiliates to take, a Tax position (whether on a Tax Return or otherwise) that is inconsistent with the allocation reflected in the Allocation Schedule.

## ARTICLE X
## MISCELLANEOUS

Section 10.1    Notices.    All notices and other communications in connection with this Agreement shall be in writing, shall be effective upon receipt and shall be deemed given if delivered personally, sent via facsimile (with answer-back confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address of a party as shall be specified by like notice):

(a)    if to Sellers, care of:

CCS Medical Holdings, Inc.
14255 49th Street North, Suite 301
Clearwater, Florida 33762
Attention: Chief Financial Officer
Fax: (800) 397-0545

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention:  Mark A. Cognetti and Michael J. Kelly
Fax:  (212) 728-8111

(b)    if to Buyer, to:

[_____]

with a copy to:

[_____]

Any party may change the address to which notices, claims, demands and other communications hereunder are to be delivered by giving the other parties notice in the manner set forth herein.

Section 10.2    Interpretation.    When a reference is made in this Agreement to Articles, Sections, Exhibits, Annexes or Schedules, such reference shall be to an Article or Section of or Exhibit, Annex or Schedule to this Agreement unless otherwise indicated.  The table of contents and headings contained in this Agreement are for reference purposes only and

shall not affect in any way the meaning or interpretation of this Agreement. Except as otherwise expressly provided herein, all references to "dollars" or "$" shall be deemed references to the lawful money of the United States of America. Unless otherwise indicated, the word "day" shall be interpreted as a calendar day. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." References to the "transactions contemplated by this Agreement" and similar expressions include the transactions contemplated by the Ancillary Documents. The words "hereof," "herein," "hereby," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole (including any exhibits hereto and schedules delivered herewith) and not to any particular provisions of this Agreement. Whenever used in this Agreement, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. The Sellers Disclosure Schedule and the Buyer Disclosure Schedule, as well as all other schedules, annexes and exhibits hereto, shall be deemed part of this Agreement and included in any reference to this Agreement.

Section 10.3  Counterparts.  This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party, it being understood that each party need not sign the same counterpart. Either party may deliver its signed counterpart of this Agreement to the other party by means of facsimile or any other electronic medium, and such delivery will have the same legal effect as hand delivery of an originally executed counterpart.

Section 10.4  Entire Agreement.  This Agreement (including the documents and the instruments referred to in this Agreement) and the Confidentiality Agreement constitute the full and entire agreement and supersede all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter of hereof and thereof.

Section 10.5  Survival.  The representations and warranties, and covenants and agreements required by their terms to be performed at or prior to the Closing, of the parties contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall not survive the Closing. Except as set forth in the preceding sentence, the covenants and agreements of the parties contained in this Agreement shall survive in accordance with their respective terms. From and after the Closing, Buyer shall indemnify, hold harmless and defend Sellers and their Affiliates and their respective directors, officers, employees, shareholders, members, partners, agents, successors and assigns from and against all demands, claims, actions, liabilities, losses, costs, damages or expenses whatsoever (including without limitation, attorneys' fees and expenses) asserted against, imposed upon or incurred by such persons to the extent resulting from, arising out of or in connection with any Purchased Asset or Assumed Liability and Buyer's conduct of the Business from and after the Closing.

Section 10.6  Amendment; Waiver.  This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the parties hereto. Any waiver of any provision of this Agreement shall be deemed ineffective and be of no force or effect unless pursuant to a written instrument executed by the party or parties to this Agreement against whom enforcement is sought.

Section 10.7    Fees and Expenses.  Except as otherwise expressly provided in this Agreement (including without limitation, in Section 5.4), each party to this Agreement shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the transactions contemplated herein.

Section 10.8    Governing Law; Jurisdiction.  This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of New York without giving effect to the choice-of-law provisions thereof to the extent that the application of the laws of another jurisdiction would be required thereby.  The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise under this Agreement and in respect of the transactions contemplated hereby; provided, however, that in the event the Bankruptcy Court at any time declines to accept jurisdiction, each of the parties hereby irrevocably (i) submits to the exclusive jurisdiction of the courts of the State of New York and the federal courts of the United States located in New York, New York regarding any such claim or dispute; (ii) agrees that all claims and disputes shall be heard and determined in such courts; (iii) waives, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the venue of any such claim or dispute brought in such court or any defense of inconvenient forum for the maintenance of such claim or dispute; and (iv) agrees that a judgment in any claim or dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 10.9    Assignment; Third Party Beneficiaries.

(a)    Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by either of the parties without the prior written consent of the other parties; provided, however, Sellers may assign their rights, interests and/or obligations under this Agreement after the Closing in connection with a chapter 11 plan of reorganization.  Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by each of the parties and their respective successors and assigns.  This Agreement (including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person other than the parties hereto any rights or remedies under this Agreement.

(b)    The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto.  Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance with this Agreement without notice or liability to any other Person.   In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any of the parties hereto.  Consequently, Persons other than the parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 10.10  Bulk Sales Laws.  Buyer and Sellers agree to waive compliance by the other parties hereto with the provisions of the bulk sales laws of any jurisdiction.

28

Section 10.11  <u>Specific Performance</u>.  Buyer acknowledges and agrees that Sellers would be damaged irreparably in the event any of the provisions of this Agreement that are to be performed by Buyer are not performed in accordance with their specific terms or otherwise are breached.  Accordingly, Buyer agrees that Sellers shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement by Buyer and to enforce specifically this Agreement and the terms and provisions hereof by Buyer, in addition to any other remedy to which Sellers may be entitled, at law or in equity.  Buyer hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

<div align="center">[Signature pages follow]</div>

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the date first above written.

**SELLERS**

CCS MEDICAL HOLDINGS, INC.

By:_____
    Name:
    Title

CCS ACQUISITION HOLDING-SUB CORPORATION

By:_____
    Name:
    Title

CCS MEDICAL, INC.

By:_____
    Name:
    Title

MPTC HOLDINGS, INC.

By:_____
    Name:
    Title

MP TOTALCARE, INC.

By:_____
    Name:
    Title

[Signature Page to Asset Purchase Agreement]

MP TOTALCARE SERVICES, INC.

By:_____
    Name:
    Title


MP TOTALCARE SUPPLY, INC.

By:_____
    Name:
    Title


TOTALCARE WHOLESALE. INC.

By:_____
    Name:
    Title


MEDICAL HOLDINGS, INC.

By:_____
    Name:
    Title


MP TOTALCARE MEDICAL, INC.

By:_____
    Name:
    Title


MEDSHIP DIRECT, INC.

By:_____
    Name:
    Title


[Signature Page to Asset Purchase Agreement]

CHRONIC CARE SOLUTIONS, INC.

By:_____
    Name:
    Title


DEGC ENTERPRISES (U.S.), INC.

By:_____
    Name:
    Title


SECURE CARE MEDICAL, INC.

By:_____
    Name:
    Title


MEDICAL EXPRESS DEPOT, INC.

By:_____
    Name:
    Title


KEYMED, INC.

By:_____
    Name:
    Title


CCS STAR, LLC

By: KeyMed, Inc., its sole member

By:_____
    Name:
    Title

[Signature Page to Asset Purchase Agreement]

MEDSTAR DIABETIC SUPPLY, LIMITED PARTNERSHIP

By: CCS Star, LLC, its general partner

By: KeyMed, Inc., its sole member

By:_____
    Name:
    Title:


**BUYER**


[_____]

By:_____
Name:
Title:


[Signature Page to Asset Purchase Agreement]

## Annex I

1. CCS Acquisition Holding-Sub Corporation

2. CCS Medical, Inc.

3. MPTC Holdings, Inc.

4. MP TotalCare, Inc.

5. MP TotalCare Services, Inc.

6. MP TotalCare Supply, Inc.

7. TotalCare Wholesale. Inc.

8. Medical Holdings, Inc.

9. MP TotalCare Medical, Inc.

10. Medship Direct, Inc.

11. Chronic Care Solutions, Inc.

12. DEGC Enterprises (U.S.), Inc.

13. Secure Care Medical, Inc.

14. Medical Express Depot, Inc.

15. KeyMed, Inc.

16. CCS Star, LLC

17. Medstar Diabetic Supply, Limited Partnership