# EXHIBIT B

SPA

INVESTMENT AGREEMENT

among

CCS MEDICAL HOLDINGS, INC.,

CCS ACQUISITION HOLDING-SUB CORPORATION

and

[BUYER]

Dated as of _____ __, 2010

# TABLE OF CONTENTS

ARTICLE I    DEFINITIONS ..........................................................................................2

    Section 1.1    Definitions.................................................................................................2

ARTICLE II    INVESTMENT ........................................................................................9

    Section 2.1    Investment ...............................................................................................9
    Section 2.2    Parent Retained Restructured Assets; New CCS Assumed Liabilities. ..............9
    Section 2.3    Purchase Price. ........................................................................................9
    Section 2.4    Closing ...................................................................................................10
    Section 2.5    Issuer's Closing Deliverables.................................................................10
    Section 2.6    Buyer's Closing Deliverables.................................................................10

ARTICLE III    REPRESENTATIONS AND WARRANTIES OF ISSUER ...........................10

    Section 3.1    Corporate Organization .........................................................................10
    Section 3.2    Authority; No Violation. ........................................................................11
    Section 3.4    Consents and Approvals.........................................................................12
    Section 3.5    Scheduled Agreements ...........................................................................12
    Section 3.6    Compliance with Law ............................................................................12
    Section 3.7    Broker's Fees..........................................................................................12
    Section 3.8    Legal Proceedings ..................................................................................12
    Section 3.9    Issuer Benefit Plans; Employees ...........................................................12
    Section 3.10    Taxes ......................................................................................................12

ARTICLE IV    REPRESENTATIONS AND WARRANTIES OF BUYER ...........................13

    Section 4.1    Organization...........................................................................................13
    Section 4.2    Authority; No Violation. ........................................................................13
    Section 4.3    Consents and Approvals.........................................................................14
    Section 4.4    Financial Ability.....................................................................................14
    Section 4.5    Brokers ...................................................................................................14
    Section 4.6    Investment Intent....................................................................................14
    Section 4.7    Independent Investigation ......................................................................14

ARTICLE V    COVENANTS...........................................................................................14

    Section 5.1    Conduct of Business Prior to the Closing Date......................................14
    Section 5.2    Further Assurances .................................................................................15
    Section 5.3    Employees. .............................................................................................15
    Section 5.4    Required Approvals.................................................................................16
    Section 5.5    Bankruptcy Matters; Other Covenants and Agreements.........................16
    Section 5.6    Confidentiality........................................................................................17
    Section 5.7    Access to Information / Preservation of Books and Records...................17

| | | |
|---|---|---|
| Section 5.8 | Publicity | 18 |
| Section 5.9 | Disclaimer of Warranties | 18 |
| Section 5.10 | Transfer Taxes | 18 |
| Section 5.11 | Intellectual Property | 19 |
| Section 5.12 | Standstill | 19 |

| | | |
|---|---|---|
| ARTICLE VI | CONDITIONS TO OBLIGATIONS OF BUYER | 19 |

| | | |
|---|---|---|
| Section 6.1 | Representations and Warranties of Issuer | 19 |
| Section 6.2 | Performance of Issuer's Obligations | 19 |
| Section 6.3 | Approval Order | 19 |
| Section 6.4 | Plan of Reorganization | 20 |
| Section 6.5 | No Violation of Orders | 20 |
| Section 6.6 | HSR Act | 20 |
| Section 6.7 | Documents | 20 |

| | | |
|---|---|---|
| ARTICLE VII | CONDITIONS TO OBLIGATIONS OF ISSUER | 20 |

| | | |
|---|---|---|
| Section 7.1 | Representations and Warranties of Buyer | 20 |
| Section 7.2 | Performance of Buyer's Obligations | 20 |
| Section 7.3 | Approval Order | 20 |
| Section 7.4 | Plan of Reorganization | 20 |
| Section 7.5 | Consents and Approvals | 20 |
| Section 7.6 | No Violation of Orders | 20 |
| Section 7.7 | HSR Act | 21 |
| Section 7.8 | Documents | 21 |

| | | |
|---|---|---|
| ARTICLE VIII | TERMINATION | 21 |

| | | |
|---|---|---|
| Section 8.1 | Termination | 21 |
| Section 8.2 | Effect of Termination | 22 |

| | | |
|---|---|---|
| ARTICLE IX | MISCELLANEOUS | 22 |

| | | |
|---|---|---|
| Section 9.1 | Notices | 22 |
| Section 9.2 | Interpretation | 23 |
| Section 9.3 | Counterparts | 23 |
| Section 9.4 | Entire Agreement | 24 |
| Section 9.5 | Survival | 24 |
| Section 9.6 | Amendment; Waiver | 24 |
| Section 9.7 | Fees and Expenses | 24 |
| Section 9.8 | Governing Law; Jurisdiction | 24 |
| Section 9.9 | Assignment; Third Party Beneficiaries. | 24 |
| Section 9.10 | Specific Performance | 25 |

List of Exhibits

Exhibit A – Form of Approval Order
Exhibit B – Form of Transition Services Agreement

# INVESTMENT AGREEMENT

This INVESTMENT AGREEMENT (this "Agreement"), dated as of [_____], 2010, is made and entered into by and among CCS Medical Holdings, Inc., a Delaware corporation ("Parent"), CCS Acquisition Holding-Sub Corporation ("Issuer"), and [_____], a [_____] ("Buyer").[1]

WHEREAS, on July 8, 2009 (the "Petition Date"), Parent, Issuer, and each of Issuer's Subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief commencing cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, the Debtors [intend to] [have] file[d] that certain Second Joint Chapter 11 Plan of Reorganization for CCS Medical, Inc. and its Affiliated Debtors with the Bankruptcy Court on [_____] and as may be amended or supplemented from time to time (the "Plan of Reorganization"), which contemplates a new investment in the corporation that will be the successor to Issuer under the Plan of Reorganization ("New CCS") by Buyer, in the common stock, par value $[__] per share, of New CCS (the "New Common Stock");

WHEREAS, pursuant to the Plan of Reorganization, among other things, upon confirmation of such Plan of Reorganization (the "Effective Time" and the date on which the Effective Time occurs, the "Effective Date"), Issuer will be authorized to take any action necessary to cause Buyer to become the owner of 100% of the Shares (as defined below) in exchange for the consideration contemplated by this Agreement;

WHEREAS, the Bidding Procedures Order established the procedures by which the Debtors may accept bids for the purchase of all or substantially all of the assets of the Debtors;

WHEREAS, the Debtors have determined it is in the best interests of the Bankruptcy Estates to accept bids for the purchase of all of the issued and outstanding capital stock of New CCS;

WHEREAS, the execution and delivery of this Agreement and Issuer's and Parent's ability to consummate the transactions set forth in this Agreement are subject to, among other things, the entry of the Approval Order and the Confirmation Order.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, the parties hereby agree as follows:

---

[1] **BUYER MUST BE A CREDITWORTHY ENTITY OR A CREDITWORTHY ENTITY MUST GUARANTEE BUYER'S OBLIGATIONS UNDER THIS AGREEMENT.**

# ARTICLE I
# DEFINITIONS

Section 1.1 <u>Definitions</u>. In this Agreement, the following terms have the meanings specified or referred to in this <u>Section 1.1</u> and shall be equally applicable to both the singular and plural forms.

"<u>Affiliate</u>" means, with respect to any Person, any other Person which, at the time of determination, directly or indirectly, through one or more intermediaries, Controls, is Controlled by or is under Common Control with such Person.

"<u>Agreement</u>" has the meaning set forth in the preamble.

"<u>Alternative Transaction</u>" means (i) the direct or indirect sale, transfer or other disposition, in one or more transactions, of substantially all of the assets of Issuer and its Subsidiaries, or all of the issued and outstanding capital stock of Issuer, to one or more third parties, or (ii) the consummation of the transactions contemplated by the Plan of Reorganization.

"<u>Ancillary Documents</u>" means, collectively, the Transition Services Agreement, and each other agreement, instrument or document being executed and delivered under this Agreement or in connection herewith.

"<u>Approval Order</u>" means that certain Order, in form and substance reasonably acceptable to Buyer and to Issuer and substantially in the form annexed hereto as <u>Exhibit A</u>, approving, among other things, Issuer and Parent entering into this Agreement.

"<u>Assumed Contracts</u>" means those certain contracts, agreements, leases and other obligations assumed by the Debtors pursuant to the Plan of Reorganization or such other Orders of the Bankruptcy Court, including the Approval Order and/or the Confirmation Order.

"<u>Auction</u>" means that certain auction held pursuant to the Bidding Procedures Order.

"<u>Bankruptcy Case</u>" means the chapter 11 cases of the Debtors.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Estate</u>" means the bankruptcy estate that exists by virtue of the Bankruptcy Case.

"<u>Bidding Procedures Order</u>" means the Order of the Bankruptcy Court entered on November 24, 2009, as may be amended from time to time, approving among other things, the bidding procedures in connection with the proposed sale of the Debtors' assets.

"<u>Books and Records</u>" mean all documents used by Issuer and its Subsidiaries in connection with, or relating to, the operations of Issuer and its Subsidiaries, including all files,

DB02:9196874.1

068347.1001

data, reports, plans, mailing lists, supplier lists, customer lists, price lists, marketing information and procedures, advertising and promotional materials, equipment records, warranty information, records of operations, standard forms of documents, manuals of operations or business procedures and other similar procedures (including all discs, tapes and other media-storage data containing such information), which, for the avoidance of doubt, shall exclude the Retained Books and Records.

"Business Day" means any day other than a Saturday, a Sunday or any other day on which commercial banks are not generally open for business in New York City.

"Buyer" has the meaning set forth in the preamble.

"Buyer Ancillary Documents" means all Ancillary Documents being or to be executed and delivered by Buyer or an Affiliate of Buyer.

"Buyer Disclosure Schedule" has the meaning set forth in Article IV.

"Claims" means any and all claims against, rights to payment from, indebtedness of, or other rights with respect to, Parent, Issuer and/or any Subsidiary, including without limitation, pursuant to or in respect of the (i) First Lien Credit Agreement, (ii) Second Lien Credit Agreement, (iii) PIK Credit Agreement, and/or (iv) DIP Credit Agreement.

"Closing" has the meaning set forth in Section 2.6.

"Closing Date" has the meaning set forth in Section 2.6.

"COBRA Continuation Coverage" has the meaning set forth in Section 5.3(c).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" means that certain Confidentiality Agreement by and between Parent and Buyer, dated as of [_____].

"Confirmation Order" means that certain Order issued by the Bankruptcy Court confirming the Plan of Reorganization.

"Control" means, as to any Person, the ownership or possession, directly or indirectly, through one or more intermediaries, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by contract or otherwise. The terms "Controlled by" and "under Common Control with" have correlative meanings.

"Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assumed Contracts to the extent required by section 365 of the Bankruptcy Code and any order of the Bankruptcy Court.

"Deposit Amount" has the meaning set forth in Section 2.5(b).

"DIP Credit Agreement" means that certain $10,000,000 Debtor in Possession Credit Agreement, dated as of July 14, 2009, by and among Issuer, certain Affiliates of Issuer, Imperial Capital, LLC, as administrative agent and collateral agent, and the other lenders party thereto, as may be amended from time to time.

"Disclosure Schedules" means the Buyer Disclosure Schedule and the Issuer Disclosure Schedule.

"Employees" has the meaning set forth in Section 5.3(a).

"Encumbrances" means all mortgages, pledges, charges, liens, debentures, trust deeds, claims, assignments by way of security or otherwise, security interests, conditional sales contracts or other title retention agreements, rights of first refusal or similar interests or instruments charging, or creating a security interest in the Shares or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting title to the Shares or any part thereof or interest therein.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Excluded Contracts" means all contracts and leases listed on or described in Schedule 2.2, and any contracts or leases to which the Issuer and/or any Subsidiary is a party, whereby the consummation of the transactions contemplated hereby would require consent of the other party thereto pursuant to Section 365(c)(1) of the Bankruptcy Code, which consent has not been obtained as of the Closing Date.

"Existing Credit Facilities" means the First Lien Credit Agreement, the Second Lien Credit Agreement, the PIK Credit Agreement and the DIP Credit Agreement.

"First Lien Credit Agreement" means that certain First Lien Credit Agreement, dated as of September 30, 2005, by and among CCS Acquisition Holding-Sub Corporation, CCS Medical, Inc., as borrower, the lenders party thereto, Wachovia Bank, National Association, as administrative agent, Bank of America, N.A., as syndication agent, and JPMorgan Chase Bank, N.A., as documentation agent.

"GAAP" means United States generally accepted accounting principles as in effect on the date of this Agreement.

"Governmental Entity" means any foreign, federal or state insurance or other regulatory, self-regulatory or enforcement authorities or any courts, administrative agencies or commissions or other governmental authorities or instrumentalities.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Issuer" has the meaning set forth in the preamble.

- 4 -

"Issuer Ancillary Documents" means all Ancillary Documents being or to be executed and delivered by Issuer or Parent.

"Issuer Benefit Plan" means each "employee benefit plan" within the meaning of Section 3(3) of ERISA and all other employee compensation and benefits plans, policies, programs, arrangements or payroll practices, including multiemployer plans within the meaning of Section 3(37) of ERISA, and each other stock purchase, stock option, restricted stock, severance, retention, employment, consulting, change-of-control, collective bargaining, bonus, incentive, deferred compensation, employee loan, fringe benefit and other benefit plan, agreement, program, policy, commitment or other arrangement, whether or not subject to ERISA (including any related funding mechanism now in effect or required in the future), whether formal or informal, oral or written, in each case sponsored, maintained, contributed or required to be contributed to by Issuer or its Subsidiaries for the benefit of their employees or directors.

"Issuer Disclosure Schedule" has the meaning set forth in Article III.

"Knowledge of Issuer" means, as to a particular matter, the actual knowledge of any of the individuals set forth in Schedule 1.1.

"Law" means applicable statutes, common laws, rules, ordinances, regulations, codes, orders, judgments, injunctions, writs, decrees, governmental guidelines or interpretations having the force of law or bylaws, in each case, of a Governmental Entity.

"Material Adverse Effect" means any change, effect, event, occurrence or development that has a material adverse effect on the ability of Issuer to timely consummate the transactions contemplated by this Agreement; except that any such material adverse effect that results from or arises out of any of the following shall not be considered in determining whether a Material Adverse Effect has occurred: (A) the announcement of the execution and delivery of this Agreement; (B) with respect to any Debtor, events relating to or resulting from the Bankruptcy Case; (C) changes in general economic or political conditions or the securities markets in general; (D) the taking of any action specifically required by this Agreement; (E) changes in Laws or changes in GAAP; (F) any outbreak or escalation of hostilities or war or any act of terrorism; (G) any weather-related or other force majeure event; (H) any outbreak of illness or other public health-related event; or (I) any facts, conditions, changes, violations, inaccuracies, circumstances, effects or events that are generally applicable to Persons engaged in the industry in which Issuer or its Subsidiaries operate.

"New CCS" has the meaning set forth in the recitals.

"New CCS Assumed Liabilities" shall mean:

(a)     all accounts payable and accrued expenses of Issuer and/or any Subsidiary as of the Closing Date which have been incurred in the Ordinary Course of Business and Issuer and its Subsidiaries' general overhead expenses (including, without limitation, rent, utilities, insurance and taxes), in each case, arising from and after the Petition Date;

(b)     all liabilities, obligations and duties of Issuer and/or any Subsidiary to perform under the Assumed Contracts (other than the Excluded Contracts);

(c)     all liabilities, obligations and duties of Issuer and/or any Subsidiary to perform under the Issuer Benefit Plans, subject to Section 5.3(b) below;

(d)     all Trade Claims of Issuer and/or any Subsidiary;

(e)     all Cure Costs of Issuer and/or any Subsidiary; and

(f)     the PTO Liabilities of Issuer and/or any Subsidiary.

"New Common Stock" has the meaning set forth in the recitals.

"Next-Highest Bidder" shall have the meaning given to such term in the Bidding Procedures Order.

"Order" means any order, decision, injunction, directive, judgment, decree, ruling, writ, assessment, award, decision, stipulation or verdict.

"Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the business of the Issuer and its Subsidiaries through the date of this Agreement, consistent with past practice from and after the Petition Date.

"Outside Date" has the meaning set forth in Section 8.1(c).

"Parent" has the meaning set forth in the preamble.

"Parent Retained Restructured Assets" shall mean:

(a)     all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, in each case of the Issuer any/or any Subsidiary, at or prior to 12:01 A.M., New York City time on the Closing Date;

(b)     all Excluded Contracts;

(c)     any rights, claims or causes of action of Issuer any/or any Subsidiary under this Agreement or the Ancillary Documents, or any other contract or agreement to which Buyer and Issuer or any Subsidiary are a party;

(d)     all claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Issuer and/or any Subsidiary arising outside of the Ordinary Course of Business, including, but not limited to, causes of action arising out of or related to the Bankruptcy Case;

(e)     all preference or avoidance claims and actions of Issuer and/or any Subsidiary under chapter 5 of the Bankruptcy Code, including any such claims and actions arising under Sections 544, 547, 548, 549 and 550 of the Bankruptcy Code;

- 6 -

(f)     all receivables, claims, deposits, prepayments, refunds, suits, causes of action, choses in action, rights of recovery, rights of set-off and rights of recoupment or similar rights of Issuer any/or any Subsidiary related to any Parent Retained Restructured Asset;

(g)     the Retained Books and Records; and

(h)     all assets of Issuer and/or any Subsidiary set forth on <u>Schedule 2.2</u>.

"<u>Permitted Encumbrance</u>" means (a) Encumbrances for current Taxes, special assessments or other governmental charges not yet due and payable or the amount or validity of which is being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP and are not material in amount or value in relation to the value of the associated property; (b) mechanics', materialmen's, carriers', workers', repairers' and similar statutory liens arising or incurred in the Ordinary Course of Business; (c) deposits or pledges made in the Ordinary Course of Business in connection with, or to secure payment of, worker's compensation, unemployment insurance, old age pension programs mandated under applicable Law or other social security; (d) easements, covenants, conditions, claims, restrictions or other similar matters of record on real property, leasehold estates or personalty that would not be reasonably likely to have a material adverse effect on the use, title, value or possession of the property subject thereto; (e) local, county, state and federal laws, ordinances or governmental regulations now or hereafter in effect which would not be reasonably likely to have a material adverse effect on the use, title, value or possession of the property subject thereto; and (f) Encumbrances that will be released on or prior to the Closing whether pursuant to the Approval Order or otherwise.

"<u>Permitted Recipient</u>" has the meaning set forth in <u>Section 5.6</u>.

"<u>Permits</u>" mean all material licenses, franchises, permits, approvals and other authorizations from a Governmental Entity that are used by or held in the name of Parent, Issuer or any of its Subsidiaries, including but not limited to, Medicaid billing numbers and Medicare supplier numbers.

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or other entity or Governmental Entity.

"<u>Petition Date</u>" has the meaning set forth in the recitals.

"<u>PIK Credit Agreement</u>" means that certain Credit Agreement, dated as of September 30, 2005, by and among CCS Acquisition Holding-Sub Corporation, the lenders party thereto and Bank of America, N.A., as administrative agent.

"<u>Plan of Reorganization</u>" has the meaning set forth in the recitals.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

"PTO Liabilities" means all unused vacation time and paid time off accrued by the Transferred Employees prior to the Closing Date as provided under Issuer's or it's Subsidiaries' applicable vacation and paid time off policies and guidelines.

"Representative" means any Person's Affiliates, and such Person's and its Affiliates' respective directors, officers, employees, agents, advisors, attorneys, accountants, consultants and representatives.

"Retained Books and Records" means (A) any documents (including books and records) that Parent, the Issuer and/or any Subsidiary is required by applicable Law to retain, (B) one copy of the Books and Records, and (C) any books and records or information related to any Parent Retained Asset.

"Scheduled Agreements" has the meaning set forth in Section 3.5.

"Second Lien Credit Agreement" means that certain Second Lien Credit Agreement, dated as of September 30, 2005, by and among CCS Acquisition Holding-Sub Corporation, CCS Medical, Inc., as borrower, the lenders party thereto, Wachovia Bank, National Association, as administrative agent, Bank of America, N.A., as syndication agent, and JPMorgan Chase Bank, N.A., as documentation agent.

"Subsidiary" means any direct or indirect wholly owned subsidiary of Issuer.

"Successful Bidder" has the meaning assigned to such term in the Bidding Procedures Order.

"Tax" means (i) all federal, state, local and foreign income, excise, gross receipts, gross income, ad valorem, profits, gains, property, capital, sales, transfer, use, payroll, employment, severance, withholding, duties, intangibles, franchise, backup withholding, value added and other taxes, charges, levies or like assessments together with all penalties and additions to tax and interest thereon and (ii) any liability for the payment of any amounts of the type described in clause (i) of this definition as a result of being a member of an affiliated, consolidated, combined or unitary group for any period, as a result of any tax sharing or tax allocation agreement, arrangement or understanding, or as a result of being liable for another Person's taxes as a transferee or successor.

"Tax Return" means any federal, state, local or foreign (including any other governmental subdivision or taxing authority) tax return, report or similar statement, and any declaration, statement, claim for refund, report, schedule, form, or information return, or any amendment to any of the foregoing, relating to Taxes and all attachments thereto, as well as any records or documents that are required to be kept or maintained by applicable Law.

"Trade Claim" means any unsecured claim arising prior to the Petition Date relating to the delivery of goods or services to Issuer or any Subsidiary from trade creditors or service providers in the ordinary course of a Issuer's or Subsidiary's business which goods or services providers are designated by the Buyer in consultation with the Issuer as a provider from whom Buyer will require goods or services after the Closing Date.

- 8 -

"Transfer Taxes" means any real property transfer or gains, real property excise, sales, use, transfer, value added, stock transfer and stamp taxes, any transfer, recording, registration and other fees, and any similar Taxes which become payable in connection with the transactions contemplated by this Agreement, other than any such taxes imposed upon or relating to the income or gain of Issuer any/or any Subsidiary.

"Transferred Employees" has the meaning set forth in Section 5.3(a).

"Transition Services Agreement" means the Transition Services Agreement in the form attached hereto as Exhibit B.

ARTICLE II
INVESTMENT

Section 2.1    Investment.    On the Closing Date, subject to the terms and conditions of this Agreement, New CCS will issue and sell to Buyer, and Buyer will purchase from New CCS, free and clear of any and all Encumbrances, other than Permitted Encumbrances and as may arise under applicable securities Laws, [____] shares of New Common Stock representing 100% of the capital stock of New CCS issued and outstanding as of the Effective Time (such shares of New Common Stock, the "Shares").

Section 2.2    Parent Retained Restructured Assets; New CCS Assumed Liabilities.

(a)    Pursuant to the Plan of Reorganization, at Closing, the Parent Retained Restructured Assets, including without limitation, the Purchase Price, shall be Transferred to Parent. Notwithstanding anything to the contrary contained herein, in no event shall New CCS, any of its subsidiaries or Buyer be deemed to have any right, title or interest to the Parent Retained Restructured Assets other than as expressly provided in the Plan of Reorganization.

(b)    Pursuant to the Plan of Reorganization, at Closing, the New CCS Assumed Liabilities shall be assumed by New CCS, and shall remain and continue as liabilities and obligations of New CCS, and New CCS shall pay, perform and discharge when due, the New CCS Assumed Liabilities and Buyer and New CCS (and its subsidiaries) shall indemnify Parent and Debtors from any and all liability in respect thereof.

Section 2.3    Purchase Price.

(a)    The purchase price for the Shares shall be $[_____] in cash, payable by wire transfer of immediately available funds (the "Purchase Price").

(b)    Prior to or simultaneously with the execution of this Agreement, Buyer shall have deposited with Parent an amount equal to $[10% OF THE PURCHASE PRICE] (the "Deposit Amount"). The Deposit Amount shall be credited against the Purchase Price at the Closing. Parent shall have the right to retain the Deposit Amount upon termination of this Agreement prior to the Closing if, at the time of such termination, Buyer is in breach of any provision of this Agreement. Buyer shall have the right to receive the Deposit Amount upon

- 9 -

termination of this Agreement prior to Closing if, at the time of such termination, Buyer is not then in breach of any provision of this Agreement.

Section 2.4 <u>Closing</u>. The closing of the sale and purchase of the Shares (the "<u>Closing</u>") shall take place as promptly as practicable, and in any event no later than the third (3rd) Business Day following the date on which the conditions set forth herein have been satisfied or waived (other than conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), or at such other time and date as the parties hereto shall agree in writing (the "<u>Closing Date</u>"). The Closing shall take place at the offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, or at such other place as the parties hereto shall agree in writing.

Section 2.5 <u>Issuer's Closing Deliverables</u>. At the Closing, Issuer shall deliver or cause to be delivered to Buyer: (i) duly executed stock certificates evidencing the Shares; and (ii) a certificate executed by a duly elected officer of Issuer certifying that the conditions set forth in <u>Sections 6.1</u> and <u>6.2</u> have been satisfied.

Section 2.6 <u>Buyer's Closing Deliverables</u>. At the Closing, Buyer shall deliver or cause to be delivered to Issuer or its designee: (i) the Purchase Price (less the Deposit Amount) by wire transfer of immediately available funds to the account(s) specified by Issuer or its designee prior to Closing (it being understood that, pursuant to the Plan of Reorganization and as contemplated by Section 2.2(a), the Purchase Price shall be Transferred to Parent); and (ii) a certificate executed by a duly elected officer of Buyer certifying that the conditions set forth in <u>Sections 7.1</u> and <u>7.2</u> have been satisfied.

ARTICLE III
REPRESENTATIONS AND WARRANTIES OF ISSUER

Subject to and as qualified by items disclosed in (a) the Schedules of Assets and Liabilities or the Statement of Financial Affairs, each as filed with the Bankruptcy Court in connection with the Bankruptcy Cases, or (b) the disclosure schedule (the "<u>Issuer Disclosure Schedule</u>") delivered by Issuer to Buyer prior to the execution of this Agreement (it being understood that (x) disclosure in any section of such Issuer Disclosure Schedule shall be deemed to be disclosed in other sections of such Issuer Disclosure Schedule to the extent that it is reasonably discernible that such disclosure that such disclosure is relevant to another section of such Issuer Disclosure Schedule, and (y) notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such Issuer Disclosure Schedule shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance or that such item has had or would be reasonably likely to result in a Material Adverse Effect), Issuer hereby represents and warrants to Buyer as follows:

Section 3.1 <u>Corporate Organization</u>. Issuer is a corporation duly organized, validly existing and, as of the date of this Agreement, in good standing under the laws of the State of Delaware. Issuer has the requisite corporate power and authority to own or lease all of its properties and assets and to carry on its business as it is presently being conducted (subject to the provisions of the Bankruptcy Code), and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by Issuer or the character or location

- 10 -

of the properties and assets owned or leased by Issuer makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not reasonably be expected to result in a Material Adverse Effect.

Section 3.2    Authority; No Violation.

(a)    Issuer and Parent each has full corporate power and authority to execute and deliver this Agreement and the Issuer Ancillary Documents executed by Issuer and Parent, as the case may be, and subject to the entry of the Approval Order and the Confirmation Order, to consummate the transactions contemplated hereby and thereby. Subject to the entry of the Approval Order and the Confirmation Order, the execution and delivery of this Agreement and the Issuer Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by Issuer and Parent. This Agreement has been, and the Issuer Ancillary Documents have been, or will at Closing be, duly and validly executed and delivered by Issuer and Parent and (assuming due authorization, execution and delivery by Buyer or the other parties thereto, as applicable and subject to the entry of the Approval Order and the Confirmation Order) constitute the valid and binding obligations of Issuer and Parent, enforceable against Issuer and Parent in accordance with their respective terms (except as may be limited by bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws of general applicability relating to or affecting the rights of creditors generally and subject to general principles of equity).

(b)    Neither the execution and delivery of this Agreement or the Issuer Ancillary Documents by Issuer and Parent, nor the consummation by Issuer and Parent of the transactions contemplated hereby or thereby, nor compliance by Issuer and Parent with any of the terms or provisions of this Agreement, will (i) violate any provision of the respective organizational documents of Issuer or Parent or (ii) violate in any material respect any Law, judgment, order, injunction or decree applicable to Issuer or Parent or any of their properties or assets.

Section 3.3    Capitalization.

(a)    Immediately following the Effective Time, and upon issuance of the Shares at the Closing, (i) the authorized capital stock of New CCS shall consist of [_____] shares of New Common Stock, and (ii) the Shares shall be the only issued and outstanding shares of capital stock of New CCS.

(b)    Each of the Shares when issued to Buyer in accordance with the Plan of Reorganization and this Agreement will be duly authorized, validly issued, fully paid, non-assessable. At the Closing, Buyer will acquire good and valid title to the Shares, free and clear of any and all Encumbrances, other than Permitted Encumbrances and as may arise under applicable securities Laws. All issued and outstanding shares of capital stock, if any, of each subsidiary of New CCS have been duly authorized and validly issued, and are fully paid, non-assessable and free of and clear of any and all Encumbrances, other than Permitted Encumbrances and as may arise under applicable securities Laws.

- 11 -

Section 3.4     Consents and Approvals.   Other than the Approval Order, the Confirmation Order, and except as required by the HSR Act, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by Issuer and Parent of this Agreement or the consummation by Issuer and Parent of the transactions contemplated by this Agreement or the Issuer Ancillary Documents.

Section 3.5     Scheduled Agreements.   Schedule 3.5 sets forth a complete and accurate list of the following agreements to which Issuer or any Subsidiary is a party (collectively, the "Scheduled Agreements"):  (i) contracts with any employee of Issuer or any Subsidiary; and (ii) contracts for the purchase of, or payment for, supplies or products, or for the performance of services by a third party which supplies products or services, that are used in the conduct of the business of the Issuer any/or any Subsidiary, which involves consideration paid by Issuer or any Subsidiary in excess of $10,000,000 per year.

Section 3.6     Compliance with Law.   As of the date of this Agreement, neither Issuer nor any Subsidiary is in material breach or violation of, or default under, any material requirement of Law applicable to Issuer or any Subsidiary.

Section 3.7     Broker's Fees.   Neither Issuer nor any Person acting on behalf of Issuer has incurred any liability for any broker's fees, commissions or finder's fees in connection with the transactions contemplated by this Agreement for which Issuer or any Subsidiary will be responsible.

Section 3.8     Legal Proceedings.   As of the date of this Agreement, there are no pending or, to the Knowledge of Issuer, threatened, legal, administrative, arbitral or other proceedings, claims, actions, suits or governmental or regulatory investigations of any nature to which Issuer or any Subsidiary is a party, except, in each case, in connection with the Bankruptcy Cases or as would not reasonably be expected to result in a Material Adverse Effect.

Section 3.9     Issuer Benefit Plans; Employees.   Schedule 3.9 sets forth a list of each Issuer Benefit Plan.  Issuer has provided or made available to Buyer or its counsel with respect to each and every Issuer Benefit Plan a true and complete copy of all plan documents, if any.

Section 3.10     Taxes.  All Tax Returns that are material and required to be filed on or before the Closing Date by, or with respect to, the Issuer or any Subsidiary have been, or will be, timely filed on or before the Closing Date. Issuer and its Subsidiaries have timely paid Taxes shown as due and payable on the such Tax Returns unless payment of such Taxes has been stayed under section 362 of the Bankruptcy Code.  There is no action, suit, proceeding, investigation, audit or claim now proposed or pending against or with respect to the Issuer and any Subsidiary in respect of any material Tax.

DB02:9196874.1

068347.1001

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Subject to and as qualified by items disclosed in the disclosure schedule (the "Buyer Disclosure Schedule") delivered by Buyer to Issuer prior to the execution of this Agreement (it being understood that (a) disclosure in any section of such Buyer Disclosure Schedule shall be deemed to be disclosed in other sections of such Buyer Disclosure Schedule to the extent that it is reasonably discernible that such disclosure that such disclosure is relevant to another section of such Buyer Disclosure Schedule, and (b) notwithstanding anything in this Agreement to the contrary, the mere inclusion of an item in such schedule as an exception to a representation or warranty shall not be deemed an admission that such item represents a material exception or material fact, event or circumstance), Buyer hereby represents and warrants to Issuer and Parent as follows:

Section 4.1    Organization.  Buyer is a [_____] duly organized, validly existing and, as of the date of this Agreement, in good standing under the laws of the State of [_____]. Buyer has the requisite corporate or similar power and authority to own or lease all of its properties and assets and to carry on its business as it is now being conducted, and is duly licensed or qualified to do business in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified would not reasonably be expected to impair the ability of Buyer to consummate the transactions contemplated by this Agreement.

Section 4.2    Authority; No Violation.

(a)    Buyer has full corporate or similar power and authority to execute and deliver this Agreement and the Buyer Ancillary Documents, and subject to the provisions of the Bankruptcy Code, to consummate the transactions contemplated hereby and thereby.  The execution and delivery of this Agreement and the Buyer Ancillary Documents and the consummation of the transactions contemplated hereby and thereby have been duly and validly approved by Buyer and no other corporate or similar proceedings on the part of Buyer are necessary to approve this Agreement or the Buyer Ancillary Documents or to consummate the transactions contemplated hereby or thereby.  This Agreement and the Buyer Ancillary Documents have been duly and validly executed and delivered by Buyer and (assuming due authorization, execution and delivery by Issuer and Parent, as applicable) constitute the valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms (except as may be limited by bankruptcy, insolvency, fraudulent transfer, moratorium, reorganization or similar laws of general applicability relating to or affecting the rights of creditors generally and subject to general principles of equity).

(b)    Neither the execution and delivery of this Agreement or the Buyer Ancillary Documents by Buyer, nor the consummation by Buyer of the transactions contemplated hereby or thereby, nor compliance by Buyer with any of the terms or provisions of this Agreement or the Buyer Ancillary Documents, will (i) violate any provision of the

- 13 -

organizational documents of Buyer, or (ii) violate any Law, judgment, order, injunction or decree applicable to Buyer.

Section 4.3  Consents and Approvals.  Other than the Approval Order, the Confirmation Order, and except as required by the HSR Act, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the transactions contemplated by this Agreement or the Buyer Ancillary Documents.

Section 4.4  Financial Ability.  Buyer has, and will have at Closing, sufficient immediately available funds to pay the Purchase Price at Closing and perform its obligations hereunder.

Section 4.5  Brokers.  Neither Buyer nor any Person acting on its behalf has paid or become obligated to pay any fee or commission to any broker, finder or intermediary for or on account of the transactions contemplated by this Agreement.

Section 4.6  Investment Intent.  Buyer is an informed and sophisticated purchaser, and has engaged expert advisors in connection with evaluating the Debtors' businesses and making the decision to enter into this Agreement.  Buyer is acquiring the Shares for its own account for investment and not with a view to, or for sale or other disposition in connection with, any distribution of all or any part thereof, except in compliance with applicable federal and state securities Laws.  Buyer acknowledges that the Shares have not been registered under any applicable securities laws.  Buyer is an "accredited investor" as such term is defined under Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, and has such knowledge and experience in financial and business matters so that it is capable of evaluating the merits and risks of its purchase of the Shares and the consummation of the transactions contemplated by this Agreement.

Section 4.7  Independent Investigation.  Buyer hereby acknowledges and affirms that it has completed its own independent investigation, analysis and evaluation of the Issuer and its Subsidiaries, that it has made all such reviews and inspections of the Issuer and its Subsidiaries as it has deemed necessary or appropriate, and that in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, it has relied on its own independent investigation, analysis and evaluation of Issuer's representations and warranties made in Article III.

ARTICLE V
COVENANTS

Section 5.1  Conduct of Business Prior to the Closing Date.  Except as (i) expressly permitted by this Agreement, (ii) approved by the Bankruptcy Court, (iii) contemplated by the Plan of Reorganization, or (iv) with the written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed), during the period from the date of this Agreement to the Closing Date, Issuer and its Subsidiaries shall conduct their respective businesses in the Ordinary Course of Business and in compliance in all material respects with all applicable Laws.

DB02:9196874.1                                                                      068347.1001

Section 5.2    Further Assurances.  Upon the request of a party hereto at any time after the Closing, the other party will execute and deliver such further instruments of assignment, transfer, conveyance, endorsement, direction or authorization and other documents as the requesting party or its counsel may reasonably request in order to perfect title of Buyer to the Shares or otherwise effectuate the purposes of this Agreement.

Section 5.3    Employees.

(a)    Benefits.  Until the date that is twelve (12) months after the Closing Date, Buyer shall provide, or cause one of its Affiliates to provide, employee benefits under employee benefit plans to the employees of Issuer or its Subsidiaries who remain employed by Buyer or its Affiliates following the Closing Date (the "Transferred Employees") that are substantially similar in the aggregate than those provided to the Transferred Employees pursuant to Issuer Benefit Plans as of the date of this Agreement.   Nothing herein shall prohibit Buyer from amending or terminating any particular Issuer Benefit Plan in accordance with its terms or applicable Law.

(b)    Eligibility; Service Credit.   From and after the Closing Date, each Transferred Employee shall (to the extent permitted by applicable Laws) be credited under each of Buyer's employee benefit plans or programs in which such Transferred Employee participates, with his or her years of service with Issuer or any Subsidiary before the Closing Date for purposes of vesting, eligibility, and level of benefits (except for purposes of benefit accrual under a defined benefit pension plan or where such credit would result in a duplication of benefits) to the same extent as such Transferred Employee was entitled, before the Closing Date, to credit for such service with Issuer or any Subsidiary under any similar Issuer Benefit Plan in which such Transferred Employee participated immediately prior to the Closing Date.   In addition, and without limiting the generality of the foregoing, Buyer shall use its commercially reasonable efforts to (i) cause to be waived any eligibility requirements (to the extent such requirements were satisfied by the applicable Transferred Employee prior to the Closing Date with respect to the similar Issuer Benefit Plan) or pre-existing condition limitations applicable to any Transferred Employee, and (ii) give effect, in determining any deductible maximum out of pocket limitations, to amounts paid by any Transferred Employee during the plan year in which the Closing Date occurs.

(c)    No Third Party Beneficiaries.  Notwithstanding anything set forth in this Section 5.3, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Issuer Benefit Plan or (ii) shall limit the right of Buyer or any of its Affiliates to amend, terminate or otherwise modify any Issuer Benefit Plan or any of Buyer's or any of its Affiliate's employee benefit plans or programs following the Closing Date. Without limiting the generality of the preceding sentence, Issuer and Buyer acknowledge and agree that all provisions contained in this Section 5.3 with respect to current and former employees of Issuer or any Subsidiary are included for the sole benefit of Issuer and Buyer, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (x) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of any Issuer, any participant in any Issuer Benefit Plan, or any

- 15 -

dependent or beneficiary thereof, or (y) to continued employment with Buyer or any of its Affiliates.

(d)     Notwithstanding anything to the contrary contained herein, nothing in this Section 5.3 shall be deemed to require the Debtors to delay or otherwise alter the completion of the Bankruptcy Cases.

Section 5.4     Required Approvals.

(a)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the parties hereto shall use their best efforts to cooperate and take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any applicable Laws) to satisfy the conditions set forth in Sections 6.6 and 7.7 hereof, including the preparation and filing of all forms, registrations and notices required pursuant to applicable anti-trust Law to be filed to consummate the Closing. In furtherance of the foregoing, the parties shall as promptly as reasonably practicable following the execution of this Agreement, make all premerger notification filings required under (i) the HSR Act (which shall in no event be made more than ten (10) Business Days after the date of this Agreement), and (ii) the pre-merger notification rules in any other jurisdiction in which the parties agree applicable Law requires a premerger notification filing (which filing shall be made promptly following such determination). Buyer shall be responsible for and shall pay all fees and other costs in respect of any required premerger notification filings.

(b)     The parties shall use their best efforts to take all steps as may be necessary to obtain an approval from, or to resolve an action or proceeding by, any Governmental Entity, whether by judicial or administrative action, challenging this Agreement or the consummation of the transactions contemplated hereby or the performance of obligations hereunder under any antitrust law. Notwithstanding the foregoing, Buyer will, and will cause its Affiliates to, commit to and effect, by consent decree, hold separate orders, trust, and otherwise, the divestiture of any assets or business of Buyer (or its Affiliates), and permit and suffer to be imposed on it any other restrictions on any of its activities, assets, or business as may be necessary to avoid the entry of, or to effect the dissolution of or vacate or lift, any Order relating to any antitrust challenge by any Governmental Entity that would otherwise have the effect of preventing or materially delaying the consummation of the Closing.

(c)     Prior to the Closing, upon the terms and subject to the conditions of this Agreement, the parties hereto shall use their reasonable best efforts to cooperate and take, or cause to be taken, all actions, and to do, or cause to be done all things necessary, proper or advisable (subject to any applicable Laws) necessary to satisfy the conditions to Closing set forth in this Agreement (other than those set forth in Sections 6.6 and 7.7 hereof, which shall be subject to Section 5.4(a) above), including, but not limited to the preparation and filing of all forms, registrations and notices required pursuant to applicable Law (other than anti-trust Law, which shall be subject to Section 5.4(a) above).

Section 5.5     Bankruptcy Matters; Other Covenants and Agreements.     Within two (2) Business Days following the date of completion of the Auction, Issuer shall file with the Bankruptcy Court a notice of filing of a successful bid and the form of the Approval Order.

- 16 -

Buyer will promptly take such actions as are reasonably requested by Issuer to assist in obtaining entry of the Approval Order and the Confirmation Order, including furnishing affidavits or other documents or information reasonably requested by Issuer for filing with the Bankruptcy Court for the purposes of obtaining approval of this Agreement and entry of each such Orders. In the event that the entry of the Approval Order or the Confirmation Order shall be appealed and until such time as this Agreement has been terminated, each of Issuer and Buyer shall use their best efforts to defend such appeal. Other than as set forth in Section 8.2, none of Issuer nor its Affiliates or Representatives shall have any liability to Buyer, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of a definitive agreement for an Alternative Transaction.

Section 5.6 <u>Confidentiality</u>. The parties acknowledge that Parent and Buyer previously executed the Confidentiality Agreement, which Confidentiality Agreement shall continue in full force and effect in accordance with its terms; <u>provided</u>, <u>that</u>, upon Closing, Buyer's obligations pursuant thereto with respect to Confidential Information (as defined in the Confidentiality Agreement) relating solely to the Issuer and its Subsidiaries shall terminate. Notwithstanding the foregoing, the parties acknowledge and understand that in connection with seeking the Approval Order and the Confirmation Order and the implementation thereof, this Agreement (together with the Annexes, Exhibits and Schedules attached hereto) may be filed with the Bankruptcy Court and made publicly available, and, prior to the entry of the Approval Order, disclosures relating to the transactions contemplated by this Agreement may be made to the Debtors' creditors, other potential bidders and their respective advisors and representatives, and the parties agree that such filing and disclosures will not be deemed to violate any confidentiality obligations owing to any party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding anything to the contrary contained herein, no provision of this Agreement shall in any way limit the disclosure of information by the Debtors in connection with the administration of the Bankruptcy Case.

Section 5.7 <u>Access to Information / Preservation of Books and Records.</u>

(a) From the date of this Agreement until the earlier of (i) termination of this Agreement and (ii) the Closing, Issuer and its Subsidiaries shall permit Buyer and its Representatives (including its legal advisors and accountants), to make such reasonable investigation of Issuer and its Subsidiaries as Buyer reasonably requests, and shall provide Buyer reasonable access to the Books and Records as Buyer reasonably requests. Any such investigation and access shall be during regular business hours upon reasonable advance notice in a manner that minimizes disruption to the business, operations and activities of Issuer and its Subsidiaries. In connection with Buyer's access, Buyer shall be accompanied at all times by a Representative of Issuer unless Issuer otherwise agrees, shall not interfere with the use and operation of the offices and other facilities of Parent, Issuer and its Subsidiaries, and shall comply with all safety and security rules and regulations for such offices and other facilities. Issuer shall use its reasonable efforts to cause its Representatives to cooperate with Buyer and its Representatives in connection with such investigation. Notwithstanding anything to the contrary contained herein, Issuer and its Subsidiaries shall be entitled to withhold access to, or investigation or examination of, any information which they determine (i) includes trade secrets or other proprietary information, (ii) is protected by attorney-client privilege, work-product or

any other similar privilege or doctrine, (iii) the disclosure of which is prohibited pursuant to any agreement to which Parent, Issuer or any Subsidiary is a party, or applicable Law, or (iv) includes customer names or pricing information. Any confidential information provided to Buyer shall be deemed Confidential Information under the Confidentiality Agreement and shall be subject to the terms thereof.

(b)     From and after the Closing until the date that is thirty-six (36) months after the Closing Date, Buyer shall provide Issuer with reasonable access to the Books and Records (and allow Issuer to make extracts and copies of such Books and Records during such access) in connection with the Bankruptcy Case or any other proceeding or action relating thereto. Any such access shall be during regular business hours upon reasonable advance notice and in a manner that minimizes disruption to the business, operations and activities of Buyer.

(c)     Buyer shall preserve and retain the Books and Records in place as of the Closing for a period of six (6) years following the Closing Date.

Section 5.8     Publicity.   Except (i) as required by applicable Law, including any Order by the Bankruptcy Court, (ii) in connection with any filings by the Debtors or in any proceedings before the Bankruptcy Court or (iii) in connection with the Auction, neither Issuer nor Buyer shall (and shall cause their Representatives not to) issue any press release or make any public announcement concerning this Agreement or the transactions contemplated hereby without having provided Issuer, or Buyer, as the case may be, at least one (1) Business Day to review and comment on such release or announcement (which comments shall be reasonably considered by Issuer, or Buyer, as the case may be).

Section 5.9     Disclaimer of Warranties.   Notwithstanding anything in this Agreement to the contrary, it is the explicit intent of each party hereto that Parent, Issuer and its Subsidiaries are not making any representations or warranties whatsoever, express or implied, beyond those expressly given in Article III of this Agreement, and it is understood that, except for the representations and warranties contained herein, Buyer takes the Shares "as is" and "where is." Without limiting the generality of the foregoing, except for the representations and warranties specifically contained in Article III, Parent, Issuer and its Subsidiaries hereby expressly disclaim and negate any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to (a) the condition of Issuer and its Subsidiaries (including any implied or expressed warranty of merchantability or fitness for a particular purpose, or of conformity to models or samples of materials) or (b) any infringement by any Issuer or any of its Affiliates of any patent or proprietary right of any third party; it being the intention of Issuer and Buyer that the Shares are to be accepted by Buyer in their present condition and state of repair. It is understood that any cost estimates, projections or other predictions or other statements or information contained or referred to in the offering materials that have been provided to Buyer are not and shall not be deemed to be representations or warranties of Issuer or any of its Affiliates.

Section 5.10     Transfer Taxes.   Notwithstanding any provision of this Agreement to the contrary, all Transfer Taxes shall be borne by Buyer. Issuer will, at the sole cost and expense of Buyer, file all necessary Tax Returns and other documentation with respect to all

- 18 -

Transfer Taxes and fees, and, if required by applicable Law, Buyer will, and will cause its Affiliates to, join in the execution of any such Tax Returns and other documentation.

Section 5.11 <u>Intellectual Property</u>. Notwithstanding any other provision in this Agreement, Buyer and Issuer consent to the use by Parent of the name "CCS Medical" or any other name or designation of the Debtors following the consummation of the Closing for the use in connection with the Bankruptcy Cases and the winding down of the affairs of the Debtors.

Section 5.12 <u>Standstill</u>. Without the prior written consent of Parent and Issuer, or absent approval of the Bankruptcy Court, neither Buyer nor Buyer's Representatives or Affiliates to whom Buyer has provided Confidential Information (as such term is defined in the Confidentiality Agreement) will, directly or indirectly, (i) offer for sale, sell, or otherwise dispose of, and/or purchase, trade or otherwise acquire (or enter into any transaction or device that is designed to, or could be expected to, result in the disposition or acquisition by any Person at any time in the future of) any Claims or interests therein (including, without limitation, any Claims that may be deemed to be beneficially owned (within the meaning of Rule 13d-3 under the Securities Exchange Act of 1934, as amended or any successor provision thereto, as applicable)) by Buyer, (ii) enter into any swap or other derivatives transaction that transfers to another, in whole or in part, any of the economic benefits or risks of ownership of the Claims, or (iii) publicly disclose the intention to do any of the foregoing, in each case for a period commencing on the date of this Agreement and ending on the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with <u>Article VIII</u> hereof. Notwithstanding the foregoing, the obligations of Buyer under the Confidentiality Agreement shall in no way be altered or otherwise affected by the provisions of this <u>Section 5.12</u>.

ARTICLE VI
CONDITIONS TO OBLIGATIONS OF BUYER

The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment or waiver, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

Section 6.1 <u>Representations and Warranties of Issuer</u>. All representations and warranties made by Issuer in this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" set forth therein) at and as of the Closing Date (except for such representations and warranties that are made as of a specific date, in which case they shall be true and correct as of such specific date), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

Section 6.2 <u>Performance of Issuer's Obligations</u>. Issuer shall have performed in all material respects all obligations required under this Agreement to be performed by Issuer on or before the Closing Date.

Section 6.3 <u>Approval Order</u>. The Bankruptcy Court shall have entered the Approval Order, and such Approval Order shall not be stayed pending appeal.

Section 6.4   Plan of Reorganization.   The Plan of Reorganization shall be effective.

Section 6.5   No Violation of Orders.   No preliminary or permanent injunction or other Order issued by any court or Governmental Entity, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any Governmental Entity shall be in effect which prevents or prohibits the consummation of any of the transactions contemplated by this Agreement or that makes it illegal for either party hereto to perform its obligations hereunder.

Section 6.6   HSR Act.   All waiting periods (and any extensions thereof) under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired or been terminated.

Section 6.7   Documents.   Each of the items required to be delivered to Buyer pursuant to Section 2.5 shall have been delivered.

## ARTICLE VII
## CONDITIONS TO OBLIGATIONS OF ISSUER

The obligation of Issuer to consummate the transactions contemplated by this Agreement is subject to the fulfillment or waiver, at or before the Closing Date, of the following conditions, any one or more of which may be waived by Issuer in their sole discretion:

Section 7.1   Representations and Warranties of Buyer.   All representations and warranties made by Buyer in this Agreement shall be true and correct at and as of the date of this Agreement and at and as of the Closing Date as if again made by Buyer on and as of such date (except to the extent expressly made as of an earlier date, in which case as of such earlier date).

Section 7.2   Performance of Buyer's Obligations.   Buyer shall have performed in all material respects all obligations required under this Agreement to be performed by it on or before the Closing Date.

Section 7.3   Approval Order.   The Bankruptcy Court shall have entered the Approval Order, and such Approval Order shall not be stayed pending appeal.

Section 7.4   Plan of Reorganization.   The Plan of Reorganization shall be effective.

Section 7.5   Consents and Approvals.   Issuer shall have received all consents and approvals in respect of this Agreement and the transactions contemplated hereby pursuant to, or contemplated by, each of the Existing Credit Facilities.

Section 7.6   No Violation of Orders.   No preliminary or permanent injunction or other Order issued by any court or Governmental Entity, nor any statute, rule, regulation, decree or executive order promulgated or enacted by any Governmental Entity shall be in effect which prevents or prohibits the consummation of any of the transactions contemplated by this Agreement or that makes it illegal for either party hereto to perform its obligations hereunder.

- 20 -

Section 7.7    <u>HSR Act</u>. All waiting periods (and any extensions thereof) under the HSR Act applicable to the consummation of the transactions contemplated hereby shall have expired or been terminated.

Section 7.8    <u>Documents</u>. Each of the items required to be delivered to Issuer pursuant to <u>Section 2.6</u> shall have been delivered.

ARTICLE VIII
TERMINATION

Section 8.1    <u>Termination</u>. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing in the following manner:

(a)    by mutual written consent of Issuer and Buyer;

(b)    by either Issuer or Buyer, if any Governmental Entity with jurisdiction over such matters shall have issued an order or injunction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and non-appealable;

(c)    (i) by Issuer, if the Closing shall not have occurred on or before the forty-fifth (45th) day after the entry of the Confirmation Order, or (ii) by Buyer, if Buyer is the Next Highest Bidder, if the Closing shall not have occurred on or before the date on which Buyer's bid is no longer required to remain open pursuant to the Bidding Procedures Order (such date set forth in (i) and (ii) above, the "<u>Outside Date</u>"); <u>provided</u>, <u>that</u>, the right to terminate this Agreement under this <u>Section 8.1(c)</u> shall not be available to Issuer or Buyer if the failure of the Closing to occur prior to the Outside Date is the result of the failure by such party to perform its obligations under this Agreement;

(d)    by either Issuer or Buyer, if Issuer consummates an Alternative Transaction;

(e)    by either Issuer or Buyer, at any time following the stay or reversal of the Approval Order or the Confirmation Order by a court of competent jurisdiction (unless the Closing has occurred prior to the stay or reversal of the Approval Order or the Confirmation Order), and such stay or reversal is not reversed, revoked, voided or vacated within ninety (90) days thereof; but the right to terminate this Agreement under this <u>Section 8.1(e)</u> shall not be available to Issuer or Buyer if the failure of any such Order not being entered is the result of the failure by such party to perform its obligations under this Agreement;

(f)    by Buyer, in the event of any inaccuracy in any of Issuer's representations or warranties contained in this Agreement or any breach of any of Issuer's covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in <u>Section 6.1</u> or <u>Section 6.2</u>, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice

- 21 -

thereof and (y) the Outside Date; provided, that, Buyer shall not have the right to terminate this Agreement under this Section 8.1(f) at a time when Issuer have (or would have after the passage of time) the right to terminate this Agreement under Section 8.1(g);

(g)     by Issuer, in the event of any inaccuracy in any of Buyer's representations or warranties contained in this Agreement or any breach of any of Buyer's covenants or agreements contained in this Agreement which, individually or in the aggregate with all other such inaccuracies and breaches, (i) would result in a failure of a condition set forth in Section 7.1 or Section 7.2, and (ii) is either incapable of being cured or, if capable of being cured, is not cured in all material respects within the earlier of (x) thirty (30) calendar days after written notice thereof and (y) the Outside Date; provided, that, Issuer shall not have the right to terminate this Agreement under this Section 8.1(g) at a time when Buyer has (or would have after the passage of time) the right to terminate this Agreement under Section 8.1(f);

(h)     by Issuer or Buyer if the Auction is held and (i) Buyer is not the Successful Bidder or the Next-Highest Bidder, or (ii) Buyer is the Next-Highest Bidder but is no longer obligated to remain as the Next-Highest Bidder pursuant to the terms of the Bidding Procedures Order.

Section 8.2     Effect of Termination.  If a party terminates this Agreement under Section 8.1, this Agreement shall become void and have no further effect, except that the agreements contained in this Article VIII, the last two sentences of Section 2.4(b), Section 5.6 and Article IX shall survive the termination hereof.  There shall be no liability or obligation after such termination on the part of any party except for fraud or intentional breach.  No termination of this Agreement shall affect the obligations of the parties pursuant to the Confidentiality Agreement, except to the extent specified in such Confidentiality Agreement.

ARTICLE IX
MISCELLANEOUS

Section 9.1     Notices.  All notices and other communications in connection with this Agreement shall be in writing, shall be effective upon receipt and shall be deemed given if delivered personally, sent via facsimile (with answer-back confirmation), mailed by registered or certified mail (return receipt requested) or delivered by an express courier (with confirmation) to the parties at the following addresses (or at such other address of a party as shall be specified by like notice):

(a)     if to Issuer, care of:

CCS Medical Holdings, Inc.
14255 49th Street North, Suite 301
Clearwater, Florida 33762
Attention: Chief Financial Officer
Fax: (800) 397-0545

with a copy to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019
Attention: Mark A. Cognetti and Michael J. Kelly
Fax: (212) 728-8111

(b)    if to Buyer, to:

[_____]

with a copy to:

[_____]

Any party may change the address to which notices, claims, demands and other communications hereunder are to be delivered by giving the other parties notice in the manner set forth herein.

Section 9.2    Interpretation. When a reference is made in this Agreement to Articles, Sections, Exhibits, Annexes or Schedules, such reference shall be to an Article or Section of or Exhibit, Annex or Schedule to this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Except as otherwise expressly provided herein, all references to "dollars" or "$" shall be deemed references to the lawful money of the United States of America. Unless otherwise indicated, the word "day" shall be interpreted as a calendar day. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." References to the "transactions contemplated by this Agreement" and similar expressions include the transactions contemplated by the Ancillary Documents. The words "hereof," "herein," "hereby," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole (including any exhibits hereto and schedules delivered herewith) and not to any particular provisions of this Agreement. Whenever used in this Agreement, any noun or pronoun shall be deemed to include the plural as well as the singular and to cover all genders. The Issuer Disclosure Schedule and the Buyer Disclosure Schedule, as well as all other schedules, annexes and exhibits hereto, shall be deemed part of this Agreement and included in any reference to this Agreement.

Section 9.3    Counterparts. This Agreement may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when counterparts have been signed by each of the parties and delivered to the other party, it being understood that each party need not sign the same counterpart. Either party may deliver its signed counterpart of this Agreement to the other party by means of facsimile or any other electronic medium, and such delivery will have the same legal effect as hand delivery of an originally executed counterpart.

    

Section 9.4    Entire Agreement. This Agreement (including the documents and the instruments referred to in this Agreement) and the Confidentiality Agreement constitute the full and entire agreement and supersede all prior agreements and understandings, both written and oral, between the parties with respect to the subject matter of hereof and thereof.

Section 9.5    Survival. The representations and warranties, and covenants and agreements required by their terms to be performed at or prior to the Closing, of the parties contained in this Agreement or in any certificate or other writing delivered pursuant hereto or in connection herewith shall not survive the Closing. Except as set forth in the preceding sentence, the covenants and agreements of the parties contained in this Agreement shall survive in accordance with their respective terms.

Section 9.6    Amendment; Waiver. This Agreement may not be amended, modified or supplemented except by a written instrument executed by each of the parties hereto. Any waiver of any provision of this Agreement shall be deemed ineffective and be of no force or effect unless pursuant to a written instrument executed by the party or parties to this Agreement against whom enforcement is sought.

Section 9.7    Fees and Expenses. Except as otherwise expressly provided in this Agreement (including without limitation, in Section 5.4), each party to this Agreement shall bear and pay all costs, fees and expenses that it incurs, or which may be incurred on its behalf, in connection with this Agreement and the transactions contemplated herein.

Section 9.8    Governing Law; Jurisdiction. This Agreement shall be governed by and interpreted and enforced in accordance with the laws of the State of New York without giving effect to the choice-of-law provisions thereof to the extent that the application of the laws of another jurisdiction would be required thereby. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise under this Agreement and in respect of the transactions contemplated hereby; provided, however, that in the event the Bankruptcy Court at any time declines to accept jurisdiction, each of the parties hereby irrevocably (i) submits to the exclusive jurisdiction of the courts of the State of New York and the federal courts of the United States located in New York, New York regarding any such claim or dispute; (ii) agrees that all claims and disputes shall be heard and determined in such courts; (iii) waives, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the venue of any such claim or dispute brought in such court or any defense of inconvenient forum for the maintenance of such claim or dispute; and (iv) agrees that a judgment in any claim or dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable Law.

Section 9.9    Assignment; Third Party Beneficiaries.

(a)    Neither this Agreement nor any of the rights, interests or obligations under this Agreement shall be assigned by either of the parties without the prior written consent of the other parties; provided, however, Issuer may assign their rights, interests and/or obligations under this Agreement after the Closing in connection with the Plan of Reorganization. Subject to the preceding sentence, this Agreement shall be binding upon, inure to the benefit of and be enforceable by each of the parties and their respective successors and assigns. This Agreement

- 24 -

(including the documents and instruments referred to in this Agreement) is not intended to and does not confer upon any Person other than the parties hereto any rights or remedies under this Agreement.

(b)      The representations and warranties in this Agreement are the product of negotiations among the parties hereto and are for the sole benefit of the parties hereto. Any inaccuracies in such representations and warranties are subject to waiver by the parties hereto in accordance with this Agreement without notice or liability to any other Person. In some instances, the representations and warranties in this Agreement may represent an allocation among the parties hereto of risks associated with particular matters regardless of the knowledge of any of the parties hereto. Consequently, Persons other than the parties hereto may not rely upon the representations and warranties in this Agreement as characterizations of actual facts or circumstances as of the date of this Agreement or as of any other date.

Section 9.10   <u>Specific Performance</u>. Buyer acknowledges and agrees that Issuer would be damaged irreparably in the event any of the provisions of this Agreement that are to be performed by Buyer are not performed in accordance with their specific terms or otherwise are breached. Accordingly, Buyer agrees that Issuer shall be entitled to an injunction or injunctions to prevent breaches of the provisions of this Agreement by Buyer and to enforce specifically this Agreement and the terms and provisions hereof by Buyer, in addition to any other remedy to which Issuer may be entitled, at law or in equity. Buyer hereby waives (i) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate, and (ii) any requirement under any Law to post a bond or other security as a prerequisite to obtaining equitable relief.

[Signature pages follow]

DB02:9196874.1     068347.1001

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be duly executed as of the date first above written.

**ISSUER**

CCS ACQUISITION HOLDING-SUB CORPORATION

By:_____
    Name:
    Title

**PARENT**

CCS MEDICAL HOLDINGS, INC.

By:_____
    Name:
    Title

**BUYER**

[_____]

By:_____
Name:
Title:

[Signature Page to Investment Agreement]