## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| CCS Medical, Inc., et al., | ) | Case No. 09-12390 (CSS) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## FIRST AMENDED DISCLOSURE STATEMENT WITH RESPECT TO THE MODIFIED SECOND JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR CCS MEDICAL, INC. AND ITS AFFILIATED DEBTORS

Dated: Wilmington, Delaware
      February 9, 2010

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

**Young Conaway Stargatt & Taylor, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801-1037
(302) 571-6600

*Co-Counsel to the Debtors and Debtors in Possession*

INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION OR AMENDMENT. THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY NOR WILL THERE BE ANY DISTRIBUTION OF THE SECURITIES DESCRIBED HEREIN UNTIL THE EFFECTIVE DATE OF THE PLAN. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL THE SECURITIES DESCRIBED HEREIN AND IS NOT A SOLICITATION OF AN OFFER TO BUY SUCH SECURITIES IN ANY STATE WHERE SUCH OFFER OR SALE IS NOT PERMITTED.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST, AND HOLDERS OF INTERESTS IN, THE DEBTORS (INCLUDING, WITHOUT LIMITATION, THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED WITH OR REVIEWED BY, AND THE PLAN SECURITIES (AS DEFINED HEREIN) TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE WILL NOT HAVE BEEN THE SUBJECT OF A REGISTRATION STATEMENT FILED WITH, THE SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**") UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR WITH ANY SECURITIES REGULATORY AUTHORITY OF ANY STATE UNDER ANY STATE SECURITIES OR "BLUE SKY" LAWS. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT, AND THE OFFER OF THE NEW SECURITIES THAT MAY BE DEEMED TO BE MADE PURSUANT TO THE SOLICITATION, ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE EXEMPTIONS PROVIDED BY SECURITIES ACT SECTIONS 3(a)(9) AND 4(2), OR OTHER APPLICABLE EXEMPTIONS, AND EXPECT THAT THE ISSUANCE OF THE NEW SECURITIES UNDER THE PLAN WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES BY REASON OF THE APPLICABILITY OF BANKRUPTCY CODE SECTIONS 1145(a)(1) AND (2) AND SECURITIES ACT SECTION 4(2), OR OTHER APPLICABLE EXEMPTIONS.

EXCEPT AS OTHERWISE SET FORTH HEREIN, THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE BY THE DEBTORS AS OF THE DATE HEREOF, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT, UNDER ANY CIRCUMSTANCES, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF.

NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT, THE PLAN AND THE EXHIBITS AND SCHEDULES ATTACHED OR INCORPORATED BY REFERENCE OR REFERRED TO IN THE DISCLOSURE STATEMENT AND/OR PLAN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN AND CERTAIN OF THE PLAN DOCUMENTS. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN OR THE APPLICABLE PLAN DOCUMENTS AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN OR THE APPLICABLE PLAN DOCUMENTS ARE CONTROLLING. THE SUMMARIES OF THE PLAN AND THE PLAN DOCUMENTS IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE, TO THE FULL TEXT OF THE PLAN AND THE APPLICABLE PLAN DOCUMENTS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PERSON, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR INTERESTS.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. EACH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION OF VOTES TO ACCEPT THE PLAN, THE PLAN, THE PLAN DOCUMENTS AND THE TRANSACTIONS CONTEMPLATED HEREBY AND THEREBY.

# TABLE OF CONTENTS

**ARTICLE I.** INTRODUCTION..................................................................................1
    **1.1.** General..................................................................................................1
    **1.2.** The Confirmation Hearing....................................................................2
    **1.3.** Voting; Holders of Claims Entitled to Vote; Classification ...............3
    **1.4.** Projections and Forward-Looking Statements......................................5

**ARTICLE II.** SUMMARY OF PLAN AND CLASSIFICATION AND TREATMENT
    OF CLAIMS AND INTERESTS THEREUNDER............................6

**ARTICLE III.** BUSINESS DESCRIPTION AND PREPETITION INDEBTEDNESS..............14
    **3.1.** The Debtors' Businesses.....................................................................14
    **3.2.** Prepetition Indebtedness and Capital Structure..................................14

**ARTICLE IV.** EVENTS LEADING TO CHAPTER 11 FILING AND PRIOR
    CONFIRMATION PROCEEDINGS ...............................................15
    **4.1.** The Debtors' Prepetition Financial Position and the Events Leading up
        to the Commencement of the Reorganizations Case. .........................15
    **4.2.** Commencement of the Reorganization Cases and the Original Plan. ..............15

**ARTICLE V.** THE PLAN ........................................................................................18
    **5.1.** Overview of Chapter 11......................................................................18
    **5.2.** Settlement of Certain Inter-Creditor/Intercompany Issues.................18
    **5.3.** Substantive Consolidation of Certain of the Debtors. ........................19
    **5.4.** Limitations of Plan Distribution to Interests......................................21
    **5.5.** Limitations on Plan Distributions on Account of Assumed Liabilities. ............21
    **5.6.** Separate Classification of Other Secured Claims. ..............................21
    **5.7.** Overview of the Plan..........................................................................21
    **5.8.** Summary of Sale Transactions if Implemented...................................29
    **5.9.** Summary of Capital Structure of SA Reorganized Debtors if the Stand
        Alone Transactions are Implemented. .................................................31
    **5.10.** Acceptance or Rejection of the Plan; Effect of Rejection by One or
        More Classes of Claims or Equity Interests........................................35
    **5.11.** Means for Implementation..................................................................36
    **5.12.** Distributions.......................................................................................39
    **5.13.** Procedures for Resolving Claims.......................................................44
    **5.14.** Executory Contracts and Unexpired Leases. ......................................46
    **5.15.** Conditions Precedent to Confirmation and Consummation of the Plan. ...........48
    **5.16.** Effect of Confirmation. ......................................................................50
    **5.17.** Miscellaneous Provisions...................................................................55

**ARTICLE VI.** CONFIRMATION OF THE PLAN OF REORGANIZATION .........................58
    **6.1.** Confirmation Hearing..........................................................................58
    **6.2.** Confirmation.......................................................................................59
    **6.3.** Classification of Claims and Interests.................................................65
    **6.4.** Consummation. ...................................................................................65

**ARTICLE VII.** ALTERNATIVES TO CONFIRMATION AND CONSUMMATION
OF THE PLAN .................................................................65
    **7.1.**    Liquidation Under the Bankruptcy Code...........................................65
    **7.2.**    Alternative Plan(s) of Reorganization. ...........................................66
    **7.3.**    Dismissal of the Debtors' Reorganization Cases...............................66

**ARTICLE VIII.** SUMMARY OF VOTING PROCEDURES....................................67

**ARTICLE IX.** DESCRIPTION AND HISTORY OF REORGANIZATION CASES.............67
    **9.1.**    Schedules, Statements and Bar Date.............................................68
    **9.2.**    Settlements & Compromises......................................................68
    **9.3.**    Sale of Assets...................................................................68
    **9.4.**    Appointment of the Second Lien Lender Committee. ..........................69

**ARTICLE X.** GOVERNANCE OF THE SA REORGANIZED DEBTORS UNDER
THE STAND ALONE TRANSACTIONS .......................................69
    **10.1.**    Board of Directors and Management..............................................69
    **10.2.**    Indemnification of Directors and Officers.......................................70
    **10.3.**    New Stockholder and Registration Rights Agreement. .......................71
    **10.4.**    The Credit Agreements. .........................................................71

**ARTICLE XI.** CERTAIN RISK FACTORS TO BE CONSIDERED........................71
    **11.1.**    Certain Bankruptcy Considerations. .............................................71
    **11.2.**    Risks Relating to Recoveries if the Sale Transactions are Implemented...........73
    **11.3.**    Risks Relating to Closing the Sale Transactions. ..............................73
    **11.4.**    Risks Relating to the Stand Alone Transactions and the Reorganized
First Lien Term Loan Facility, the Reorganized Second Lien Term Loan
Facility, the New Revolving Credit Facility, the DIP Roll Option and
the New Common Stock. ........................................................74
    **11.5.**    Risks Relating to Tax and Accounting Consequences of the Plan. ..................78
    **11.6.**    Risks Associated with the Business...............................................79

**ARTICLE XII.** SECURITIES LAW MATTERS .......................................86
    **12.1.**    Plan Securities...................................................................86
    **12.2.**    Issuance and Resale of Plan Securities Under the Plan. .....................87

**ARTICLE XIII.** CONCLUSION .....................................................89

# ARTICLE I.

## INTRODUCTION

### 1.1.  *General.*

CCS Medical, Inc. ("**CCS**") and the other debtors and debtors-in-possession, as set forth on Schedule 1.1 hereto (collectively, the "**Debtors**"), hereby transmit this disclosure statement (as it may be amended, supplemented or otherwise modified from time to time, the "**Disclosure Statement**") pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "**Bankruptcy Code**"), in connection with the Debtors' solicitation of votes (the "**Solicitation**") to confirm the Modified Second Joint Chapter 11 Plan of Reorganization for CCS Medical, Inc. and its Affiliated Debtors, dated as of February 9, 2010 (the "**Plan**," a copy of which is attached to this Disclosure Statement as Exhibit 1).[1]

Annexed as Exhibits to this Disclosure Statement are copies of the following documents:

- Plan (Exhibit 1);

- Prepetition Corporate Organizational Chart (Exhibit 2);

- Certain Federal Income Tax Consequences of the Plan (Exhibit 3);

- Liquidation Analysis (Exhibit 4);

- Financial Projections for the SA Reorganized Debtors (Exhibit 5); and

- Disclosure Statement Order (Exhibit 6).

On February 9, 2010, after notice and a hearing, the Bankruptcy Court (i) entered an order approving this Disclosure Statement (the "**Disclosure Statement Order**") as containing "adequate information" to enable a hypothetical, reasonable investor typical of holders of Claims against or Interests in the Debtors to make an informed judgment as to whether to accept or reject the Plan and (ii) authorized the Debtors to use this Disclosure Statement in connection with the Solicitation. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

The Disclosure Statement Order sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan, and for filing objections to confirmation of the

---

[1]     All capitalized terms used but not defined herein shall have the meanings ascribed in the Plan.

Plan, the record date for voting purposes and the applicable standards for tabulating Ballots. In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballot in their entirety before voting on the Plan. No solicitation of votes may be made except pursuant to this Disclosure Statement and section 1125 of the Bankruptcy Code. In voting on the Plan, holders of Claims entitled to vote should not rely on any information relating to the Debtors and their businesses other than the information contained in or incorporated by reference into this Disclosure Statement, the Plan and all exhibits hereto and thereto.

THIS DISCLOSURE STATEMENT IS NOT INTENDED TO REPLACE A CAREFUL AND DETAILED REVIEW AND ANALYSIS OF THE PLAN BY EACH HOLDER OF A CLAIM OR INTEREST. THIS DISCLOSURE STATEMENT IS INTENDED TO AID AND SUPPLEMENT THAT REVIEW. THE DESCRIPTION OF THE PLAN HEREIN IS ONLY A SUMMARY. HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES-IN-INTEREST ARE CAUTIONED TO REVIEW THE PLAN AND ANY RELATED ATTACHMENTS FOR A FULL UNDERSTANDING OF THE PLAN'S PROVISIONS. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN.

Additional copies of this Disclosure Statement (including the Exhibits hereto) can be accessed free of charge from the following website: http://chapter11.epiqsystems.com/CCSMedical. Additional copies of this Disclosure Statement (including the Exhibits hereto) are also available upon request made to the office of the Debtors' co-counsel, at Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019, Attention: Michael J. Kelly, Esq. and Lauren C. Cohen, Esq., (212) 728-8000 (phone) or (212) 728-8111 (facsimile), or at Young Conaway Stargatt & Taylor, LLP, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801-1037, Attention: Robert Brady, Esq. and Matthew B. Lunn, Esq., (302) 571-6600 (phone) or (302) 571-1253 (facsimile).

In addition, a Ballot for voting to accept or reject the Plan with respect to each Debtor is enclosed with this Disclosure Statement for the holders of Claims that are entitled to vote to accept or reject the Plan. **The Disclosure Statement Order establishes March 5, 2010 at 4:00 p.m. (Prevailing Eastern Time) as the "Voting Deadline".** If you are a holder of a Claim entitled to vote on the Plan and did not receive a Ballot, received a damaged Ballot or lost your Ballot, or if you have any questions concerning the procedures for voting on the Plan, please call: (646) 282-2400, or send your written inquiry to:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attn: CCS Balloting

## 1.2.    *The Confirmation Hearing.*

A hearing will be held before the Honorable Christopher S. Sontchi, United States Bankruptcy Judge for the District of Delaware, United States Bankruptcy Court, 5th Floor

Courtroom 6, 824 North Market Street, Wilmington, DE 19801 on **March 11, 2010, at 4:30 p.m. (Prevailing Eastern Time)**, to consider confirmation of the Plan. The Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. Objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before **March 5, 2010, at 4:00 p.m. (Prevailing Eastern Time)**, in the manner set forth in the Disclosure Statement Order. The hearing on confirmation of the Plan may be adjourned from time to time without further notice except for the announcement of the adjourned date and time at the hearing on confirmation or any adjournment thereof.

### 1.3.    *Voting; Holders of Claims Entitled to Vote; Classification*

Pursuant to the provisions of the Bankruptcy Code, only holders of claims or equity interests in classes of claims or equity interests that are Impaired and that are not deemed to have rejected a plan of reorganization are entitled to vote to accept or reject such proposed plan. Generally, a claim or interest is impaired under a plan if the holder's legal, equitable or contractual rights are altered under such plan. Classes of claims or equity interests under a chapter 11 plan in which the holders of claims or equity interests are unimpaired are deemed to have accepted such plan and are not entitled to vote to accept or reject the proposed plan. In addition, classes of claims or equity interests in which the holders of claims or equity interests will not receive or retain any property are deemed to have rejected the plan and are not entitled to vote to accept or reject the plan. The Debtors serve over 400,000 individual customer-patients. The Debtors believe that if any such individuals hold Claims, they have been or will be satisfied in the ordinary course of the Debtors' business pursuant to orders of the Bankruptcy Court. Accordingly, the Debtors are not soliciting such holders' votes.

The Plan is a plan of reorganization with respect to Consolidated Holdings and each of the other Debtors. Each Class of Claims and Interests is a Class of Claims, if applicable, for Consolidated Holdings and each of the other respective Debtors. The following table designates the Classes of Claims against and Interests in each of Consolidated Holdings and the other Debtors, and specifies which Classes are (a) Impaired or unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject the Plan. Notwithstanding the foregoing, if the Bankruptcy Court determines that Classes 1 and/or 4 are unimpaired within the meaning of section 1124 of the Bankruptcy Code, the holders of the Claims within such Class(es) shall be deemed to have accepted the Plan with respect thereto.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Impaired | Yes |
| Class 2 | First Lien Lender Claims | Impaired | Yes |
| Class 3 | Second Lien Lender Claims | Impaired | Yes |
| Class 4 | Other Secured Claims | Impaired | Yes |
| Class 5 | Trade Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | PIK Lender Claims | Impaired | Yes |
| Class 8 | Existing Stock Interests | Impaired | No (deemed to reject) |
| Class 9 | Other Existing Interests | Impaired | No (deemed to reject) |
| Class 10 | Existing Securities Law Claims | Impaired | No (deemed to reject) |

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan. **Your vote on the Plan is important.** The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan vote to accept such plan, unless the provisions of section 1129(b) of the Bankruptcy Code are met.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan and/or to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the non-acceptance of a plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims votes to accept the plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class.

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. This Disclosure Statement and the Exhibits attached hereto, the Plan and the related documents are the only materials the Debtors are providing to creditors for their use in determining whether to vote to accept or reject the Plan, and such materials may not be relied upon or used for any purpose other than to vote to accept or reject the Plan.

Please complete, execute and return your Ballot(s) to the Debtors' claims and voting agent (the "**Voting Agent**") at the address below:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Tel. (646) 282-2400
Attn: CCS Balloting

TO BE COUNTED, YOUR ORIGINAL BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN **4:00 P.M., PREVAILING EASTERN TIME, ON MARCH 5, 2010,**

UNLESS EXTENDED BY THE DEBTORS. YOUR BALLOT MAY BE SENT VIA MAIL, OVERNIGHT COURIER OR MESSENGER. ALL BALLOTS MUST BE SIGNED.

The Ballots have been specifically designed for the purpose of soliciting votes on the Plan from the Classes entitled to vote with respect thereto. Accordingly, in voting on the Plan, please use only the Ballots sent to you with this Disclosure Statement or provided by the Debtors' Voting Agent.

The Debtors have fixed **February 2, 2010**, with respect to Class 2 First Lien Lender Claims (the "**First Lien Lender Record Date**"), and **4:00 P.M., Prevailing Eastern Time, on February 9, 2010**, with respect to all other Classes (the "**General Creditor and Interest Holder Record Date**," and together with the First Lien Lender Record Date, the "**Voting Record Date**") as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept the Plan. Accordingly, only holders of record of Claims or Interests as of the Voting Record Date that are otherwise entitled to vote on the Plan, will receive a Ballot and may vote on the Plan.

All properly completed Ballots received no later than the Voting Deadline will be counted for purposes of determining whether each voting Class of Impaired Claims has accepted the Plan. The Voting Agent will prepare and file with the Bankruptcy Court a certification of the results of the balloting with respect to the Plan on a Class-by-Class basis with respect to the Classes entitled to vote.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS IN THE BEST INTERESTS OF ALL HOLDERS OF CLAIMS AND RECOMMEND THAT ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### 1.4. *Projections and Forward-Looking Statements.*

This Disclosure Statement contains projected financial information and certain other forward-looking statements, all of which are based on various estimates and assumptions and will not be updated to reflect events occurring after the date hereof. Such information and statements are subject to inherent uncertainties and to a wide variety of significant business, economic and competitive risks, including, among others, those described herein. Actual events, circumstances, effects and results may vary significantly from those included in or contemplated by such projected financial information and such other forward-looking statements. Accordingly, such projected financial information is not necessarily indicative of the future financial condition or results of operations of the Debtors, which in each case may vary significantly from those set forth in such projected financial information. Consequently, the projected financial information and other forward-looking statements should not be regarded as representations by any of the Debtors, their advisors, or any other Person that the projected financial conditions or results of operations can or will be achieved.

# ARTICLE II.

## SUMMARY OF PLAN AND CLASSIFICATION AND
## TREATMENT OF CLAIMS AND INTERESTS THEREUNDER

The Plan is a "toggle" plan inasmuch as it contemplates the following alternatives: (a) the sale of the Debtors' assets and distribution of the proceeds thereof pursuant to the Plan, (b) the sale of the Debtors' assets prior to the Effective Date, in which case the proceeds of such sale will be distributed pursuant to the Plan, or (c) if a sale is not consummated on or before the Effective Date, a stand alone reorganization whereby the First Lien Lenders will "swap" their debt for $200 million of New Notes and 100% of the equity in the Reorganized Debtors. By voting to accept the Plan you are voting in favor of all three "toggles" under the Plan.

The first two "toggles" under the Plan contemplate the sale of the Debtors' business through the Sale Transactions. The Sale Transactions may be implemented through the sale of the new equity of the Reorganized Debtors under the Plan or all or substantially all of the Debtors' assets pursuant to a sale under section 363 of the Bankruptcy Code (as applicable) to the bidder submitting the highest and/or best offer for the purchase of the Debtors' business. Following consummation of the Sale Transactions, proceeds from the Sale Transactions as well as the sale of any remaining assets will be distributed in accordance with the Plan.

As described below, the Debtors are currently engaged in a sale process. Pursuant to the Bidding Procedures Order, the deadline for submitting qualified bids for the purchase of the Debtors' Assets was February 8, 2010. If more than one bid is received, the Debtors will conduct an auction (the "**Auction**") on February 15, 2010, or such other date as the parties shall agree. Following the Auction, the Debtors will select the bidder submitting the highest and/or best offer for the Debtors' business.

If the highest bid submitted contains a proposed Cash Purchase Price of $295 million or more, the Debtors do not expect to proceed with the Stand Alone Transactions unless the Court fails to approve the sale. If the price obtained from the Sale Transactions is otherwise less than $295 million in Cash, the Debtors will have the ability under the Plan (subject to the conditions set forth in Section 11.1 of the Plan) to proceed with the sale nonetheless or to toggle to the Stand Alone Transactions.

The table below (a) classifies the Claims against, and Interests in, the Debtors into separate Classes, (b) summarizes the treatment of each Class under the Plan, (c) identifies which Classes are entitled to vote on the Plan based on rules set forth in the Bankruptcy Code, and (d) sets forth the estimated amount of claims in each Class on a consolidated basis. **All statements in this Disclosure Statement regarding the amount of Claims and Interests are estimates only and are based on information known to the Debtors at the date hereof. The final amounts of Claims Allowed by the Bankruptcy Court may vary significantly from these estimates.**

The total enterprise value of the Debtors for purposes of the Plan will not be determined until after conclusion of the sale process. Accordingly, the Debtors are not in a

position to provide definitive estimates of recoveries for Classes 1-7. The Second Lien Group (as defined in Article IV herein) does not agree that the Bidding Procedures and the sale process contemplated thereby, will result in a final determination as to the total enterprise value of the Debtors. The Second Lien Group reserves all of its rights to contest the valuation of the Debtors as contemplated by the Plan. The Second Lien Group reserves the right to file a competing plan of reorganization.

Using the valuation set forth in the Original Disclosure Statement (as defined below) as hypothetical floor, the Debtors estimate the recoveries of the First Lien Lender Claims, to be approximately 73%. Second Lien Lender Claims will only receive a recovery under the Plan on account of their Claims if a Sales Transaction is consummated and the proceeds thereof are in excess of the sum of Allowed DIP Lender Claims, Allowed First Lien Lender Claims, Allowed Administrative Expenses Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed Other Secured Claims, and other appropriate reserves for winding down these cases. Under the Stand Alone Transactions, the First Lien Lenders have agreed to provide a portion of their recovery on account of the First Lien Lender Claims in the form of Cash as a "gift" to the holders of Allowed Trade Claims and Allowed General Unsecured Claims, all as set forth in greater detail in Article V hereof, provided certain conditions are met. In that scenario, the holders of Allowed Trade Claims are expected to receive a 100% recovery on account of their Claims and the holders of Allowed General Unsecured Claims are expected to receive approximately 2.4%. If the Sale Transactions are implemented, the Debtors expect (i) the Purchaser will assume most of the Claims that would otherwise be Trade Claims and pay such Claims in full, and (ii) that there will be no recoveries on account of Trade Claims and General Unsecured Claims that are not assumed in a Sale Transaction. Under all three plan scenarios, the holders of Claims in Classes 7 and 10 (PIK Lender Claims and Existing Security Law Claims) are not expected to receive any recoveries on account of such Claims and all of the Debtors' existing common stock and preferred shares (other than stock held by other Debtors) and other Interests in Classes 8 and 9 will be cancelled and the holders of such stock and Interests shall not be entitled to any recovery under the Plan.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| Unclassified | DIP Lender Claims | Unless such holder agrees to different treatment, each holder of a DIP Lender Claim shall be paid 100% of the then outstanding amount, if any, of such DIP Lender Claim and the permitted outstanding and unpaid fees and | No. | $11,132,000[2] |

---

[2]     This amount includes certain fees and expenses authorized to be paid to the First Lien Lenders in connection with the Final DIP Order and the DIP Credit Agreement.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| | | expenses of such holder in Cash. *See Sections 5.7(a)(1) and 5.9 for a further description of the treatment of the DIP Lender Claims and the DIP Roll Option.* | | |
| Unclassified | Administrative Expense Claims | Each holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim, unless such holder agrees to different treatment. | No. | $0[3] |
| Unclassified | U.S. Trustee Fees | On the Effective Date or as soon as practicable thereafter, the PED Debtors shall pay all U.S. Trustee Fees that are due and owing as of the Effective Date. | No. | $85,000 |
| Unclassified | Fee Claims | Each holder of an Allowed Fee Claim for which a final fee application has been properly and timely filed and served shall be paid to the extent approved by order of the Bankruptcy Court. | No. | $2,918,000[4] |
| Unclassified | Priority Tax Claims | Unless such holder agrees to different treatment, each holder of an Allowed Priority Tax Claim shall receive, in the applicable PED Debtor's discretion, either | No. | $188,000 |

---

[3] The Second Lien Group has stated that they intend to file an administrative expense claim in the amount of approximately $3.5 million for "substantial contribution." By order, dated February 2, 2010, the Bankruptcy Court granted the members of the Second Lien Group an allowed administrative expense claim for fees and expenses of the members' professionals nunc pro tunc, to November 23, 2009, and continuing until otherwise ordered by the Bankruptcy Court. If and when the Second Lien Group files such claim, the amounts asserted in such claim will be reserved for in accordance with the terms of the Plan.

This amount also does not include approximately $9 million of payments on account of 503(b)(9) Claims satisfied pursuant to the Order Authorizing Debtors to Pay Prepetition Obligations of Certain Critical Vendors, dated July 9, 2009 [Docket No. 39] (the "**Critical Vendors Order**").

[4] This amount includes professional fees and expenses that are expected to be unpaid as of the Effective Date.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| | | (a) Cash in an amount equal to the amount of such Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Commencement Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim. | | |
| Class 1 | Priority Non-Tax Claims | Claims in this Class are Impaired. Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, each holder of an Allowed Claim in Class 1 shall receive Cash in an amount equal to the amount of such Claim. | Yes. | $0[5] |
| Class 2 | First Lien Lender Claims | Claims in this Class are Impaired. Except to the extent that a holder of an Allowed First Lien Lender Claim agrees to less favorable treatment on account of such Claim, each holder of an Allowed Claim in Class 2 shall receive, in full and final satisfaction of such Allowed First Lien Lender Claim, its Pro Rata Share of the First Lien Lender Distribution; provided, however, to the extent that any L/C issued under the First Lien Credit Agreement remains undrawn as of the Effective Date, the Debtors shall either (i) if the Sale Transactions are implemented, (A) create a cash | Yes. | $348,834,000[6] |

---

[5]    The Debtors received authority to satisfy prepetition employee wages and benefits subject to priority pursuant to sections 507(a)(4) and (a)(5). Accordingly, all prepetition wages and benefits have been satisfied in the ordinary course.

[6]    This amount includes amounts outstanding for issued but undrawn L/C's.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| | | reserve (in the form of a deposit account maintained at the L/C Issuer) on account of the L/C Issuer's Pro Rata Share of the First Lien Lender Distribution, which shall be either used to fund draws on any of the L/Cs or distributed in accordance with the distribution scheme under the Plan upon termination or expiration of the L/C if such L/C continues to remain undrawn, (B) cause such L/C to be replaced with another letter of credit, (C) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (D) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion; or (ii) if the Sale Transactions are not implemented, (A) cause such L/C to be replaced with a letter of credit issued under the New Revolving Credit Facility, (B) collateralize such L/C with Cash in an amount equal to 103% of the face amount thereof, (C) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (D) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion. | | |
| Class 3 | Second Lien Lender Claims | Claims in this Class are Impaired. The holders of Allowed Second Lien Lender Claims shall receive their Pro Rata Share of the Second Lien Lender Distribution. | Yes. | $112,774,000 |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| Class 4 | Other Secured Claims | Claims in this Class are Impaired. Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment, the holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors, on account of such Claims: (i) Cash in an amount equal to such Claim; (ii) treatment on such other terms such that it will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (iii) deferred Cash payments to the extent permissible under the Bankruptcy Code. | Yes. | $0 |
| Class 5 | Trade Claims | Claims in this Class are Impaired. If the Sale Transactions are implemented, holders of Allowed Trade Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. If the Sale Transactions are not implemented, the holders of Allowed Trade Claims shall not receive any distribution or retain any property on account of such Claims; _provided_, _however_, that as part of the settlements and compromises contained in the Plan, each holder of a Trade Claim shall receive the Trade Payment. Payments shall be made on, or as soon as reasonably practicable after, the latest of (a) the Effective Date, (b) the date such Claim becomes an Allowed Claim, and (c) to the extent the Sale Transactions are not implemented, unless otherwise | Yes. | $910,000[7] |

---

[7]    This amount does not include $13 million in Trade Claims satisfied pursuant to the Critical Vendors Order.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| | | agreed by the PED Debtors, the date on which such holder has agreed in writing to provide the PED Debtors with trade credit on customary ordinary course terms. | | |
| Class 6 | General Unsecured Claims | Claims in this Class are Impaired. If the Sale Transactions are implemented, holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. If the Sale Transactions are not implemented, the holders of Allowed General Unsecured Claims shall not receive any distribution or retain any property on account of such Claims; _provided_, _however_, that each holder of an Allowed General Unsecured Claim shall receive Cash in the amount of the Lump Sum Payment. Payment shall be made on, or as soon thereafter as reasonably practicable, the later of the Effective Date, the date the Bankruptcy Court enters an order estimating such claims and the first Quarterly Distribution Date after such General Unsecured Claim becomes an Allowed General Unsecured Claim. | Yes. | $8,830,000[8] |
| Class 7 | PIK Lender Claims | Claims in this Class are Impaired. If the Sale Transactions are implemented, the holders of Allowed PIK Lender Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. | Yes. | $83,300,000 |

---

[8]     This amount does not include contingent customer claims on account of customer programs authorized to be performed in the ordinary course, including payment of any refunds or other Claims held by the Debtors' patients. This amount also does not include certain employee bonus obligations that the Debtors have obtained, or will seek, Bankruptcy Court approval to pay.

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|-------|-------------|-----------|------------------|-----------------------------------------------------------------------------------|
| | | If the Sale Transactions are not implemented, the holders of PIK Lender Claims shall not receive any distribution or retain any rights to any property on account of such PIK Lender Claim, _provided_, _however_, that if the Bankruptcy Court ultimately determines that the PIK Lender Claims shall be treated as General Unsecured Claims, the holder of an Allowed PIK Lender Claim shall receive Cash in the amount of the Lump Sum Payment. Payment shall be made on, or as soon thereafter as reasonably practicable, the later of the Effective Date, the date the Bankruptcy Court enters an order estimating such claims and the first Quarterly Distribution Date after such Claim becomes an Allowed PIK Lender Claim. | | |
| Class 8 | Existing Stock Interests | Interests in this Class are Impaired. Existing Stock Interests shall be cancelled and holders of Existing Stock Interests shall not receive any distribution or retain any rights to any property on account of such Interests. | No; deemed to have rejected the Plan. | Not Applicable |
| Class 9 | Other Existing Interests | Interests in this Class are Impaired. Other Existing Interests shall be cancelled and holders of Other Existing Interests shall not receive or retain any distribution under the Plan on account of such Other Existing Interests; _provided_, _however_, that any Debtor that owns Other Existing Interests in another Debtor may, at the discretion of the Debtors, retain such Other Existing Interests. | No; deemed to have rejected the Plan. | Not Applicable |

| Class | Description | Treatment | Entitled to Vote | Estimated Amount of Claims or Interests in Class (for all Debtors in the aggregate) |
|---|---|---|---|---|
| Class 10 | Existing Securities Law Claims | Claims in this Class are Impaired. Holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims. | No; deemed to have rejected the Plan. | $0 |

# ARTICLE III.

## BUSINESS DESCRIPTION AND PREPETITION INDEBTEDNESS

### 3.1. *The Debtors' Businesses.*

CCS Medical, Inc. began operations in September 2005, when CCS Medical Holdings, Inc. acquired Chronic Care Solutions, Inc. and MPTC Holdings, Inc., two of the leading chronic care and diabetes supply companies in the United States. CCS Medical, Inc. is a national company based in Clearwater, Florida, that serves patients with chronic diseases throughout the United States and Puerto Rico. CCS Medical, Inc. delivers products and value-added services to individuals living with select chronic medical conditions, including diabetes, urological, and ostomy-related disorders, chronic wounds, incontinence, respiratory conditions and other illnesses. The Debtors operate in two business units—chronic care and diabetes. The Debtors' primary product focus is on diabetes, a large and fast growing component of the chronic care market. The Debtors' business is grounded in its ability to provide value-added services, direct mail distribution of supplies to patients, and business-to-business relationships.

*For additional information regarding the Debtors' business operations please refer to the Affidavit of Stephen M. Saft in Support of Chapter 11 Petitions and First Day Pleadings, dated July 8, 2009 [Docket No. 4] (the "First Day Affidavit"), which is incorporated herein by reference.*

### 3.2. *Prepetition Indebtedness and Capital Structure.*

Holdings is the direct or indirect parent of each of the other Debtors. A corporate organizational chart is annexed hereto as <u>Exhibit 2</u>.

As of the Commencement Date, the Debtor Obligors had approximately $522 million of outstanding financing. $329 million represents principal outstanding under a first lien revolver and first lien term loan pursuant to that certain First Lien Credit Agreement. The obligations under the First Lien Credit Agreement are guaranteed by each of the Debtor Obligors (other than CCS, the borrower) and are secured by a first priority security interest in substantially

all of the assets of the Debtor Obligors and mature on September 30, 2012 in the case of the term loan obligations and September 30, 2011, in the case of the revolving loan obligations.

The Debtor Obligors are also party to that certain Second Lien Credit Agreement with a principal amount outstanding as of the Commencement Date of $110 million. The obligations under the Second Lien Credit Agreement are guaranteed by each of the Debtor Obligors (other than CCS, the borrower), are secured by a second priority security interest in substantially all of the Debtor Obligors' assets and mature on March 30, 2013.

In connection with the Debtor Obligors' interest payments under the First Lien Credit Agreement and Second Lien Credit Agreement, the Debtor Obligors are party to the Swap Agreements. The Debtors believe that the outstanding obligations under the Swap Agreements as of the Commencement Date were approximately $14.1 million. Such obligations are secured *pari passu* with the Debtor Obligors' obligations under the First Lien Credit Agreement. On July 9, 2009, the Swap Counterparties delivered notice to the Debtors of their termination of the Swap Agreements.

CCS Acquisition Holding-Sub Corporation also has approximately $83 million in outstanding principal obligations under the PIK Credit Agreement. The obligations under the PIK Credit Agreement are unsecured and mature on September 30, 2015.

For the year ending December 31, 2008, the Debtors reported total gross revenue of approximately $487,791,000. As of September 30, 2009, the Debtors' unaudited consolidated balance sheet reflected total assets of approximately $265,221,000 and total liabilities of approximately $609,852,000.

## ARTICLE IV.

## EVENTS LEADING TO CHAPTER 11 FILING
## AND PRIOR CONFIRMATION PROCEEDINGS

**4.1.** *The Debtors' Prepetition Financial Position and the Events Leading up to the Commencement of the Reorganizations Case.*

*For a description of the Debtors' prepetition financial position and the events leading up to the commencement of the Reorganization Cases please refer to the First Day Affidavit, which is incorporated herein by reference.*

**4.2.** *Commencement of the Reorganization Cases and the Original Plan.*

On July 8, 2009, the Debtors commenced the Reorganization Cases by filing petitions for relief under chapter 11 of the Bankruptcy Code. Concurrently with the commencement of the Reorganization Cases, the Debtors filed certain motions for immediate relief, including the payment of prepetition wages and employee benefits, taxes and other regulatory fees, obligations in connection with customer programs, critical vendors and priority trade obligations and the maintenance of their existing cash management system.

The Debtors believed that they may not have been able to meet their ongoing postpetition obligations unless they were authorized to obtain Debtor in Possession Financing and use Cash claimed as part of their collateral by the First Lien Lenders and Second Lien Lenders. On the Commencement Date, the Debtors also filed with the Bankruptcy Court a motion seeking approval of an interim and final order authorizing the Debtors to obtain Debtor in Possession Financing and use Cash claimed as part of their collateral by the First Lien Lenders and Second Lien Lenders [Docket No. 16] (the "**DIP Motion**"), which was approved by an interim court order, dated July 9, 2009 [Docket No. 36]. A final order [Docket No. 108] approving the relief requested in the DIP Motion was entered by the Bankruptcy Court on July 27, 2009. Pursuant to the terms of the DIP Credit Agreement, the Debtors exercised their rights to extend the maturity date of the obligations under the DIP Credit Agreement for an additional two (2) months. The Debtors and the DIP Lenders amended the DIP Credit Agreement effective December 30, 2009, to further extend the maturity date of the obligations outstanding under the DIP Credit Agreement, to February 26, 2010, which date shall be further extended an additional one (1) month upon approval of the Bankruptcy Court of the Sale Transactions or the Stand Alone Transactions on or prior thereto. Additionally, by stipulation dated November 23, 2009, the Debtors and the Required First Lien Lenders agreed to an initial extension of the use of cash collateral through December 21, 2009. The Debtors have also reached an agreement with the Required First Lien Lenders regarding an additional extension of the use of cash collateral through February 17, 2010.

On July 17, 2009, in accordance with the terms of an agreement by and between the Debtors and the holders of over 70% of the outstanding obligations under the First Lien Credit Agreement to support the terms of a plan of reorganization as outlined therein (the "**Plan Support Agreement**"), the Debtors filed a plan of reorganization (as amended, the "**Original Plan**"). On August 20, 2009, the Bankruptcy Court approved the Disclosure Statement with respect to the Original Plan (as amended, the "**Original Disclosure Statement**") as containing adequate information in accordance with section 1125 of the Bankruptcy Code. On August 25, 2009, the Debtors commenced solicitation of the Original Plan. The majority of Classes that voted, voted overwhelmingly to accept the Original Plan.

An ad hoc group of lenders under the Second Lien Credit Agreement (the "**Second Lien Group**"), consisting at the time of two Second Lien Lenders, objected to confirmation of the Original Plan on the basis that the Original Plan did not meet the requirements of section 1129 of the Bankruptcy Code because it undervalued the Debtors' Assets and did not provide sufficient recovery on account of the Second Lien Lender Claims. A number of other objections were received, but had been resolved in principal prior to commencement of the confirmation hearing with respect to the Original Plan.

The confirmation hearing with respect to the Original Plan focused on the valuation of the Reorganized Debtors as set forth in the Original Disclosure Statement. The Debtors' financial advisors, using various established methods for determining valuation, reached the conclusion that the Debtors' total enterprise value was in the range of approximately $230-$280 million. The Second Lien Group disputed the Debtors' valuation and presented a valuation report prepared by their financial advisors, which indicated that the total enterprise value of the Reorganized Debtors was in the range of $400-$500 million. The confirmation hearing commenced on October 8, 2009 and was continued from time to time through October

23, 2009, at which time the Bankruptcy Court denied confirmation of the Original Plan on the basis that the Debtors failed to meet their burden regarding the valuation of the Reorganized Debtors' business.

The Debtors determined that without the support of the First Lien Lenders for an alternative plan of reorganization or the ability to otherwise "cram up" the First Lien Lenders with either cash and/or new debt sufficient to satisfy their claims, the Debtors needed to pursue a sale of their Assets through a section 363 sale. The Debtors thereafter sought approval of the Debtors' Motion for an Order (A) Approving Bidding Procedures in connection with Marketing and Proposed Sale of Substantially All of the Debtors' Assets, and (B) Granting Related Relief, filed by the Debtors on October 30, 2009 [Docket No. 532] (the "**Bidding Procedures Motion**"), authorizing the Debtors to conduct a marketing process reasonably calculated to obtain the highest and/or best possible bid for the Debtors' Assets and to determine the true value of the Debtors' Assets. The Bidding Procedures were approved by the Court by entry of an order dated November 24, 2009 (the "**Bidding Procedures Order**"). The Debtors also continued to engage in extensive negotiations with certain of the First Lien Lenders and Second Lien Lenders to reach a fully consensual plan of reorganization. The Debtors, the First Lien Lenders and Second Lien Lenders also engaged in a Bankruptcy Court-ordered mediation, however, the parties remain at an impasse.

Pursuant to the Bidding Procedures Order, parties interested in bidding on the Debtors' Assets were required to submit non-binding indications of interest by January 11, 2010, (the "**LOI Deadline**") and final bids by February 8, 2010 (the "**Bid Deadline**"). If more than one final qualifying bid is received by February 8, 2010, the Debtors will hold the Auction and, subject to the Debtors' ability to satisfy the First Lien Lender Claims, intend to seek the sale of all or substantially all of the Debtors' Assets and intend to seek approval of such sale to the bidder submitting the highest and/or best offer for the Debtors' Assets, including if such bidder seeks to purchase the New Common Stock of the Reorganized Issuer (the "**Successful Bidder**") and confirmation of the Plan, including the Sale Transactions contemplated therein. However, in the event the Debtors do not receive a qualified bid by the Bid Deadline, or after completion of the Auction, a bid containing a Purchase Price of $295 million or more, in Cash consideration, or such lesser amount as the Debtors and the Required First Lien Lenders accept, the Debtors may seek approval of the Stand Alone Transactions contemplated in the Plan.

*For more information regarding the events leading up to the commencement and pursuit of the sale process in accordance with the terms of the Bidding Procedures Order, please refer to the Bidding Procedures Motion.*

The Debtors, in the exercise of their fiduciary duties, continue to consider all restructuring alternatives. It is possible that one or more sale transactions could occur prior to the Effective Date or be effectuated by the Reorganized Debtors after the Effective Date.

# ARTICLE V.

## THE PLAN

### 5.1. Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and its equity interest holders. In addition to permitting the rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's Assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the petition date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, any Person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor, to the fullest extent permitted by applicable law, from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

In general, a chapter 11 plan of reorganization (a) divides claims and equity interests into separate classes, (b) specifies the property, if any, that each class is to receive under the plan, and (c) contains other provisions necessary to the reorganization of the debtor and required or permitted by the Bankruptcy Code.

Pursuant to section 1125 of the Bankruptcy Code, acceptance or rejection of a plan may not be solicited after the commencement of the Reorganization Cases until such time as the court has approved a disclosure statement as containing adequate information. Pursuant to section 1125(a) of the Bankruptcy Code, "adequate information" is information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy applicable disclosure requirements, the Debtors are submitting this Disclosure Statement to holders of Claims that are Impaired and not deemed to have rejected the Plan.

### 5.2. Settlement of Certain Inter-Creditor/Intercompany Issues.

The treatment of Claims against and Interests in the Debtors under the Plan represents, among other things, the settlement and compromise of certain inter-creditor disputes.

Notwithstanding anything to the contrary in the Plan, on or after the Effective Date, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged as determined appropriate by the PED Debtors in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

## 5.3. *Substantive Consolidation of Certain of the Debtors.*

(a)     The entry of the Confirmation Order shall constitute the approval by the Bankruptcy Court pursuant to sections 105(a) and 1123(a)(5)(C) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of Holdings and CCS Acquisition for all purposes related to the Plan, including without limitation, for purposes of voting, confirmation and distribution. As a result of such substantive consolidation, (i) all Assets and liabilities of CCS Acquisition shall be treated as though they were merged into and with the Assets and liabilities of Holdings, (ii) no distribution shall be made under the Plan on account of Intercompany Claims, if any, between Holdings and CCS Acquisition, (iii) all guarantees of Holdings and CCS Acquisition of each other's obligations and any joint or several liability of Holdings and CCS Acquisition shall be deemed an obligation of Consolidated Holdings and (iv) each and every Claim filed or to be filed in the Reorganization Case of Holdings or CCS Acquisition shall be deemed filed against Consolidated Holdings and shall be deemed one Claim against and obligation of Consolidated Holdings. The Plan does not provide for the substantive consolidation of any of the Debtors other than Holdings and CCS Acquisition.

(b)     Unless the Bankruptcy Court has approved the substantive consolidation of Holdings and CCS Acquisition by a prior order, the Plan shall serve as, and shall be deemed to be, a motion for entry of an order substantively consolidating the estates of Holdings and CCS Acquisition as set forth in the Plan. If no objection to substantive consolidation under the Plan is timely filed and served, then the holders of Claims will be deemed to have consented to substantive consolidation for purposes of the Plan and the Bankruptcy Court may approve substantive consolidation of Holdings and CCS Acquisition in the Confirmation Order. If any objection(s) to the substantive consolidation provided for in the Plan is timely filed and served, a hearing with respect to the substantive consolidation of Holdings and CCS Acquisition and the objections thereto shall be scheduled by the Bankruptcy Court, which hearing may coincide with the Confirmation Hearing.

Sections 105(a) and 1123(a)(5) of the Bankruptcy Code empower a bankruptcy court to authorize substantive consolidation pursuant to a chapter 11 plan over the objections of creditors. In re Owens Corning, 419 F.3d 195 (3d Cir. 2005) amended by 2005 U.S. App. Lexis 18043 (Aug. 23, 2005). In reversing the district court's consolidation of a parent company and a number of its subsidiary guarantors, the Third Circuit did not endorse any specific set of "factors" a court should consider in ordering consolidation. Instead, the Third Circuit Court of Appeals articulated a number of "principles" to guide the court in its analysis. Owens Corning, 419 F.3d at 211. These principles include: (i) absent compelling circumstances courts must respect entity separateness; (ii) recognition that substantive consolidation nearly always addresses harms caused by debtors disregarding separateness; (iii) mere benefit of administration is "hardly a harm calling substantive consolidation into play"; (iv) substantive consolidation

should be used rarely and as a last resort after alternative remedies have been considered and rejected; and (v) substantive consolidation may not be used as a "sword." Id.

Using these principles, the Third Circuit Court of Appeals set forth the standard by which courts in this jurisdiction must weigh requests for substantive consolidation where creditor consent is lacking. Specifically, in ordering substantive consolidation (absent consent of the parties) courts must either find, with respect to the entities in question, that (a) prepetition, they disregarded their separateness "so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity," or (b) postpetition, "their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." Id.

The Debtors believe that substantive consolidation of Holdings and CCS Acquisition is warranted here because, among other reasons, both entities are holding companies that do not have business operations and have assets of *de minimis* or no value. Moreover, CCS Acquisition is wholly owned by Holdings. The primary obligations of CCS Acquisition are unsecured obligations arising under the PIK Credit Agreement, pursuant to which no other Debtor is an obligor or guarantor, and guarantee obligations under the First Lien Credit Agreement and Second Lien Credit Agreement. The Debtors believe that the levels of secured obligations at CCS Acquisition, which are also co-obligations of the Debtor Obligors, far exceed the value of any assets that would be distributed by CCS Acquisition, and that creditors of CCS Acquisition other than the Debtors' secured lenders are not entitled to receive a distribution from CCS Acquisition's assets. Additionally, CCS Acquisition's guarantee obligations will ultimately be satisfied by the distributions in the Plan from other Debtors. The Debtors further believe that substantive consolidation of Holdings and CCS Acquisition under the terms of the Plan will not adversely impact the treatment of any of the Debtors' creditors but, rather, will reduce administrative expenses by automatically eliminating duplicate claims asserted against more than one of the Debtors, decreasing the administrative difficulties and costs, as well as eliminating the need to determine professional fees on a case-by-case basis and streamlining the process of making Distributions. Accordingly, based on the foregoing, the Debtors believe that substantive consolidation of the estates of Holdings and CCS Acquisition is justified.

(c)     Separate Plans/Non-Consolidation of the Other Debtors.

The Plan is a joint plan of each of the Debtors and constitutes a separate plan of reorganization for each such Debtor other than Consolidated Holdings. Each Class of Claims or Interests shall be deemed a separate Class with respect to Consolidated Holdings and the other Debtors. Except as specifically set forth in the Plan, nothing in the Plan or this Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, except as provided in Section 2.2(a) of the Plan, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as holding a separate Claim against each Debtor's estate; *provided, however*, that no holder shall be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in the Plan), and such Claims will be administered and treated in the manner provided in the Plan.

### 5.4. *Limitations of Plan Distribution to Interests.*

No Plan Distributions shall be made on account of any Interests in any Debtor regardless of whether such Interests are held by a Person which is not a Debtor; *provided, however,* that any Debtor that owns Interests in another Debtor may at the election of the Reorganized Debtor retain such Interests.

### 5.5. *Limitations on Plan Distributions on Account of Assumed Liabilities.*

No Plan Distributions shall be made to any holder of an Assumed Liability with respect to any such Assumed Liability. On the Effective Date, the Assumed Liabilities shall no longer be deemed obligations of the Debtors, and the PED Debtors shall have no obligations to any holder of an Assumed Liability.

### 5.6. *Separate Classification of Other Secured Claims.*

Although all Other Secured Claims against the Debtors have been placed in one category for purposes of nomenclature, each such Other Secured Claim, to the extent secured by Liens or security interests separate from those Liens or security interests securing Other Secured Claims, shall be treated as being in a separate Class from such Other Secured Claims for purposes of voting on the Plan and receiving Plan Distributions.

### 5.7. *Overview of the Plan.*

**THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN AND EXHIBITS AND SCHEDULES THERETO AND THE PLAN SUPPLEMENT.**

This section summarizes the treatment of each of the Classes of Claims and Interests under the Plan and describes other provisions of the Plan. Only holders of Allowed Claims — Claims that are not in dispute, contingent, or unliquidated in amount and are not subject to objection or estimation — may be entitled to receive distributions under the Plan. For a more detailed description of the definition of "Allowed," see Article I of the Plan. Until a Disputed Claim or Interest becomes Allowed, no distribution of Cash, securities and/or other instruments or property otherwise available to the holder of such Claim or Interest will be made.

Other than as specifically provided in the Plan, the treatment under the Plan of each Claim and Interest will be in full satisfaction, settlement, release and discharge of all Claims or Interests. The PED Debtors will make all payments and other distributions to be made under the Plan unless otherwise specified.

In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Lender Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims of the Debtors have not been classified, and the holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or

Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

(a)     Unclassified Claims.

(1)     DIP Lender Claims.

Except to the extent the DIP Lenders agree to less favorable treatment, on the Effective Date, the DIP Lenders shall release any and all liens against and security interests in the Debtors' (and the Estates') property held by the DIP Lenders and shall be paid 100% of the then outstanding amount, if any, of the DIP Lender Claims and the permitted outstanding and unpaid fees and expenses of the DIP Lenders in Cash. Without limiting the foregoing, if the Sale Transactions are not implemented, at any time prior to the Effective Date the Debtors and the DIP Lenders (each in its sole discretion) jointly may elect, subject to the consent of the Required First Lien Lenders, to satisfy the unpaid principal under the DIP Credit Agreement by consummating the DIP Roll Option. Upon satisfaction in full of the DIP Lender Claims, any and all liens against and security interests in the Debtors' (and the Estates') property held by the DIP Lenders shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person, the DIP Credit Agreement shall be deemed terminated, and the Debtors' (and the PED Debtors') obligations thereunder shall be canceled; _provided_, _however_, if the DIP Roll Option is effectuated, the security interests provided to the DIP Lenders under the DIP Credit Agreement and related Bankruptcy Court order shall continue and attach to the property subject to such security interests with the same priority as applied during the pendency of the Reorganization Cases to secure all obligations in respect of the DIP Lender Claims following the Effective Date until paid in full in Cash.

(2)     Administrative Expense Claims.

Time for Filing Administrative Expense Claims:  Each holder of an Administrative Expense Claim, other than the holder of:

- a Fee Claim;

- a 503(b)(9) Claim;

- an Administrative Expense Claim that has been Allowed on or before the Effective Date, including pursuant to the Plan;

- an Assumed Liability;

- a SAP Rollover Claim; and/or

- U.S. Trustee Fees,

must file with the Claims Agent at one of the following addresses:

| If Delivered by Mail: | If Delivered by Overnight or Hand Delivery: |
|---|---|
| CCS Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>FDR Station, P.O. Box 5015<br>New York, NY 10150-5015 | CCS Claims Processing Center<br>c/o Epiq Bankruptcy Solutions, LLC<br>757 Third Avenue, 3rd Floor<br>New York, NY 10017 |

and serve on the PED Debtors, in accordance with Section 14.16 of the Plan, proof of such Administrative Expense Claim by the Administrative Expense Bar Date. Such proof of Administrative Expense Claim must include at a minimum (i) the name of each Debtor that is purported to be liable for the Administrative Expense Claim, (ii) the name of the holder of the Administrative Expense Claim, (iii) the amount of the Administrative Expense Claim, (iv) the basis of the Administrative Expense Claim, and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

<u>Treatment of Administrative Expense Claims.</u>

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment of such Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the PED Debtors in the ordinary course of business consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such transactions.

(3)     Fee Claims.

<u>Time for Filing Fee Claims.</u>

All Fee Claims must be filed with the Bankruptcy Court and served on the PED Debtors no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Reorganization Cases, the allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court. **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND DISCHARGED.**

Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Bankruptcy Court.

<u>Treatment of Fee Claims.</u>

A Fee Claim in respect of which a final fee application has been properly filed and served pursuant to Section 3.3(a) of the Plan shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all allowed Professional Fees (including estimated fees through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the Debtors and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Professional Fees for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the allowed Professional Fees of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the PED Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Professional Fees, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, *less* any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

(4) U.S. Trustee Fees.

On the Effective Date or as soon as reasonably practicable thereafter, the PED Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

(5) Priority Tax Claims.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in the applicable PED Debtor's discretion, either (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Commencement Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim.

(b) Classification of Claims and Interests.

(1) Priority Non-Tax Claims (Class 1).

<u>Treatment.</u>

Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date

a Priority Non-Tax Claim becomes an Allowed Claim, the holder of such Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Claim.

Voting.

Priority Non-Tax Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(2)     First Lien Lender Claims (Class 2).

Allowance.

On the Effective Date, the First Lien Lender Claims shall be deemed Allowed Claims in the aggregate amount of $348,098,206 (or such other amount as may be determined by order of the Bankruptcy Court), plus accrued but unpaid interest, fees, and expenses as of the Effective Date arising under the First Lien Credit Agreement (including without limitation, interest arising after the Commencement Date at the default rate set forth in the First Lien Credit Agreement), plus the amount of any L/Cs drawn after the Commencement Date and prior to the Effective Date, for the purposes of the Plan and these Reorganization Cases.

Treatment.

On the Effective Date, except to the extent that a holder of a First Lien Lender Claim agrees to less favorable treatment on account of such Claims, each holder of an Allowed First Lien Lender Claim shall receive, in full and final satisfaction of such Allowed First Lien Lender Claim, its Pro Rata Share of the First Lien Lender Distribution; *provided, however*, to the extent that any L/C issued under the First Lien Credit Agreement remains undrawn as of the Effective Date, the Debtors shall either (i) if the Sale Transactions are implemented, (A) create a cash reserve (in the form of a deposit account maintained at the L/C Issuer) on account of the L/C Issuer's Pro Rata Share of the First Lien Lender Distribution, which shall be either used to fund draws on any of the L/Cs or distributed in accordance with the distribution scheme under the Plan upon termination or expiration of the L/C if such L/C continues to remain undrawn, (B) cause such L/C to be replaced with another letter of credit, (C) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (D) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion; or (ii) if the Sale Transactions are not implemented, (A) cause such L/C to be replaced with a letter of credit issued under the New Revolving Credit Facility, (B) collateralize such L/C with Cash in an amount equal to 103% of the face amount thereof, (C) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (D) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion. The Disbursing Agent shall have the authority to withhold any Distribution pursuant to Section 5.2 of the Plan to any First Lien Lender, until it is in receipt of such First Lien Lenders' required signatures to each of the applicable Plan Documents to which such First Lien Lender shall be a party. If the Sale Transactions are not implemented, each holder of a First Lien Lender Claim shall be deemed to have waived the right to receive any Plan Distribution or Plan Consideration on account of its Deficiency Claim.

<u>Voting.</u>

The First Lien Lender Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

    (3)     Second Lien Lenders Claims (Class 3).

<u>Allowance:</u>

On the Effective Date, the Second Lien Lender Claims shall be deemed Allowed Claims in the aggregate amount of $110,000,000 (or such other amount as may be determined by order of the Bankruptcy Court), plus accrued but unpaid interest, fees, and expenses as of the Effective Date, arising under the Second Lien Credit Agreement to the extent allowed under section 506 of the Bankruptcy Code, *provided*, *however*, the procedures for determining the identity of the holders of the Second Lien Lender Claims shall be determined as agreed to by the Debtors and the Second Lien Lenders who submit ballots in connection with voting on the Plan, or as may be determined by the Bankruptcy Court.

<u>Treatment.</u>

The holders of Allowed Second Lien Lender Claims shall receive their Pro Rata Share of the Second Lien Lender Distribution.

<u>Voting.</u>

The Second Lien Lender Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

    (4)     Other Secured Claims (Class 4).

<u>Treatment.</u>

Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment on account of such Claims, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date that an Other Secured Claim becomes an Allowed Claim, the holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors on account of such Claims: (i) Cash in an amount equal to such Claim; (ii) treatment on such other terms such that the holder of such Other Secured Claim will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (iii) deferred Cash payments, to the extent permissible under the Bankruptcy Code; *provided*, *however*, that Class 4 Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor and with the consent of the Required First Lien Lenders, without further notice to or order of the Bankruptcy Court. Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided in the Plan. On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim shall be deemed released,

terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

### Voting.

Other Secured Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(5)    Trade Claims (Class 5).

### Treatment.

If the Sale Transactions are implemented, the holders of Allowed Trade Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. If the Sale Transactions are not implemented, the holders of Allowed Trade Claims shall not receive any distribution or retain any property on account of such Claims; _provided_, _however_, that, as part of the settlements and compromises contained in the Plan, each holder of a Trade Claim shall receive the Trade Payment. Payments shall be made on, or as soon as reasonably practicable after, the latest of (A) the Effective Date, (B) the date such Claim becomes an Allowed Claim, and (C) to the extent the Sale Transactions are not implemented, unless otherwise agreed by the PED Debtors, the date on which such holder has agreed in writing to provide the PED Debtors with trade credit on customary ordinary course terms.

### Voting.

The Trade Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(6)    General Unsecured Claims (Class 6).

### Treatment.

If the Sale Transactions are implemented, the holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. If the Sale Transactions are not implemented, the holders of Allowed General Unsecured Claims shall not receive any distribution nor retain any property on account of such Claims, _provided_, _however_, that each holder of an Allowed General Unsecured Claim shall receive Cash in the amount of the Lump Sum Payment. Payment shall be made on, or as soon thereafter as reasonably practicable, the later of the Effective Date, the date the Bankruptcy Court enters an order estimating such claims and the first Quarterly Distribution Date after such General Unsecured Claim becomes an Allowed General Unsecured Claim.

### Voting.

The General Unsecured Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(7)     PIK Lender Claims (Class 7).

Treatment:

If the Sale Transactions are implemented, the holders of Allowed PIK Lender Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. If the Sale Transactions are not implemented, the holders of PIK Lender Claims shall not receive any distribution or retain any rights to any property on account of such Claims, *provided*, *however*, that if the Bankruptcy Court ultimately determines that the PIK Lender Claims shall be treated as General Unsecured Claims, the holder of an Allowed PIK Lender Claim shall receive Cash in the amount of the Lump Sum Payment. Payment shall be made on, or as soon thereafter as reasonably practicable, the later of the Effective Date, the date the Bankruptcy Court enters an order estimating such claims and the first Quarterly Distribution Date after such Claim becomes an Allowed PIK Lender Claim.

Voting:

The PIK Lender Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

(8)     Existing Stock Interests (Class 8).

Treatment.

Existing Stock Interests shall be cancelled and holders of Existing Stock Interests shall receive no distribution or retain any rights to any property on account of such Interests.

Voting.

In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Stock Interests are conclusively presumed to reject the Plan on account of such Interests.

(9)     Other Existing Interests (Class 9).

Treatment.

Other Existing Interests shall be cancelled and holders of Other Existing Interests shall not receive or retain any distribution under the Plan on account of such Other Existing Interests, *provided*, *however*, that any Debtor that owns Other Existing Interests in another Debtor may, at the discretion of the Debtors, retain such Other Existing Interests.

Voting.

In accordance with section 1126(g) of the Bankruptcy Code, the holders of Other Existing Interests are conclusively presumed to reject the Plan on account of such Other Existing Interests.

(10)   Existing Securities Law Claims (Class 10).

Treatment.

Holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims.

Voting.

In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Securities Law Claims are conclusively presumed to reject the Plan and are not entitled to vote to accept or reject the Plan on account of such Claims.

**5.8.**   *Summary of Sale Transactions if Implemented.*

In the event the Sale Transactions are implemented, the Debtors anticipate that the following transactions will occur to fund the Debtors' obligations under the Plan and the wind-down of the Debtors' Estates.

If the Sale Transactions are implemented, they will serve as the cornerstone of the Plan. The Debtors, pursuant to the procedures established in the Bidding Procedures Order, were in contact with 186 potential financial and strategic investors regarding their interest in making a bid for the purchase of the Debtors' Assets. The Debtors signed 37 confidentiality agreements with potential bidders and have provided such potential bidders with initial diligence access, including an information memorandum and preliminary access to a data room. The Debtors informed those parties that signed confidentiality agreements with the Debtors that the Debtors' would entertain the possibility of conducting a sale pursuant to a plan of reorganization.

(a)   Description of the Purchase Agreement.

On or in connection with the Effective Date, the Debtors will enter into a Purchase Agreement with the Purchaser for the sale of the New Common Stock of the Reorganized Issuer or all or substantially all of the Assets (as applicable). It is expected that the Purchaser will assume certain executory contracts and unexpired leases in accordance with Article X of the Plan and the Cure Procedures Motion and will assume certain liabilities of the Debtors including the Cure Amounts. The terms of the Purchase Agreement have not been negotiated; however, the Debtors have filed a form Purchase Agreement with the Bankruptcy Court. The summary of the Purchase Agreement is qualified in its entirety by reference to the Plan and the Purchase Agreement. The final form of Purchase Agreement submitted by the Successful Bidder shall be filed with the Bankruptcy Court prior to the hearing to approve the Sale Transactions.

(b)   Liquidation of the Debtors' Excluded Assets and Distributions to Holders of Claims.

It is anticipated that certain of the Debtors' assets will not be sold as part of the Sale Transactions to the Purchaser. In addition, certain inactive Debtors are not expected to be

transferred under the Purchase Agreement. The Excluded Assets will be identified in the Purchase Agreement.

The Liquidating Debtors shall continue to exist after the Effective Date for the purposes of making Distributions to the holders of Allowed Claims under the Plan, and to take any other steps in furtherance thereof or as may be reasonably necessary or appropriate to wind down the affairs of the Estates and the Liquidating Debtors. The principal purpose of the Liquidating Debtors shall be to liquidate, collect and maximize the Cash value of the assets of the Debtors remaining after the Purchase Agreement is consummated and make distributions in respect of Allowed Claims in accordance with the terms of the Plan. The Chief Wind Down Officer shall be authorized to merge, consolidate, or dissolve any of the Liquidating Debtors, as the Chief Wind Down Officer deems appropriate and in accordance with the other provisions of the Plan.

(c)    Transfer of the Debtors' Assets to the Liquidating Debtors.

On the Effective Date, the Excluded Assets, including all assets of the Debtors or their Estates which are neither distributed nor abandoned by the Debtors on the Effective Date, shall be deemed transferred, dividended, or assigned to such Liquidating Debtor(s) as they deem appropriate. On the Effective Date, or as soon thereafter as reasonably practicable, the Liquidating Debtors shall liquidate the Excluded Assets to the extent practicable.

(d)    Establishment of the Wind-Down Reserve.

The activities and operations of the Liquidating Debtors and the Chief Wind Down Officer (other than Distributions from the Disputed Claims Reserves and the Unsecured Claims Distribution Fund) shall be funded through a reserve to be established on the Effective Date, in accordance with the terms of the Wind-Down Budget, to fund the winding-down of the affairs of the Debtors and the Liquidating Debtors and the other items reflected in the Wind-Down Budget. The Wind-Down Reserve shall be funded as of the Effective Date, and thereafter from time to time, from Debtors' Cash and the Distributable Sale Proceeds in an amount sufficient to fund the Wind-Down Budget. Upon the closing of the Reorganization Cases and the dissolution of the Liquidating Debtors, or such earlier time as it appears, in the reasonable view of the Chief Wind Down Officer, that the Wind-Down Reserve is overfunded, the Chief Wind Down Officer shall make any excess funds available for distribution and funding of the other reserves and distributions in accordance with the terms of the Plan.

(e)    Selection, Removal and Replacement of the Chief Wind Down Officer.

The identity of the Chief Wind Down Officer shall be disclosed in the Plan Supplement and is subject to the approval of the Bankruptcy Court in the Confirmation Order. After the Effective Date, the Chief Wind Down Officer may be removed and/or replaced by a successor in accordance with the terms of the Chief Wind Down Officer Agreement.

**5.9.** *Summary of Capital Structure of SA Reorganized Debtors if the Stand Alone Transactions are Implemented.*

In the event the Sale Transactions are not implemented, the following table summarizes the anticipated capital structure of the SA Reorganized Debtors pursuant to the Stand Alone Transactions, including the post-Effective Date financing arrangements that the Reorganized Debtor Obligors expect to enter into to fund their obligations under the Plan and provide for their post-Effective Date working capital needs. The anticipated principal terms of the following instruments are described in more detail below. The summaries of the SA Reorganized Debtors' capital structure are qualified in their entirety by reference to the Plan and the applicable Plan Documents. The Debtors continue to negotiate the amount and other material terms of the Reorganized First Lien Term Loan Facility, Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility. Pursuant to the Plan, the terms of the Reorganized First Lien Term Loan Facility, Reorganized Second Lien Term Loan Facility, and the New Revolving Credit Facility may be amended with the consent of the Required First Lien Lenders at any time prior to the Effective Date.

| Instrument | Description |
|---|---|
| *Reorganized First Lien Term Loan Facility* | The Reorganized First Lien Term Loan Facility will provide for a term loan in an aggregate principal amount of $150 million (or such lesser amount as may be agreed to by the Debtors and the Required First Lien Lenders prior to the Effective Date) and, subject to certain exceptions, will be secured by a first priority lien on substantially all of the assets of the Reorganized Debtor Obligors, whether now existing or subsequently acquired (excluding the New Revolving Credit Facility Collateral (as defined below)), and a second priority lien on the New Revolving Credit Facility Collateral. Borrowings under the Reorganized First Lien Term Loan Facility will bear interest at a rate of LIBOR plus 6% per annum (with a 3% LIBOR floor) or the base rate plus 5% per annum (with a base rate floor equal to three-month LIBOR plus 1%), at the option of Reorganized CCS, payable quarterly in Cash, and will mature on the fifth anniversary of the Effective Date. |
| *Reorganized Second Lien Term Loan Facility* | The Reorganized Second Lien Term Loan Facility will provide for a term loan in an aggregate principal amount of $50 million (or such other amount as may be agreed to by the Debtors and the Required First Lien Lenders prior to the Effective Date, but in no event greater than $50 million plus any reduction in the aggregate principal amount of the Reorganized First Lien Term Loan Facility) and, subject to certain exceptions, will be secured by a second priority lien on substantially all of the assets of the Reorganized Debtor |

| Instrument | Description |
|---|---|
| | Obligors, whether now existing or subsequently acquired (excluding the New Revolving Credit Facility Collateral) and a third priority lien on the New Revolving Credit Facility Collateral. Borrowings under the Reorganized Second Lien Term Loan Facility will bear interest at a rate of LIBOR plus 8% per annum (with a 3% LIBOR floor) or the base rate plus 7% per annum (with a base rate floor equal to 3-month LIBOR plus 1%), at the option of Reorganized CCS, payable quarterly. Reorganized CCS will be required to pay, in Cash, the amount of interest accrued at LIBOR (with a floor of 3%) (the "**Cash Pay Amount**"). Any interest above the Cash Pay Amount shall be added, on the relevant interest payment date, to the amount outstanding under the Reorganized Second Lien Term Loan Facility (any amount so added, a "**PIK Payment**") and shall thereafter bear interest as set forth above; *provided, however,* that Reorganized CCS may elect, subject to the restrictions on making such election contained in the Reorganized First Lien Term Loan Facility, to pay a portion of the interest above the Cash Pay Amount in Cash; *provided, further,* that on or prior to the Effective Date, the Reorganized Debtors will determine whether the exception to the application of IRC (defined below) Section 163(e)(5) contained in IRC Section 163(e)(5)(F) applies to the Reorganized Second Lien Term Loan Facility, and if they determine that such exception may not apply in whole or in part for any reason, including the Reorganized Second Lien Term Loan Facility being held by a party related (within the meaning of IRC Section 108(e)(4)) to the issuer, a sufficient amount of the accrued PIK Payment shall be paid in Cash at the end of the first quarter after the fifth anniversary of the Effective Date and on each quarter thereafter so that the Reorganized Second Lien Term Loan Facility is not an applicable high yield discount obligation within the meaning of IRC Section 163(i). The SA Reorganized Debtors shall provide notice to the holders of the First Lien Lender Claims and the holders of the New Notes under the Reorganized Second Lien Term Loan Facility as soon as is practicable stating whether the terms of the Reorganized Second Lien Term Loan Facility have been revised as above, or whether the terms remain as outlined on Exhibit C to the Plan. |
| *New Revolving Credit Facility* | The New Revolving Credit Facility will provide for revolving borrowings in an aggregate amount outstanding |

| **Instrument** | **Description** |
| --- | --- |

at any time of up to approximately $25 million (or such other amount as the Debtors and the Required First Lien Lenders reasonably agree) and will provide for letters of credit to be issued up to an aggregate amount of $10 million. The proceeds of the New Revolving Credit Facility will be used to refinance borrowings under the DIP Credit Agreement and provide liquidity for general corporate purposes and letters of credit. Subject to certain exceptions, the New Revolving Credit Facility will be secured by a first priority lien on substantially all of the accounts receivable, inventory and other related assets of the Reorganized Debtor Obligors (the "**New Revolving Credit Facility Collateral**"). The New Revolving Credit Facility will mature on the fourth anniversary of the Effective Date.

*Dip Roll Option*

If at any time prior to the Effective Date the Debtors and the DIP Lenders (each in its sole discretion) jointly elect, subject to the consent of the Required First Lien Lenders, to satisfy the unpaid principal under the DIP Credit Agreement by consummating the DIP Roll Option, the loans in the existing DIP Credit Agreement will be rolled into the Reorganized First Lien Term Loan Facility, on a dollar for dollar basis, as a new senior tranche under that facility. The DIP Roll Option will have three month maturity, which may be extended for an additional 3 months upon payment of a 2% fee. Interest will be payable at LIBOR plus 9.0%, with a 3.0% LIBOR floor increasing to LIBOR plus 12.0% on the three month anniversary, if the DIP Roll Option is extended. All principal and interest, costs, fees and expenses, shall be secured by first priority liens on (i) the collateral securing the obligations under the Reorganized First Lien Term Loan Facility and (ii) to the extent not included in clause (i), any other collateral securing the obligations under the DIP Credit Agreement.

*New Common Stock*

On the Effective Date, Reorganized Issuer will be authorized to issue 1,000,000 shares of New Common Stock, with par value of $0.01 per share, to be issued to the holders of First Lien Lender Claims, in accordance with Sections 5.2 and 7.5 of the Plan.

(a)     Description of New Common Stock.

1.     Issuance.

The Debtors currently expect that the issuer of the New Common Stock will be Reorganized Holdings. The Debtors have the right under the Plan to designate another Reorganized Debtor to be the issuer of the New Common Stock. The Debtors will exercise such designation right if, among other things, the Plan is not confirmed as to Holdings or if any tax or other benefits warrant such designation. Any such issuer shall be, on and after the Effective Date, the parent entity of the other Reorganized Debtors. Consistent with the foregoing, and as provided in Section 7.3 of the Plan, in connection with the Effective Date, one or more of the Debtors or the Reorganized Debtors may be dissolved or merged with another Debtor or Reorganized Debtor.

Reorganized Issuer will be authorized to issue 1,000,000 shares of New Common Stock, with par value of $0.01 per share, to be issued to the holders of First Lien Lender Claims, in accordance with Section 7.5 of the Plan.

2.     New Stockholder and Registration Rights Agreement Restrictions on Transfer.

In order to avoid the expense and administrative burden of complying with the reporting obligations under the U.S. Securities Exchange Act of 1934, as amended, the Amended Certificate will contain restrictions on transfer of the New Common Stock and any option, warrant or other right to purchase or otherwise acquire shares of New Common Stock, designed to ensure that there will be fewer than 500 holders of New Common Stock (determined pursuant to the Exchange Act). These transfer restrictions will remain in place until (a) the board of directors of Reorganized Issuer determines otherwise, or (b) the Amended Certificate is amended to provide otherwise by the affirmative vote of 66 2/3 % of the issued and outstanding New Common Stock. As such, the New Stockholder and Registration Rights Agreement and the Amended Certificate will require notice to Reorganized Issuer of any proposed transfer of New Common Stock to a third party and will restrict such transfer if Reorganized Issuer's board of directors reasonably determines that the transfer would, if effected, result in Reorganized Issuer having 500 or more holders of record (determined pursuant to the Exchange Act). In addition, the New Stockholder and Registration Rights Agreement will provide for: (a) "piggyback" registration rights for the New Common Stock (with customary exceptions); (b) following the initial public offering of Reorganized Issuer, customary demand registration rights; (c) customary information rights; and (d) preemptive rights (with customary exceptions).

(b)     Corporate Structure of Reorganized Issuer.

1.     Reorganized Issuer.

On the Effective Date, Reorganized Issuer's amended certificate of incorporation (the "**Certificate**") and amended by-laws (the "**By-laws**"), both in the forms as may be acceptable to the Debtors, will be automatically authorized and approved and Reorganized Issuer will file the Certificate with the Secretary of State of Delaware on the Effective Date. The

Certificate and By-laws will be included in the Plan Supplement. The Certificate will, among other things: (a) authorize issuance of 1,000,000 shares of New Common Stock (par value $0.01), which shall be issued to the holders of Allowed First Lien Lender Claims in Class 2, in accordance with Section 7.5 of the Plan; (b) include, pursuant to section 1123(a)(6) of the Bankruptcy Code, a provision prohibiting the issuance of non-voting equity securities; (c) to the extent necessary or appropriate, include any restrictions on the transfer of the New Common Stock; and (d) to the extent necessary or appropriate, include such provisions as may be necessary to effectuate the Plan.

**5.10.** *Acceptance or Rejection of the Plan; Effect of Rejection by One or More Classes of Claims or Equity Interests.*

(a) Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

(b) Elimination of Vacant Classes.

Any Class of Claims or Interests that does not have a holder of a Claim or Interest as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

(c) Voting Classes.

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

(d) Confirmation of All Cases.

Except as otherwise determined by a Debtor in its sole discretion, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld, the Plan shall not be deemed to have been confirmed as to each Debtor, unless and until the Plan has been confirmed as to Consolidated Holdings and each of the other Debtors. If the Plan is not confirmed as to one or more of the Debtors but the other Debtors determine to proceed with the Plan with the consent of the Required Lenders, which consent shall not be unreasonably withheld, then the Debtor(s) as to which the Plan may not be confirmed shall be severed from, and the Plan shall not apply to, such Debtor(s).

**5.11.** *Means for Implementation.*

    (a)    Distributions.

    As applicable, the Disbursing Agent shall develop procedures for the distribution of the Distributable Sale Proceeds, the Trade Payment and the Lump Sum Payment to be made to the holders of Allowed Claims on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date such Claim becomes an Allowed Claim.

    (b)    Plan Documents.

    On the Effective Date, or as soon thereafter as reasonably practicable, the PED Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents, as applicable, including but not limited to, the Purchase Agreement and the Chief Wind Down Officer Agreement and/or as applicable the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, or the New Revolving Credit Facility, the New Stockholder and Registration Rights Agreement, and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further court, corporate, board or shareholder action or approval.

    (c)    Cancellation of Certain Existing Security Interests.

    Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the PED Debtors any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*. Upon the full payment or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall be deemed to have authorized the PED Debtors to file any termination statements, instruments of satisfactions, or releases of all such security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*.

    (d)    Cancellation of Existing Securities and Agreements.

    1.    Except for the purpose of evidencing a right to distribution under the Plan, and except as otherwise set forth in the Plan, on the Effective Date, all of the Debtors' obligations under any agreements, instruments, and certificates evidencing any Claim, any Existing Stock Interest, or any Other Existing Interests and any rights of any holder in respect thereof against the Debtors, shall be deemed cancelled, discharged and of no force or effect.

    2.    Notwithstanding Section 7.4(a) of the Plan, the applicable provisions of the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect for the purposes of permitting the Disbursing Agent to make the distributions to be made to holders of Allowed First Lien Lender Claims and to the holders of Allowed Second Lien Lender Claims. The holders of or parties to such cancelled (or converted, as applicable) instruments, securities and other documentation will have no rights against the Debtors arising from or

relating to such instruments, securities and other documentation or the cancellation (or conversion, as applicable) thereof, except the rights provided pursuant to the Plan and shall deliver to the PED Debtors any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*, and shall be deemed to have authorized the PED Debtors to file any termination statements, instruments of satisfactions, or releases of all such security interests with respect to such Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*.

3.　　Nothing in Section 7.4 of the Plan shall be deemed to affect the rights or obligations of holders of Claims as against other holders of Claims under agreements, instruments, or certificates, or otherwise.

4.　　Notwithstanding any other term or provision of Section 7.4 of the Plan, the confirmation of the Plan shall not operate to discharge, modify or otherwise affect (i) any reimbursement or other obligations of the First Lien Lenders to the L/C Issuer under the First Lien Credit Agreement, (ii) any indemnity or other obligations of the First Lien Lenders in favor of the First Lien Administrative Agent under the First Lien Credit Agreement, or (iii) any indemnity or other obligations of the Second Lien Lenders in favor of the Second Lien Administrative Agent under the Second Lien Credit Agreement.

(e)　　Authorization, Issuance and Delivery of New Common Stock.

1.　　On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Issuer shall be authorized to issue or cause to be issued the New Common Stock in accordance with the terms of the Plan and the Amended Certificates, without the need for any further corporate or shareholder action. The New Common Stock, when so issued, shall be duly authorized, validly issued, fully paid and non-assessable. The New Common Stock shall be made by book entry or delivery of one or more certificates representing such shares, as described in the Plan, as and to the extent practicable. Any certificates of New Common Stock shall bear a legend restricting the sale, transfer, assignment or other disposal of such shares. On the Effective Date, the New Common Stock shall not be registered under the Securities Act of 1933, as amended, and shall not be listed for public trading on any securities exchange.

2.　　On the Effective Date, or as soon thereafter as reasonably practicable, 100% of the New Common Stock shall be delivered to, if the Sale Transactions are implemented, the Purchaser or, if the Sale Transactions are not implemented, the Disbursing Agent for distribution to the holders of the First Lien Lender Claims in accordance with the terms of the Plan.

(f)　　The Sale Transactions.

Subject to Section 11.1 of the Plan, if the Debtors elect to effectuate the Sale Transactions, the provisions of Section 7.6 of the Plan shall govern.

(g)    The Stand Alone Transactions.

If the Debtors do not effectuate the Sale Transactions as provided in Section 7.6, Section 7.7 of the Plan shall govern.

1.    Continued Corporate Existence.

Except as otherwise provided in the Plan, the SA Reorganized Debtors shall continue to exist after the Effective Date for the purposes of satisfying their obligations under the Plan and the continuation of their businesses. In connection with the Effective Date and at any time thereafter, each Debtor or SA Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law as such Debtor or SA Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, causing (i) a Debtor or SA Reorganized Debtor to be merged into another Debtor or SA Reorganized Debtor, or its Subsidiary and/or affiliate, (ii) a Debtor or SA Reorganized Debtor to be dissolved, (iii) the legal name of a Debtor or SA Reorganized Debtor to be changed, (iv) the conversion of a Debtor or SA Reorganized Debtor to another form of entity, including from a corporation to a limited liability company, or (v) the closure of a Debtor or SA Reorganized Debtor's case on the Effective Date or any time thereafter.

2.    Corporate Action.

A.    On the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended and restated in substantially the forms set forth in the Plan Supplement.

B.    Any action under the Plan to be taken by or required of the Debtors, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws or the issuance of securities and instruments, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or SA Reorganized Debtors' board of directors as applicable.

C.    The Debtors and SA Reorganized Debtors shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan. In addition, the selection of the persons who will serve as the initial directors and officers of the SA Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on the Effective Date without any requirement of further action by the board of directors or stockholders of the applicable SA Reorganized Debtor. On the Effective Date, the New Common Stock, to the extent applicable under the Plan, will be transferred to the Disbursing Agent and the Disbursing Agent will hold the New Common Stock until distributions of same are made.

**5.12. *Distributions***

    (a)    Distributions.

    The Disbursing Agent shall make all distributions to the appropriate holders of Allowed Claims, free and clear of all Liens, claims and encumbrances, except as otherwise set forth in the Plan. A PED Debtor acting as the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

    (b)    No Postpetition Interest on Claims.

    Unless otherwise specifically provided for in the Plan, in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Commencement Date.

    (c)    Date of Distributions.

    Unless otherwise provided in the Plan, any distributions and deliveries to be made under the Plan shall be made on the Effective Date or as soon thereafter as is practicable, provided that the Disbursing Agent may utilize periodic distribution dates to the extent appropriate. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

    (d)    Distribution Record Date.

    As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, the PED Debtors, the DIP Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent, or their respective agents, shall be deemed closed. The Debtors, the PED Debtors, the DIP Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent and their respective agents, as applicable, shall have no obligation to (but may in their sole discretion) recognize any transfer of Claims occurring after the close of business on the applicable Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and leases, the PED Debtors shall have no obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

    (e)    Surrender of Cancelled Instruments or Securities.

    As a condition precedent to any holder of an Allowed Claim receiving any Plan Distribution on account of such Allowed Claim, unless waived in writing by the Disbursing Agent, the holder of such Allowed Claim shall have properly tendered to the Disbursing Agent

for cancellation, any notes or other form of securities evidencing the right to payment, pursuant to the Plan.

(f)     Failure to Surrender Cancelled Instruments.

Except as may otherwise be agreed by the Disbursing Agent, if the holder of a Claim has not surrendered, or been deemed to have surrendered, any securities required to be tendered pursuant to Section 8.5 of the Plan within one year after the Effective Date, such holder of a Claim shall have its Claim or Interest discharged and shall be forever barred from asserting any such Claim against the Debtors or their property. In such cases, any distribution on account of such Claim or Interest shall be disposed of pursuant to the provisions set forth in Section 8.8 of the Plan.

(g)     Delivery of Distribution.

On or as promptly as practicable after the Effective Date, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, except as may otherwise be provided in Section 8.1 of the Plan, make all distributions or payments to any holder of an Allowed Claim at (a) the address of such holder on the books and records of the Debtors or their agents, or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest; *provided*, *however*, such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from (a) the Effective Date and (b) the date such holder's Claim is Allowed.

(h)     Unclaimed Property.

One year from the later of (a) the Effective Date, and (b) the date a Claim is first Allowed, all unclaimed property or interests in property on account of such Claim shall revert to the PED Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred. The PED Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, or proofs of Claim filed against the Debtors.

(i)     Satisfaction of Claims.

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

(j)     Manner of Payment Under Plan.

Except as specifically provided in the Plan, at the option of the Disbursing Agent, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

(k)     Fractional Shares.

No fractional shares of New Common Stock or any other form of security shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock or another security that is not a whole number, the shares of the New Common Stock or such other security subject to such distribution will be rounded to the next lower whole number. The total number of shares of New Common Stock or other security to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down. The Disbursing Agent shall not have any obligation to make a distribution that is less than one (1) share of New Common Stock or other securities. Fractional shares of New Common Stock or other securities that are not distributed in accordance with Section 8.11 of the Plan shall be returned to the PED Debtors, and cancelled.

(l)     De Minimis Payments and Distributions.

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not have any obligation to make a distribution less than $100 on account of any Allowed Claim; such amounts not distributed shall be returned to, and become the proceeds of, the PED Debtors. Further, if the final amount to be distributed is less than $5,000, the Liquidating Debtors may, at the conclusion of the Reorganization Cases, donate such amounts to a charity or charities designated by the Liquidating Debtors.

(m)     No Distribution in Excess of Amount of Allowed Claim.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth in the Plan) in excess of the Allowed amount of such Claim plus postpetition interest on such Claim, to the extent provided in Section 8.2 of the Plan. Further, if the Sale Transactions are not implemented, notwithstanding anything in the Plan to the contrary, the holder of an Allowed Claim shall only be entitled to a single recovery or such other Plan Distribution as provided in the Plan on account of such Claim, such that upon satisfaction of such Claim against one Debtor all guarantees or co-liability of another Debtor of the payment, performance or collection against the first Debtor with respect to such Claim shall be deemed eliminated and cancelled and shall not entitle the holder of such Claim to a recovery or Plan Distribution as against any other Debtor.

(n)     Exemption from Securities Laws.

The issuance of the New Common Stock to holders of Claims pursuant to the Plan shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the maximum extent permitted thereunder, and subject to the transfer restrictions contained in the

Amended Certificates and, if the Sale Transactions are not implemented, the New Stockholder and Registration Rights Agreement, such New Common Stock may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable U.S. federal securities laws shall not be a condition to the occurrence of the Effective Date of the Plan.

(o)     Setoffs and Recoupments.

The Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, and the distributions to be made pursuant to the Plan on account of such Allowed Claim, any and all claims, rights and Causes of Action that a Debtor, or PED Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided, however,* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by a Debtor, or PED Debtor or its successor of any and all claims, rights and Causes of Action that a Debtor, or PED Debtor or its successor may possess against such holder.

(p)     Rights and Powers of the Disbursing Agent.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan, (ii) make all applicable distributions or payments contemplated by the Plan, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(q)     Expenses Incurred by the Disbursing Agent.

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the PED Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent, on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the PED Debtors.

(r)     Withholding and Reporting Requirements.

In connection with the Plan and all distributions thereunder, the Disbursing Agent and the PED Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions, including with respect to the Distributable Sale Proceeds, the Trade Payments, and the Lump Sum Payments under the Plan shall be subject to any such withholding and reporting requirements. The Disbursing Agent and the PED Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay

applicable withholding taxes or establishing any other mechanisms the Debtors, the Disbursing Agent and the PED Debtors believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications pursuant to any procedures adopted by the Disbursing Agent and the PED Debtors prior to or after the Effective Date and/or as approved by the Bankruptcy Court. Notwithstanding any other provision of the Plan, (a) each holder of an Allowed Claim that is to receive a distribution under the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to the Plan unless and until such holder has made arrangements satisfactory to the Disbursing Agent or the PED Debtors for the payment and satisfaction of such tax obligations or has, to the satisfaction of the Disbursing Agent and the PED Debtors, established an exemption therefrom.

(s)     Cooperation with Disbursing Agent.

The PED Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or PED Debtors' books and records. The PED Debtors will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 8.18 of the Plan.

(t)     Hart-Scott-Rodino Antitrust Improvements Act.

Any New Common Stock to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. In the event any applicable notification and waiting periods do not expire without objection, the Debtors or their agent shall, in their sole discretion, be entitled to sell such entity's shares of New Common Stock that were to be distributed under the Plan to such entity, and thereafter shall distribute the proceeds of the sale to such entity.

(u)     Investments by the Liquidating Debtors.

All Cash held by the Liquidating Debtors, including Cash held pursuant to Section 8.8 of the Plan, shall be invested in accordance with section 345 of the Bankruptcy Code, or as otherwise permitted by a Final Order of the Bankruptcy Court during the Reorganization Cases and as deemed appropriate by the Liquidating Debtors or the Chief Wind Down Officer. The earnings on such investments shall be included in the Wind-Down Reserve.

(v)     Time Bar to Cash Payments by Check.

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to Section 8.22 of the Plan may be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check must be made in writing on or

before the later of the first anniversary of the Effective Date and the six (6) month anniversary of the date on which the Distribution was made. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall be deemed Unclaimed Property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Section 8.8 of the Plan.

**5.13.** *Procedures for Resolving Claims.*

    (a)    Objections to Claims.

    Other than with respect to Fee Claims, only the PED Debtors shall be entitled to object to Claims after the Effective Date. Any objections to those Claims (other than Administrative Expense Claims) that have been filed on or before the Bar Date shall be served and filed on or before the later of: (a) ninety (90) days after the Effective Date; or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) of the Plan. Any Claims filed after the Bar Date or Administrative Expense Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors or the PED Debtors, unless the Person or entity wishing to file such untimely Claim has received prior Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the PED Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Within fifteen (15) days of the end of each calendar quarter, the PED Debtors shall provide the Disbursing Agent with, and file with the Bankruptcy Court, a written report identifying all Disputed Claims that have been settled and become Allowed Claims during the preceding quarter. Such report will identify the Claim with specificity, the amount of the Disputed Claim as asserted and the amount of the Claim as Allowed. Upon request of the applicable Disbursing Agent, the PED Debtors shall provide documentation, if any, supporting the settlement.

    (b)    Disputed Claims.

    1.    No Distributions or Payments Pending Allowance.

    Except as provided in Section 9.2 of the Plan, Disputed Claims shall not be entitled to any Plan Distributions unless and until such Claims become Allowed Claims.

    2.    Plan Distributions to Holders of Subsequently Allowed Claims.

    On each Quarterly Distribution Date, the Disbursing Agent will make distributions or payments (i) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (ii) on account of previously Allowed Claims of property that would have been distributed or paid to the holders of such Claims on the dates

distributions previously were made to holders of Allowed Claims in such Class had the Disputed Claims that have become Disallowed Claims been Disallowed Claims on such dates. The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Plan Consideration as to which holders of such Claims would have been entitled under this Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims. The PED Debtors shall maintain the Disputed Claims Reserves on account of the Disputed Claims. The Disputed Claims Reserves may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims that have subsequently become Disallowed Claims shall be released from such reserve and used to fund the other reserves and Distributions under the Plan.

(c)     Estimation of Claims.

Any Debtor, PED Debtor or holder of a Claim may request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, any objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.

(d)     No Recourse.

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by the Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no holder of a Claim shall have recourse against the Debtors, the Disbursing Agent, the Chief Wind Down Officer, the PED Debtors, or any of their respective professionals, consultants, attorneys, advisors, officers, directors, or members or their successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code. THE BANKRUPTCY COURT'S ENTRY OF AN ORDER ESTIMATING CLAIMS MAY LIMIT THE DISTRIBUTION TO BE MADE ON SUCH DISPUTED CLAIM, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIM.

(e)     Preservation of Insurance.

The discharge and release of the Debtors as provided in the Plan, and the revesting of property in the PED Debtors, shall not diminish or impair the enforceability of any insurance policies that may cover Claims against any Debtor or other Person.

**5.14.** *Executory Contracts and Unexpired Leases.*

      (a)     Treatment of Executory Contracts if Sale Transactions are Implemented.

      If the Sale Transactions are implemented, (i) to the extent not previously assumed, assumed and assigned, or rejected, as of and subject to the occurrence of the Effective Date and the payment of the applicable Cure Amount, the executory contracts and unexpired leases to be assumed and assigned to the Purchaser, as shall be set forth in the Purchase Agreement, shall be deemed assumed and assigned as of the Effective Date to the Purchaser; and (ii) as of the date of entry of the Confirmation Order, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party that are not to be assumed and assigned to the Purchaser shall be deemed rejected. Notwithstanding the foregoing, any executory contracts or unexpired leases that: (a) are designated specifically or by category as a contract or lease that the Debtors are not seeking to assume or reject at this time, if any (the "**Liquidating Debtors' Contracts**") shall remain property of the Estate and subject to assumption, assumption and assignment or rejection; or (b) are the subject of a separate motion to assume, assume and assign, or reject under section 365 of the Bankruptcy Code pending on the Effective Date and shall be governed by the order approving such motion..

      (b)     Treatment of Executory Contracts if Sale Transactions are not Implemented.

      If the Sale Transactions are not implemented, as of and subject to the occurrence of the Effective Date and the payment of the applicable Cure Amount, all executory contracts and unexpired leases to which any Debtor is a party shall be deemed assumed, or assumed and assigned (as applicable), except for any executory contracts or unexpired leases that: (a) previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (b) are designated specifically or by category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, if any; or (c) are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date. If the Sale Transactions are not implemented, on or before one (1) business day prior to the Confirmation Hearing, the Debtors shall file the Schedule of Rejected Contracts and Leases setting forth each executory contract or unexpired lease to be rejected pursuant to Section 10.2 of the Plan. As of and subject to the occurrence of the Effective Date, all contracts identified on the Schedule of Rejected Contracts and Leases shall be deemed rejected. If the Sale Transactions are not implemented, subject to the occurrence of the Effective Date and payment of any Cure Amount, if applicable, each executory contract and unexpired lease assumed pursuant to Section 10.2 of the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

      (c)     Claims Based on Rejection of Executory Contracts or Unexpired Leases.

      All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Pursuant to Section 5.6 of the Plan, all such Claims shall, to the fullest extent permitted by applicable law, be discharged on the Effective Date, and shall not be enforceable against the PED Debtors or their respective properties or

interests in property. Any party that fails to object to the rejection of its executory contract by the Confirmation Objection Deadline (as defined herein) or file a proof of claim in accordance with the terms of the Bar Date Order, shall be forever barred, estopped and enjoined from disputing the rejection and/or from asserting any claim against such applicable Debtor arising under section 365 of the Bankruptcy Code.

(d)     Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

1.     Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Sections 10.1 and 10.2 of the Plan, any monetary amounts by which each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Plan is in default for the period prior to the Effective Date shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of such "**Cure Amount**" in Cash (1) if the Sale Transactions are implemented, in accordance with the terms of the Purchase Agreement; (2) within thirty (30) days after the later of (i) the Effective Date or (ii) the date on which the Cure Amount has been resolved (either consensually or through judicial decision); or (3) on such other less favorable terms to the non-Debtor party as the parties to such executory contracts or unexpired leases may otherwise agree.

2.     The Cure Procedures Order shall govern the rights of the non-Debtor parties to the executory contracts and unexpired leases to object to the Cure Amounts, the assumption, and/or the assumption and assignment of its executory contract or unexpired lease.

(e)     Indemnification of Certain Directors, Officers and Employees.

If the Sale Transactions are not implemented, for purposes of the Plan, the obligation of a Debtor to indemnify and reimburse any Person or entity serving at any time on or after the Commencement Date as one of its directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any other corporation or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing (each, an "**Indemnification Agreement**") shall with respect to Claims concerning such Person's or Entity's acts or omissions: (i) survive confirmation of the Plan and the Effective Date; (ii) become obligations of the SA Reorganized Debtors, and such obligations shall continue in full force and effect (and not be modified, amended or terminated in any manner adverse to any Indemnitee without the written consent of the affected Indemnitee) for a period of not less than six years following the Effective Date; and (iii) not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date. Notwithstanding anything to the contrary in the Plan, the Indemnification Agreements shall not be subject to the requirements of Section 10.2 of the Plan, and failure to include the Indemnification Agreements on any schedule of executory contracts to be assumed or assumed and assigned (as applicable) by the Debtors shall not affect the rights of Indemnitees provided by Section 10.5 of the Plan.

Notwithstanding the foregoing, the indemnification described in paragraph (a) of Section 10.5 of the Plan shall not apply to any Claims or Entities to the extent described on the Indemnification Exclusion Schedule.

### 5.15. *Conditions Precedent to Confirmation and Consummation of the Plan.*

(a)     Conditions Precedent to Confirmation.

Confirmation of the Plan is subject to:

1.     if the Sale Transactions are implemented, the Successful Bidder shall have submitted a bid containing a Purchase Price sufficient to satisfy the Allowed DIP Lender Claims and Allowed First Lien Lender Claims in full in Cash, or the Required First Lien Lenders shall have otherwise consented to the consummation of the Sale Transactions;

2.     if the Stand Alone Transactions are implemented, the proposed Purchase Price in the highest and/or best bid submitted for the purchase of the Debtors' business shall not have been $295 million or more in Cash consideration, or the Court shall have otherwise denied approval of the Sale Transaction;

3.     if the Stand Alone Transactions are implemented, reasonable, customary and appropriate severance and other compensation agreements covering the period commencing on the Effective Date of the Plan, and lasting for a period of not less than one year, being negotiated and agreed upon among CCS and those current officers of CCS that will continue with Reorganized CCS, and each such agreement being satisfactory to the Required First Lien Lenders;

4.     this Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code;

5.     entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Required Lenders; and

6.     the material Plan Documents having been filed in substantially final form prior to the Confirmation Hearing.

(b)     Conditions Precedent to the Effective Date.

The occurrence of the Effective Date is subject to:

1.     subject to Section 6.5 of the Plan, the Confirmation Order with respect to each Debtor having been entered by the Bankruptcy Court, being in full force and effect and not subject to any stay or injunction, and being in form and substance reasonably satisfactory to the Debtors and Required Lenders;

2.     the Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that

the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith, including, but not limited to:

- if the Sale Transactions are to be consummated, (A) each of the conditions to Closing (as defined in the Purchase Agreement) under the Purchase Agreement shall have been satisfied or waived in accordance with the provisions thereof; and (B) the Debtors shall have sufficient Cash on hand to fund the Wind-Down Reserve; or

- if the Stand Alone Transactions are to be consummated, (A) the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, and all documents ancillary thereto, each in form and substance reasonably satisfactory to the Debtors and the Required First Lien Lenders; (B) if the DIP Roll Option has not been elected pursuant to Section 3.1 of the Plan, the New Revolving Credit Facility (1) shall have closed on substantially the terms and conditions set forth on Exhibit D to the Plan and/or such other terms as shall be mutually acceptable to the Debtors and the Required First Lien Lenders; and (2) shall be in full force and effect; (C) the amended and restated certificate of incorporation and by-laws of the Reorganized Debtors (which documents shall comply with the requirements of Plan confirmation under the Bankruptcy Code), each in form and substance reasonably satisfactory to the Required First Lien Lenders and the Debtors; (D) the New Stockholder and Registration Rights Agreement, each in form and substance satisfactory to the Required First Lien Lenders and the Debtors; and (E) if the DIP Roll Option is not elected, the Debtors shall have Cash on hand and/or availability under the New Revolving Credit Agreement as of the Effective Date of at least $25 million;

3. all material governmental, regulatory and third party approvals, waivers and/or consents in connection with the restructuring contemplated by the Plan, if any, shall have been obtained and shall remain in full force and effect, and there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated in the Plan; and

4. no law or order shall be in effect which has the effect of making illegal or otherwise restricting, preventing or prohibiting consummation of the Plan.

(c)     Waiver of Conditions Precedent and Bankruptcy Rule 3020(e).

The Debtors and the Required Lenders shall have the right to jointly waive one or more of the conditions precedent set forth in Sections 11.1 (b), (c) and (f) of the Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with confirmation of the Plan.

The Debtors and Required Lenders shall have the right to jointly waive the conditions precedent set forth in Sections 11.2(a) and (b) of the Plan at any time with respect to any Debtor without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of the Plan. Further, the Plan shall be deemed a request for a waiver of the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), and such stay shall be waived by the Confirmation Order.

If any condition precedent to the Effective Date is waived pursuant to Section 11.3 of the Plan and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of the Plan shall foreclose any ability to challenge the Plan in any court.

(d)     Effect of Failure of Conditions.

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 60 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then upon motion by the applicable Debtor(s) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order shall be vacated by the Bankruptcy Court as to such Debtor(s). Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.2 of the Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to Section 11.4 of the Plan, the Plan shall be null and void in all respects, as to such Debtor(s) and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against or Interests in the applicable Debtors; (b) prejudice in any manner the rights of the holder of any Claim or Interest in the applicable Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by the applicable Debtors or any other entity with respect to any matter set forth in the Plan.

## 5.16.    *Effect of Confirmation.*

(a)     Binding Effect.

The Plan shall be binding and inure to the benefit of the Debtors, all holders of Claims and Interests, and their respective successors and assigns.

(b)     Vesting of Assets.

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the property of each Estate shall vest in the PED Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan, the Purchase Agreement, or in the Confirmation Order. Each Debtor shall have the right to have any of its Assets vest on the Effective Date in another Reorganized Debtor. The PED Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and causes of action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan

or the Confirmation Order and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided in the Plan or the Confirmation Order. Without limiting the foregoing, the PED Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

(c) Discharge of Claims Against and Interests in the Debtors.

Upon the Effective Date and in consideration of the distributions to be made under the Plan, to the fullest extent permitted by applicable law, except as otherwise provided in the Plan or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor.

(d) Term of Pre-Confirmation Injunctions or Stays.

Unless otherwise provided in the Plan, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date and thereafter to the extent permitted under applicable law.

(e) Injunction Against Interference With Plan.

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

(f) Injunction.

1. *Except as otherwise provided in the Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the PED Debtors, or the Estates or any of their property, the Purchaser, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against*

the Debtors, the PED Debtors, or the Estates or any of their property, the Purchaser, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the PED Debtors, or the Estates or any of their property, the Purchaser, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the fullest extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided, however,* that nothing contained in the Plan shall preclude such persons from exercising their rights pursuant to and consistent with the terms of the Plan.

2.      Each holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in the Plan.

(g)      Releases.

1.      *Releases by the Debtors.*

Except as otherwise provided in the Plan or the Confirmation Order, as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights of the Debtors to enforce the Plan and the contracts, instruments, releases, credit facilities and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the parties released pursuant to Section 12.7 of the Plan, the Reorganization Cases, the Plan or this Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Released Party; *provided, however,* that (i) the releases set forth in Section 12.7(a) of the Plan shall not release any Debtor's claims, rights, or causes of action for money borrowed from or owed to a Debtor or its Subsidiary by any of its directors, officers or former employees as set forth in such Debtors' or Subsidiary's books and records, and (ii) in no event shall anything in Section 12.7(a) of the Plan be construed as a release of any Person's fraud, gross negligence or willful misconduct for matters with respect to the Debtors and their Subsidiaries and/or affiliates.

2.      *Releases by Holders of Claims and Interests.*

Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors under the Plan, the Plan Consideration, New Common Stock and other contracts, instruments, releases, agreements or documents executed

*and delivered in connection with the Plan, and each entity (other than a Debtor) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to the Plan for all purposes and the restructuring embodied in the Plan and deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under the Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with the Plan), including, without limitation, any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtors commencing the Reorganization Cases or as a result of the Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, the Plan or this Disclosure Statement against any Released Party; provided, however, that in no event shall anything in Section 12.7(b) of the Plan be construed as a release of any Person's fraud or willful misconduct for matters with respect to the Debtors and their Subsidiaries and/or affiliates (the "__Third Party Release__").*

3.      *Notwithstanding the foregoing, the releases contained in paragraph (a) and (b) of this Section 5.16 shall not apply to any Claims or Entities to the extent described in the Release and Claim Exclusion Schedule.*

The Debtors believe that the releases by each of the Debtors and the holders of Claims and Interests of each of the Released Parties as described in this Section 5.16 and Sections 12.7(a) and 12.7(b) of the Plan (the "**Releases**"), are integral to the Plan. Moreover, the Debtors have received substantial contributions to the Plan from the Released Parties. In addition to the significant gifting by the First Lien Lenders, the Released Parties have played a critical role in the formulation of the Debtors' Plan and have expended an immense amount of time and resources analyzing and negotiating the complex issues presented by the Debtors' capital structure. The Plan reflects the settlement and resolution of several of these complex issues.

Further, if the Stand Alone Transactions are implemented, the First Lien Lenders are agreeing to continue to carry up to $200 million in additional indebtedness and provide for certain consideration to be provided under the Plan to the holders of Trade Claims, and General Unsecured Claims. The willingness of these creditors to take such risks and provide such benefits to the other holders of Claims against the Estates is a substantial contribution to the Plan and to these cases; absent such willingness, the Plan would not have been possible, and the Debtors may have been unable to reorganize. The substantial and extensive contributions by the Released Parties — both monetary and non-monetary — further justify the non-Debtor releases set forth in the Plan.

Additionally, an identity of interest may exist between the Debtors and certain non-Debtor Released Parties, such that the non-Debtor releases are appropriate in that they eliminate effectively additional unknown claims against the estates. The Debtors' directors and officers are parties to and beneficiaries of certain indemnification provisions, whereby the Debtors are obligated to indemnify them. Under these agreements, any claim asserted against a Released Party who the Debtors are obligated to indemnify may essentially be a claim against

the Debtors. Any such claim, even if ultimately unsuccessful, could further deplete finite estate resources. As of the date hereof, the Debtors are not aware of any claims against a Released Party.

4.      Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, of the Third Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, will constitute the Bankruptcy Court's finding that such release is (i) in exchange for the good and valuable consideration provided by the Debtors and the other Released Parties, representing good faith settlement and compromise of the claims released in the Plan; (ii) in the best interests of the Debtors and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the holders of Claims and Interests against or in the Debtors asserting any claim released pursuant to Section 12.7 of the Plan.

(h)      Exculpation and Limitation of Liability.

*None of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation the negotiation and execution of the Plan, the Reorganization Cases, the Disclosure Statement, the solicitation of votes for and the pursuit of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of the Plan except fraud, gross negligence, or willful misconduct as determined by a Final Order of the Bankruptcy Court. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan.*

(i)      Injunction Related to Releases and Exculpation.

*The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released or exculpated pursuant to the Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 12.7, 12.8 and 12.12 of the Plan.*

(j)      Termination of Subordination Rights and Settlement of Related Claims.

1.      Except as provided in the Plan, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date,

all Persons and Entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to the Plan.

2. Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to the Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their Estates, and holders of Claims and Interests, and is fair, equitable and reasonable.

(k) Retention of Causes of Action/Reservation of Rights.

Subject to Sections 12.7 and 12.12 of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The PED Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 of the Plan, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced. For the avoidance of doubt, nothing in Section 12.11 of the Plan shall modify or affect the obligations of the PED Debtors, set forth in Section 10.5 of the Plan.

(l) Avoidance Actions.

Subject to the occurrence of the Effective Date and except as provided on Schedule 12.12 of the Plan, neither the Debtors nor any other party in interest shall assert any Avoidance Action not asserted by a Debtor prior to the Effective Date, *provided*, *however*, that nothing in the Plan shall prohibit the Debtors or the PED Debtors from challenging the validity, priority, perfection or extent of any lien, mortgage or security agreement or, subject to Section 9.1 of the Plan, objecting to any Claim. All such rights, Claims and Causes of Action shall be released and waived by the Debtors and their Estates under the Plan on the Effective Date. Notwithstanding anything to the contrary contained in the Plan, nothing contained in the Plan shall prejudice any rights or defenses the Debtors may have under section 502(d) of the Bankruptcy Code or from otherwise retaining such Claims and/or Causes of Action for the purposes of defending any Claim brought against the Debtors or their Estates.

**5.17.** *Miscellaneous Provisions.*

(a) Exemption from Certain Transfer Taxes.

To the fullest extent permitted by applicable law, any transfer or encumbrance of Assets or any portion(s) of Assets pursuant to, or in furtherance of, or in connection with the

Plan shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes. Without limiting the foregoing, the Sale Transactions and all asset sales pending as of the Confirmation Hearing or set forth in the applicable Debtors' post-Confirmation business plan, shall constitute a "transfer under a plan" to the fullest extent permitted by applicable law.

(b)     Amendments.

1.     *Plan Modifications*. The Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code, or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests pursuant to the Plan, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

2.     *Other Amendments*. Prior to the Effective Date the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court, *provided*, *however*, that, such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

(c)     Revocation or Withdrawal of the Plan.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date in their sole and absolute discretion. If the Debtors take such action, the Plan shall be deemed null and void.

(d)     Confirmation Order.

The Confirmation Order shall, and shall be deemed pursuant to the Plan to, ratify all transactions effected by the Debtors during the period commencing on the Commencement Date and ending on the Confirmation Date.

(e)     Substantial Consummation.

On the Effective Date, the Plan shall be deemed to be substantially consummated pursuant to section 1101 of the Bankruptcy Code.

(f)     Allocation of Plan Distributions Between Principal and Interest.

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

(g)     Severability.

If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

(h)     Section 1125(e) of the Bankruptcy Code.

The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors (and their affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under the Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or offer, issuance, sale, or purchase of the securities offered and sold under the Plan.

(i)     Notices.

In order to be effective, all notices, requests, and demands to or upon the Debtors, or the PED Debtors shall be in writing (including by facsimile transmission) and, unless otherwise provided in the Plan, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows (or to such alternative address as the PED Debtors may subsequently file with the Bankruptcy Court):

CCS Medical, Inc.
14255 49th Street North, Suite 301
Clearwater, Florida 33762
Attn:   Stephen M. Saft, Chief Financial Officer
Telephone:   (727) 507-2756
Facsimile:   (727) 507-2757

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, New York 10019-6099
Attn: Michael J. Kelly, Esq.
Lauren C. Cohen, Esq.
Telephone: (212) 728-8000
Facsimile: (212) 728-8111

-and-

Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Attn: Robert Brady, Esq.
Matthew B. Lunn, Esq.
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

(j)     Payment of Statutory Fees.

All fees payable pursuant to section 1930 of title 28 of the United States Code, due and payable through the Effective Date, shall be paid by the Debtors on or in connection with the Effective Date and amounts due thereafter shall be paid by the Debtors in the ordinary course until the entry of a final decree closing the Reorganization Cases. Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

(k)     Reservation of Rights.

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by the Debtors with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Interests prior to the Effective Date.

## ARTICLE VI.

## CONFIRMATION OF THE PLAN OF REORGANIZATION

**6.1.    *Confirmation Hearing.***

Section 1128(a) of the Bankruptcy Code requires the bankruptcy court, after appropriate notice, to hold a hearing on confirmation of a plan of reorganization. The Bankruptcy Court held the Disclosure Statement Hearing on February 9, 2010, at which, among other things, the Bankruptcy Court established the date and time of the Confirmation Hearing with respect to the Plan. The Confirmation Hearing may be adjourned or continued from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement

of the adjourned or continued date made at the Confirmation Hearing or any subsequent adjourned or continued Confirmation Hearing.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation of a plan of reorganization. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the particular Debtor or Debtors, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to chambers, together with proof of service thereof, and served upon: (a) Willkie Farr & Gallagher LLP, co-counsel for the Debtors, 787 Seventh Avenue, New York, NY 10019, Attn: Michael J. Kelly, Esq., and Lauren C. Cohen, Esq.; (b) Young Conaway Stargatt & Taylor, LLP, co-counsel for the Debtors, The Brandywine Building, 1000 West Street, 17th Floor, Wilmington, DE 19801-1037, Attn: Robert J. Brady, Esq. and Matthew B. Lunn, Esq.; (c) The Office of the United States Trustee, 844 King St., Suite 2207, Wilmington, DE 19801, Attn: Richard Schepacarter; (d) Moore and Van Allen PLLC, counsel for the First Lien Agent, 100 North Tryon Street, Suite 4700, Charlotte, NC 28202-4003, Attn: David S. Walls; (e) Wachtell, Lipton, Rosen & Katz, counsel for certain First Lien Lenders, 51 West 52nd Street, New York, NY 10019, Attn: Scott K. Charles and Joshua A. Feltman, and (f) counsel to the Second Lien Lender Committee, or to the extent the Second Lien Lender Committee has not yet been appointed, Bracewell & Giuliani, LLP, 225 Asylum Street, Suit 2600, Hartford, CT 06103, Attn: Kurt Mayr, Esq., counsel to the Second Lien Group.

Bankruptcy Rule 9014 governs objections to confirmation of the Plan. UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

## 6.2.  *Confirmation.*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of section 1129(a) of the Bankruptcy Code have been satisfied with respect to the Plan as it relates to each Debtor.

(a)     Confirmation Requirements.

Confirmation of a plan under section 1129(a) of the Bankruptcy Code requires, among other things, that:

- the plan complies with the applicable provisions of the Bankruptcy Code;

- the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code;

- the plan has been proposed in good faith and not by any means forbidden by law;

- any plan payment made or to be made by the proponent under the plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the plan and incident to the case, has been

approved by, or is subject to the approval of, the Bankruptcy Court as reasonable;

- the proponent has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer or voting trustee of the debtor, an affiliate of the debtor participating in the plan with the debtor, or a successor to the debtor under the plan. The appointment to, or continuance in, such office by such individual must be consistent with the interests of creditors and equity security holders and with public policy and the proponent must have disclosed the identity of any insider that the reorganized debtor will employ or retain, and the nature of any compensation for such insider;

- with respect to each impaired class of claims or interests, either each holder of a claim or interest of such class has accepted the plan, or will receive or retain under the plan, on account of such claim or interest, property of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor were liquidated on such date under chapter 7 of the Bankruptcy Code;

- each class of claims or interests has either accepted the plan or is not impaired under the plan;

- except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that allowed administrative expenses and priority claims will be paid in full on the effective date (except that if a class of priority claims has voted to accept the plan, holders of such claims may receive deferred Cash payments of a value, as of the effective date of the plan, equal to the allowed amounts of such claims and that holders of priority tax claims may receive on account of such claims deferred Cash payments, over a period not exceeding five (5) years after the date of assessment of such claims, of a value, as of the effective date, equal to the allowed amount of such claims);

- if a class of claims is impaired, at least one (1) impaired class of claims has accepted the plan, determined without including any acceptance of the plan by any insider holding a claim in such class; and

- confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Subject to satisfying the standard for any potential "cramdown" of Classes deemed to reject the Plan, the Debtors believe that:

- the Plan satisfies all of the statutory requirements of chapter 11 of the Bankruptcy Code;

- the Debtors have complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and

- the Plan has been proposed in good faith.

(1)     Acceptance.

Classes 1-7 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.  Classes 8-10 are Impaired and are deemed to have rejected the Plan.

Because certain Classes are deemed to have rejected the Plan, the Debtors will request confirmation of the Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code.  The Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan, any exhibit or schedules thereto or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.  The Debtors believe that the Plan will satisfy the "cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to Claims and Interests in Classes 8-10.  The Debtors will also seek confirmation of the Plan over the objection of individual holders of Claims who are members of an accepting Class.  However, there can be no assurance that the Bankruptcy Court will determine that the Plan meets the requirements of section 1129(b) of the Bankruptcy Code.

(2)     Unfair Discrimination and Fair and Equitable Test.

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each Impaired, non-accepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable" for, respectively, secured creditors, unsecured creditors and holders of equity interests, which are as follows:

- Secured Creditors.  Either:  (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim; (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim; or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- General Unsecured Creditors.  Either:  (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan on account of such claims and equity interests.

- Interests. Either: (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest; or (ii) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the plan on account of such interest.

A plan of reorganization does not "discriminate unfairly" with respect to a non-accepting class if the value of the Cash and/or securities to be distributed to the non-accepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the non-accepting class.

    (3)    Feasibility; Financial Projections; Valuation.

The Bankruptcy Code permits a plan to be confirmed only if confirmation is not likely to be followed by liquidation or the need for further financial reorganization except to the extent provided for in a plan. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections of the financial performance of the SA Reorganized Debtors for each of the four fiscal years from 2010 through 2014 (the "**Financial Projections**"). If the Sale Transactions are implemented, the holders of Claims against the Debtors will no longer have an interest in the ongoing financial performance of the Debtors' business. Accordingly the Financial Projection only relate to the ongoing business operations of the Debtors if the Stand Alone Transactions are implemented. The Financial Projections, and the assumptions on which they are based, are set forth in the SA Reorganized Debtors' projected financial information contained in Exhibit 5 hereto. Based upon these projections, the Debtors believe that they will be able to make all payments required pursuant to the Plan while conducting ongoing business operations and, therefore, that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

The Financial Projections are based on the assumption that the Plan will be confirmed by the Bankruptcy Court and, for projection purposes, the effective date will be March 31, 2010.

THE PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE PLAN. WHILE MANAGEMENT BELIEVES THE ASSUMPTIONS UNDERLYING THE PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE PROJECTIONS WILL BE REALIZED. THE DEBTORS MAKE NO REPRESENTATION OR WARRANTY AS TO THE ACCURACY OF THE PROJECTIONS.

The Debtors have prepared these Financial Projections based upon certain assumptions that they believe to be reasonable under the circumstances. Those assumptions considered to be significant are described in Exhibit 5. The Financial Projections have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the projections or their ability to achieve the projected results. Many of the

assumptions on which the projections are based are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the 4-year period of the Financial Projections may vary from the projected results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Financial Projections are based in connection with their evaluation of the Plan.

> (b)    Valuation of the PED Debtors.

The Debtors are in the process of marketing the sale of all or substantially all of their Assets through a Bankruptcy Court approved process. Pursuant to the terms of the Bidding Procedures Order, the Debtors have mailed copies of the Bidding Procedures Order and the Bidding Procedures to all previously contacted parties as well as additional parties that the Debtors, along with their Financial Advisors, Goldman Sachs & Co. ("**Goldman**") believe may have an interest in acquiring the Debtors' Assets. In all, 186 financial and strategic investors were contacted. Thirty seven (37) confidentiality agreements have been signed by interested parties. The Debtors have also informed parties that they would entertain offers to conduct a sale through a plan of reorganization.

The Bidding Procedures established January 11, 2010, as the LOI Deadline and February 8, 2010, as the Bid Deadline. The Debtors anticipate that the indications of interest, as supplemented by the bids received by the Bid Deadline, will be the leading indicator as to the total enterprise value of the Debtors' business. Until such time as the results of the Debtors' marketing process are final, there can be no assurances as to the actual value of the Debtors' Assets. Either the Bidding Procedures will produce binding irrevocable offers for the sale of the Debtors' business for a Purchase Price in excess of the Debtors' outstanding obligations under the DIP Credit Agreement and the First Lien Credit Agreement, and holders of Allowed Claims against the Debtors will receive any residual value after satisfaction of the Allowed DIP Lender Claims and Allowed First Lien Lender Claims, in accordance with the provisions of the Bankruptcy Code, or the sale process will not result in a binding irrevocable offer for the sale of the Debtors' business in excess of the DIP Lender Claims and the First Lien Lender Claims, and except to the extent the First Lien Lenders otherwise agree, no holder of an Allowed Claim against the Debtors (except for the DIP Lenders and the First Lien Lenders) shall be entitled to any recovery under the Plan. The Debtors will produce such evidence of the value of the Debtors' Assets at the Confirmation Hearing.

The Second Lien Group does not agree that the Bidding Procedures and the sale process contemplated thereby, will result in a final determination as to the total enterprise value of the Debtors. The Second Lien Group reserves all of its rights to contest the valuation of the Debtors as contemplated by the Plan. The Second Lien Group reserves the right to file a competing plan of reorganization.

(c)     Best Interests Test.

With respect to each Impaired Class of Claims and Interests, confirmation of the Plan requires that each holder of a Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  To determine what holders of Claims in each Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  The Cash amount that would be available for satisfaction of Claims and Interests would consist of the proceeds resulting from the disposition of the Assets and properties of the Debtors, augmented by the Cash held by the Debtors at the time of the commencement of the liquidation case.  Such Cash amount would be reduced by the costs and expenses of liquidation and such additional administrative claims that might result from the termination of the Debtors' business and the use of chapter 7 for the purposes of liquidation, including the fees payable to a trustee in bankruptcy, as well as those fees that might be payable to attorneys and other professionals that such a trustee might engage. In addition, claims would arise by reason of the breach or rejection of obligations incurred and leases and executory contracts (including vendor and customer contracts) assumed or entered into by the Debtors prior to the filing of the chapter 7 case.

To determine if the Plan is in the best interests of each Impaired Class, the present value of the distributions from the proceeds of a liquidation of the Debtors' assets and properties that each such Class would receive, after subtracting the amounts attributable to the above, must be compared with the value of the property offered to such Classes of Claims under the Plan.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Debtors' Reorganization Cases, including (i) the increased costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail, and (iii) the substantial increases in claims that would arise from a discontinuation of the Debtors' business, the Debtors have determined that confirmation of the Plan will provide each holder of an Allowed Claim with a recovery that is not less than such holder would receive pursuant to the liquidation of the Debtors under chapter 7.  It is likely that distribution of the proceeds of the liquidation could be delayed after the completion of such liquidation in order to resolve claims and prepare for distributions. In the likely event litigation was necessary to resolve claims asserted in the chapter 7 case, the delay could be prolonged.

The Debtors have prepared a liquidation analysis which is annexed hereto as Exhibit 4 (the "**Liquidation Analysis**").  The information set forth in Exhibit 4 provides (a) a summary of the liquidation values of the Debtors' Assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the Assets of the Debtors' estates, (b) the allocation to each Class of such value in a liquidation, and (c) the expected recoveries of the Debtors' creditors and equity interest holders under the Plan.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. The Liquidation Analysis is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies beyond the control of the Debtors and their management. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the results of a liquidation of the Debtors. Accordingly, the values reflected might not be realized if the Debtors were, in fact, to be liquidated. The chapter 7 liquidation period is assumed to average six to nine months following the appointment of a chapter 7 trustee, allowing for, among other things, the discontinuation and wind-down of operations, the sale of the operations, the sale of assets and the collection of receivables. All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

## 6.3. *Classification of Claims and Interests.*

The Debtors believe that the Plan meets the classification requirements of the Bankruptcy Code.

## 6.4. *Consummation.*

The Plan will be consummated on the Effective Date. The Effective Date will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in the Plan, have been satisfied or waived pursuant to the Plan. For a more detailed discussion of such conditions precedent and the consequences of the failure to meet such conditions, see Article V herein.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## ARTICLE VII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' capital structure will remain over leveraged and the Debtors will remain unable to service their debt obligations or to cure the alleged defaults thereunder. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

## 7.1. *Liquidation Under the Bankruptcy Code.*

The Debtors could be liquidated under chapter 7 of the Bankruptcy Code. A discussion of the effect that a chapter 7 liquidation would have on the recoveries of the holders of Claims is set forth in Article VI of this Disclosure Statement. The Debtors believe that liquidation under Chapter 7 would result in lower aggregate distributions being made to creditors

than those provided for in the Plan, which is demonstrated by the Liquidation Analysis set forth in Article VI and attached as Exhibit 4 of this Disclosure Statement.

## 7.2. *Alternative Plan(s) of Reorganization.*

The Debtors believe that failure to confirm the Plan will lead inevitably to expensive and protracted Reorganization Cases. In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process involving many different parties with widely disparate interests. The Debtors will continue to consider any proposal for the sale of the Debtors' Assets that provides the best opportunity to maximize value for the Debtors.

The Debtors believe that not only does the Plan fairly adjust the rights of various Classes of holders of Claims and enable the stakeholders to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class of Claims or Interests.

The Debtors' exclusivity to file a plan of reorganization in the Reorganization Cases was not extended by the Bankruptcy Court. Accordingly, all parties in interest are entitled to submit a competing plan of reorganization for solicitation.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS AND INTERESTS AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES. THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

## 7.3. *Dismissal of the Debtors' Reorganization Cases.*

Dismissal of the Debtors' Reorganization Cases would have the effect of restoring (or attempting to restore) all parties to the *status quo ante*. Upon dismissal of the Debtors' Reorganization Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time consuming process of negotiation with the creditors of the Debtors, and possibly resulting in costly and protracted litigation in various jurisdictions. Most significantly, dismissal of the Debtors' Reorganization Cases may permit acceleration of the obligations of certain of the Debtors under the First Lien Credit Agreement, the Second Lien Credit Agreement and the PIK Credit Agreement in accordance with their respective terms. Moreover, the First Lien Lenders and the Second Lien Lenders may be permitted to foreclose upon the assets that are subject to their Liens, which is a substantial portion of the Debtors' assets and almost all of their Cash. Dismissal will also permit unpaid unsecured creditors to obtain and enforce judgments against the Debtors. The Debtors believe that these actions would seriously undermine their ability to operate and could lead ultimately to

the liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that dismissal of the Debtors' Reorganization Cases is not a viable alternative to the Plan.

## ARTICLE VIII.

## SUMMARY OF VOTING PROCEDURES

This Disclosure Statement, including all Exhibits hereto, together with the related materials included herewith, is being furnished to the holders of Claims in Classes 1-7, which Classes are the only Classes entitled to vote on the Plan.

All votes to accept or reject the Plan must be cast by using the ballot (the "**Ballot**") enclosed with this Disclosure Statement. No other votes will be counted. Consistent with the provisions of Bankruptcy Rule 3018, the Debtors have fixed February 2, 2010, with respect to Class 2 First Lien Lender Claims, and 4:00 P.M. (Prevailing Eastern Time) on February 9, 2010, with respect to all other Classes, as the time and date for the determination of Persons who are entitled to receive a copy of this Disclosure Statement and all of the related materials and to vote whether to accept the Plan. as the Voting Record Date. Ballots must be RECEIVED by the Voting Agent no later than 4:00 p.m. (Prevailing Eastern Time) on March 5, 2010, unless the Debtors, at any time, in their sole discretion, extend such date by oral or written notice to the Voting Agent, in which event the period during which Ballots will be accepted will terminate at 4:00 p.m. (Prevailing Eastern Time) on such extended date.

Ballots previously delivered may be withdrawn or revoked at any time prior to the Voting Deadline by the beneficial owner on the Voting Record Date who completed the original Ballot. Only the person or nominee who submits a Ballot can withdraw or revoke that Ballot. A Ballot may be revoked or withdrawn either by submitting a superseding Ballot or by providing written notice to the Voting Agent.

Acceptances or rejections may be withdrawn or revoked prior to the Voting Deadline by delivering a written notice of withdrawal or revocation to the Voting Agent. To be effective, notice of revocation or withdrawal must: (i) be received on or before the Voting Deadline by the Voting Agent at its address specified on the back cover of this Disclosure Statement; (ii) specify the name of the holder of the Claim whose vote on the Plan is being withdrawn or revoked; (iii) contain the description of the Claim as to which a vote on the Plan is being withdrawn or revoked; and (iv) be signed by the holder of the Claim who executed the Ballot reflecting the vote being withdrawn or revoked, in the same manner as the original signature on the Ballot. The foregoing procedures should also be followed with respect to a person entitled to vote on the Plan who wishes to change (rather than revoke or withdraw) its vote.

## ARTICLE IX.

## DESCRIPTION AND HISTORY OF REORGANIZATION CASES

*Please refer to Article IV herein for a description of the events leading up to the Reorganization Cases and the prior confirmation proceedings.*

### 9.1. *Schedules, Statements and Bar Date.*

     (a)     Schedules and Statements.

On the Commencement Date, the Debtors filed a motion seeking to extend the deadline by which they were required to file with the Bankruptcy Court their Schedules of Assets and Liabilities (collectively, as amended from time to time, the "**Schedules**") and Statement of Financial Affairs (collectively, as amended from time to time, the "**SOFAS**"), which request was approved by the Bankruptcy Court on July 9, 2009 [Docket No. 42]. On August 18, 2009, each of the Debtors filed their Schedules and SOFAS in their respective Cases. The Schedules and SOFAS for CCS Medical, Inc. were filed as Docket No. 169.

     (b)     Bar Date.

Upon the motion of the Debtors, the Bankruptcy Court fixed November 3, 2009, as the date by which proofs of claim were required to be filed in the Reorganization Cases for all creditors other than governmental units (the "**General Bar Date**"), and January 4, 2010, as the date for the filing of proofs of claim by a governmental unit. The Debtors have from time to time agreed to certain extensions of the General Bar Date, including with respect to certain of the Second Lien Lenders, which extension has since passed.

### 9.2. *Settlements & Compromises.*

The Debtors have also sought and obtained Bankruptcy Court approval of various settlements with the holders of claims against these estates, including:

     (a)     the Settlement Agreement by and between certain of the Debtors and Blue Cross Blue Shield of Florida, Inc. ("**BCBSF**"), approved on December 2, 2009 [Docket No. 610], resolving various claims held by BCBSF against the Debtors and providing for certain amendments to the existing provider agreements;

     (b)     the Settlement Agreement and Release of Claims by and between Medtronic MiniMed, Inc., MiniMed Distribution Corporation, and DEGC Enterprises (U.S.), Inc. D/B/A CCS Medical, Sanvita, Inc., and CCS Medical, Inc, approved on November 4, 2009 [Docket No. 542], resolving certain prepetition litigation and release of claims held by the parties; and

     (c)     the Separation and Release Agreements by and between Michael Geldart and certain of the Debtors, approved on September 29, 2009 [Docket No. 385], authorizing the Debtors to enter into a consulting arrangement and exchange releases of claims with Michael Geldart, a former officer of the Debtors.

### 9.3. *Sale of Assets.*

Since the commencement of these Reorganization Cases, the Debtors have also sought and obtained approval of the sale of substantially all of the assets of Sanvita, Inc., one of the Debtors, to a wholly owned subsidiary of Nova and certain related transition services and supply agreements [Docket No. 384]. The sale of the Sanvita, Inc. business line provided the

Debtors with significant benefits, including the reduction of claims against the Debtors, and more beneficial trade terms in connection with the Debtors' continued reliance on the Nova product line.

### 9.4.    *Appointment of the Second Lien Lender Committee.*

By letter dated July 23, 2009, the Second Lien Group made a formal request to the U.S. Trustee for the appointment of an official committee of Second Lien Lenders. That request was denied, and on August 14, 2009, the Second Lien Group filed a motion on shortened notice with the Bankruptcy Court seeking appointment of an official committee of Second Lien Lenders [Docket No. 144]. That request was initially denied by the Bankruptcy Court [Docket No. 238]; however, on November 23, 2009, the Bankruptcy Court entered an order vacating its prior order and directing the U.S. Trustee to appoint an official committee of Second Lien Lenders. On December 2, 2009, the U.S. Trustee filed a motion for reconsideration and/or clarification of the Bankruptcy Court's order appointing an official committee of Second Lien Lenders. An order approving the appointment of an official committee of Second Lien Lenders was entered on January 11, 2010 [Docket No.677]. On February 2, 2010, the Bankruptcy Court vacated its prior order directing the appointment of an official committee of Second Lien Lenders and ordered that pursuant to section 503(b)(3)(D) of the Bankruptcy Code, the Second Lien Group has and continues to provide a substantial contribution to the Reorganization Cases and granted the members of the Second Lien Group an allowed administrative expense claim for the fees and expenses of the members' professionals, nunc pro tunc, to November 23, 2009, and continuing until otherwise ordered by the Bankruptcy Court. [Docket No. 758].

### ARTICLE X.

## GOVERNANCE OF THE SA REORGANIZED DEBTORS
## UNDER THE STAND ALONE TRANSACTIONS

### 10.1.    *Board of Directors and Management.*

(a)    Reorganized Issuer's Board.

On the Effective Date, the Board of Reorganized Issuer shall have seven (7) members, to be appointed as follows: (i) the Chief Executive Officer of Reorganized Issuer shall be a director; (ii) two directors shall be appointed by certain institutional funds affiliated with Highland Capital Management, L.P. (collectively, "**Highland Institutional**"); (iii) two directors shall be appointed by certain retail funds affiliated with Highland Capital Management, L.P. (collectively, "**Highland Retail**"); (iv) one director shall be appointed by a fund affiliated with Eos Partners, L.P. ("**Eos**") or their direct assigns (the "**Eos Parties**") if Eos or its direct assigns hold collectively at least 10% of the First Lien Lender Claims as of the Effective Date; and (v) one independent director shall be appointed by the majority vote of the First Lien Lenders other than Highland Institutional, Highland Retail, the Eos Parties and their respective affiliates; *provided*, *however*, if no director is appointed pursuant to clause (iv) above then two independent directors shall be appointed pursuant to clause (v).

Thereafter, if at any time (x) either Highland Institutional or Highland Retail individually owns New Common Stock constituting less than 10% but more than or equal to 5% of the aggregate amount of New Common Stock issued on the Effective Date, then Highland Institutional or Highland Retail, as the case may be, shall thereafter be entitled to appoint only one director and the vacancy created thereby shall be filled as set forth below; or (y) either Highland Institutional, Highland Retail or the Eos Parties individually owns New Common Stock constituting less than 5% of the aggregate amount of New Common Stock issued on the Effective Date, then Highland Institutional, Highland Retail or the Eos Parties, as the case may be, shall thereafter no longer be entitled to appoint any directors and the vacancy created thereby shall be filled as set forth below (but Highland Institutional, Highland Retail and/or the Eos Parties, as the case may be, will be entitled to vote for directors otherwise subject to majority vote of all holders of New Common Stock).

Directors appointed to fill vacancies created as a result of the immediately preceding paragraph shall be appointed by a majority of the holders of the New Common Stock.

The members of the Board and initial officers of Reorganized Issuer and the other SA Reorganized Debtors shall be the individuals identified in the Plan Supplement. The existing Board of each of the Debtors shall be deemed to have resigned on and as of the Effective Date.

(b)     Post-Effective Date Management Equity Plan.

Pursuant to the Management Equity Plan, up to 10% of the equity of Reorganized Issuer shall be reserved for the Board of Reorganized Issuer to grant options to purchase New Common Stock or restricted stock (in each case to the extent permitted by applicable law) to members of the Board of Reorganized Issuer and to the management of the SA Reorganized Debtors. The Management Equity Plan will contain terms and conditions (including the form of equity grant) as determined by the Reorganized Board.

(c)     Post-Effective Date Management Agreements.

On the Effective Date, the SA Reorganized Debtors shall execute the Management Agreements, the material terms of which to the extent agreed shall be included in the Plan Supplement, which shall be filed at least five (5) Days prior to the Confirmation Hearing. The Management Agreements will cover the period commencing on the Effective Date of the Plan, and shall include the reasonable, customary and appropriate severance and other compensation of the management of the SA Reorganized Debtors.

**10.2.    *Indemnification of Directors and Officers.***

The Amended Certificate of Incorporation and the certificates or articles of incorporation or organization of the SA Reorganized Debtors will authorize the SA Reorganized Debtors to indemnify and exculpate their respective officers, directors or managers and agents to the fullest extent permitted under applicable law.

### 10.3. *New Stockholder and Registration Rights Agreement.*

Reorganized Issuer shall be authorized and directed to enter into and consummate the transactions contemplated by the New Stockholder and Registration Rights Agreement and such documents, and any agreement or document entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by the New Stockholder and Registration Rights Agreement).

### 10.4. *The Credit Agreements.*

On the Effective Date, the SA Reorganized Debtors shall be authorized to enter into and perform under the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility, as well as execute, deliver, file, record and issue any notes, documents, or agreements in connection therewith, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Person (other than as expressly required by the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility or the New Revolving Credit Facility).

## ARTICLE XI.

## CERTAIN RISK FACTORS TO BE CONSIDERED

### 11.1. *Certain Bankruptcy Considerations.*

(a)    General.

While the Debtors believe that the Reorganization Cases will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the bankruptcy proceeding, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' businesses. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors and suppliers, customers and employees. The proceedings will also involve additional expenses and may divert some of the attention of the Debtors' management away from the operation of the businesses.

The extent to which bankruptcy proceedings disrupt the Debtors' businesses will likely be directly related to the length of time it takes to complete the proceedings. If one or more of the Debtors is unable to obtain confirmation of the Plan on a timely basis because of a challenge to the Plan or a failure to satisfy the conditions to the Plan, it may be forced to operate in bankruptcy for an extended period while it tries to develop a different reorganization plan that

can be confirmed. That would increase both the probability and the magnitude of the potentially adverse effects described herein.

(b)     Reservation of Rights Regarding the Original Plan.

Notwithstanding anything herein to the contrary, the Debtors reserve the right at any point during the Reorganization Cases, including before or after solicitation of the Plan, to seek reconsideration and confirmation of the Original Plan.

(c)     Failure to Receive Requisite Acceptances.

If the votes of (i) the holders of at least two-thirds in amount of the Claims in such Class actually voting on the Plan have voted to accept it, and (ii) more than one-half in number of the holders in such Class actually voting on the Plan have voted to accept it (such votes, the "**Requisite Acceptances**") are not received, one or more of the Debtors may not be able to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code because at least one Impaired class will not have voted in favor of the Plan as required by section 1129(a)(10) of the Bankruptcy Code. If the Requisite Acceptances are not received, one or more of the Debtors may seek to accomplish an alternative restructuring of its capitalization and obligations to creditors and obtain acceptances to an alternative plan of reorganization, or otherwise, and/or may be required to liquidate these estates under chapter 7 or 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to, or as favorable to the Debtors' creditors as, those proposed in the Plan.

(d)     Failure to Confirm the Plan.

Even if the Requisite Acceptances are received, the Bankruptcy Court, which, as a court of equity may exercise substantial discretion, may decide not to confirm the Plan. Section 1129 of the Bankruptcy Code requires, among other things, a showing that confirmation of the Plan will not be followed by liquidation or the need for further financial reorganization of the Debtors except to the extent provided under a plan, and that the value of distributions to dissenting holders of Claims and Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan meets such test, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Additionally, the Solicitation must comply with the requirements of section 1125 of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to the length of the solicitation period and the adequacy of the information contained in this Disclosure Statement.

(e)     Failure to Consummate the Plan.

One condition to consummation of the Plan is the entry of the Confirmation Order which will approve, among other things, the assumption or assumption and assignment, as applicable, of the majority of the Debtors' executory contracts and unexpired leases and the execution of the Purchase Agreement, and the Chief Wind Down Officer Agreement or the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility, as

applicable. There can be no assurance that these or other conditions to consummation will be satisfied (or waived). Even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and the restructuring completed.

(f)     Objections to Classification of Claims.

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

(g)     Size and Amount of Allowed Claims and Interests.

While the Debtors believe that they have accurately estimated the size and amount of the claims that may be asserted against the Debtors, there may be Claims and Interests that the Debtors may not be aware of or that may not be discharged as a result of these Reorganization Cases. Further, in the event that the Bankruptcy Court ultimately determines that the Second Lien Lender Claims and/or the PIK Lender Claims shall be treated as General Unsecured Claims, the size and amount of Allowed General Unsecured Claims may be significantly larger, and the distributions to the holders of Allowed General Unsecured Claims may be significantly diluted. To that end, to the extent the size and amount of the Allowed Claims and Allowed Interests in any Class are greater than the Debtors estimated, recoveries on such Claims and Interests may be different than those described herein. There can be no assurance that the size and amount of Allowed Claims and Interests will not be less than or greater than the size and amounts estimated herein.

## 11.2.   *Risks Relating to Recoveries if the Sale Transactions are Implemented.*

As the Bid Deadline has not passed, the Debtors do not know if any bids for the Debtors' business will be timely received, or if such bids will contain a proposed purchase price in excess of the Allowed DIP Lender Claims and Allowed First Lien Lender Claims. Accordingly, the Debtors cannot project at this time the estimated recoveries to holders of Allowed Claims in the event the Sale Transactions are implemented. There can be no assurances that consummation of the Sale Transactions will result in greater recoveries to holders of Allowed Claims than if the Stand Alone Transactions are consummated, nor can there be any assurances that consummation of the Stand Alone Transactions will result in greater recoveries to holders of Allowed Claims than consummation of the Sale Transactions.

## 11.3.   *Risks Relating to Closing the Sale Transactions.*

The Sale Transactions may be subject to various conditions, including without limitation, the (a) execution of the Purchase Agreement, (b) approval of assumption and assignment of certain executory contracts and unexpired leases, (c) required consents, and (d) regulatory approval, as well as other closing conditions as may be contemplated by the Purchase Agreement or such other agreements related thereto. While the Debtors hope to satisfy the conditions to the closing of the Sale Transactions there can be no assurances that the Debtors

will actually satisfy such conditions. Accordingly, there is a risk that the Sale Transactions may not be consummated.

**11.4.** ***Risks Relating to the Stand Alone Transactions and the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility, the DIP Roll Option and the New Common Stock.***

     (a)     Variances from Financial Projections.

The Financial Projections included as <u>Exhibit 5</u> to this Disclosure Statement reflect numerous assumptions concerning the anticipated future performance of the SA Reorganized Debtors, as well as assumptions with respect to the prevailing market, economic and competitive conditions, which are beyond the control of the SA Reorganized Debtors, and which may not materialize. The Debtors believe that the assumptions underlying the Financial Projections are reasonable. However, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the actual financial results of the Debtors and the SA Reorganized Debtors. Therefore, the actual results achieved throughout the projection period necessarily will vary from the projected results, and these variations may be material and adverse. Moreover, the Debtors continue to explore the sale of one or more lines of business. The occurrence of such sale (whether prior to or after the Effective Date) could have a material impact on the Financial Projections.

     (b)     Substantial Leverage; Ability to Service Debt.

Although the SA Reorganized Debtors will have less indebtedness than the Debtors, the SA Reorganized Debtors will still have substantial indebtedness. On the Effective Date, after giving effect to the transactions contemplated by the Plan, the SA Reorganized Debtors will, on a consolidated basis, have (i) approximately $150 million (or such lesser amount as may be agreed to by the Debtors and the Required First Lien Lenders prior to the Effective Date) in secured indebtedness under the Reorganized First Lien Term Loan Facility, (ii) approximately $50 million (or such other amount as may be agreed to by the Debtors and the Required First Lien Lenders prior to the Effective Date, but in no event greater than $50 million <u>plus</u> any reduction in the aggregate principal amount of the Reorganized First Lien Term Loan Facility) in secured indebtedness under the Reorganized Second Lien Term Loan Facility, and (iii) up to $35 million in secured indebtedness under the New Revolving Credit Facility.

**The degree to which the SA Reorganized Debtors will be leveraged could have important consequences because:**

- it could affect the SA Reorganized Debtors' ability to satisfy their obligations under the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility and the SA Reorganized Debtors' other obligations;

- a substantial portion of the SA Reorganized Debtors' cash flow from operations will be dedicated to debt service and unavailable to support operations, working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes;

- the SA Reorganized Debtors' ability to obtain additional financing in the future may be limited;

- the SA Reorganized Debtors may be more highly leveraged than some of their competitors, which may place the SA Reorganized Debtors at a competitive disadvantage;

- the SA Reorganized Debtors' flexibility in planning for, or reacting to, changes in their business may be limited; and

- it may make the SA Reorganized Debtors more vulnerable in the event of a downturn in their business or the economy in general.

The SA Reorganized Debtors' ability to make payments on and to refinance their debt, including the obligations under the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility and the SA Reorganized Debtors' other obligations, will depend on their ability to generate Cash in the future. This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the SA Reorganized Debtors.

There can be no assurance that the SA Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the SA Reorganized Debtors' debt obligations, including, among other obligations, the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility. The SA Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the SA Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

(c) Identity of Issuer of New Common Stock.

The identity of the issuer of the New Common Stock has yet to be determined. Although the Debtors currently expect that the issuer of the New Common Stock will be Reorganized Holdings, the Debtors have the right under the Plan to designate another Reorganized Debtor to be the issuer of the New Common Stock. The Debtors will exercise such designation right if, among other things, the Plan is not confirmed as to Holdings or if any tax or other benefits warrant such designation.

(d) Significant Holders.

In connection with the Stand Alone Transactions, it is contemplated that the First Lien Lenders will receive one hundred percent (100%) of the New Common Stock. The First Lien Lenders will be in a position to control the outcome of actions requiring stockholder approval, including the election of directors, and their interests might conflict with interests of other constituents of the SA Reorganized Debtors.

(e)     Obligations Under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility, or the DIP Roll Option.

The SA Reorganized Debtors' obligations under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility or the DIP Roll Option will be secured by substantially all of the assets of the SA Reorganized Debtors. If the SA Reorganized Debtors become insolvent or are liquidated, or if there is a default under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility, or the DIP Roll Option, and payment on any obligation thereunder is accelerated, the lenders under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility or the DIP Roll Option would be entitled to exercise the remedies available to a secured lender under applicable law, and they would have a claim on the assets securing the obligations that would be superior to any claim of the holders of unsecured debt.

(f)     Restrictive Covenants.

The Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility or the DIP Roll Option will contain various covenants which may limit the discretion of the SA Reorganized Debtors' management by restricting the SA Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, make certain investments or acquisitions, pay dividends or sell, transfer, lease or otherwise dispose of certain assets. In addition, it is expected that the Reorganized First Lien Term Loan Facility will require the SA Reorganized Debtors to meet certain financial covenants set forth in the Plan.

Any failure to comply with the restrictions of the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility, the DIP Roll Option, or any other subsequent financing agreements may result in an event of default. An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies. If the SA Reorganized Debtors are unable to repay amounts outstanding under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility, the New Revolving Credit Facility or the DIP Roll Option when due, the lenders thereunder could, subject to the terms of the relevant agreements, seek to foreclose on the collateral which is pledged to secure the indebtedness outstanding under such facilities. Substantially all of the assets of the SA Reorganized Debtors will be pledged as security under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility or the DIP Roll Option.

(g)     Lack of Trading Market.

It is anticipated that there will be no active trading market for the New Common Stock. Reorganized Issuer has no present intention to register any of the Plan Securities (as defined below) under the Securities Act, nor to apply to list any of the foregoing on any national securities exchange. Accordingly, there can be no assurance that any market will develop or as

to the liquidity of any market that may develop for any such Plan Securities. In addition, Reorganized Issuer will not be required to file reports with the SEC or otherwise provide financial or other information to the public which may further impair liquidity and prevent brokers or dealers from publishing quotations.

(h)     Restrictions on Transfer.

Holders of Plan Securities (as defined below) who are deemed to be "underwriters" as defined in section 1145(b) of the Bankruptcy Code will be restricted in their ability to transfer or sell such Plan Securities. These Persons will be permitted to transfer or sell such Plan Securities only pursuant to (a) "ordinary trading transactions" by a holder that is not an "issuer" within the meaning of section 1145(b), (b) an effective registration statement under the Securities Act, or (c) the provisions of Rule 144 under the Securities Act, if available, or another available exemption from the registration requirements of the Securities Act. Reorganized Issuer has no current plans to register any of the Plan Securities under the Securities Act or under equivalent state securities laws such that the recipients of the New Common Stock would be able to resell their securities pursuant to an effective registration statement. Moreover, Reorganized Issuer does not currently intend to make publicly available the information required by Rule 144, thereby limiting the ability of holders of Plan Securities to avail themselves of Rule 144.

The New Stockholder and Registration Rights Agreement and the Amended Certificate of Incorporation will contain restrictions on stockholders' ability to transfer the New Common Stock. The summary of these documents contained herein is qualified in its entirety by the Plan and the applicable Plan Documents. The New Stockholder and Registration Rights Agreement and the Amended Certificate of Incorporation may restrict certain transfers of New Common Stock. Furthermore, these documents may restrict transfers that would result in the New Common Stock of Reorganized Issuer being held of record by more than 500 persons, unless such transfer is otherwise approved by the board of directors. The New Stockholder and Registration Rights Agreement shall provide for customary rights and obligations, including without limitation, pre-emptive rights, rights of first refusal and co-sale rights (drag and tag), demand, and piggyback registration rights, independent director approval on affiliate transactions, modifications of the SA Reorganized Debtors' organizational documents (including the New Stockholder Agreement and Registration Rights Agreement), and other such terms and conditions as mutually agreed upon by the Debtors and the Required First Lien Lenders.

All certificates for shares of the New Common Stock shall conspicuously bear the following legend:

THE SHARES REPRESENTED BY THIS CERTIFICATE
HAVE NOT BEEN REGISTERED UNDER THE SECURITIES
ACT OF 1933, AS AMENDED, OR ANY STATE SECURITIES
LAWS AND MAY NOT BE SOLD, PLEDGED OR
OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE
WITH THE REGISTRATION REQUIREMENTS OF THE
SECURITIES ACT OF 1933, AS AMENDED, OR AN
EXEMPTION THEREFROM AND, IN EACH CASE, IN

COMPLIANCE WITH APPLICABLE STATE SECURITIES LAWS.

In addition, all certificates for shares of New Common Stock shall conspicuously bear the following legend:

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO VARIOUS CONDITIONS, INCLUDING CERTAIN RESTRICTIONS ON SALE, DISPOSITION OR TRANSFER AS SET FORTH IN THE CORPORATION'S CERTIFICATE OF INCORPORATION, AS AMENDED (THE "CERTIFICATE OF INCORPORATION"), AND THE STOCKHOLDERS' AGREEMENT DATED AS OF [_____ __], 2010 AMONG THE CORPORATION AND THE STOCKHOLDERS NAMED THEREIN, AS IT MAY BE AMENDED FROM TIME TO TIME (THE "STOCKHOLDERS' AGREEMENT"). NO REGISTRATION OR TRANSFER OF THESE SHARES WILL BE MADE ON THE BOOKS OF THE CORPORATION UNLESS AND UNTIL SUCH RESTRICTIONS SHALL HAVE BEEN COMPLIED WITH. THE CORPORATION WILL FURNISH WITHOUT CHARGE TO EACH HOLDER OF RECORD OF THE SHARES REPRESENTED BY THIS CERTIFICATE A COPY OF THE CERTIFICATE OF INCORPORATION AND STOCKHOLDERS' AGREEMENT, CONTAINING THE ABOVE-REFERENCED RESTRICTIONS ON TRANSFERS OF STOCK, UPON WRITTEN REQUEST TO THE CORPORATION AT ITS PRINCIPAL PLACE OF BUSINESS.

*See* Article XII "*Securities Law Matters*" for additional information regarding restrictions on resales of the Plan Securities (as defined below).

(i)     Dividend Policies.

All of the SA Reorganized Debtors' cash flow will be required to be used in the foreseeable future (a) to make payments under the Reorganized First Lien Term Loan Facility, the Reorganized Second Lien Term Loan Facility and the New Revolving Credit Facility or the DIP Roll Option, (b) to fund the SA Reorganized Debtors' other obligations under the Plan, and (c) for working capital and capital expenditure purposes. Accordingly, Reorganized Issuer does not anticipate paying cash dividends on the New Common Stock in the foreseeable future.

## 11.5.  *Risks Relating to Tax and Accounting Consequences of the Plan.*

(a)     Certain Tax Consequences of the Plan Raise Unsettled and Complex Legal Issues and Involve Factual Determinations.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors currently do not intend to seek any ruling from the

Internal Revenue Service (the "**IRS**") on the tax consequences of the Plan. Even if the Debtors decide to request a ruling, there would be no assurance that the IRS would rule favorably or that any ruling would be issued before the Effective Date. In addition, in such case, there would still be issues with significant uncertainties, which would not be the subject of any ruling request. *Thus, there can be no assurance that the IRS will not challenge the various positions the Debtors have taken, or intend to take, with respect to the tax treatment in the Plan, or that a court would not sustain such a challenge.*

(b)     Use of Historical Financial Information.

As a result of the consummation of the Plan and the transactions contemplated thereby, the Reorganized Debtors believe they will be subject to the fresh-start accounting rules. Fresh-start accounting allows for the assessment of every balance sheet account for possible fair value adjustment, resulting in the emergence of a new company recapitalized and revalued. This process is guided by purchase price allocation standards under GAAP.

**11.6.    *Risks Associated with the Business.***

If the Sale Transactions are consummated, the Debtors believe that holders of Claims against the Debtors will not have an interest in the risks associated with the business going-forward. Accordingly, this Section 11.6 only addresses risks associated with the business to the extent the Stand Alone Transactions are consummated.

(a)     The Debtors' Reorganization Cases May Negatively Impact Their Future Operations.

While the Debtors believe they will be able to emerge from chapter 11 relatively expeditiously, there can be no assurance as to timing for approval of the Plan or the Debtors' emergence from chapter 11. Additionally, notwithstanding the support of their largest creditors, the Reorganization Cases may adversely affect the Debtors' ability to retain existing customers, attract new customers and maintain contracts that are critical to its operations.

(b)     The Debtors Operate in an Industry that is Subject to Price Competition.

In all of the Debtors' product and service lines, the Debtors face strong competition from companies both large and small, located in the United States and abroad, on factors including quality of care and service, reputation within the healthcare community, scope of products and services, geographical scope and price. The Debtors operate in an industry that is subject to price competition, which has created downward pressure on pricing that may adversely affect the Debtors' business or their ability to meet their financial obligations. If price competition continues, the Debtors may have to change their practices or modify their services in order to reduce costs. In addition, in the event that the Debtors change their practices or modify their services, the Debtors' relationships with healthcare professionals and the patients they serve may suffer or their results of operations may be adversely affected.

(c)     Medicare Competitive Bidding for Durable Medical Equipment Suppliers
        May Adversely Affect the Debtors' Business.

MMA provides for a national phased-in program for competitive bidding of
certain durable medical equipment items, which may include mail-order diabetes testing supplies
such as those sold by the Debtors.  MIPPA temporarily delayed the implementation of Round 1
of the program and also decreased reimbursement for the competitively bid product categories,
including mail-order diabetes testing supplies, by 9.5% starting January 1, 2009.  In January
2009, The Centers for Medicare and Medicaid Services ("**CMS**") published a regulation
implementing the provisions of the MIPPA regarding competitive bidding.  These regulations
became final on April 18, 2009.  Bidding was completed in late 2009 and implementation of the
Round 1 Rebid is expected to begin in January 2011.  The MMA also contemplates a Round 2
of the program but a timeline has yet to be announced.  A competitive bidding program such as
the program contemplated by the MMA could negatively affect the Debtors' operating results as
a result of lower reimbursement rates for competitively bid items and/or the Debtors' failure to
secure status as contracted suppliers.

The MMA also gave CMS the additional authority, beginning in 2009, to use
pricing information that it gathers during the initial competitive bidding phases for the purposes
of establishing reimbursement rates in geographic areas that are not subject to competitive
bidding.  The MIPPA requires CMS to issue further guidance on whether and how it intends to
use this authority through the formal rulemaking process, and delays the earliest implementation
date to 2011.  The Debtors' operating results may be negatively affected if CMS uses this
authority to impose lower reimbursement rates in geographic areas that would otherwise not
have been impacted by competitive bidding.  In addition, many non-Medicare private and
governmental insurance plans base their reimbursement rates on Medicare rates.  Accordingly, a
decrease in Medicare reimbursement rates may lead to a corresponding decrease in the
reimbursement rates of non-Medicare private and governmental insurance plans, which, in turn,
may adversely affect the Debtors' business.

(d)     The Debtors are Highly Dependent on Payments from Third-Party
        Healthcare Payors, Including Medicare, Medicaid and Other Government
        Sponsored Programs, and the Uncertainty of Third-Party Reimbursement
        May Adversely Affect the Debtors' Business.

A substantial portion of the Debtors' revenue is derived from third-party private
and governmental payors, including Medicare, Medicaid and other government sponsored
programs.  These third-party payors exercise significant control over patient access and
increasingly use their enhanced bargaining power to secure discounted rates and other
requirements that may increase the cost of service.  If third-party payors do not approve the
Debtors' products for reimbursement or fail to reimburse them adequately, sales will suffer as
some physicians or their patients will opt for a competing product that is covered for
reimbursement or has a lower patient responsibility payment.  Even if third-party payors make
reimbursement available, such reimbursement may not be adequate or these payors'
reimbursement policies may adversely affect the Debtors' ability to achieve profitability.  The
Debtors' sales will continue to depend, in part, upon the extent to which coverage of and
reimbursement for their products will be available from government health administration

authorities, private health insurers, health maintenance organizations and other third-party payors.

In addition, certain estimates are required to record the Debtors' net revenues and accounts receivable at their net realizable values as a result of the nature of the industry and reimbursement environment in which the Debtors operate. Due to the continuing changes in this industry and reimbursement environment, the Debtors' estimates could change by a material amount in the near term, which could have an impact on their operations and cash flows.

    (e)    Reductions in Reimbursement Rates for the Debtors' Products Could Adversely Affect Their Business and Results of Operations.

Sales of a significant portion of the Debtors' diabetes products and medical supplies depend largely on whether levels of reimbursement from government healthcare programs, such as Medicare and Medicaid, and private payors will be adequate. Healthcare professionals may not use or prescribe the Debtors' products, and patients may not purchase the Debtors' products, if these third-party payors do not provide reimbursement for the costs of the Debtors' products. Consequently, the Debtors may be unable to sell their products on a profitable basis if third-party payors deny coverage or reduce their current levels of reimbursement. Third-party payors continually review their coverage policies carefully for existing and new therapies and can, without notice, deny coverage for treatments that include the use of the Debtors' products or if the patient responsibility is excessive. For example, Medicare frequently engages in efforts to contain costs, which may result in a reduction of coverage of, and reimbursement for, the Debtors' products. Because many private payors model their coverage and reimbursement policies on Medicare policies, third-party payors' coverage of, and reimbursement for, the Debtors' products could be negatively impacted by legislative, regulatory or other measures that reduce Medicare coverage and reimbursement generally. Furthermore, the Centers for Medicare & Medicaid Services could invoke its inherent reasonableness authority to reduce reimbursement levels for Medicare covered products, which could have an adverse effect on the Debtors' results of operations. A reduction in payments received from, or a loss of coverage under, Medicare could result in similar actions being taken by private payors, which could have an adverse effect on the Debtors' results of operations.

    (f)    The Success of the Debtors' Business Depends Heavily on their Relationships with Healthcare Professionals who Prescribe the Debtors' Products, and the Debtors' Failure to Maintain or Develop these Relationships Could Adversely Affect their Results of Operations.

The Debtors' sales force has developed and maintains close relationships with a number of healthcare professionals. The Debtors' sales of the products they offer depend significantly on such professionals' recommendations of the services that the Debtors provide. The Debtors' failure to maintain these relationships and develop similar relationships with other leading healthcare professionals could result in a decrease in the recommendation of the Debtors' services, which may adversely affect the Debtors' results of operations.

    (g)    The Debtors' Business and their Industry are Highly Regulated and, if Government Regulations are Interpreted or Enforced in a Manner Adverse

to the Debtors or their Business, the Debtors May be Subject to Enforcement Actions, Penalties, Exclusion and Other Material Limitations on their Operations.

The Debtors and their suppliers are extensively regulated by federal, state and local government agencies. The Debtors are required to register their business for permits and/or licenses with, and comply with certain operating and security standards of, the U.S. Drug Enforcement Administration or the Food and Drug Administration state boards of pharmacy, state health departments and other state agencies. In addition, the Debtors are subject to federal and state laws and regulations that govern financial and other arrangements among healthcare providers, including federal and state anti-kickback statutes, federal and state false claims laws and regulations, beneficiary inducement laws and regulations and other fraud and abuse laws and regulations. The Debtors are also subject to federal and state laws governing the confidentiality of patient information. In addition, federal legislation has resulted in national standards for the protection of patient information in electronic health information transactions.

Because the healthcare industry will continue to be subject to substantial regulations, the Debtors cannot guarantee that their activities will not be reviewed or challenged by regulatory agencies in the future. Failure to have the necessary clearances, approvals, permits and licenses, the loss of such clearances, approvals, permits and licenses, or the failure to comply with these laws, regulations and administrative requirements could subject the Debtors to significant civil and criminal sanctions, and could result in suspension of their operations or exclusion of their business from participation in Medicare, Medicaid and other federal and state healthcare programs.

(h)     The Debtors' Promotional Materials and Practices to Promote the Sale of Medical Supplies and Products they Distribute are Subject to Extensive Government Regulation.

Promotional materials and practices to promote the sale of medical products are subject to federal and state laws and regulations that require claims and statements not to be false or misleading and to be consistent with any legal and regulatory conditions for clearance or approval to market such products. Promotional claims for medical products typically must be within the bounds of labeling that has been approved or cleared by regulatory authorities, while unapproved or off-label claims are prohibited. Although the Debtors' marketing and sales force receive initial and periodic training to ensure that all marketing and sales practices are conducted within regulatory requirements, the interpretation of such requirements and the enforcement discretion policies of regulatory authorities may change, or regulatory authorities may conclude that the Debtors' practices are not in compliance with such requirements. Failure to comply with laws and regulations as interpreted and enforced by regulatory authorities could have a material adverse effect on the Debtors' business, financial condition or results of operations.

(i)     The Debtors' Marketing and Sales Practices may Contain Risks that could have an Adverse Impact on them.

The Debtors' marketing and sales practices directed toward existing and potential referral sources have included certain modest provision of goods and services that the Debtors

believe is standard in the industry. Under applicable federal and state healthcare fraud and abuse, anti-kickback, false claims and self-referral laws, it could be determined that the Debtors' marketing and sales practices fall outside permitted compensation arrangements, thereby subjecting them to possible civil and/or criminal sanctions (including exclusion from the Medicare and Medicaid programs) which could have an adverse effect on the Debtors' business. Although the Debtors believe that they maintain a satisfactory compliance program, it may not be adequate in the detection or prevention of violations.

Certain federal and state laws and regulations regarding reimbursement and coverage of products and services by Medicare and Medicaid, as well as federal and state laws addressing healthcare fraud and abuse, are broad in scope and apply to the Debtors' relationships with healthcare providers and entities that may prescribe or recommend the Debtors' products, and who may assist the Debtors in the development and promotion of their products. These laws and regulations are also complex, and even minor, inadvertent irregularities in claim submissions can potentially give rise to a charge that the law has been violated. Any violations of these laws or regulations could result in a material adverse effect on the Debtors' business, financial condition and results of operations. If there is a change in law, regulation or administrative or judicial interpretations, the Debtors may have to change one or more of their business practices to be in compliance with these laws. Required changes could be costly and time consuming. Any failure to make required changes could result in the Debtors losing business or their existing business practices being challenged as unlawful.

(j)     Audits or Denials of the Debtors' Claims by Government Agencies Could Reduce the Debtors' Revenues and Have an Adverse Affect on the Debtors' Results of Operations.

As part of the Debtors' business operations, the Debtors submit claims on behalf of patients directly to, and receive payments from, Medicare, Medicaid and other third-party payors. The Debtors are subject to extensive government regulation, including requirements for submitting reimbursement claims under appropriate codes and maintaining certain documentation to support their claims. Medicare contractors and Medicaid agencies periodically conduct pre- and post-payment reviews and other audits of claims and are under increasing pressure to more closely scrutinize healthcare claims and supporting documentation. The Debtors have periodically been subject to pre- and post-payment reviews as well as audits of claims and may experience such reviews and audits of claims in the future. Such reviews and similar audits of the Debtors' claims could result in material delays in payment, as well as material recoupments or denials, which would reduce the Debtors' net sales and profitability, or result in the Debtors' exclusion from participation in the Medicare or Medicaid programs. Private payors may from time to time conduct similar reviews and audits.

(k)     The Development of New Technologies that Reduce the Need for Consumable Testing Supplies or the Other Products that the Debtors Distribute Could Adversely Affect the Debtors' Business.

The majority of the Debtors' diabetes supply products sales are of consumable testing supplies used to draw and test small quantities of blood for the purpose of measuring and monitoring glucose levels. The commercialization and widespread acceptance of new

technologies may eliminate or reduce the need for consumable testing supplies or other products that the Debtors' distribute, reduce the Debtors' sales, and adversely affect the Debtors' results of operations.

(l)     The Debtors Could Lose Patients and Revenues to New or Existing Competitors who have Greater Financial or Operating Resources.

The profitability of the Debtors' business depends on their ability to retain as customers the patients they serve and to receive recurring and sustained reorders from such patients.  Reorder rates are inherently uncertain due to several factors, many of which are outside of the Debtors' control, including changing patient preferences, changes in payor coverage and reimbursement requirements, patient transition to extended care facilities, patient mortality and general economic conditions.  Reorder rates are also affected by the Debtors' ability to compete with retail pharmacies, direct-to-consumer distributors of medical supplies, healthcare product distributors, pharmacy benefit management companies and prescription drug plans with in-house pharmacies.  The loss of patients and revenues would negatively affect the Debtors' operating results and financial condition.

(m)     If the Debtors are Unable to Effectively Adapt to Changes in the Healthcare Industry, their Continued Success Could be Adversely Affected.

In recent years, the healthcare industry has experienced significant change driven by efforts to reduce costs and improve standards of care.  In addition to reduction in Medicare, Medicaid and third-party reimbursement, these efforts include potential national healthcare reform, increased and restrictive pharmacy benefit management, and horizontal and vertical consolidation within the healthcare industry.  The result of these efforts will likely put downward pressure on product pricing, which may adversely affect the Debtors' sales and profitability.  The Debtors' inability to react effectively to these and other changes in the healthcare industry could adversely affect the Debtors' operating results.  Due to uncertainties regarding the ultimate features of reform initiatives and their enactment and implementation, the Debtors cannot predict which, if any, of such reforms will be adopted, when they may be adopted or what impact they may have on the Debtors' product sales.

(n)     If the Debtors' Costs of Providing Products or Services Increase, the Debtors May not be Able to Pass these Cost Increases on to their Customers.

In many of the Debtors' markets, due to competitive pressures or the fact that reimbursement rates are set by law, the Debtors have very little control over the price at which they sell their products and services.  If the Debtors' costs increase, the Debtors may not be able to increase their prices, which would adversely affect their results of operations.  Accordingly, any increase in the cost of such products and services could adversely affect the Debtors' results of operations and impair their financial condition.

(o)     The Debtors' Business is Dependent on Sophisticated Information Systems that may Impact Business Operations if they Fail to Operate Properly or Not as Anticipated.

The success of the Debtors' business depends on the ability to obtain, process, analyze, maintain and manage data.  The Debtors have become more reliant on their information systems due to the consolidation and centralization of administrative functions.  Management relies on these information systems because:

- third-party ancillary billing services require proper tracking and reporting;

- customer orders must be received and shipped on a timely basis;

- billings and collections for all customers must be managed efficiently and accurately;

- product cost information, net of rebates, is needed by the sales force in a timely manner to conduct business;

- product reporting, such as product sales by vendor and vendor incentives earned, is a requirement;

- centralized procurement and inventory management systems are required for effective inventory management;

- regulatory compliance on certain products requires proper tracking and reporting;

- rebates are received from manufacturers when certain products are sold and sophisticated systems are required to track, apply and collect such rebates;

- data and information systems must be converted after acquisitions are consummated and during operating system conversions; and

- proper employee compensation and recordkeeping is required.

The Debtors' business, financial condition and results of operations may be materially adversely affected if, among other things:

- the Debtors' information systems are interrupted or fail for any extended length of time;

- services relating to the Debtors' information systems are not kept current;

- the Debtors' information systems become unable to support expanded business;

- information is lost or unable to be restored or processed; or

- information security is breached.

(p)     Legal Matters.

Like other participants in the healthcare market, the Debtors may be subject to lawsuits alleging negligence, product liability or other similar legal claims, many of which involve large claims and significant defense costs. Any of these claims, whether with or without merit, could result in costly litigation and divert the time, attention and resources of the Debtors' management. Although the Debtors currently maintain liability insurance intended to cover such claims, the coverage limits of such insurance policies may not be adequate or all such claims may not be covered by the insurance. In addition, these insurance policies must be renewed annually. Although the Debtors have been able to obtain liability insurance, such insurance may not be available in the future on acceptable terms, if at all. It is not anticipated that any current or pending lawsuit, either individually or in the aggregate, is likely to have a material adverse effect on the Debtors' financial condition. However, no assurances can be provided that the Debtors will be able to successfully defend or settle all pending or future purported claims, and the Debtors' failure to do so may have a material adverse effect on the Reorganized Debtors.

## ARTICLE XII.

## SECURITIES LAW MATTERS

**THIS DISCUSSION OF SECURITY LAW MATTERS IS INTENDED TO COVER THE STAND ALONE TRANSACTIONS ONLY AND IS NOT INTENDED TO COVER SECURITIES LAW MATTERS AS THEY MAY AFFECT THE PURCHASER IF THE SALE TRANSACTIONS ARE IMPLEMENTED.**

### 12.1.   *Plan Securities.*

The Plan provides, under certain circumstances, for Reorganized Issuer to issue to the Purchaser or the First Lien Lenders (as applicable) shares of New Common Stock. As used herein, the term "**Plan Securities**" shall refer to the New Common Stock issued in connection with the Stand Alone Transactions.

The Debtors believe that the Plan Securities constitute "securities," as defined in Section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable state securities laws. The Debtors further believe that the offer and sale of the Plan Securities pursuant to the Plan are, and subsequent transfers of the Plan Securities by the holders thereof that are not "underwriters," as defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code, will be, exempt from federal and state securities registration requirements under various provisions of the Securities Act, the Bankruptcy Code and state securities laws.

The New Stockholder and Registration Rights Agreement and the Amended Certificate of Incorporation contain restrictions on stockholders' ability to transfer the New Common Stock, as described more fully in Section 11.4(h) hereto.

**12.2.** *Issuance and Resale of Plan Securities Under the Plan.*

      (a)      Exemption from Registration.

      Section 3(a)(9) of the Securities Act provides that Section 5 of the Securities Act and, by virtue of Section 18 of the Securities Act, any state law requirements for the offer and sale of a security, do not apply to any security exchanged by an issuer with its existing security holders exclusively where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange. Section 1145 of the Bankruptcy Code provides that Section 5 of the Securities Act and any state law requirements for the offer and sale of a security do not apply to the offer or sale of stock, options, warrants or other securities by a debtor if (a) the offer or sale occurs under a plan of reorganization, (b) the recipients of the securities hold a claim against, an interest in, or claim for administrative expense against the debtor, and (c) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for Cash and property. In reliance upon these exemptions and Section 4(2) of the Securities Act and Regulation D promulgated thereunder, the Plan Securities will not be registered under the Securities Act or any state securities laws. To the extent that the Plan Securities are issued under the Plan and are covered by section 1145 of the Bankruptcy Code, the Plan Securities may be resold without registration under the Securities Act or other federal securities laws, unless the holder is an "underwriter" (as discussed below) with respect to such securities, as such term is defined in Section 2(a)(11) of the Securities Act and in the Bankruptcy Code. In addition, the Plan Securities generally may be able to be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of those states; however, the availability of such exemptions cannot be known unless individual state securities laws are examined. Therefore, recipients of the Plan Securities are advised to consult with their own legal advisors as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

      (b)      Resales of Plan Securities; Definition of Underwriter.

      Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as one who, except with respect to "ordinary trading transactions" of an entity that is not an "issuer," (a) purchases a claim against, interest in, or claim for an administrative expense in the case concerning the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such claim or interest, or (b) offers to sell securities offered or sold under a plan for the holders of such securities, or (c) offers to buy securities offered or sold under a plan from the holders of such securities, if such offer to buy is (i) with a view to distribution of such securities and (ii) under an agreement made in connection with the plan, with the consummation of the plan, or with the offer or sale of securities under the plan, or (d) is an issuer of the securities within the meaning of Section 2(a)(11) of the Securities Act. In addition, a Person who receives a fee in exchange for purchasing an issuer's securities could also be considered an underwriter within the meaning of Section 2(a)(11) of the Securities Act.

      The definition of an "issuer" for purposes of whether a Person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, by reference to Section 2(a)(11) of the Securities Act, includes as "statutory underwriters" all persons who, directly or indirectly,

through one or more intermediaries, control, are controlled by, or are under common control with, an issuer of securities. The reference to "issuer," as used in the definition of "underwriter" contained in Section 2(a)(11), is intended to cover "controlling persons" of the issuer of the securities. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be a "controlling person" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.

Resales of the Plan Securities by Persons deemed to be "underwriters" (which definition includes "controlling person") are not exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law. Under certain circumstances, holders of Plan Securities who are deemed to be "underwriters" may be entitled to resell their Plan Securities pursuant to the limited safe harbor resale provisions of Rule 144. Generally, Rule 144 would permit the public sale of securities received by such person if current information regarding the issuer is publicly available and if volume limitations, manner of sale requirements and certain other conditions are met. However, the Reorganized Debtors do not presently intend to make publicly available the requisite current information regarding the Reorganized Debtors and, as a result, Rule 144 will not be available for resales of Plan Securities by persons deemed to be underwriters.

Whether any particular Person would be deemed to be an "underwriter" (including whether such Person is a "controlling person") with respect to the Plan Securities would depend upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any Person would be deemed an "underwriter" with respect to the Plan Securities. In view of the complex nature of the question of whether a particular Person may be an underwriter, the Debtors make no representations concerning the right of any Person to freely resell Plan Securities. **Accordingly, the Debtors recommend that potential recipients of Plan Securities consult their own counsel concerning whether they may freely trade such securities in compliance with the federal and state securities laws.**

## ARTICLE XIII.

## CONCLUSION

The Debtors believe that confirmation and implementation of the Plan is preferable to any of the alternatives described herein because it will provide the greatest recovery to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial administrative costs and are likely to reduce if not eliminate any return to unsecured creditors who hold Claims. Moreover, under such alternatives, holders of Interests are highly unlikely to receive any recovery on account of their Interests or otherwise. The Debtors urge the holders of Impaired Claims in Classes 1-7 who are entitled to vote on the Plan to vote to accept the Plan and to evidence such acceptance by returning their Ballots to the Voting Agent so that they will be received not later than 4:00 p.m., Prevailing Eastern Time, on March 5, 2010.

Dated: February 9, 2010
      Wilmington, Delaware

Respectfully submitted,

CCS MEDICAL, INC., on behalf of itself and its affiliated debtors and debtors-in-possession

By: _/s/ Stephen Saft_
      Stephen Saft
      Chief Financial Officer

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

**Young Conaway Stargatt & Taylor, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801-1037
(302) 571-6600

*Co-Counsel to the Debtors and Debtors in Possession*

## SCHEDULE 1.1

### LIST OF DEBTORS AND DEBTORS IN POSSESSION

(1)    CCS Medical, Inc.

(2)    CCS Medical Holdings, Inc.

(3)    CCS Acquisition Holding-Sub Corporation

(4)    CCS Star LLC

(5)    Chronic Care Solutions, Inc.

(6)    DEGC Enterprises (U.S.), Inc.

(7)    KeyMed, Inc.

(8)    Medical Express Depot, Inc.

(9)    Medical Holdings, Inc.

(10)    MedShip Direct, Inc.

(11)    MedStar Diabetic Supply Limited Partnership

(12)    MPTC Holdings, Inc.

(13)    MP TotalCare, Inc.

(14)    MP TotalCare Medical, Inc.

(15)    MP TotalCare Services, Inc.

(16)    MP TotalCare Supply, Inc.

(17)    Sanvita, Inc.

(18)    Secure Care Medical, Inc.

(19)    TotalCare Wholesale, Inc.

# **EXHIBIT 1**

PLAN