# EXHIBIT 3

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

THIS DISCUSSION OF FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS NOT INTENDED TO COVER TAX CONSEQUENCES OF THE PLAN AS THEY MAY AFFECT THE PURCHASER IF THE SALE TRANSACTIONS ARE IMPLEMENTED.

*I. Introduction.*

The following discussion summarizes certain federal income tax consequences expected to result from the consummation of the Plan. This discussion is only for general information purposes and only describes the expected tax consequences to holders of claims entitled to vote on the Plan that in the Stand Alone Transactions are receiving distributions of stock or debt (each, a "**Holder**"). It is not a complete analysis of all potential federal income tax consequences and does not address any tax consequences arising under any state, local or foreign tax laws or federal estate or gift tax laws. This discussion is based on the Internal Revenue Code of 1986, as amended (the "**IRC**"), Treasury Regulations promulgated thereunder, judicial decisions, and published rulings and administrative pronouncements of the Internal Revenue Service (the "**IRS**"), all as in effect on the date of this Disclosure Statement. These authorities may change, possibly retroactively, resulting in federal income tax consequences different from those discussed below. No ruling has been or will be sought from the IRS, and no legal opinion of counsel will be rendered, with respect to the matters discussed below. There can be no assurance that the IRS will not take a contrary position regarding the federal income tax consequences resulting from the consummation of the Plan or that any contrary position would not be sustained by a court.

For purposes of this discussion, the terms "**Old First Lien Loans**" and "**Old DIP Loans**" are used to refer to the loans under the First Lien Credit Agreement and the DIP Credit Agreement respectively, the Old First Lien Loan and Old DIP Loan together referred to as the "**Old Loans**" and the terms "**New First Lien Loans**," "**New Second Lien Loans**," and "**New DIP Loans**" are used to refer to the Reorganized First Lien Term Loan, the Reorganized Second Lien Term Loan, and the DIP Roll Option, respectively, the New First Lien Loan, New Second Lien Loan, and the New DIP Loan together referred to as the "**New Loans**." This discussion assumes that Holders of the Old Loans have held such property as "capital assets" within the meaning of IRC Section 1221 (generally, property held for investment) and Holders will hold the New Loans and the New Common Stock as capital assets. In addition, this discussion assumes that the Debtors' obligations under the Old Loans and New Loans will be treated as debt for federal income tax purposes.

This discussion addresses the tax consequences of two alternative scenarios. If the Sale Transactions are not implemented, and the Stand Alone Transactions are implemented (the "**Debt Swap Alternative**"), the Debtors will issue a combination of New Loans, New Common Stock, and, possibly, Cash, in exchange for the Old Loans. If instead the Sale Transactions are implemented (the "**Liquidation Alternative**"), the Debtors will receive Cash from the Purchaser in exchange for the New Common Stock or the Assets, as applicable, and then distribute the majority of that Cash to Holders of Old Loans and other Allowed Claims.

This discussion does not address all federal income tax considerations that may be relevant to a particular Holder in light of that Holder's particular circumstances or to Holders subject to special rules under the federal income tax laws, such as financial institutions, insurance companies, brokers, dealers or traders in securities, commodities or currencies, tax-exempt organizations, tax-qualified retirement plans, partnerships and other pass-through entities, foreign corporations, foreign trusts, foreign estates, Holders who are not citizens or residents of the U.S., Holders subject to the alternative minimum tax, Holders holding the Old Loans, New Loans, or New Common Stock as part of a hedge, straddle or other risk reduction strategy or as part of a conversion transaction or other integrated investment, Holders who have a functional currency other than the U.S. dollar and Holders that acquired the Old Loans in connection with the performance of services.

HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE U.S. FEDERAL INCOME TAX CONSEQUENCES TO THEM OF THE CONSUMMATION OF THE PLAN AND THE OWNERSHIP AND DISPOSITION OF THE NEW LOANS AND NEW COMMON STOCK RECEIVED PURSUANT TO THE DEBT SWAP ALTERNATIVE OF THE PLAN, AS WELL AS ANY TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL OR FOREIGN TAX LAWS, OR ANY OTHER FEDERAL TAX LAWS.

TO COMPLY WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A TAXPAYER UNDER THE INTERNAL REVENUE CODE, (B) ANY SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN, AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## II. *Federal Income Tax Consequences to the Debtors.*

(a) Cancellation of Indebtedness and Reduction of Tax Attributes.

The Debtors generally should realize cancellation of indebtedness ("**COD**") income to the extent the sum of (i) Cash and the fair market value of any property (including, if applicable, New Common Stock) and (ii) the issue prices of the New Loans received by Holders (if applicable) is less than the sum of (x) the adjusted issue prices of the Old Loans, (y) the adjusted issue price of any other debt exchanged for property pursuant to the Plan and (z) the amount of any unpaid accrued interest on the Old Loans and such other debt to the extent previously deducted by the Debtors.

The Debtors currently estimate that the amount of COD income realized upon consummation of the Plan could range from approximately $200 million to approximately $350 million; however, the ultimate amount of COD income realized by the Debtors is uncertain because, among other things, it will depend on the fair market value of the New Common Stock and the issue price of the New Loans on the Effective Date (if applicable). COD income realized

by a debtor will be excluded from income if the discharge of debt occurs in a case brought under the Bankruptcy Code, the debtor is under the court's jurisdiction in such case and the discharge is granted by the court or is pursuant to a plan approved by the court (the "**Bankruptcy Exception**"). Because the Bankruptcy Exception will apply to the transactions consummated pursuant to the Plan, the Debtors will not be required to recognize any COD income realized as a result of the implementation of the Plan.

A debtor that does not recognize COD income under the Bankruptcy Exception generally must reduce certain tax attributes by the amount of the excluded COD income. This reduction will occur after the determination of the Debtors' tax liability for the year of the discharge, such that, if the Liquidation Alternative of the Plan is implemented, certain of the attributes may first be used to offset any gain arising from the sale of the Debtors' assets. Attributes subject to reduction include NOLs, NOL carryforwards and certain other losses, credits and carryforwards, and the debtor's tax basis in its assets (including stock of subsidiaries). A debtor's tax basis in its assets generally may not be reduced below the amount of liabilities remaining immediately after the discharge of indebtedness. If the debtor is a member of a consolidated group and reduces its basis in the stock of another group member, a "look-through rule" requires a corresponding reduction in the tax attributes of the lower-tier member. NOLs for the taxable year of the discharge and NOL carryovers to such year generally are the first attributes subject to reduction. However, a debtor may elect under IRC Section 108(b)(5) (the "**Section 108(b)(5) Election**") to reduce its basis in its depreciable property first. If the debtor is a member of a consolidated group, the debtor may treat stock in another group member as depreciable property for purposes of the Section 108(b)(5) Election, provided the lower-tier member consents to a corresponding reduction in its basis in its depreciable property. If a debtor makes a Section 108(b)(5) Election, the limitation on reducing the debtor's basis in its assets below the amount of its remaining liabilities does not apply. The Debtors have not yet determined whether they will make the Section 108(b)(5) Election.

At December 31, 2008, the Debtors had NOLs for federal income tax purposes of approximately $33 million expiring in the years 2004 through 2028. None of these NOLs are subject to pre-existing usage limitations under IRC Section 382. The Debtors believe that, for federal income tax purposes, the Debtors' consolidated group generated approximately $16 million of consolidated NOLs in the 2008 tax year, and likely generated additional NOLs during the 2009 tax year. However, the amount of the Debtors' 2009 NOLs will not be determined until the Debtors prepare their consolidated federal income tax returns for such periods. Moreover, the Debtors' NOLs are subject to audit and possible challenge by the IRS. Accordingly, the amount of the Debtors' NOLs ultimately may vary from the amounts set forth above.

The Debtors currently anticipate that the application of IRC Section 108(b) (assuming no Section 108(b)(5) Election is made) will likely result in the elimination of the Debtors' consolidated NOLs and a reduction of a portion of the tax basis in their assets, if such NOLs are not used against gain arising from the sale of the Debtors' assets in the Liquidation Alternative. However, the ultimate effect of the attribute reduction rules is uncertain because, among other things, it will depend on the amount of COD income realized by the Debtors and the extent to which the Debtors are required to reduce other tax attributes.

Instead of taking advantage of the Bankruptcy Exception, under the provisions of the American Recovery and Reinvestment Act of 2009, the Debtors may make an election to defer the inclusion of any COD income recognized in connection with the Plan (the "**Deferral Election**"). If the Debtors make the Deferral Election, such COD income would be included in income by the Debtors ratably over a 5-year period beginning in 2014. The Debtors may decide to make the Deferral Election if they determine that the effect of such election is less costly than the tax attribute reduction that would result from the application of the Bankruptcy Exception.

(b) Section 382 Limitation on NOLs if the Debt Swap Alternative is Implemented.

Under IRC Section 382, if a corporation or a consolidated group with NOLs (a "**Loss Corporation**") undergoes an "ownership change," the Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) generally will be subject to an annual limitation in the post-change period. In general, an "ownership change" occurs if the percentage of the value of the Loss Corporation's stock owned by one or more direct or indirect "five percent shareholders" increases by more than fifty percentage points over the lowest percentage of value owned by the five percent shareholders at any time during the applicable testing period (an "**Ownership Change**"). The testing period generally is the shorter of (i) the three-year period preceding the testing date or (ii) the period of time since the most recent Ownership Change of the corporation.

Subject to the special bankruptcy rules discussed below, the amount of the annual limitation on a Loss Corporation's use of its pre-change NOLs (and certain other tax attributes) is generally equal to the product of the applicable long-term tax-exempt rate (as published by the IRS for the month in which the Ownership Change occurs) and the value of the Loss Corporation's outstanding stock immediately before the Ownership Change (excluding certain capital contributions). If a Loss Corporation has a net unrealized built-in gain ("**NUBIG**") immediately prior to the Ownership Change, the annual limitation may be increased during the subsequent five-year period (the "**Recognition Period**"). If a Loss Corporation has a net unrealized built-in loss ("**NUBIL**") immediately prior to the Ownership Change, certain losses recognized during the Recognition Period also would be subject to the annual limitation and thus would reduce the amount of pre-change NOLs that could be used by the Loss Corporation during the five-year period.

The Debtors expect the consummation of the Debt Swap Alternative of the Plan will result in an Ownership Change of the Debtors' consolidated group. The remainder of this discussion assumes that the expected Ownership Change will occur on the Effective Date, though it is possible the IRS could take the position that the Ownership Change occurred on the date the Plan is confirmed by the Bankruptcy Court. If the IRS took the position that the ownership change occurred on the Confirmation Date, the consequences of such change could be other than as described below. Because the Ownership Change that occurs on the Effective Date will occur in a case brought under the Bankruptcy Code, one of the following two special rules will apply in determining the Debtors' ability to utilize NOLs attributable to tax periods preceding the Effective Date in post-Effective Date tax periods.

Under IRC Section 382(l)(5), an Ownership Change in bankruptcy will not result in any annual limitation on the debtor's pre-change NOLs if the stockholders or "qualified creditors" of the debtor receive at least fifty percent (50%) of the stock (by vote and value) of the reorganized debtor in the bankruptcy reorganization as a result of being shareholders or creditors of the debtor. Instead, the debtor's pre-change NOLs are reduced by the amount of any interest deductions with respect to debt converted into stock in the bankruptcy reorganization that were allowed in the three taxable years preceding the taxable year in which the Ownership Change occurs and in the part of the taxable year prior to and including the effective date of the bankruptcy reorganization. However, if any pre-change NOLs of the debtor already are subject to an annual usage limitation under IRC Section 382 at the time of an Ownership Change subject to IRC Section 382(l)(5), those NOLs will continue to be subject to such limitation.

A qualified creditor is any creditor who has held the debt of the debtor continuously during the period beginning at least eighteen months prior to the petition date or who has held "ordinary course indebtedness" at all times since it has been outstanding. A creditor who does not become a direct or indirect five percent shareholder of the reorganized debtor generally may be treated by the debtor as having always held any debt exchanged for stock for purposes of determining whether such creditor is a qualified creditor unless the creditor's participation in formulating the plan of reorganization makes evident to the debtor that the creditor has not owned the debt for the requisite period. The Debtors believe that the Ownership Change expected to result from the consummation of the Plan may satisfy the requirements of IRC Section 382(l)(5), though no assurance can be given in this regard.

If IRC Section 382(l)(5) applies to an Ownership Change, any subsequent Ownership Change of the debtor within a two-year period will result in the debtor being unable to use any pre-change losses following such subsequent Ownership Change. A debtor may elect not to apply IRC Section 382(l)(5) to an Ownership Change that otherwise satisfies its requirements. This election must be made on the debtor's federal income tax return for the taxable year in which the Ownership Change occurs. The Debtors have not yet determined whether to elect out of the application of IRC Section 382(l)(5) if it is determined they otherwise qualify. If the Effective Date occurs in 2010, assuming the Ownership Change resulting from implementation of the Plan satisfies the requirements of IRC Section 382(l)(5), the Debtors would have until as late as September 15, 2011, to determine whether to elect not to apply IRC Section 382(l)(5).

If an Ownership Change pursuant to a bankruptcy plan does not satisfy the requirements of IRC Section 382(l)(5), or if a debtor elects not to apply IRC Section 382(l)(5), the debtor's use of its pre-change NOLs will be subject to an annual limitation as determined under IRC Section 382(l)(6). In such case, the amount of the annual limitation generally will be equal to the product of the applicable long-term tax-exempt rate (4.14% for February 2010) and the value of the debtor's outstanding stock immediately after the bankruptcy reorganization, provided such value may not exceed the value of the debtor's gross assets immediately before the Ownership Change, subject to certain adjustments. Depending on whether the debtor has a NUBIG or NUBIL immediately prior to the Ownership Change, the annual limitation may be increased or decreased during the Recognition Period. However, if any pre-change NOLs of the debtor already are subject to an annual limitation at the time of an Ownership Change subject to IRC Section 382(l)(6), those NOLs will be subject to the lower of the two annual limitations.

NOLs not utilized in a given year due to the annual limitation may be carried forward for use in future years until their expiration dates. To the extent the Reorganized Debtors' annual limitation exceeds the consolidated group's taxable income in a given year, the excess will increase the annual limitation in future taxable years.

(c)     Taxable Sales If the Liquidation Alternative is Implemented.

The sales of New Common Stock or the assets of the Debtors (as applicable) pursuant to the Liquidation Alternative of the Plan will be taxable transactions. Thus, the Debtors must recognize any gain or loss realized on each such sale. To determine the amount of gain or loss realized on any sale, the total consideration received in such sale must be allocated among the assets sold in accordance with their relative fair market values. The gain or loss realized with respect to each asset is then determined separately by subtracting the selling Debtor's tax basis in such asset from the amount of consideration received for such asset. To the extent that the Debtors recognize a net gain in any taxable year from the asset sales, such gain may be offset either by operating losses that accrue during the tax year of the sale or by the Debtors' NOLs and/or capital loss carryforwards. The Debtors may, however, recognize some alternative minimum tax as a result of Asset sales if the gain from the sale is offset by NOLs and/or capital loss carryforwards, and not by operating losses from the same tax year as the year of the sale. Any resulting tax will be paid by the Debtors.

(d)     Alternative Minimum Tax.

In general, an alternative minimum tax ("**AMT**") is imposed on a corporation's alternative minimum taxable income ("**AMTI**") at a 20% rate, to the extent such tax exceeds the corporation's regular federal income tax for the taxable year. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated, with further adjustments required if AMTI, determined without regard to adjusted current earnings ("**ACE**"), differs from ACE. In addition, even though a corporation otherwise might be able to offset all of its taxable income for regular tax purposes by available NOL carryforwards, under current law only 90% of its AMTI generally may be offset by available NOL carryforwards. Accordingly, for tax periods after the Effective Date, the Reorganized Debtors may have to pay AMT regardless of whether they generate non-AMT NOLs or have sufficient non-AMT NOL carryforwards to offset regular taxable income for such periods. In addition, in the case of the Debt Swap Alternative, if a corporation undergoes an Ownership Change and is in a NUBIL position on the date of the Ownership Change, the corporation's aggregate tax basis in its assets would be reduced for certain AMT purposes to reflect the fair market value of such assets as of the change date. A corporation that pays AMT generally is later allowed a nonrefundable credit (equal to a portion of its prior year AMT liability) against its regular federal income tax liability in future taxable years when it is no longer subject to the AMT.

## III. Federal Income Tax Consequences to Holders of Certain Claims if the Debt Swap Alternative is Implemented.

(a) Tax Securities.

The tax consequences of the Plan to a Holder of a Claim may depend in part upon (1) whether such Claim is based on an obligation that constitutes a "security" for federal income tax purposes and (2) whether all or a portion of the consideration received for such Claim is stock or an obligation that constitutes a "security" for federal income tax purposes. The determination of whether a debt obligation is a security involves an overall evaluation of the nature of the obligation, with the term of the obligation usually regarded as one of the most significant factors. Debt obligations with a term of less than five years generally have not qualified as securities, whereas debt obligations with a term of ten years or more generally have qualified as securities. Another important factor in determining whether a debt obligation is a security is the extent to which the obligation is subordinated to other liabilities of the issuer. Generally, the more senior the debt obligation, the less likely it is to be a security. It is uncertain whether the Old First Lien Loans, the Old DIP Loans, or the New Loans will be considered securities for federal tax purposes and Holders are advised to consult their tax advisors with respect to this issue.

(b) Holders of Old First Lien Loans (Class 2).

(1) Exchange of Old First Lien Loans for New Loans and Common Stock.

Under applicable Treasury Regulations, the significant modification of a debt instrument will result in a deemed exchange of the "old" debt instrument for a "new" debt instrument and will be a taxable event upon which gain or loss may be recognized in certain circumstances. A modification of a debt instrument is significant if the modified instrument differs materially either in kind or extent from the original debt instrument. Pursuant to the Plan, the terms of the Old First Lien Loans will be amended or otherwise modified as set forth in the New Loans. The adoption of the amendments to the New Loans will likely result in a significant modification of the Old First Lien Loans and the Debtors intend to take such position for federal income tax purposes. **The remainder of this discussion assumes that the adoption of the proposed amendments constitutes a significant modification.**

The federal income tax consequences of the consummation of the Plan to Holders of Old First Lien Loans depend, in part, on whether the Old First Lien Loans and New Loans constitute "securities" for purposes of the "reorganization" provisions of the IRC, as described above under "Tax Securities." If the Old First Lien Loans and the New First Lien Loans constitute securities for federal income tax purposes, subject to the "Other Considerations — Accrued Interest" discussion below, the exchange would generally qualify as a tax deferred exchange and the Holders of Old First Lien Loans would not recognize gain or loss upon the exchange of the Old First Lien Loans for the New Loans and the New Common Stock. A Holder's adjusted tax basis in the Old First Lien Loans will be allocated between the New Loans and the New Common Stock in accordance with their respective fair market values on the Effective Date, and the Holder's holding period in the New Loans and New Common Stock will include the Holder's holding period in the Old First Lien Loans. The tax-deferred receipt of the

New Common Stock is not free from doubt if the issuer of the New Common Stock is Reorganized Holdings and not Reorganized CCS. However, a published IRS Revenue Ruling (Revenue Ruling 59-222) indicates that the receipt of New Common Stock may be part of the tax-deferred exchange in these circumstances, provided that the Old First Lien Loans constitute securities for tax purposes.

If the Old First Lien Loans are treated as securities for federal income tax purposes and the exchange for New Common Stock is tax-deferred as described in the preceding paragraph, but the New Loans are not treated as securities, each Holder will recognize gain, but not loss, in an amount equal to the lesser of (i) the issue price of the New Loans and (ii) the excess, if any, of (A) the sum of fair market value of the New Common Stock plus the issue price of the New Loans over (B) the adjusted basis of the Holder in the Old First Lien Loans. A Holder's holding period in the New Common Stock would include the Holder's holding period in its Old First Lien Loans, while the Holder would start a new holding period in the New Loans. The Holder's basis in the New Loans would equal their issue price, and the Holder's basis in the New Common Stock would equal the Holder's basis in its First Lien Lender Claim less the issue price of the New Loans plus the amount of gain, if any, recognized on the exchange.

If the Old First Lien Loans do not qualify as securities, the exchange of the Old First Lien Loans for the New Loans and New Common Stock would be a fully taxable exchange. If the exchange is fully taxable, subject to the "Other Considerations — Accrued Interest" and "Market Discount" discussions below, a Holder of Old First Lien Loans would recognize gain or loss on the exchange of Old First Lien Loans for the New Loans and Common Stock. The amount of gain or loss recognized by a Holder would be equal to the difference between (i) the sum of the issue price of the New Loans (see "New Loans" discussion below) and the fair market value of the New Common Stock received in the exchange and (ii) the Holder's adjusted tax basis in the Old First Lien Loans exchanged therefor. In that case, a Holder's holding period in the New Common Stock and in the New Loans would begin on the day after the Effective Date.

Holders should consult their tax advisors regarding the tax treatment of the exchange of Old First Lien Loans for the New Loans and New Common Stock, the character of any gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, as its character will be determined by a number of factors, including (but not limited to) the tax status of the Holder, whether the Old First Lien Loans constitute a capital asset in the Holder's hands, whether the Old First Lien Loans have been held for more than one year, and whether and to what extent the Holder previously claimed a bad debt deduction with respect to the Old First Lien Loans. Holders also should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(2) New First Lien Loans: Interest and Original Issue Discount.

Payments of stated interest under the New First Lien Loans will constitute payments of "qualified stated interest" and generally will be taxable to Holders as ordinary income at the time the payments are received or accrued, in accordance with the Holder's method of tax accounting.

- 8 -

The preceding paragraph assumes the amount of the New First Lien Loans will not be issued with original issue discount ("**OID**"). The New First Lien Loans generally would be treated as issued with OID if the principal amount of the New First Lien Loans plus all scheduled interest payments thereon, other than payments of qualified stated interest, exceeds the issue price of the loan by more than a *de minimis* amount. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. Because the relevant trading period is generally in the future, it is impossible to predict whether the Old First Lien Loans or the New First Lien Loans will be publicly traded during the relevant period. However, the Debtors anticipate that the Old First Lien Loans and New First Lien Loans should not be treated as publicly traded and, therefore, that the issue price of the New First Lien Loans should be its stated principal amount.

(3) New Second Lien Loans: Interest and Original Issue Discount.

The New Second Lien Loans will be treated as issued with OID. In general, a debt instrument is treated as having OID to the extent its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount. The "stated redemption price at maturity" on a New Second Lien Loan is the sum of all payments provided by the debt instrument other than "qualified stated interest." Because a portion of the interest payments in respect of the New Second Lien Loans will be added to the amount outstanding under the New Second Lien Loan ("**PIK Payment**"), the Debtors do not intend to treat such interest paid in respect of such notes as qualified stated interest.

The PIK Payment is large enough to cause the New Second Lien Loans to be treated as issued with OID. However, the exact amount of OID will depend on the New Second Lien Loan's issue price. The issue price of a debt instrument issued in exchange for another debt instrument depends on whether either debt instrument is considered publicly traded for purposes of the OID rules at any time during the sixty-day period ending thirty days after the issue date. If neither debt instrument is publicly traded, the issue price of the new debt instrument will be its stated principal amount if the new debt instrument provides for adequate stated interest (*i.e.*, interest at least at the applicable federal rate as of the issue date), or will be its imputed principal amount if the instrument does not provide for adequate stated interest. If the new debt instrument is publicly traded, its issue price generally will be its trading price immediately

following issuance. If the old debt instrument is publicly traded, but the new debt instrument is not, the issue price of the new debt instrument generally will be the fair market value of the old debt instrument at the time of the exchange less the fair market value of the portion of the old debt instrument allocable to any other property received in the exchange.

A debt instrument will be considered to be publicly traded if certain pricing information related to the instrument is generally available on a quotation medium. Because the relevant trading period is generally in the future, it is impossible to predict whether the Old First Lien Loans or the New Second Lien Loans will be publicly traded during the relevant period. However, the Debtors anticipate that the Old First Lien Loans and New Second Lien Loans should not be treated as publicly traded and, that therefore, the issue price of the New Second Lien Loans should be its stated principal amount.

Because the New Second Lien Loan is issued with OID, the Holder generally will be required to accrue the OID in respect of the New Second Lien Loan and include such amount in gross income as interest over the term of such note based on the constant yield method. Accordingly, a Holder generally will be required to include amounts in gross income in advance of the payment of Cash in respect of such income. A Holder's tax basis in a New Second Lien Loan will be increased by the amount of any OID included in income and reduced by any Cash received (other than payments of qualified stated interest) with respect to such note.

(4) New Loans: Sale, Retirement or Other Taxable Disposition.

A Holder of the New Loans will recognize gain or loss upon the sale, redemption, retirement or other taxable disposition of the obligations due under the New Loans equal to the difference between the amount realized upon the disposition (less a portion allocable to any unpaid accrued interest which generally will be taxable as ordinary income) and the Holder's adjusted tax basis in the New Loans. Any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New Loans for more than one year as of the date of disposition. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(5) New Common Stock.

A Holder of New Common Stock generally will be required to include in gross income as ordinary dividend income the amount of any distributions paid on the New Common Stock to the extent such distributions are paid out of the Reorganized Debtors' current or accumulated earnings and profits as determined for federal income tax purposes. Distributions not treated as dividends for federal income tax purposes will constitute a return of capital and will first be applied against and reduce a Holder's adjusted tax basis in the New Common Stock, but not below zero. Any excess amount will be treated as gain from a sale or exchange of the New Common Stock. Holders that are treated as corporations for federal income tax purposes may be entitled to a dividends received deduction with respect to distributions out of earnings and profits.

A Holder of New Common Stock will recognize gain or loss upon the sale or other taxable disposition of New Common Stock equal to the difference between the amount realized upon the disposition and the Holder's adjusted tax basis in the New Common Stock. Subject to the rules discussed below in "Market Discount" and the recapture rules under IRC Section 108(e)(7), any such gain or loss generally will be capital gain or loss, and will be long-term capital gain or loss if the Holder has held the New Common Stock for more than one year as of the date of disposition. Under the IRC Section 108(e)(7) recapture rules, a Holder may be required to treat gain recognized on the taxable disposition of the New Common Stock as ordinary income if the Holder took a bad debt deduction with respect to the Old Loans or recognized an ordinary loss on the exchange of the Old Loans for New Common Stock. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers.

(c) Holders of Old DIP Loans.

The holders of the Old DIP Loans may receive either Cash or New DIP Loans in exchange for their Old DIP Loans. It is uncertain whether the Old DIP Loans or the New DIP Loans will be considered securities for federal tax purposes and holders are advised to consult their tax advisors with respect to this issue.

If the Old DIP Loans and the New DIP Loans both constitute securities for federal income tax purposes, subject to "Other Considerations — Accrued Interest" discussion below, the exchange would generally qualify as a tax deferred exchange and the holders of the Old DIP Loans would not recognize gain or loss upon the exchange of the Old DIP Loans for the New DIP Loans. A Holder's adjusted tax basis in the Old DIP Loans will be carried over to the New DIP Loans, and the Holder's holding period in the New DIP Loans would include the Holder's holding period in the Old DIP Loans.

If the Old DIP Loans or the New DIP Loans are not securities, or if the holders of the Old DIP Loans receive only Cash, a Holder will recognize gain or loss equal to the difference between the "amount realized" by the Holder and such Holder's adjusted tax basis in the Old DIP Loans. The "amount realized" is equal to the sum of the issue price of the New DIP Loans and the Cash received under the Plan in respect of a Holder's Claim (to the extent that such Cash or other property is not allocable to any portion of the Old DIP Loan representing accrued but unpaid interest (see "Other Considerations — Accrued Interest")).

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Old DIP Loan in its hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Old DIP Loan, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Old DIP Loan. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are limitations on the deduction of capital losses by both corporate and noncorporate taxpayers. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

(d)  Market Discount.

A Holder will be considered to have acquired an Old Loan at a market discount if its tax basis in the loan immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest) after the acquisition date, subject to a statutorily defined *de minimis* exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the Holder's election, under a constant yield method. A Holder that acquired an Old Loan at a market discount previously may have elected to include the market discount in income as it accrued over the term of the note.

A Holder that acquires a debt instrument at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income to the extent of accrued market discount not previously included in gross income by the Holder. However, special rules apply to the disposition of a market discount obligation in certain types of non-recognition transactions, such as a recapitalization. Under these rules, a Holder that acquired an Old Loan at a market discount generally should not be required to recognize any accrued market discount as income at the time of the exchange of Old Loans for New Loans and New Common Stock to the extent it receives stock or securities in exchange for the Old Loan. Rather, on a subsequent taxable disposition of the stock or securities received in the exchange, any gain realized by the Holder on a disposition of the stock will be ordinary income to extent of the market discount accrued on the Old Loan prior to the exchange that is allocable to the stock, and any gain realized by the Holder on a disposition of the securities will be ordinary income to the extent of the allocable amount of market discount accrued on the Old Loan prior to the exchange and the amount of market discount accrued on the securities after the exchange. The method of allocating accrued market discount to stock and securities when both are received in exchange for a market discount obligation in a recapitalization is uncertain. Accordingly, Holders that acquired the Old Loans with market discount should consult their tax advisors regarding this issue.

## *IV. Federal Income Tax Consequences to Holders of Certain Claims if Liquidation Alternative is Implemented.*

Generally, a Holder of an Old Loan that receives Cash under the Liquidation Alternative will recognize gain or loss equal to the difference between the "amount realized" by such Holder and such Holder's adjusted tax basis in the Old Loan. The "amount realized" is equal to the sum of the Cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim (to the extent that such Cash or other property is not allocable to any portion of the Old Loan representing accrued but unpaid interest (see "Other Considerations — Accrued Interest")).

The character of any recognized gain or loss (*e.g.*, ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Old Loan in its hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Old Loan, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Old Loan. Holders should consult their tax advisors regarding the applicable tax rates and netting rules for capital gains and losses. There are

limitations on the deduction of capital losses by both corporate and noncorporate taxpayers. HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.

*V. Other Considerations.*

      (a)    Accrued Interest.

There is general uncertainty regarding the extent to which the receipt of Cash or other property should be treated as attributable to unpaid accrued interest. The PED Debtors intend to take the position that Cash or property distributed pursuant to the Plan will first be allocable to the principal amount of a Holder's Claim and then, to the extent necessary, to any unpaid accrued interest thereon. The IRS, however, could take a contrary position.

To the extent any property received pursuant to the Plan is considered attributable to unpaid accrued interest, a Holder will recognize ordinary income to the extent the value of the property exceeds the amount of unpaid accrued interest previously included in gross income by the Holder. A Holder's tax basis in such property should be equal to the amount of interest income treated as satisfied by the receipt of the property, and its holding period in the property should begin on the day after the Effective Date. A Holder generally will be entitled to recognize a loss to the extent any accrued interest previously included in its gross income is not paid in full. HOLDERS SHOULD CONSULT THEIR TAX ADVISORS REGARDING THE EXTENT TO WHICH CONSIDERATION RECEIVED UNDER THE PLAN SHOULD BE TREATED AS ATTRIBUTABLE TO UNPAID ACCRUED INTEREST.

      (b)    Information Reporting and Backup Withholding.

The PED Debtors (or their paying agent) may be obligated to furnish information to the IRS regarding the consideration received by Holders (other than corporations and other exempt Holders) pursuant to the Plan. In addition, the PED Debtors will be required to report annually to the IRS with respect to each Holder (other than corporations and other exempt Holders) the amount of interest paid and OID, if any, accrued on the New Loans, the amount of dividends paid on the New Common Stock, and the amount of any tax withheld from payment thereof.

Holders may be subject to backup withholding (currently at a rate of 28%) on the consideration received pursuant to the Plan. Backup withholding may also apply to interest, OID and principal payments on the New Loans, dividends paid on the New Common Stock and proceeds received upon sale or other disposition of the New Loans or New Common Stock. Certain Holders (including corporations) generally are not subject to backup withholding. A Holder that is not otherwise exempt generally may avoid backup withholding by furnishing to the PED Debtors (or their paying agent) its taxpayer identification number and certifying, under penalties of perjury, that the taxpayer identification number provided is correct and that the Holder has not been notified by the IRS that it is subject to backup withholding.

Backup withholding is not an additional tax. Taxpayers may use amounts withheld as a credit against their federal income tax liability or may claim a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

THE FOREGOING DISCUSSION OF FEDERAL INCOME TAX CONSIDERATIONS IS FOR GENERAL INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. EACH HOLDER SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN DESCRIBED HEREIN. NEITHER THE PROPONENTS NOR THEIR PROFESSIONALS WILL HAVE ANY LIABILITY TO ANY PERSON OR HOLDER ARISING FROM OR RELATED TO THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN OR THE FOREGOING DISCUSSION.