|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| CCS Medical, Inc., <u>et al.</u>, | ) | Case No. 09-12390 (CSS) |
|  | ) |  |
| Debtors. | ) | Jointly Administered |
|  | ) |  |

---

## MODIFIED SECOND JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR CCS MEDICAL, INC. AND ITS AFFILIATED DEBTORS AS CONFIRMED

---

Dated: Wilmington, Delaware
      March 31, 2010

**Willkie Farr & Gallagher LLP**
787 Seventh Avenue
New York, New York 10019-6099
(212) 728-8000

**Young Conaway Stargatt & Taylor, LLP**
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19899-0391
(302) 571-6600

Co-Counsel to the Debtors and Debtors in Possession

# TABLE OF CONTENTS

**ARTICLE I.** DEFINITIONS AND INTERPRETATION ..................................................1

**ARTICLE II.** RESOLUTION OF CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES ...............................................................22

    **2.1.**    Settlement of Certain Inter-Creditor Issues. ................................22
    **2.2.**    Substantive Consolidation of Certain of the Debtors. ..................22
    **2.3.**    Limitations of Plan Distributions to Interests. ............................23
    **2.4.**    Limitations on Plan Distributions on Account of Assumed Liabilities. ........23

**ARTICLE III.** DIP LENDER CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS ........23

    **3.1.**    DIP Lender Claims. ...................................................................23
    **3.2.**    Administrative Expense Claims. .................................................24
    **3.3.**    Fee Claims. ...............................................................................25
    **3.4.**    U.S. Trustee Fees. .....................................................................26
    **3.5.**    Priority Tax Claims. ..................................................................26

**ARTICLE IV.** CLASSIFICATION OF CLAIMS AND INTERESTS ..................26

    **4.1.**    Classification of Claims and Interests. ........................................26
    **4.2.**    Impaired Classes of Claims. .......................................................26
    **4.3.**    Separate Classification of Other Secured Claims. .......................27

**ARTICLE V.** TREATMENT OF CLAIMS AND INTERESTS ........................27

    **5.1.**    Priority Non-Tax Claims (Class 1). ............................................27
    **5.2.**    First Lien Lender Claims (Class 2). ............................................27
    **5.3.**    Second Lien Lenders Claims (Class 3). .......................................28
    **5.4.**    Other Secured Claims (Class 4). ................................................29
    **5.5.**    Trade Claims (Class 5). ..............................................................29
    **5.6.**    General Unsecured Claims (Class 6). ..........................................29
    **5.7.**    PIK Lender Claims (Class 7). .....................................................30
    **5.8.**    Existing Stock Interests (Class 8). ..............................................30
    **5.9.**    Other Existing Interests (Class 9). .............................................30
    **5.10.**    Existing Securities Law Claims  (Class 10). ...............................31

**ARTICLE VI.** ACCEPTANCE OR REJECTION OF THE PLAN; EFFECT OF REJECTION BY ONE OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS. ..............................................................31

    **6.1.**    Class Acceptance Requirement. ..................................................31
    **6.2.**    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown." ............................................31
    **6.3.**    Elimination of Vacant Classes. ...................................................31
    **6.4.**    Voting Classes. .........................................................................31
    **6.5.**    Confirmation of All Cases. .........................................................32

**ARTICLE VII.** MEANS FOR IMPLEMENTATION ..................................................................32

    **7.1.**    Distributions. ..............................................................................32
    **7.2.**    Plan Documents. ..........................................................................32
    **7.3.**    Cancellation of Certain Existing Security Interests. .....................32
    **7.4.**    Cancellation of Existing Securities and Agreements. ....................33
    **7.5.**    Authorization, Issuance and Delivery of New Common Stock. ......33
    **7.6.**    The Sale Transactions. .................................................................34
    **7.7.**    The Stand-Alone Transactions. .....................................................37

**ARTICLE VIII.** DISTRIBUTIONS. ..............................................................................39

    **8.1.**    Distributions. ..............................................................................39
    **8.2.**    No Postpetition Interest on Claims. .............................................39
    **8.3.**    Date of Distributions. ..................................................................39
    **8.4.**    Distribution Record Date. ............................................................39
    **8.5.**    Surrender of Cancelled Instruments or Securities. .......................40
    **8.6.**    Failure to Surrender Cancelled Instruments. ................................40
    **8.7.**    Delivery of Distribution. ..............................................................40
    **8.8.**    Unclaimed Property. ....................................................................40
    **8.9.**    Satisfaction of Claims. .................................................................41
    **8.10.**    Manner of Payment Under Plan. ..................................................41
    **8.11.**    Fractional Shares. .......................................................................41
    **8.12.**    De Minimis Payments and Distributions. .....................................41
    **8.13.**    No Distribution in Excess of Amount of Allowed Claim. ...............41
    **8.14.**    Exemption from Securities Laws. .................................................42
    **8.15.**    Setoffs and Recoupments. ...........................................................42
    **8.16.**    Rights and Powers of the Disbursing Agent. ................................42
    **8.17.**    Expenses Incurred by the Disbursing Agent. ................................42
    **8.18.**    Withholding and Reporting Requirements. ...................................43
    **8.19.**    Cooperation with Disbursing Agent. ............................................43
    **8.20.**    Hart-Scott-Rodino Antitrust Improvements Act. ..........................43
    **8.21.**    Investments by the Liquidating Debtors. ......................................43
    **8.22.**    Time Bar to Cash Payments by Check.. .........................................44

**ARTICLE IX.** PROCEDURES FOR RESOLVING CLAIMS ...........................................44

    **9.1.**    Objections to Claims. ...................................................................44
    **9.2.**    Disputed Claims. .........................................................................45
    **9.3.**    Estimation of Claims. ..................................................................45
    **9.4.**    No Recourse. ...............................................................................45
    **9.5.**    Preservation of Insurance. ...........................................................46

**ARTICLE X.** EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...........................46

    **10.1.**    Treatment of Executory Contracts if Sale Transactions are
            Implemented. ..............................................................................46
    **10.2.**    Treatment of Executory Contracts if Sale Transactions are not
            Implemented. ..............................................................................46

|       |                                                                                 |    |
|-------|---------------------------------------------------------------------------------|----|
| 10.3. | Claims Based on Rejection of Executory Contracts or Unexpired Leases............ | 47 |
| 10.4. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases............ | 47 |
| 10.5. | Indemnification of Certain Directors, Officers and Employees. .................. | 47 |

**ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** .................................................. 48

| 11.1. | Conditions Precedent to Confirmation.............................. | 48 |
| 11.2. | Conditions Precedent to the Effective Date. ........................ | 49 |
| 11.3. | Waiver of Conditions Precedent and Bankruptcy Rule 3020(e)................. | 50 |
| 11.4. | Effect of Failure of Conditions. ................................... | 50 |

**ARTICLE XII. EFFECT OF CONFIRMATION** ....................................... 51

| 12.1.  | Binding Effect. ................................................ | 51 |
| 12.2.  | Vesting of Assets. .............................................. | 51 |
| 12.3.  | Discharge of Claims Against and Interests in the Debtors. ............. | 51 |
| 12.4.  | Term of Pre-Confirmation Injunctions or Stays. ..................... | 51 |
| 12.5.  | Injunction Against Interference With Plan. .......................... | 51 |
| 12.6.  | Injunction. ................................................... | 52 |
| 12.7.  | Releases....................................................... | 52 |
| 12.8.  | Exculpation and Limitation of Liability. ............................ | 54 |
| 12.9.  | Injunction Related to Releases and Exculpation. ..................... | 54 |
| 12.10. | Termination of Subordination Rights and Settlement of Related Claims. .......... | 54 |
| 12.11. | Retention of Causes of Action/Reservation of Rights. ................ | 54 |
| 12.12. | Avoidance Actions.............................................. | 55 |

**ARTICLE XIII. RETENTION OF JURISDICTION** ................................... 55

**ARTICLE XIV. MISCELLANEOUS PROVISIONS** ................................... 57

| 14.1.  | Critical Vendor and Other Payments. ............................... | 57 |
| 14.2.  | Exemption from Certain Transfer Taxes. ............................ | 57 |
| 14.3.  | Disallowance of Existing Stock Interests and Other Existing Interests......... | 57 |
| 14.4.  | Dissolution of Second Lien Lender Committee........................ | 57 |
| 14.5.  | Termination of Professionals. ..................................... | 57 |
| 14.6.  | Access. ....................................................... | 57 |
| 14.7.  | Amendments. .................................................. | 58 |
| 14.8.  | Revocation or Withdrawal of this Plan. ............................. | 58 |
| 14.9.  | Confirmation Order. ............................................ | 58 |
| 14.10. | Substantial Consummation. ....................................... | 58 |
| 14.11. | Allocation of Plan Distributions Between Principal and Interest. ........ | 58 |
| 14.12. | Severability. ................................................... | 59 |
| 14.13. | Governing Law. ................................................ | 59 |
| 14.14. | Section 1125(e) of the Bankruptcy Code............................. | 59 |
| 14.15. | Time. ......................................................... | 59 |
| 14.16. | Notices. ....................................................... | 59 |

**14.17.** Payment of Statutory Fees. .............................................................60

**14.18.** Reservation of Rights. ...................................................................60

**ARTICLE XV.** SECOND LIEN GROUP SETTLEMENT ........................................61

**15.1.** Allowance and Treatment of the Second Lien Lender Claims. ....................61

**15.2.** Substantial Contribution Claim. ...................................................61

**15.3.** Releases By and Among the Settlement Parties. ...........................62

**15.4.** Representations Respecting Claims Holdings. ..............................63

## EXHIBITS

EXHIBIT A          List of Debtors

EXHIBIT B          Term Sheet for the Reorganized First Lien Term Loan Facility

EXHIBIT C          Term Sheet for the Reorganized Second Lien Term Loan Facility

EXHIBIT D          Term Sheet for the New Revolving Credit Facility

EXHIBIT E          DIP Roll Option Term Sheet

# INTRODUCTION

CCS Medical, Inc. and the other debtors and debtors-in-possession in the above-captioned cases, as set forth on <u>Exhibit A</u> hereto, propose the following joint plan of reorganization for the resolution of the outstanding Claims[1] against and Interests in the Debtors. The Plan provides for the substantive consolidation of Holdings and CCS Acquisition and otherwise constitutes a separate plan of reorganization for the other non-consolidated Debtors. The Plan is a "toggle" plan inasmuch as it contemplates (a) the sale of the Debtors' Assets pursuant to the Plan and the distribution of the proceeds thereof to holders of Claims, (b) the sale of the Debtors' Assets prior to the Effective Date, in which case the proceeds of such Sale will be distributed pursuant to the Plan, or (c) if a sale is not consummated on or before the Effective Date and the value of the Debtors' Assets is determined by the Bankruptcy Court to be less than the sum of the Allowed DIP Lender Claims and the Allowed First Lien Lender Claims, a stand alone reorganization. Reference is made to the Disclosure Statement for a discussion of the Debtors' history, business, properties, operations, projections for those operations, risk factors, a summary and analysis of this Plan, and certain related matters including, among other things, certain restrictions and tax matters related to the securities and other consideration to be issued and/or distributed under this Plan. The Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation.

Parties are encouraged to read the Plan and the Disclosure Statement and their respective exhibits and schedules in their entirety before voting to accept or reject the Plan. No materials other than the Disclosure Statement and the respective schedules and exhibits attached thereto and referenced therein, and approved by the Bankruptcy Court have been authorized by the Bankruptcy Court for use in soliciting acceptances or rejections of the Plan.

## ARTICLE I.

## DEFINITIONS AND INTERPRETATION

### A.    *Definitions.*

The following terms shall have the meanings set forth below (such meanings to be equally applicable to both the singular and plural):

**1.1**    *503(b)(9) Claim* means a Claim against a Debtor arising under section 503(b)(9) of the Bankruptcy Code for payment of goods received by such Debtor within twenty (20) days prior to the Commencement Date.

**1.2**    *Accessing Parties* shall have the meanings ascribed to such term in Section 14.6 of the Plan.

**1.3**    *Administrative Expense Bar Date* means the first Business Day that is forty-five (45) days after the Effective Date.

---

[1]    All capitalized terms used but not defined herein shall have the meanings set forth in Article I herein.

**1.4** *Administrative Expense Claims* means a Claim against a Debtor for costs and expenses of administration of its Reorganization Case under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to the actual and necessary costs and expenses incurred after the Commencement Date of preserving such Debtor's Estate and operating the businesses of such Debtor (such as wages, salaries or commissions for services and payments for goods and other services and leased premises), but not including Fee Claims or U.S. Trustee Fees.

**1.5** *Allowed Claim* or *Allowed [_____] Claim* or *Allowed [_____] Interest* (with respect to a specific type of Claim or Interest, if specified) means: (a) any Claim (or a portion thereof) against or Interest in a Debtor (A) that is scheduled by a Debtor pursuant to the Bankruptcy Code and Bankruptcy Rules in a liquidated amount and not listed as contingent, unliquidated or disputed on the Schedules; or (B) as to which a proof of Claim or Interest has been timely filed, or deemed timely filed, with the Bankruptcy Court pursuant to the Bankruptcy Code, the Bankruptcy Rules and/or any applicable orders of the Bankruptcy Court, or late filed with leave of the Bankruptcy Court, and as to which the deadline or applicable period of limitation fixed by applicable law or order of the Bankruptcy Court to dispute, deny, equitably subordinate, estimate or otherwise limit recovery with respect thereto has passed; or (b) any Claim or Interest or portion thereof (i) that is allowed in any contract, instrument, or other agreement entered into in connection with the Plan, (ii) that is allowed pursuant to the terms of the Plan, (iii) that is allowed by Final Order of the Bankruptcy Court, or (iv) with respect to an Administrative Expense Claim only (x) that was incurred by a Debtor in the ordinary course of business during the Reorganization Cases to the extent due and owing without defense, offset, recoupment or counterclaim of any kind, and (y) that is not otherwise disputed. An Allowed Claim shall: (a) include a previously Disputed Claim to the extent such Disputed Claim becomes allowed by Final Order; and (b) be net of any setoff amount of any claim that may be asserted by any Debtor against the holder of such Claim, which amount shall be deemed to have been set off in accordance with the provisions of the Plan, and in particular Section 8.15 hereof.

**1.6** *Amended Certificate* means the amended and restated certificate of incorporation for Reorganized Holdings or such other issuer of the New Common Stock determined in accordance with this Plan, as applicable, substantially in the form set forth in the Plan Supplement, as may be amended prior to the Effective Date with the consent of the Required First Lien Lenders.

**1.7** *Assets* means all of the right, title and interest of one or more of the Debtors in and to property of whatever type or nature (real, personal, mixed, intellectual, tangible or intangible).

**1.8** *Assumed Liabilities* means those liabilities of the Debtors that (a) are assumed by the Purchaser in a Sale Transaction implemented under section 363 of the Bankruptcy Code, or (b) effectively are assumed by the Reorganized Debtors in a Sale Transaction and shall be paid by the Reorganized Debtors, in each case pursuant to the terms of the Purchase Agreement.

**1.9** *Avoidance Actions* means any and all avoidance, recovery, subordination or other actions or remedies against Persons that may be brought by or on behalf of a Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation,

actions, settlements or remedies under sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code.

**1.10** ***Ballot*** means the form or forms distributed to holders of Impaired Claims entitled to vote on the Plan on which is to be indicated the acceptance or rejection of the Plan.

**1.11** ***Bankruptcy Code*** means title 11 of the United States Code, as amended from time to time, as applicable to the Reorganization Cases.

**1.12** ***Bankruptcy Court*** means the United States Bankruptcy Court for the District of Delaware, or any other court exercising competent jurisdiction over the Reorganization Cases or any proceeding therein.

**1.13** ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Reorganization Cases, and any Local Rules of the Bankruptcy Court.

**1.14** ***Bar Date*** means any deadline for filing proofs of Claim against a Debtor with respect to Claims that arose on or prior to the Commencement Date including 503(b)(9) Claims, as established by an order of the Bankruptcy Court.

**1.15** ***Bar Date Order*** means that certain Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving Form and Manner of Notice Thereof, dated September 29, 2009 [Docket No. 386].

**1.16** ***Bidding Procedures Order*** means that certain Order (A) Approving Bidding Procedures in connection with Marketing and Proposed Sale of Substantially All of the Debtors' Assets, and (B) Granting Related Relief, dated as of November 24, 2009 [Docket No. 596].

**1.17** ***Business Day*** means any day other than a Saturday, Sunday, or a "legal holiday," as defined in Bankruptcy Rule 9006(a).

**1.18** ***Cash*** means the legal currency of the United States and equivalents thereof.

**1.19** ***Causes of Action*** means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including, but not limited to, all claims for breach of fiduciary duty, negligence, malpractice, breach of contract, aiding and abetting, fraud, inducement, avoidance, recovery, subordination, and all Avoidance Actions) of any of the Debtors and/or the Estates that are pending or may be asserted against any Person or Entity on or after the date hereof, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

**1.20** *CCS* means CCS Medical, Inc.

**1.21** *CCS Acquisition* means CCS Acquisition Holding-Sub Corporation.

**1.22** *Chief Wind Down Officer* means an individual or entity to be designated by the Debtors prior to the Confirmation Hearing to serve as an officer of the Liquidating Debtors.

**1.23** *Chief Wind Down Officer Agreement* means the agreement between the Liquidating Debtors and the Chief Wind Down Officer, dated as of the Effective Date.

**1.24** *Claim* means "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.25** *Claims Agent* means the agent of the Clerk of the Bankruptcy Court, Epiq Bankruptcy Solutions, LLC or its successors or assigns.

**1.26** *Class* means a category of Claims or Interests pursuant to section 1123(a)(1) of the Bankruptcy Code, and as set forth in Article IV of this Plan.

**1.27** *Collateral* means any property or interest in property of a Debtor subject to a Lien to secure the payment or performance of a Claim.

**1.28** *Commencement Date* means July 8, 2009.

**1.29** *Confirmation Date* means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order on the docket.

**1.30** *Confirmation Hearing* means a hearing to be held by the Bankruptcy Court regarding confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.31** *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**1.32** *Consolidated Holdings* means, collectively, Holdings and CCS Acquisition as substantively consolidated in accordance with the Plan.

**1.33** *Cure Amount* has the meaning set forth in Section 10.4(a) of this Plan.

**1.34** *Cure Dispute* means, with respect to a contract or lease to be assumed or assumed and assigned hereunder, a dispute regarding: (a) the Cure Amount; (b) the ability of the applicable Debtor, the Purchaser, or the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code); or (c) any other matter pertaining to assumption, the assumption and assignment or the cure payments required by section 365(b)(1) of the Bankruptcy Code.

**1.35** *Cure Procedures Order* means that certain Order approving the Debtors' Motion for an Order (A) Establishing Procedures to Determine Cure Amounts and Deadlines for

Objections to the Assumption or Assumption and Assignment of Certain of the Debtors' Contracts and Leases, and (B) Granting Related Relief, dated January 7, 2010 [Docket No. 668].

**1.36** *Debtor Obligors* means each of the Debtors, other than Holdings, as obligors or guarantors under the First Lien Credit Agreement, Second Lien Credit Agreement, and the Swap Agreements.

**1.37** *Debtors* means CCS and each of its affiliated debtors and debtors in possession in the Reorganization Cases, as set forth on Exhibit A hereto.

**1.38** *Deficiency Claim* means that portion of a Claim that is undersecured pursuant to section 506 of the Bankruptcy Code.

**1.39** *DIP Agent* means Imperial Capital, LLC, or its successors or assigns, each in its capacity as administrative agent and/or collateral agent under the DIP Credit Agreement.

**1.40** *DIP Credit Agreement* means that certain $10,000,000 Debtor In Possession Credit Agreement (as may be amended, restated, supplemented or otherwise modified from time to time, including all documents related thereto), dated July 14, 2009, by and between, among others, the Debtors, the DIP Agent, and the DIP Lenders.

**1.41** *DIP Lender Claims* means the Claims of the DIP Lenders arising in respect of the Debtors' obligations under the DIP Credit Agreement.

**1.42** *DIP Lenders* means collectively, the DIP Agent, and the lenders party to the DIP Credit Agreement from time to time, each in their capacity as such.

**1.43** *DIP Roll Option* means the option to satisfy that portion of the DIP Lender Claims relating to unpaid principal under the DIP Credit Agreement on the terms set forth in the DIP Roll Option Term Sheet.

**1.44** *DIP Roll Option Term Sheet* means the term sheet annexed hereto as Exhibit E, as may be amended prior to the Effective Date with the consent of the DIP Lenders and the Required First Lien Lenders.

**1.45** *Disallowed Claim* or *Disallowed [_____] Claim* or *Disallowed [_____] Interest* means a Claim or Interest that, pursuant to a ruling of the Bankruptcy Court or other court of competent jurisdiction, a Final Order, or provision in the Plan, as the case may be, shall not be Allowed.

**1.46** *Disbursing Agent* means any entity designated as such by the PED Debtors, in its capacity as such.

**1.47** *Disclosure Statement* means the disclosure statement that relates to the Second Joint Chapter 11 Plan of Reorganization for CCS Medical, Inc. and its Affiliated Debtors, as such disclosure statement may be amended, modified, or supplemented (including all exhibits and schedules annexed thereto or referred to therein).

**1.48    Disclosure Statement Hearing** means a hearing held by the Bankruptcy Court to consider approval of the Disclosure Statement as containing adequate information as required by section 1125 of the Bankruptcy Code, as the same may be adjourned or continued from time to time.

**1.49    Disclosure Statement Order** means the order of the Bankruptcy Court, dated February 9, 2010 approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code [Docket No. 788].

**1.50    Disputed [_____] Claim** means any portion (including, when appropriate, the whole) of a Claim that is not an Allowed Claim or Disallowed Claim including, for the avoidance of doubt, any claim that is the subject of a request to be estimated filed on or before the deadline provided in the Confirmation Order or any claim that has been estimated (but not allowed) by an Estimation Order.

**1.51    Disputed Claims Reserves** means, collectively, the Disputed General Unsecured Claims Reserve and the Disputed Priority Claims Reserve.

**1.52    Disputed General Unsecured Claims Reserve** means Cash to be held in reserve by the Liquidating Debtors if the Sale Transactions are implemented for the benefit of each holder of a Disputed Trade Claim, Disputed General Unsecured Claim, or Disputed PIK Lender Claims, in an amount equal to the Distributions such Disputed Claims would be entitled to on the Effective Date, if each such Disputed Claim were an Allowed Claim in its full face amount on the Effective Date.

**1.53    Disputed Priority Claims Reserve** means the Cash to be held in reserve, by the Liquidating Debtors if the Sale Transactions are implemented for the benefit of the holders of Disputed Administrative Expense Claims, Disputed Fee Claims, Disputed Priority Tax Claims, Disputed Non-Tax Claims, and Disputed Other Secured Claims, in an amount equal to the Distributions such Disputed Claims would be entitled to on the Effective Date, if each such Disputed Claim were an Allowed Claim in its full face amount on the Effective Date.

**1.54    Distribution Record Date** means the Voting Record Date as such term is defined in the Disclosure Statement Order, or such other date as shall be established by the Bankruptcy Court.

**1.55    Distributable Sale Proceeds** means (a) the Cash portion of the Sale Proceeds, (b) any non-Cash portion of the Sale Proceeds that may reasonably be distributed to the holders of Allowed Claims, to the extent the Required First Lien Lenders have agreed to receive such non-Cash Sale Proceeds in-kind, and (c) the proceeds of any non-Cash portion of the Sale Proceeds that has otherwise been liquidated by the Liquidating Debtors.

**1.56    Distributions** means the distributions to be made hereunder to holders of Claims and Interests, as applicable.

**1.57    Effective Date** means the date that is a Business Day as soon as reasonably practicable after the entry of the Confirmation Order on which:  (a) no stay of the Confirmation

Order is in effect; and (b) all conditions specified in Section 11.2 have been (i) satisfied or (ii) waived pursuant to Section 11.3.

**1.58** ***Entity*** means an "entity" (as that term is defined in section 101(15) of the Bankruptcy Code).

**1.59** ***Estate*** means each estate created in the Reorganization Cases pursuant to section 541 of the Bankruptcy Code.

**1.60** ***Estimation Order*** means an order or orders of the Bankruptcy Court estimating for distribution purposes (under section 502(c) of the Bankruptcy Code) the allowed amount of any Claim, including the Confirmation Order if the Confirmation Order grants the same relief that would have been granted in a separate Estimation Order.

**1.61** ***Excluded Assets*** means any Assets of the Debtors retained by or transferred to the Liquidating Debtors in connection with the Sale Transactions.

**1.62** ***Excluded Liabilities*** means the liabilities of the Debtors, other than the Assumed Liabilities.

**1.63** ***Exculpated Parties*** means, collectively: (a) the Debtors and their directors, officers, employees, agents, members, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons), each solely in their capacity as such, and only if such Persons occupied any such positions at any time on or after the Commencement Date; (b) the First Lien Lenders and their officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, and other professionals retained by such persons), each solely in their capacity as such, and only if such Persons occupied any such positions at any time on or after the Commencement Date; (c) the First Lien Administrative Agent and its officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, and other professionals retained by such persons), each solely in their capacity as such, and only if such Persons occupied any such positions at any time on or after the Commencement Date; (d) the Disbursing Agent and its officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, and other professionals retained by such persons), each solely in their capacity as such; (e) the Chief Wind Down Officer and its officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors and other professionals retained by such persons), each solely in their capacity as such, and (f) the Second Lien Lender Committee and its members, advisors and professionals (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons), each solely in their capacity as such. The term ***Exculpated Parties*** excludes Wachovia Bank, National Association, in its capacity as Second Lien Lender Agent.

**1.64** ***Existing Securities Law Claim*** means any Claim, whether or not the subject of an existing lawsuit (a) arising from rescission of a purchase or sale of any equity securities of any Debtor or an affiliate of any Debtor, (b) for damages arising from the purchase or sale of any such equity security, (c) for violations of the securities laws, misrepresentations, or any similar

Claims, including, to the extent related to the foregoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, any attorneys' fees, other charges, or costs incurred on account of the foregoing Claims, or (d) except as otherwise provided for in this Plan, including Section 10.5 hereof, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such Claim, including (i) any prepetition indemnification, reimbursement or contribution obligations of the Debtors, pursuant to the Debtors' corporate charters, by-laws, agreements entered into any time prior to the Commencement Date, or otherwise, and relating to Claims otherwise included in the foregoing clauses (a) through (c), held by any officer or director of the Debtor not holding such position as of the Commencement Date, and (ii) Claims based upon allegations that the Debtors made false and misleading statements or engaged in other deceptive acts in connection with the sale of equity securities, or otherwise subject to section 510(b) of the Bankruptcy Code.

**1.65** *Existing Stock Interest* means the preferred and common stock of Holdings, including any outstanding and treasury preferred or common stock.

**1.66** *Fee Claim* means a Claim by a Professional for Professional Fees.

**1.67** *Final DIP Order* means that certain Agreed Final Order Pursuant to 11 U.S.C. Sections 105, 361, 362, 363, 364 and 507 and Rules 2002, 4001, 9014, and 9019 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness with Priority Over All Other Secured Indebtedness and with Administrative Super-Priority, (2) Granting Liens, (3) Authorizing the Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. Section 363 and Providing for Adequate Protection, and (4) Modifying the Automatic Stay, entered by the Bankruptcy Court on July 27, 2009, [Docket No. 108].

**1.68** *Final Order* means an order, ruling or judgment that (a) is in full force and effect, (b) is not stayed, and (c) is no longer subject to review, reversal, modification or amendment, by appeal or writ of certiorari; *provided, however*, that the possibility that a motion under Rule 59 or 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules of Civil Procedure or the Bankruptcy Rules, may be filed relating to such order, ruling or judgment shall not cause such order, ruling or judgment not to be a Final Order.

**1.69** *First Lien Administrative Agent* means Wachovia Bank, National Association, or its successors and assigns, in its capacity as administrative agent for the First Lien Lenders under the First Lien Credit Agreement.

**1.70** *First Lien Bookrunners* means Wachovia Capital Markets, LLC, Banc of America Securities LLC, and J.P. Morgan Securities Inc., or their respective successors and assigns, in their capacity as joint bookrunners under the First Lien Credit Agreement.

**1.71** *First Lien Credit Agreement* means that certain First Lien Credit Agreement, dated as of September 30, 2005 (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements), among CCS Medical, Inc., CCS Acquisition Holding-Sub Corporation, the other Debtor Obligors, and the First Lien Lenders.

**1.72** *First Lien/Debtor Parties* means the Debtors, the Highland Entities, Wachovia (in its capacities as First Lien Administrative Agent, as former Second Lien Administrative Agent, and as a First Lien Lender) and the First Lien Lenders.

**1.73** *First Lien Documentation Agent* means JPMorgan Chase Bank, N.A., or its successors and assigns, in its capacity as documentation agent under that certain First Lien Credit Agreement.

**1.74** *First Lien Joint Lead Arrangers* means Wachovia Capital Markets, LLC and Banc of America Securities LLC, or their respective successors and assigns, in their capacity as joint lead arrangers under the First Lien Credit Agreement.

**1.75** *First Lien Lender* means (i) the lenders and participants under the First Lien Credit Agreement from time to time together with the First Lien Administrative Agent, the First Lien Syndication Agent, the First Lien Documentation Agent, the First Lien Joint Lead Arrangers, and the First Lien Bookrunners, and their successors and assigns, each in their capacity as such; and (ii) the Swap Counterparties.

**1.76** *First Lien Lender Claim* means any Claim against a Debtor held by a First Lien Lender related to the First Lien Credit Agreement, including a Hedge Claim. For the avoidance of doubt, the First Lien Claims shall include claims in respect of any L/C.

**1.77** *First Lien Lender Distribution* means (a) if the Sale Transactions are implemented, the First Lien Lender Sale Proceeds, or (b) if the Sale Transactions are not implemented, (i) the New Notes and (ii) 100% of the New Common Stock.

**1.78** *First Lien Lender Sale Proceeds* means the Distributable Sale Proceeds plus from time to time available Cash (including any Cash from the proceeds of the liquidation of the Excluded Assets), in each case, after reserving in full for the Wind-Down Reserve, the Holdback Amount Reserve, and the Disputed Priority Claims Reserve, and satisfying in full all Allowed DIP Lender Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Other Secured Claims, in a total amount not to exceed the total amount of the Allowed First Lien Lender Claims.

**1.79** *First Lien Syndication Agent* means Bank of America, N.A., or its successors and assigns, in its capacity as syndication agent under the First Lien Credit Agreement.

**1.80** *General Unsecured Claim* means any Claim against a Debtor, other than: (a) a DIP Lender Claim; (b) an Administrative Expense Claim; (c) a Fee Claim; (d) a Priority Tax Claim; (e) a Priority Non-Tax Claim; (f) a First Lien Lender Claim; (g) a Second Lien Lender Claim, unless the Bankruptcy Court ultimately determines that the Second Lien Lender Deficiency Claims shall be treated as General Unsecured Claims; (h) an Other Secured Claim; (i) a Trade Claim; (j) a PIK Lender Claim, unless the Bankruptcy Court ultimately determines that the PIK Lender Claims shall be treated as General Unsecured Claims; (k) an Existing Securities Law Claim or (l) a Claim on account of any guaranty or similar obligation of such Debtor relating to the foregoing types of Claims identified in this Section 1.80 (a)-(k). General Unsecured Claims include, but are not limited to (w) Claims relating to or arising out of environmental laws of the United States or any state, city or municipality, (x) Rejection Claims,

(y) any Deficiency Claims (except as otherwise provided in the Plan or ordered by the Bankruptcy Court), and (z) Claims (except as set forth in the preceding sentence) based on or arising out of acts, conduct or events occurring prior to the Commencement Date, whether or not such acts, conduct or events occurred in the ordinary course of the Debtors' businesses, and whether or not a lawsuit based on the acts, conduct or events was filed prior to the Commencement Date against a Debtor.

**1.81** *Hedge Claims* means a Claim against a Debtor held by a Swap Counterparty relating to the Swap Agreements.

**1.82** *Highland Entities* means Highland Capital Management, L.P., together with the institutional and retail funds managed by it that are or at any time were holders of First Lien Lender Claims and/or Second Lien Lender Claims.

**1.83** *Holdback Amount* means, with respect to Professional Fees, amounts held back pursuant to an order or orders of the Bankruptcy Court in the Reorganization Cases, including the Order Pursuant to Section 105(a) and 331 of the Bankruptcy Code Establishing Procedures for the Interim Compensation and Reimbursement of Expenses of Professionals, dated July 24, 2009 [Docket No. 93].

**1.84** *Holdback Amount Reserve* means, with respect to Professional Fees, the Cash to be held in reserve, from and after the Effective Date, for the benefit of the Professionals, and to be held in trust for the Professionals, for the payment of the Holdback Amount.

**1.85** *Holdings* means CCS Medical Holdings, Inc.

**1.86** *Impaired* means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

**1.87** *Indemnification Agreement* has the meaning set forth in Section 10.5 of this Plan.

**1.88** *Indemnification Exclusion Schedule* means a schedule setting forth the Claims and/or Entities to which the indemnification in Section 10.5 of the Plan shall not apply, which schedule shall be satisfactory to the Required First Lien Lenders.

**1.89** *Indemnitee* means the holder of a Claim related to or arising from the obligation of a Debtor to exculpate, indemnify, and advance any expenses to any Person or entity serving at any time on or after the Commencement Date as one of its directors or officers (statutory or otherwise) by reason of such Person's or entity's service in such capacity, or as a director or officer (statutory or otherwise) of any other corporation or legal entity, for acts or omissions occurring at or prior to the consummation of the Plan, whether asserted or claimed prior to, at or after the consummation of the Plan, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing.

**1.90** *Intercompany Claim* means any Claim, cause of action, or remedy asserted by a Debtor against another Debtor.

**1.91**  *Intercreditor Agreement* means that certain Intercreditor Agreement, dated September 30, 2005, by and between the First Lien Administrative Agent and the Second Lien Administrative Agent (each in its capacity as such).

**1.92**  *Interest* means the interest of any holder of an equity security in any Debtor, whether or not represented by any issued and outstanding share, or other instrument evidencing a present ownership interest in any Debtor, whether or not transferable, or any option, warrant, or right, contractual or otherwise, to acquire any such interest, including Existing Stock Interests.

**1.93**  *L/C* means any letter of credit issued under the First Lien Credit Agreement.

**1.94**  *L/C Issuer* means the issuer of an L/C under the First Lien Credit Agreement.

**1.95**  *Lien* has the meaning set forth in section 101(37) of the Bankruptcy Code.

**1.96**  *Liquidating Debtors* means if the Sale Transactions are implemented, those Debtors whose stock interests are not transferred directly or indirectly to the Purchaser as part of the Sale Transactions, and which remain in existence after the Effective Date for the purpose of effectuating the Distributions to be made to the holders of Allowed Claims under the Plan.

**1.97**  *Liquidating Debtors' Contracts* has the meaning set forth in Section 10.1 of the Plan.

**1.98**  *Lump Sum Payment* means with respect to the holder of an Allowed General Unsecured Claim, an amount equal to the lesser of their Pro Rata Share of $250,000 and 20% of such Allowed Claim.

**1.99**  *Management Agreements* means, collectively, those agreements that will be entered into by one or more of the SA Reorganized Debtors with certain of their officers, the material terms of which to the extent agreed shall be set forth in the Plan Supplement.

**1.100**  *Management Equity Plan* means the post-Effective Date management incentive plan to be adopted by the SA Reorganized Debtors.

**1.101**  *New Common Stock* means, if the Sale Transactions are not implemented, 1,000,000 shares of Class A Common Stock, par value $0.01, of Reorganized Issuer, or if the Sale Transactions are implemented, such other number of shares as determined by the Purchaser and set forth in the Purchase Agreement to be authorized and issued by Reorganized Issuer in connection with the implementation of this Plan.

**1.102**  *New Notes* means the notes or other evidence of the repayment obligations of the Reorganized Debtor Obligors (other than such notes or repayment obligations respecting payment of DIP Lender Claims if the Debtors elect to effectuate the DIP Roll Option) under the credit agreements evidencing the Reorganized First Lien Term Loan Facility and the Reorganized Second Lien Term Loan Facility.

**1.103**  *New Revolving Credit Facility* means a new asset based revolving loan facility in the amount of approximately $25 million or such other amount as the Debtors and the Required

First Lien Lenders shall reasonably agree, by and among Reorganized CCS, as borrower, the other Reorganized Debtor Obligors, as guarantors, and such third-party lender(s), to be obtained in connection with Plan emergence and on terms at least as favorable to Reorganized CCS as those set forth on Exhibit D to the Plan and/or on such other terms as the Debtors and the Required First Lien Lenders may agree.

**1.104** ***New Stockholder and Registration Rights Agreement*** means that certain stockholders and registration rights agreement to be entered into under the terms of this Plan as of the Effective Date by and among Reorganized Issuer and all holders of the New Common Stock, a substantially final form of which shall be set forth in the Plan Supplement, as may be amended prior to the Effective Date with the consent of the Required First Lien Lenders.

**1.105** ***Other Existing Interests*** means any Interests in any of the Debtors other than Existing Stock Interests, including, but not limited to, any warrants, options, or rights to receive or purchase shares of stock of a Debtor.

**1.106** ***Other Secured Claim*** means any Secured Claim against a Debtor other than a First Lien Lender Claim.

**1.107** ***PED Debtors*** means (a) if the Sale Transactions are consummated, the Liquidating Debtors, and (b) if the Sale Transactions are not consummated, the Reorganized Debtors.

**1.108** ***Person*** means any individual, corporation, partnership, association, indenture trustee, limited liability company, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, Interest holder, or any other entity or organization.

**1.109** ***PIK Administrative Agent*** means Bank of America, N.A., or its successors and assigns, in its capacity as administrative agent for the PIK Lenders under the PIK Credit Agreement.

**1.110** ***PIK Credit Agreement*** means that certain Credit Agreement, dated as of September 30, 2005 (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements), among CCS Acquisition Holding-Sub Corporation and the PIK Lenders.

**1.111** ***PIK Lead Arranger*** means Banc of America Securities LLC, or its successors and assigns, in its capacity as sole lead arranger and sole book manager under the PIK Credit Agreement.

**1.112** ***PIK Lender Claim*** means a Claim against CCS Acquisition Holdings-Sub Corporation held by a PIK Lender relating to the PIK Credit Agreement.

**1.113** ***PIK Lenders*** means the lenders and participants under the PIK Credit Agreement from time to time together with the PIK Administrative Agent, the PIK Syndication Agent and the PIK Lead Arranger, each in its capacity as such.

**1.114** *PIK Syndication Agent* means Bank of America, N.A., or its successors and assigns, in its capacity as syndication agent under the PIK Credit Agreement.

**1.115** *Plan* means this chapter 11 plan of reorganization proposed by the Debtors, including, without limitation, the Plan Supplement, the exhibits and schedules hereto, as the same may be supplemented, amended or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

**1.116** *Plan Consideration* means, with respect to a Class or holder of Claims or Interests entitled to a distribution under this Plan, one or more of Cash, New Common Stock, New Notes, or the Distributable Sale Proceeds as applicable.

**1.117** *Plan Distribution* means the payment or distribution under the Plan of any Plan Consideration to the holder of an Allowed Claim or Allowed Interest.

**1.118** *Plan Documents* means the documents other than this Plan, to be executed, delivered, assumed, and/or performed in conjunction with the consummation of this Plan on the Effective Date, including, without limitation, any documents included in the Plan Supplement.

**1.119** *Plan Supplement* means the supplemental appendix to this Plan, to be filed on or prior to the date that is five (5) days prior to the Confirmation Hearing, which will contain, as the case may be and to the extent applicable under the Plan as of the Confirmation Date, draft forms or signed copies, or the material terms, of one or more of the following, each in a form and substance reasonably satisfactory to the Required Lenders: the Chief Wind Down Officer Agreement, the Reorganized First Lien Term Loan, the Reorganized Second Lien Term Loan, a commitment for, or term sheet with respect to, the New Revolving Credit Facility, the New Stockholder and Registration Rights Agreement, and the Amended Certificates of Incorporation of the Reorganized Debtors and the amended by-laws of the Reorganized Debtors. The Plan Supplement shall also include a list of the boards of directors and officers of the SA Reorganized Debtors, the Release and Claim Exclusion Schedule, the Indemnification Exclusion Schedule, and Schedule 12.12.

**1.120** *Priority Non-Tax Claim* means any Claim against a Debtor, other than a DIP Lender Claim, an Administrative Expense Claim, a Fee Claim and a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

**1.121** *Priority Tax Claim* means any Claim of a governmental unit (as defined in section 101(27) of the Bankruptcy Code) against a Debtor of the kind entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code, including, to the extent entitled to priority under section 507(a)(8) of the Bankruptcy Code, those Claims that are assessed post-Effective Date for the prepetition period.

**1.122** *Professional(s)* means each Person retained by order of the Bankruptcy Court in connection with the Reorganization Cases pursuant to sections 327, 328, 330, or 1103 of the Bankruptcy Code, excluding any ordinary course professionals retained pursuant to order of the Bankruptcy Court.

**1.123** *Professional Fees* means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by the Bankruptcy Court or any other court of competent jurisdiction) for legal, financial advisory, accounting and other services and reimbursement of expenses related thereto that are awardable and allowable under sections 328, 330(a), 331, 503(b) or 1103(a) of the Bankruptcy Code or otherwise and that are rendered (a) prior to the Effective Date, or (b) thereafter in connection with (i) applications filed pursuant to section 330, 331, 503(b) or 1103(a) of the Bankruptcy Code and (ii) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals retained in the Reorganization Cases, except to the extent (x) that the Bankruptcy Court has disallowed or denied authority to pay or reimburse such fees and expenses by a Final Order, or (y) any such fees and expenses have previously been paid, regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Professional Fees.

**1.124** *Pro Rata Share* means (a) with respect to any distribution of the Lump Sum Payment to the holder of an Allowed General Unsecured Claim, the proportion such Allowed General Unsecured Claim bears to the aggregate amount of all (i) Allowed General Unsecured Claims, and (ii) Disputed General Unsecured Claims; (b) with respect to any distribution of the Unsecured Claim Sale Proceeds to the holders of Allowed Trade Claims, Allowed General Unsecured Claims, and Allowed PIK Lender Claims, a distribution equal in proportion to the ratio (expressed as a percentage) that the Allowed Claim against a given Debtor bears to the aggregate amount of: (i) Allowed Trade Claims, (ii) Disputed Trade Claims, (iii) Allowed General Unsecured Claims, (iv) Disputed General Unsecured Claims; (v) Allowed PIK Lender Claims, and (vi) Disputed PIK Lender Claims against such Debtor; and (c) with respect to any other distribution on account of any Allowed Claim in a Class, a distribution equal in proportion to the ratio (expressed as a percentage) that the Allowed Claim bears to the aggregate amount of: (i) Allowed Claims in such Class; plus (ii) Disputed Claims (in their aggregate face amounts) in such Class, in each case (x) as calculated by the Disbursing Agent on or before the date of any Distribution with respect to such Claim or (y) as determined by the Bankruptcy Court.

**1.125** *Purchase Agreement* means a purchase agreement governing the terms of the Sale Transactions, as approved by the Bankruptcy Court pursuant to the Confirmation Order or such separate order of the Bankruptcy Court approving the Sale Transactions pursuant to section 363 of the Bankruptcy Code.

**1.126** *Purchase Price* means the total consideration paid by the Purchaser for the New Common Stock or all or substantially all of the Assets (as applicable) pursuant to the terms of the Purchase Agreement.

**1.127** *Purchaser* shall mean the purchaser(s) set forth in the Purchase Agreement.

**1.128** *Quarterly Distribution Date* means (a) the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within thirty (30) days of the end of a calendar quarter, then the first Quarterly Distribution Date will be the last Business Day of the month following the end of the first

calendar quarter after the calendar quarter in which the Effective Date falls, or (b) such earlier date determined by the PED Debtors.

**1.129** *Rejection Claim* means any Claim against a Debtor arising from the rejection of any executory contract or unexpired lease, including any Claim of (a) a lessor for damages resulting from the rejection of a lease of real property, as such claim shall be calculated in accordance with section 502(b)(6) of the Bankruptcy Code, and (b) an employee for damages resulting from the rejection of an employment agreement, as such Claim shall be calculated in accordance with section 502(b)(7) of the Bankruptcy Code.

**1.130** *Release and Claim Exclusion Schedule* means a schedule setting forth the Claims and/or Entities to which the releases in Section 12.7 of the Plan shall not apply, which schedule shall be satisfactory to the Required First Lien Lenders.

**1.131** *Released Parties* means, collectively, (a) the Debtors, and their directors, officers, employees, agents, members, direct and indirect shareholders, advisors and professionals (including any attorneys, financial advisors, investment bankers, and other professionals retained by such persons), each solely in its capacity as such, and only if such Persons occupied such positions at any time on or after the Commencement Date; (b) the First Lien Lenders and their officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, and other professionals retained by such persons), each solely in their capacity as such, and only if such Persons occupied any such positions at any time on or after the Commencement Date; (c) the First Lien Administrative Agent and its officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, and other professionals retained by such persons), each solely in their capacity as such, and only if such Persons occupied any such positions at any time on or after the Commencement Date; (d) the Disbursing Agent and its officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors, and other professionals retained by such persons), each solely in their capacity as such; (e) the Chief Wind Down Officer and its officers, partners, directors, employees, agents, members, shareholders, advisors and professionals (including any attorneys, financial advisors and other professionals retained by such persons), each solely in their capacity as such; and (f) the Second Lien Lender Committee and its members, advisors and professionals (including any attorneys, financial advisors, investment bankers and other professionals retained by such persons), each solely in their capacity as such. The term *Released Parties* excludes Wachovia Bank, National Association, in its capacity as Second Lien Lender Agent.

**1.132** *Reorganization Cases* means the jointly-administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors on the Commencement Date in the Bankruptcy Court and styled *In re CCS Medical, Inc., et al.*, No. 09-12390 (CSS) (Jointly Administered).

**1.133** *Reorganized CCS* means CCS on or after the Effective Date.

**1.134** *Reorganized Debtor* means each Debtor, as to which the Plan is confirmed, on and after the Effective Date.

15

**1.135  *Reorganized Debtor Obligors*** means each Debtor that is a party to the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, or the New Revolving Credit Facility on and after the Effective Date.

**1.136  *Reorganized First Lien Term Loan Facility*** means that certain first lien term loan in the amount of $150 million (or such lesser amount as may be agreed to by the Debtors and the Required First Lien Lenders prior to the Effective Date) between Reorganized CCS, as borrower, the other Reorganized Debtor Obligors, as guarantors, and the lenders deemed to be party thereto from time to time, as lenders, on the terms and conditions set forth on Exhibit B to the Plan and otherwise in form and substance satisfactory to the Required First Lien Lenders, the substantially final form of which shall be set forth in the Plan Supplement, as may be amended prior to the Effective Date with the consent of the Required First Lien Lenders (including to effectuate the DIP Roll Option).

**1.137  *Reorganized Holdings*** means Holdings on or after the Effective Date.

**1.138  *Reorganized Issuer*** means Reorganized Holdings, or such other Reorganized Debtor selected by the Debtors to be the issuer of the New Common Stock to serve as the direct or indirect owner of the other Reorganized Debtors.

**1.139  *Reorganized Second Lien Term Loan Facility*** means that certain second lien term loan in the amount of $50 million (or such other amount as may be agreed to by the Debtors and the Required First Lien Lenders prior to the Effective Date, but in no event greater than $50 million plus any reduction in the aggregate principal amount of the Reorganized First Lien Term Loan Facility) between Reorganized CCS, as borrower, the other Reorganized Debtor Obligors, as guarantors, and the lenders deemed to be party thereto from time to time, as lenders, and on the terms and conditions set forth on Exhibit C to the Plan and otherwise in form and substance satisfactory to the Required First Lien Lenders, the substantially final form of which shall be set forth in the Plan Supplement, as may be amended prior to the Effective Date with the consent of the Required First Lien Lenders (including to effectuate the DIP Roll Option). Notwithstanding the foregoing, the following provision in form and substance shall be deemed satisfactory to the Required First Lien Lenders: that on or prior to the Effective Date, the SA Reorganized Debtors will determine whether the exception to the application of IRC (defined below) Section 163(e)(5) contained in IRC Section 163(e)(5)(F) applies to the Reorganized Second Lien Term Loan Facility, and if they determine that such exception may not apply in whole or in part for any reason, including the Reorganized Second Lien Term Loan Facility being held by a party related (within the meaning of IRC Section 108(e)(4)) to the issuer, a sufficient amount of the accrued PIK Payment shall be paid in cash at the end of the first quarter after the fifth anniversary of the Effective Date and on each quarter thereafter so that the Reorganized Second Lien Term Loan Facility is not an applicable high yield discount obligation within the meaning of IRC Section 163(i). The SA Reorganized Debtors shall provide notice to the holders of the First Lien Lender Claims and the holders of the New Notes under the Reorganized Second Lien Term Loan Facility as soon as is practicable stating whether the terms of the Reorganized Second Lien Term Loan Facility have been subsequently revised to reflect the provision in the previous sentence, or whether the terms remain as outlined on Exhibit C to the Plan.

**1.140** *Representatives* means, as to any Person, the present and former officers, directors, shareholders, trustees, partners and partnerships, managers, members, affiliates, agents, employees, consultants, representatives, financial advisors, professionals, accountants, attorneys, commercial bankers, lenders, insurers, heirs, executors, estates, administrators, servicers, contractors and participants of such Person or such Person's successors or assigns, in each case solely in their capacity as such (including, without limitation, all actions or inactions taken by any such Person in their capacity as such) and not in any other capacity.

**1.141** *Required First Lien Lenders* means the First Lien Lenders holding not less than 66-2/3% in amount of all First Lien Lender Claims.

**1.142** *Required Lenders* means, (a) if the Sale Transactions are implemented, and (i) the Sale Proceeds are insufficient to satisfy the First Lien Lender Claims, the Required First Lien Lenders, or (ii) if the Sale Proceeds are sufficient to satisfy the First Lien Lender Claims, the Required Second Lien Lenders; and (b) if the Sale Transactions are not implemented, the Required First Lien Lenders.

**1.143** *Required Second Lien Lenders* means the Second Lien Lenders holding not less than a majority in amount of all Second Lien Lender Claims.

**1.144** *Sale Proceeds* means the Cash portion and the non-Cash portion, including but not limited to, stock, notes, or other form of indebtedness, of the Purchase Price received from the Sale Transactions.

**1.145** *Sale Transactions* means the sale of the New Common Stock of the Reorganized Issuer or all or substantially all of the Assets (as applicable) in accordance with the terms and conditions set forth in the Purchase Agreement as approved by the Bankruptcy Court prior to or in connection with confirmation of the Plan.

**1.146** *SA Reorganized Debtors* means the Reorganized Debtors if the Stand Alone Transactions are implemented.

**1.147** *SAP Rollover Claim* means if the Sale Transactions are not consummated, an Administrative Expense Claim (a) held by a current officer, director or employee of the Debtors for indemnification, contribution, or advancement of expenses pursuant to (i) any Debtor's certificate of incorporation, by-laws, or similar organizational document or (ii) any indemnification or contribution agreement approved by the Bankruptcy Court; and/or (b) incurred in the ordinary course of business including trade claims and claims arising out of the employment by one or more Debtors of an individual from and after the Commencement Date (but only to the extent that such employment claim is solely for outstanding wages, commissions, accrued benefits, or reimbursement of business expenses).

**1.148** *Schedule of Rejected Contracts and Leases* means a schedule of the contracts and leases to be rejected pursuant to section 365 of the Bankruptcy Code and Section 10.2 of this Plan, which shall be filed on or before one (1) business day prior to the Confirmation Hearing, as such schedule may be amended from time to time before or after the Effective Date.

**1.149 *Schedule 12.12*** means a schedule of rights, claims and causes of action which shall be excluded from the releases contained in Section 12.12 of the Plan, which shall be filed no later than five (5) days prior to the voting deadline with respect to the Plan as set forth in the Disclosure Statement and shall be included in the Plan Supplement, as may be amended prior to the Effective Date.

**1.150 *Schedule 15.1*** means the schedule of Second Lien Lender Claims filed pursuant to Section 15.1 of the Plan, which shall be filed on or before the date that is ten (10) business days following the Effective Date.

**1.151 *Schedules*** means each of the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs filed in the Reorganization Cases on August 18, 2009, as the same may be amended from time to time.

**1.152 *Second Lien Administrative Agent*** means Wachovia Bank, National Association, or its successors and assigns, in its capacity as administrative agent for the Second Lien Lenders under the Second Lien Credit Agreement.

**1.153 *Second Lien Bookrunners*** means Wachovia Capital Markets, LLC, Banc of America Securities LLC, and J.P. Morgan Securities Inc., or its successors and assigns, in their capacity as joint bookrunners under the Second Lien Credit Agreement.

**1.154 *Second Lien Credit Agreement*** means that certain Second Lien Credit Agreement, dated as of September 30, 2005 (as amended, restated, supplemented or otherwise modified heretofore, and together with its related agreements), among CCS Medical, Inc., CCS Acquisition Holding-Sub Corporation, the other Debtors, and the Second Lien Lenders.

**1.155 *Second Lien Documentation Agent*** means JPMorgan Chase Bank, N.A., or its successors and assigns, in its capacity as documentation agent under the Second Lien Credit Agreement.

**1.156 *Second Lien Group*** means Camulos Master Fund LP; Camulos Loan Vehicle Fund I, L.P.; CMF Cayman Ltd.; Transamerica Life Insurance Company; and Smith Management LLC, and each of their respective affiliates that are or at any time were holders of First Lien Lender Claims and/or Second Lien Lender Claims.

**1.157 *Second Lien Joint Lead Arrangers*** means Wachovia Capital Markets, LLC and Banc of America Securities LLC, or its successors and assigns, in their capacity as joint lead arrangers under the Second Lien Credit Agreement.

**1.158 *Second Lien Lender Claim*** means any Claim against a Debtor held by a Second Lien Lender related to the Second Lien Credit Agreement.

**1.159 *Second Lien Lender Committee*** means the official committee of Second Lien Lenders, if appointed by the U.S. Trustee. For the avoidance of doubt, if an official committee of Second Lien Lenders is not appointed, the term Second Lien Lender Committee shall have no other meaning.

**1.160** *Second Lien Lender Distribution* means either (a) if the Sale Transactions are implemented, the Second Lien Lender Sale Proceeds, or (b) if the Sale Transactions are not implemented, $0.0. Notwithstanding (a) and (b) above, if the Bankruptcy Court ultimately determines that the Second Lien Lender Deficiency Claims shall be treated as General Unsecured Claims, the Second Lien Lender Distribution with respect to the holder of such Deficiency Claim, which shall be treated as a General Unsecured Claim, shall be such holder's Pro Rata Share of the Unsecured Claims Distribution Fund.

**1.161** *Second Lien Lenders* means the lenders and participants under the Second Lien Credit Agreement from time to time together with the Second Lien Administrative Agent, the Second Lien Syndication Agent, the Second Lien Documentation Agent, the Second Lien Joint Lead Arrangers, and the Second Lien Bookrunners, each in their capacity as such.

**1.162** *Second Lien Lender Sale Proceeds* means the Distributable Sale Proceeds plus from time to time the available Cash (including any Cash from the proceeds of the liquidation of the Excluded Assets), less the First Lien Lender Sale Proceeds, in each case after reserving in full for the Wind-Down Reserve, the Holdback Amount Reserve, and the Disputed Priority Claims Reserve, and (without duplication) satisfying in full all Allowed DIP Lender Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed First Lien Lender Claims, and Allowed Other Secured Claims, in an amount not to exceed the total amount of the Allowed Second Lien Lender Claims.

**1.163** *Second Lien Syndication Agent* means Bank of America, N.A., or its successors and assigns, in its capacity as syndication agent under the Second Lien Credit Agreement.

**1.164** *Secured Claim* means a Claim against a Debtor (a) that is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or (b) to the extent that the holder thereof has a valid right of setoff pursuant to section 553 of the Bankruptcy Code, and limited to the value thereof.

**1.165** *Settlement Parties* means the First Lien/Debtor Parties and the Second Lien Group.

**1.166** *Stand Alone Transactions* means the transactions contemplated to occur in connection with the stand-alone reorganization of the Debtors' business in the event the Sale Transactions do not occur, including, without limitation, the issuance of the New Common Stock and New Notes to the First Lien Lenders.

**1.167** *Subsidiary* means any corporation, association or other business entity of which at least the majority of the securities or other ownership interest is owned or controlled by a Debtor and/or one or more subsidiaries of the Debtor.

**1.168** *Successful Bidder* means the bidder submitting the highest and/or best offer for the purchase of all or substantially all of the Debtors' Assets or the New Common Stock.

**1.169** *Swap Agreements* means (i) that certain International Swap Dealers Association, Inc. Master Agreement, dated as of September 28, 2005, by and between the Debtor Obligors

and Wachovia Bank, National Association, and its successors and assigns, and (ii) that certain International Swap Dealers Association, Inc. Master Agreement, dated as of October 6, 2005, by and between the Debtor Obligors and JPMorgan Chase Bank, N.A., and its successors and assigns.

**1.170** *Swap Counterparties* means Wachovia Bank, National Association, and JPMorgan Chase Bank, N.A., and each of their successors and assigns, each in its capacity as counterparty to one of the Swap Agreements.

**1.171** *Third Party Release* has the meaning set forth in Section 12.7(b) of this Plan.

**1.172** *Trade Claim* means any Unsecured Claim arising prior to the Commencement Date relating to the delivery of goods or services to a Debtor from trade creditors or service providers in the ordinary course of a Debtor's business which goods or services providers are designated by the Debtors as a provider from whom the PED Debtors will require goods or services after the Effective Date; provided that such Unsecured Claim shall be treated as a General Unsecured Claim if the holder thereof elects such treatment on its Ballot.

**1.173** *Trade Payment* means with respect to an Allowed Trade Claim, Cash in an amount equal to the Allowed amount of such Claim.

**1.174** *Unsecured Claim* means any Claim other than: (a) a Secured Claim; (b) a DIP Lender Claim; (c) an Administrative Expense Claim; (d) a Fee Claim; (e) a Priority Tax Claim; (f) a Priority Non-Tax Claim; (g) an Existing Securities Law Claim; (h) an Intercompany Claim; and (i) a Claim on account of any guaranty or similar obligation of any Debtor relating to the foregoing types of Claims.

**1.175** *Unsecured Claims Distribution Fund* means (a) if the Sale Transactions are implemented the Unsecured Claim Sale Proceeds; or (b) if the Sale Transactions are not implemented, the Lump Sum Payment.

**1.176** *Unsecured Claim Sale Proceeds* means the Distributable Sale Proceeds plus from time to time the available Cash (including any Cash from the proceeds of the liquidation of the Excluded Assets), less the First Lien Lender Sale Proceeds and the Second Lien Lender Sale Proceeds, available for distribution to the holders of Allowed Trade Claims, Allowed General Unsecured Claims, and Allowed PIK Lender Claims, in each case after reserving in full for the Wind-Down Reserve, the Holdback Amount Reserve, and the Disputed Priority Claims Reserve, and (without duplication) satisfying in full the Allowed DIP Lender Claims, Allowed Administrative Expense Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, Allowed First Lien Lender Claims, Allowed Second Lien Lender Claims and Allowed Other Secured Claims.

**1.177** *U.S. Trustee* means the Office of the United States Trustee for Region 3.

**1.178** *U.S. Trustee Fees* means fees arising under 28 U.S.C. § 1930(a)(6) or accrued interest thereon arising under 31 U.S.C. § 3717.

**1.179** *Wachovia* means Wachovia Bank, National Association.

**1.180** *Wind-Down Budget* means a budget (as may be amended from time to time after entry of the Confirmation Order) in form and substance reasonably satisfactory to the Required Lenders, which estimates the funds necessary to administer the Plan if the Sale Transactions are implemented, wind-down the Liquidating Debtors, and unwind the Debtors' affairs, including the costs of holding and liquidating the Estates' remaining property, objecting to Claims, making the Distributions required by the Plan, prosecuting claims and Causes of Action that may be held by the Estates against third parties that are not released, waived or transferred pursuant to the Plan (including pursuant to Article XII) or otherwise, paying taxes, filing tax returns, paying professionals' fees, funding payroll and other employee costs, providing for the purchase of errors and omissions insurance and/or other forms of indemnification for the Chief Wind Down Officer, and creating appropriate reserves for all such items and other costs of administering the Plan, the Estates and the Liquidating Debtors.

**1.181** *Wind-Down Reserve* shall have the meaning ascribed to such term in Section 7.6.

### B. *Interpretation; Application of Definitions and Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein. Any capitalized term used herein that is not defined herein shall have the meaning assigned to that term in the Bankruptcy Code. Except for the rules of construction contained in sections 102(5) of the Bankruptcy Code, which shall not apply, the rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan. Any reference in the Plan to a contract, instrument, release, or other agreement or documents being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions, and any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified, or supplemented. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. Any act required to be taken on the Effective Date, or any other applicable date, shall be deemed timely taken if taken as soon as reasonably practicable after such date.

### C. *Appendices and Plan Documents.*

All Plan Documents and exhibits to the Plan are incorporated into the Plan by reference and are a part of the Plan as if set forth in full herein. Holders of Claims and Interests may inspect a copy of the Plan Documents, to the extent filed, in the Office of the Clerk of the Bankruptcy Court during normal business hours, or obtain a copy of such Plan Documents by a written request sent to the following address:

Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor
New York, NY 10017
Attention: Angharad Bowdler
Telephone: (646) 282-2400

# ARTICLE II.

## RESOLUTION OF CERTAIN INTER-CREDITOR AND INTER-DEBTOR ISSUES

### 2.1.    *Settlement of Certain Inter-Creditor Issues*.

(a)     The treatment of Claims against and Interests in the Debtors under this Plan represents, among other things, the settlement and compromise of certain inter-creditor disputes.

(b)     Notwithstanding anything to the contrary herein, on or after the Effective Date, any and all Intercompany Claims will be adjusted (including by contribution, distribution in exchange for new debt or equity, or otherwise), paid, continued, or discharged as determined appropriate by the PED Debtors in their sole discretion. Any such transaction may be effected on or subsequent to the Effective Date without any further action by the Bankruptcy Court.

### 2.2.    *Substantive Consolidation of Certain of the Debtors*.

(a)     The entry of the Confirmation Order shall constitute the approval by the Bankruptcy Court pursuant to sections 105(a) and 1123(a)(5)(c) of the Bankruptcy Code, effective as of the Effective Date, of the substantive consolidation of Holdings and CCS Acquisition for all purposes related to the Plan, including without limitation for purposes of voting, confirmation and distribution. As a result of such substantive consolidation, (i) all Assets and liabilities of CCS Acquisition shall be treated as though they were merged into and with the Assets and liabilities of Holdings, (ii) no distribution shall be made under the Plan on account of Intercompany Claims, if any, between Holdings and CCS Acquisition, (iii) all guarantees of Holdings and CCS Acquisition of each other's obligations and any joint or several liability of Holdings and CCS Acquisition shall be deemed an obligation of Consolidated Holdings and (iv) each and every Claim filed or to be filed in the Reorganization Case of Holdings or CCS Acquisition shall be deemed filed against Consolidated Holdings and shall be deemed one Claim against and obligation of Consolidated Holdings.

The Plan does not provide for the substantive consolidation of any of the Debtors other than Holdings and CCS Acquisition.

(b)     Separate Plans/Non-Consolidation of the Other Debtors.

The Plan is a joint plan of each of the Debtors and constitutes a separate plan of reorganization for each such Debtor other than Consolidated Holdings. Each Class of Claims or Interests shall be deemed a separate Class with respect to Consolidated Holdings and the other Debtors. Except as specifically set forth herein, nothing in this Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that any one of the Debtors is subject to or liable for any claim against any other Debtor. Additionally, except as provided in Section 2.2(a) of the Plan, claimants holding Claims against multiple Debtors, to the extent Allowed in each Debtor's case, will be treated as a separate Claim against each Debtor's estate; *provided*, *however*, that no holder shall be entitled to receive more than payment in full of its Allowed Claim (plus postpetition interest, if and to the extent provided in this Plan), and such Claims will be administered and treated in the manner provided in this Plan.

**2.3.** *Limitations of Plan Distributions to Interests.*

No Plan Distributions shall be made on account of any Interests in any Debtor regardless of whether such Interests are held by a Person which is not a Debtor; *provided*, *however*, that any Debtor that owns Interests in another Debtor may at the election of the Reorganized Debtor retain such Interests.

**2.4.** *Limitations on Plan Distributions on Account of Assumed Liabilities.*

No Plan Distributions shall be made to any holder of an Assumed Liability with respect to any such Assumed Liability. On the Effective Date, the Assumed Liabilities shall no longer be deemed obligations of the Debtors, and the PED Debtors shall have no obligations to any holder of an Assumed Liability.

## ARTICLE III.

## DIP LENDER CLAIMS, ADMINISTRATIVE EXPENSE CLAIMS, FEE CLAIMS, U.S. TRUSTEE FEES AND PRIORITY TAX CLAIMS

All Claims and Interests, except DIP Lender Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims, are placed in the Classes set forth in Article IV below. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Lender Claims, Administrative Expense Claims, Fee Claims, U.S. Trustee Fees and Priority Tax Claims of the Debtors have not been classified, and the holders thereof are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.

**3.1.** *DIP Lender Claims.*

Except to the extent the DIP Lenders agree to less favorable treatment, on the Effective Date, the DIP Lenders shall release any and all liens against and security interests in the Debtors' (and the Estates') property held by the DIP Lenders and shall be paid 100% of the then outstanding amount, if any, of the DIP Lender Claims and the permitted outstanding and unpaid fees and expenses of the DIP Lenders in Cash. Without limiting the foregoing, if the Sale Transactions are not implemented, at any time prior to the Effective Date the Debtors and the DIP Lenders (each in its sole discretion) jointly may elect, subject to the consent of the Required First Lien Lenders, to satisfy the unpaid principal under the DIP Credit Agreement by consummating the DIP Roll Option. Upon satisfaction in full of the DIP Lender Claims, any and all liens against and security interests in the Debtors' (and the Estates') property held by the DIP Lenders shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person, the DIP Credit Agreement shall be deemed terminated, and the Debtors' (and the PED Debtors') obligations thereunder shall be canceled; *provided*, *however*, if the DIP Roll Option is effectuated, the security interests provided to the DIP Lenders under the DIP Credit Agreement and related Bankruptcy Court order shall continue and attach to the property subject to such security interests with the same

priority as applied during the pendency of the Reorganization Cases to secure all obligations in respect of the DIP Lender Claims following the Effective Date until paid in full in Cash.

**3.2.** ***Administrative Expense Claims***.

    (a)    Time for Filing Administrative Expense Claims.

        Each holder of an Administrative Expense Claim, other than the holder of:

        (i)    a Fee Claim;

        (ii)    a 503(b)(9) Claim;

        (iii)    an Administrative Expense Claim that has been Allowed on or before the Effective Date, including pursuant to the Plan;

        (iv)    an Assumed Liability;

        (v)    a SAP Rollover Claim; and/or

        (vi)    U.S. Trustee Fees;

must file with the Claims Agent at one of the following addresses:

| If Delivered by Mail: | If Delivered by Overnight or Hand Delivery: |
| --- | --- |
| CCS Claims Processing Center c/o Epiq Bankruptcy Solutions, LLC FDR Station, P.O. Box 5015 New York, NY 10150-5015 | CCS Claims Processing Center c/o Epiq Bankruptcy Solutions, LLC 757 Third Avenue, 3rd Floor New York, NY 10017 |

and serve on the PED Debtors, in accordance with Section 14.16 herein, proof of such Administrative Expense Claim by the Administrative Expense Bar Date. Such proof of Administrative Expense Claim must include at a minimum (i) the name of each Debtor that is purported to be liable for the Administrative Expense Claim, (ii) the name of the holder of the Administrative Expense Claim, (iii) the amount of the Administrative Expense Claim, (iv) the basis of the Administrative Expense Claim, and (v) supporting documentation for the Administrative Expense Claim. **FAILURE TO FILE AND SERVE SUCH PROOF OF ADMINISTRATIVE EXPENSE CLAIM TIMELY AND PROPERLY SHALL RESULT IN THE ADMINISTRATIVE EXPENSE CLAIM BEING FOREVER BARRED AND DISCHARGED.**

    (b)    Treatment of Administrative Expense Claims.

        Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment of such Administrative Expense Claim, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date

that is thirty (30) calendar days after the date an Administrative Expense Claim becomes an Allowed Claim, the holder of such Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Claim; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors shall be paid by the PED Debtors in the ordinary course of business consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such transactions.

**3.3.** *Fee Claims*.

(a) Time for Filing Fee Claims.

All Fee Claims must be filed with the Bankruptcy Court and served on the PED Debtors, no later than forty-five (45) days after the Effective Date. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Reorganization Cases, the allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court. **FAILURE TO FILE AND SERVE FINAL FEE APPLICATIONS TIMELY AND PROPERLY SHALL RESULT IN THE UNDERLYING FEE CLAIMS BEING FOREVER BARRED AND DISCHARGED.**

Objections to Fee Claims, if any, must be filed and served pursuant to the procedures set forth in the Confirmation Order no later than sixty (60) days after the Effective Date or such other date as may be established by the Bankruptcy Court.

(b) Treatment of Fee Claims.

A Fee Claim in respect of which a final fee application has been properly filed and served pursuant to Section 3.3(a) shall be payable to the extent approved by order of the Bankruptcy Court. Subject to the Holdback Amount, on the Effective Date, or as soon thereafter as reasonably practicable, to the extent not otherwise paid, all allowed Professional Fees (including estimated fees through the Effective Date) shall be paid in full in Cash. To receive payment on the Effective Date for unbilled fees and expenses incurred through the Effective Date, each Professional shall reasonably estimate fees and expenses due for unbilled fees and expenses for periods that will not have been billed as of the Effective Date and shall deliver such estimates to the Debtors and the U.S. Trustee prior to the Effective Date. If the estimated payment received by such Professional exceeds the actual allowed Professional Fees for the estimated period, such excess amount shall be deducted from the Holdback Amount for such Professional and if the Holdback Amount is insufficient, such Professional shall disgorge the difference. If the estimated payment received by the Professional is lower than the allowed Professional Fees of such Professional, the difference shall be promptly paid to the Professional.

On the Effective Date, the PED Debtors shall fund the Holdback Amount Reserve for payment of the Holdback Amount. Upon final allowance by the Bankruptcy Court of the Professional Fees, or entry of an earlier order of the Bankruptcy Court granting the release of the Holdback Amount, such amount, *less* any excess paid in connection with estimated fees and expenses through the Effective Date, shall be paid promptly and directly to the Professionals.

**3.4.** *U.S. Trustee Fees.*

On the Effective Date or as soon as reasonably practicable thereafter, the PED Debtors shall pay all U.S. Trustee Fees that are due and owing on the Effective Date.

**3.5.** *Priority Tax Claims.*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in the applicable PED Debtor's discretion, either (a) on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date a Priority Tax Claim becomes an Allowed Claim, Cash in an amount equal to such Allowed Claim, or (b) deferred Cash payments following the Effective Date, over a period ending not later than five (5) years after the Commencement Date, in an aggregate amount equal to the Allowed amount of such Priority Tax Claim.

## ARTICLE IV.

## CLASSIFICATION OF CLAIMS AND INTERESTS

**4.1.** *Classification of Claims and Interests.*

The following table designates the Classes of Claims against and Interests in each of the Debtors, subject to Section 2.2(a) of the Plan, and specifies which Classes are (a) Impaired or unimpaired by this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, or (c) deemed to accept or reject this Plan. Notwithstanding the foregoing, if the Bankruptcy Court determines that Classes 1 and/or 4 are unimpaired within the meaning of section 1124 of the Bankruptcy Code, the holders of the Claims within such Class(es) shall be deemed to have accepted the Plan with respect thereto.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Impaired | Yes |
| Class 2 | First Lien Lender Claims | Impaired | Yes |
| Class 3 | Second Lien Lender Claims | Impaired | Yes |
| Class 4 | Other Secured Claims | Impaired | Yes |
| Class 5 | Trade Claims | Impaired | Yes |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | PIK Lender Claims | Impaired | Yes |
| Class 8 | Existing Stock Interests | Impaired | No (deemed to reject) |
| Class 9 | Other Existing Interests | Impaired | No (deemed to reject) |
| Class 10 | Existing Securities Law Claims | Impaired | No (deemed to reject) |

**4.2.** *Impaired Classes of Claims.*

The following Classes of Claims are Impaired and are entitled to vote on this Plan.

(a)     Class 1: Class 1 consists of all Priority Non-Tax Claims.

(b)     Class 2: Class 2 consists of all First Lien Lender Claims.

(c)     Class 3: Class 3 consists of all Second Lien Lender Claims.

(d)     Class 4: Class 4 consists of all Other Secured Claims.

(e)     Class 5: Class 5 consists of all Trade Claims.

(f)     Class 6: Class 6 consists of all General Unsecured Claims.

(g)     Class 7: Class 7 consists of all PIK Lender Claims.

The following Classes of Claims and Interests are Impaired and deemed to have rejected this Plan and, therefore, are not entitled to vote on this Plan under section 1126(g) of the Bankruptcy Code.

(h)     Class 8: Class 8 consists of all Existing Stock Interests.

(i)     Class 9: Class 9 consists of all Other Existing Interests.

(j)     Class 10: Class 10 consists of Existing Securities Law Claims.

**4.3.    *Separate Classification of Other Secured Claims.***

Although all Other Secured Claims against the Debtors have been placed in one category for purposes of nomenclature, each such Other Secured Claim, to the extent secured by Liens or security interests separate than those Liens or security interests securing other Other Secured Claims, shall be treated as being in a separate Class from such other Other Secured Claims for purposes of voting on the Plan and receiving Plan Distributions.

## ARTICLE V.

## TREATMENT OF CLAIMS AND INTERESTS

**5.1.    *Priority Non-Tax Claims (Class 1).***

(a)     <u>Treatment</u>:  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment on account of such Claim, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date a Priority Non-Tax Claim becomes an Allowed Claim, the holder of such Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Claim.

(b)     <u>Voting</u>:  The Priority Non-Tax Claims are Impaired, and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

**5.2.    *First Lien Lender Claims (Class 2).***

(a)     Allowance:  On the Effective Date, the First Lien Lender Claims shall be deemed Allowed Claims in the aggregate amount of $348,098,206 (or such other amount as may be determined by order of the Bankruptcy Court), plus accrued but unpaid interest, fees, and expenses as of the Effective Date, arising under the First Lien Credit Agreement (including without limitation, interest arising after the Commencement Date at the default rate set forth in the First Lien Credit Agreement), plus the amount of any L/Cs drawn after the Commencement Date and prior to the Effective Date, for the purposes of the Plan and these Reorganization Cases.

(b)     Treatment:  On the Effective Date, except to the extent that a holder of a First Lien Lender Claim agrees to less favorable treatment on account of such Claims, each holder of an Allowed First Lien Lender Claim shall receive, in full and final satisfaction of such Allowed First Lien Lender Claim, its Pro Rata Share of the First Lien Lender Distribution; *provided*, *however*, to the extent that any L/C issued under the First Lien Credit Agreement remains undrawn as of the Effective Date, the Debtors shall either (i) if the Sale Transactions are implemented, (A) create a cash reserve (in the form of a deposit account maintained at the L/C Issuer) on account of the L/C Issuer's Pro Rata Share of the First Lien Lender Distribution, which shall be either used to fund draws on any of the L/Cs or distributed in accordance with the distribution scheme under the Plan upon termination or expiration of the L/C if such L/C continues to remain undrawn, (B) cause such L/C to be replaced with another letter of credit, (C) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (D) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion; or (ii) if the Sale Transactions are not implemented, (A) cause such L/C to be replaced with a letter of credit issued under the New Revolving Credit Facility, (B) collateralize such L/C with Cash in an amount equal to 103% of the face amount thereof, (C) provide a back-to-back letter of credit to the L/C Issuer on terms and from a financial institution reasonably acceptable to the L/C Issuer or (D) provide such other treatment as the Debtors and the L/C Issuer shall agree, each in their sole discretion. The Disbursing Agent shall have the authority to withhold any Distribution pursuant to this Section 5.2 of the Plan to any First Lien Lender, until it is in receipt of such First Lien Lenders' required signatures to each of the applicable Plan Documents to which such First Lien Lender shall be a party. If the Sale Transactions are not implemented, each holder of a First Lien Lender Claim shall be deemed to have waived the right to receive any Plan Distribution or Plan Consideration on account of its Deficiency Claim.

(c)     Voting:  The First Lien Lender Claims are Impaired, and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

**5.3.     *Second Lien Lenders Claims (Class 3)*.**

Notwithstanding anything herein to the contrary, on the Effective Date the Second Lien Lender Claims shall be deemed Allowed Claims and treated in accordance with Article XV of the Plan.

### 5.4. *Other Secured Claims (Class 4)*.

(a)     Treatment:  Except to the extent that a holder of an Allowed Other Secured Claim agrees to different treatment on account of such Claims, on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date an Other Secured Claim becomes an Allowed Claim, the holder of such Allowed Other Secured Claim shall receive, at the election of the Debtors on account of such Claims: (i) Cash in an amount equal to such Claim; (ii) treatment on such other terms such that the holder of such Other Secured Claim will not be Impaired pursuant to section 1124 of the Bankruptcy Code; or (iii) deferred Cash payments, to the extent permissible under the Bankruptcy Code; *provided, however*, that Class 4 Claims incurred by a Debtor in the ordinary course of business may be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating thereto, in the discretion of the applicable Debtor and with the consent of the Required First Lien Lenders without further notice to or order of the Bankruptcy Court.  Each holder of an Allowed Other Secured Claim shall retain the Liens securing its Allowed Other Secured Claim as of the Effective Date until full and final payment of such Allowed Other Secured Claim is made as provided herein.  On the full payment or other satisfaction of such obligations, the Liens securing such Allowed Other Secured Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person.

(b)     Voting:  Other Secured Claims are Impaired, and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

### 5.5. *Trade Claims (Class 5)*.

(a)     Treatment:  If the Sale Transactions are implemented, the holders of Allowed Trade Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds.  If the Sale Transactions are not implemented, the holders of Allowed Trade Claims shall not receive any distribution or retain any property on account of such Claims; *provided, however*, that as part of the settlements and compromises contained herein, each holder of a Trade Claim shall receive the Trade Payment.  Payments shall be made on, or as soon as reasonably practicable after, the latest of (i) the Effective Date, (ii) the date such Claim becomes an Allowed Claim, and (iii) to the extent the Sale Transactions are not implemented, unless otherwise agreed by the PED Debtors, the date on which such holder has agreed in writing to provide the PED Debtors with trade credit on customary ordinary course terms.

(b)     Voting:  The Trade Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

### 5.6. *General Unsecured Claims (Class 6)*.

(a)     Treatment:  If the Sale Transactions are implemented, the holders of Allowed General Unsecured Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds.  If the Sale Transactions are not implemented, the holders of Allowed General Unsecured Claims shall not receive any distribution or retain any property on account of such

Claims, *provided, however*, that each holder of an Allowed General Unsecured Claim shall receive Cash in the amount of the Lump Sum Payment. Payments shall be made on, or as soon thereafter as reasonably practicable, the later of the Effective Date, the date the Bankruptcy Court enters an order estimating such claims and the first Quarterly Distribution Date after such General Unsecured Claim becomes an Allowed General Unsecured Claim.

(b)    Voting: The General Unsecured Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

### 5.7.    *PIK Lender Claims (Class 7)*.

(a)    Treatment: If the Sale Transactions are implemented, the holders of Allowed PIK Lender Claims shall receive their Pro Rata Share of the Unsecured Claim Sale Proceeds. If the Sale Transactions are not implemented, the holders of PIK Lender Claims shall not receive any distribution or retain any rights to any property on account of such Claims, *provided, however*, that if the Bankruptcy Court ultimately determines that the PIK Lender Claims shall be treated as General Unsecured Claims, the holder of an Allowed PIK Lender Claim shall receive Cash in the amount of the Lump Sum Payment. Payments shall be made on, or as soon thereafter as reasonably practicable, the later of the Effective Date, the date the Bankruptcy Court enters an order estimating such claims and the first Quarterly Distribution Date after such Claim becomes an Allowed PIK Lender Claim.

(b)    Voting: The PIK Lender Claims are Impaired and the holders of such Claims are entitled to vote to accept or reject the Plan on account of such Claims.

### 5.8.    *Existing Stock Interests (Class 8)*.

(a)    Treatment: Existing Stock Interests shall be cancelled and holders of Existing Stock Interests shall receive no distribution or retain any rights to any property on account of such Interests.

(b)    Voting: In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Stock Interests are conclusively presumed to reject this Plan on account of such Interests.

### 5.9.    *Other Existing Interests (Class 9)*.

(a)    Treatment: Other Existing Interests shall be cancelled and holders of Other Existing Interests shall not receive or retain any distribution under this Plan on account of such Other Existing Interests, *provided, however*, that any Debtor that owns Other Existing Interests in another Debtor may, at the discretion of the Debtors, retain such Other Existing Interests.

(b)    Voting: In accordance with section 1126(g) of the Bankruptcy Code, the holders of Other Existing Interests are conclusively presumed to reject this Plan on account of such Other Existing Interests.

**5.10.** *Existing Securities Law Claims (Class 10).*

(a) <u>Treatment</u>: Holders of Existing Securities Law Claims shall not receive or retain any distribution under the Plan on account of such Existing Securities Law Claims.

(b) <u>Voting</u>: In accordance with section 1126(g) of the Bankruptcy Code, the holders of Existing Securities Law Claims are conclusively presumed to reject this Plan and are not entitled to vote to accept or reject the Plan on account of such Claims.

## ARTICLE VI.

## ACCEPTANCE OR REJECTION OF
## THE PLAN; EFFECT OF REJECTION BY ONE
## OR MORE CLASSES OF CLAIMS OR EQUITY INTERESTS

**6.1.** *Class Acceptance Requirement.*

A Class of Claims shall have accepted the Plan if it is accepted by at least two-thirds (2/3) in amount and more than one-half (1/2) in number of the Allowed Claims in such Class that have voted on the Plan. A Class of Interests shall have accepted the Plan if it is accepted by holders of at least two-thirds (2/3) of the Interests in such Class that actually vote on the Plan.

**6.2.** *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code or "Cramdown."*

Because certain Classes are deemed to have rejected this Plan, the Debtors will request confirmation of this Plan, as it may be modified from time to time, under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan or any Plan Document in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

**6.3.** *Elimination of Vacant Classes.*

Any Class of Claims or Interests that does not have a holder of a Claim or Interest as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**6.4.** *Voting Classes.*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the holders of such Claims or Interests in such Class.

**6.5.** *Confirmation of All Cases.*

Except as otherwise determined by a Debtor in its sole discretion, and with the consent of the Required Lenders, which consent shall not be unreasonably withheld, the Plan shall not be deemed to have been confirmed as to each Debtor, unless and until the Plan has been confirmed as to Consolidated Holdings and each of the other Debtors. If the Plan is not confirmed as to one or more of the Debtors but the other Debtors determine to proceed with the Plan with the consent of the Required Lenders, which consent shall not be unreasonably withheld, then the Debtor(s) as to which the Plan may not be confirmed shall be severed from, and the Plan shall not apply to, such Debtor(s).

## ARTICLE VII.

## MEANS FOR IMPLEMENTATION

**7.1.** *Distributions.*

As applicable, the Disbursing Agent shall develop procedures for the distribution of the Distributable Sale Proceeds, the Trade Payment and the Lump Sum Payment to be made to the holders of Allowed Claims on, or as soon thereafter as is reasonably practicable, the later of the Effective Date and the first Quarterly Distribution Date after the date such Claim becomes an Allowed Claim.

**7.2.** *Plan Documents.*

On the Effective Date, or as soon thereafter as reasonably practicable, the PED Debtors shall be authorized to enter into, file, execute and/or deliver each of the Plan Documents, as applicable, including but not limited to, the Purchase Agreement and the Chief Wind Down Officer Agreement and/or as applicable the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, or the New Revolving Credit Facility, the New Stockholder and Registration Rights Agreement, and any other agreement or instrument issued in connection with any Plan Document without the necessity of any further court, corporate, board or shareholder action or approval.

**7.3.** *Cancellation of Certain Existing Security Interests.*

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the PED Debtors any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*. Upon the full payment or other satisfaction of an Allowed Other Secured Claim, the holder of such Allowed Other Secured Claim shall be deemed to have authorized the PED Debtors to file any termination statements, instruments of satisfactions, or releases of all such security interests with respect to its Allowed Other Secured Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*.

**7.4.** *Cancellation of Existing Securities and Agreements.*

(a) Except for the purpose of evidencing a right to distribution under this Plan, and except as otherwise set forth herein, on the Effective Date, all of the Debtors' obligations under any agreements, instruments, and certificates evidencing any Claim, any Existing Stock Interest, or any Other Existing Interests and any rights of any holder in respect thereof against the Debtors, shall be deemed cancelled, discharged and of no force or effect.

(b) Notwithstanding Section 7.4(a) hereof, the applicable provisions of the First Lien Credit Agreement and the Second Lien Credit Agreement shall continue in effect for the purposes of permitting the Disbursing Agent to make the distributions to be made to holders of Allowed First Lien Lender Claims and to the holders of Allowed Second Lien Claims. The holders of or parties to such cancelled (or converted, as applicable) instruments, securities and other documentation will have no rights against the Debtors arising from or relating to such instruments, securities and other documentation or the cancellation (or conversion, as applicable) thereof, except the rights provided pursuant to this Plan and shall deliver to the PED Debtors any termination statements, instruments of satisfactions, or releases of all security interests with respect to its Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*, and shall be deemed to have authorized the PED Debtors to file any termination statements, instruments of satisfactions, or releases of all such security interests with respect to such Claim that may be reasonably required in order to terminate any related financing statements, mortgages, mechanics' liens, or *lis pendens*.

(c) Nothing in this Section 7.4 shall be deemed to affect the rights or obligations of holders of Claims as against other holder of Claims under agreements, instruments, or certificates, or otherwise.

(d) Notwithstanding any other term or provision of this Section 7.4 of the Plan, the confirmation of the Plan shall not operate to discharge, modify or otherwise affect (i) any reimbursement or other obligations of the First Lien Lenders to the L/C Issuer under the First Lien Credit Agreement, (ii) any indemnity or other obligations of the First Lien Lenders in favor of the First Lien Administrative Agent under the First Lien Credit Agreement, or (iii) any indemnity or other obligations of the Second Lien Lenders in favor of the Second Lien Administrative Agent under the Second Lien Credit Agreement.

**7.5.** *Authorization, Issuance and Delivery of New Common Stock.*

(a) On the Effective Date, or as soon thereafter as reasonably practicable, the Reorganized Issuer shall be authorized to issue or cause to be issued the New Common Stock in accordance with the terms of this Plan and the Amended Certificates, without the need for any further corporate or shareholder action. The New Common Stock, when so issued, shall be duly authorized, validly issued, fully paid and non assessable. The New Common Stock shall be made by book entry or delivery of one or more certificates representing such shares, as described herein, as and to the extent practicable. Any certificates of New Common Stock shall bear a legend restricting the sale, transfer, assignment or other disposal of such shares. On the Effective Date, the New Common Stock shall not be registered under the Securities Act of 1933, as amended, and shall not be listed for public trading on any securities exchange.

(b)     On the Effective Date, or as soon thereafter as reasonably practicable 100% of the New Common Stock shall be delivered to, as applicable, if the Sale Transactions are implemented, the Purchaser or, if the Sale Transactions are not implemented, the Disbursing Agent for distribution to the holders of the First Lien Lender Claims in accordance with the terms of the Plan.

**7.6.    *The Sale Transactions*.**

(a)     *Authorization to Implement the Sale Transactions.*  Subject to Section 11.1, if the Debtors elect to effectuate the Sale Transactions, the provisions of this Section 7.6 shall govern.

(b)     *The Purchase Agreement.*  The Debtors shall be authorized to perform their obligations under the Purchase Agreement and all of the transactions contemplated thereunder and such agreement shall be valid, binding and enforceable in accordance with its terms and each holder deemed party thereto shall be bound thereby without the need for any further actions, including the execution of such agreement by such party.

(c)     *The Liquidating Debtors.*  The Liquidating Debtors shall continue to exist after the Effective Date for the purposes of making Distributions to the holders of Allowed Claims under the Plan, and to take any other steps in furtherance thereof or as may be reasonably necessary or appropriate to wind-down the affairs of the Estates and the Liquidating Debtors. The principal purpose of the Liquidating Debtors shall be to liquidate, collect and maximize the Cash value of the assets of the Debtors remaining after the Purchase Agreement is consummated and make distributions in respect of Allowed Claims in accordance with the terms of the Plan. The Chief Wind Down Officer shall be authorized to merge, consolidate, or dissolve any of the Liquidating Debtors, as the Chief Wind Down Officer deems appropriate and in accordance with the other provisions of this Plan.

(d)     *Assets of the Liquidating Debtors.*  On or after the Effective Date, the Excluded Assets, including all assets of the Debtors or their Estates which are neither distributed nor abandoned by the Debtors on the Effective Date, shall be deemed transferred, dividended, or assigned to such Liquidating Debtor(s) as they deem appropriate.  On the Effective Date, or as soon thereafter as reasonably practicable, the Liquidating Debtors shall liquidate the Excluded Assets to the extent practicable.

(e)     *Wind-Down Reserve.*  The activities and operations of the Liquidating Debtors and the Chief Wind Down Officer (other than Distributions from the Disputed Claims Reserves) shall be funded through a reserve to be established on the Effective Date, in accordance with the terms of the Wind-Down Budget, to fund the winding-down of the affairs of the Debtors and the Liquidating Debtors and the other items reflected in the Wind-Down Budget (the "**Wind-Down Reserve**").  The Wind-Down Reserve shall be funded as of the Effective Date, and thereafter from time to time, from Debtors' Cash and the Distributable Sale Proceeds in an amount sufficient to fund the Wind-Down Budget.  Upon the closing of the Reorganization Cases and the dissolution of the Liquidating Debtors, or such earlier time as it appears, in the reasonable view of the Chief Wind Down Officer, that the Wind-Down Reserve is overfunded,

the Chief Wind Down Officer shall make any excess funds available for distribution and funding of the other reserves and distributions in accordance with the terms of this Plan.

(f) *Selection, Removal and Replacement of the Chief Wind Down Officer.* The identity of the Chief Wind Down Office shall be disclosed in the Plan Supplement and is subject to the approval of the Bankruptcy Court in the Confirmation Order. After the Effective Date, the Chief Wind Down Officer may be removed and/or replaced by a successor in accordance with the terms of the Chief Wind Down Officer Agreement.

(g) *Powers and Duties of the Chief Wind Down Officer.* The Chief Wind Down Officer shall be deemed the representative of the Estates under section 1123(b)(3)(B) of the Bankruptcy Code, and shall have all rights associated therewith. Pursuant to the terms of the Chief Wind Down Officer Agreement, the Chief Wind Down Officer shall have all duties, powers, and standing authority necessary to implement the Plan and to administer and liquidate the assets of the Liquidating Debtors for the benefit of the holders of Allowed Claims. These powers shall include, without limitation, the following:

(i) Administering the Distributions and maintaining the Disputed Claims Reserves;

(ii) Investing any Cash of the Liquidating Debtors;

(iii) Selling or otherwise transferring for value any non-Cash assets of the Liquidating Debtors;

(iv) Filing with the Bankruptcy Court reports and other documents required by the Plan or otherwise required to close the Reorganizations Cases;

(v) Preparing and filing tax and informational returns for the Debtors and as required by the Liquidating Debtors;

(vi) Retaining such professionals as the Chief Wind Down Officer may in his or her discretion deem necessary for the operation and management of the Liquidating Debtors, including entering into contingent fee arrangements with respect to the prosecution of the Debtors' Claims and Causes of Action, to the extent not otherwise released herein;

(vii) Litigating or settling any Claims or Causes of Action asserted against the Debtors or the Liquidating Debtors and using all commercially reasonable efforts to cooperate with other parties in such litigation;

(viii) Prosecuting objections to Claims;

<table>
<tr><td>(ix)</td><td>Evaluating, filing, litigating, prosecuting, settling, or abandoning the Claims and/or Causes of Action of the PED Debtors or Liquidating Debtors;</td></tr>
<tr><td>(x)</td><td>Setting off amounts owed to the Debtors or the Liquidating Debtors against any amounts otherwise due to be distributed to the holder of an Allowed Claim;</td></tr>
<tr><td>(xi)</td><td>Abandoning any property of the Liquidating Debtors that cannot be sold or otherwise disposed of for value and whose distribution to holders of Allowed Claims would not be feasible or cost-effective in the reasonable judgment of the Chief Wind Down Officer;</td></tr>
<tr><td>(xii)</td><td>Administering the Wind-Down Reserve, the Holdback Amount Reserve and the Disputed Claims Reserves. The Liquidating Debtors shall indemnify the Chief Wind Down Officer for its actions as administrator of the Disputed Claims Reserves;</td></tr>
<tr><td>(xiii)</td><td>Making interim and final distributions of Liquidating Debtors assets;</td></tr>
<tr><td>(xiv)</td><td>Winding up the affairs of the Debtors and the Liquidating Debtors and dissolving them under applicable law as appropriate;</td></tr>
<tr><td>(xv)</td><td>Providing for storage and disposal of records;</td></tr>
<tr><td>(xvi)</td><td>Incurring such charges, costs, and fees as are necessary to wind-down or sell any operating assets of the Liquidating Debtors; and</td></tr>
<tr><td>(xvii)</td><td>Taking any other actions that the Chief Wind Down Officer, in his or her reasonable discretion, determines to be in the best interest of the Debtors' Estates or the Liquidating Debtors.</td></tr>
</table>

(h) *Exculpation and Indemnification of the Chief Wind Down Officer.* The Chief Wind Down Officer Agreement shall provide for and govern the exculpation and indemnification of the Chief Wind Down Officer.

(i) *Distributions by the Liquidating Debtors.* The Liquidating Debtors are authorized to make all distributions required under the Plan in accordance with Article V of the Plan.

(j) *Wind-Down and Dissolution of the Debtors.* The Chief Wind Down Officer shall be responsible for winding up the affairs of the Debtors' Estates and liquidating the assets held by or transferred to, the Liquidating Debtors on or after the Effective Date including but not limited to preparing and filing final tax returns, filing dissolution documents pursuant to applicable law, paying any franchise taxes and other fees that are due in connection with such

dissolution, and taking any other actions that are necessary to wind-down the affairs of the Debtors.

(k)     *Compensation of Chief Wind Down Officer.*  The compensation of the Chief Wind Down Officer shall be as specified in the Chief Wind Down Officer Agreement and shall be paid by the Liquidating Debtors, subject to and consistent with the Wind Down Budget. The Chief Wind Down Officer shall also be entitled to reimbursement of reasonable expenses, which expenses shall include the reasonable fees and expenses of attorneys and/or accountants and other professionals retained by the Chief Wind Down Officer, as more fully described in the Chief Wind Down Officer Agreement.

(l)     *Termination of the Liquidating Debtors; Discharge of the Chief Wind Down Officer.*  As soon as practicable after final distributions under the Plan, the Chief Wind Down Officer shall wind up the affairs of the Liquidating Debtors, file final tax returns, arrange for storage of its records and dissolve the Liquidating Debtors pursuant to applicable law.  As soon as practicable thereafter, the Chief Wind Down Officer shall file with the Bankruptcy Court a final report of distributions and perform such other duties as are specified in the Plan, whereupon the Chief Wind Down Officer shall have no further duties under the Plan.

**7.7.    *The Stand-Alone Transactions*.**

(a)     *Authorization to Implement the Stand-Alone Transactions.*  If the Debtors do not effectuate the Sale Transactions as provided in Section 7.6, Section 7.7 of the Plan shall govern.

(b)     *Reorganized First Lien Term Loan Facility and the Reorganized Second Lien Term Loan Facility.*  On the Effective Date the Reorganized First Lien Term Loan Facility and the Reorganized Second Lien Term Loan Facility shall be valid, binding, and enforceable in accordance with their terms and each First Lien Lender shall be bound thereby without the need for any further action including the execution of such agreements by the First Lien Lenders.

(c)     *The New Revolving Credit Facility.*  On the Effective Date, if the DIP Roll Option is not effectuated, the SA Reorganized Debtors shall be authorized to enter into and perform under the New Revolving Credit Facility and such facility, upon execution of the same, shall be valid, binding and enforceable for all purposes.

(d)     *Continued Corporate Existence.*  Except as otherwise provided in this Plan, the SA Reorganized Debtors shall continue to exist after the Effective Date for the purposes of satisfying their obligations under the Plan and the continuation of their businesses. In connection with the Effective Date and at any time thereafter, each Debtor or SA Reorganized Debtor, in its sole and exclusive discretion, may take such action as permitted by applicable law as such Debtor or SA Reorganized Debtor may determine is reasonable and appropriate, including, but not limited to, causing (i) a Debtor or SA Reorganized Debtor to be merged into another Debtor or SA Reorganized Debtor, or its Subsidiary and/or affiliate, (ii) a Debtor or SA Reorganized Debtor to be dissolved, (iii) the legal name of a Debtor or SA Reorganized Debtor to be changed, (iv) the conversion of a Debtor or SA Reorganized Debtor to another form of

entity, including from a corporation to a limited liability company, or (v) the closure of a Debtor or SA Reorganized Debtor's case on the Effective Date or any time thereafter.

(e)     *Officers and Boards of Directors.*  On the Effective Date, the boards of directors of the SA Reorganized Debtors shall consist of those individuals identified in the Plan Supplement.  Except as set forth herein, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the SA Reorganized Debtors on or after the Effective Date and shall be deemed to have resigned as of the Effective Date.  Following the occurrence of the Effective Date, the board of directors of each SA Reorganized Debtor may be replaced by such individuals as are selected in accordance with the organizational documents of such SA Reorganized Debtor and the New Stockholder and Registration Rights Agreement.  On the Effective Date, the officers of the SA Reorganized Debtors shall consist of those individuals identified in the Plan Supplement.

(f)     *Management Agreements and Management Equity Plan.*  On or after the Effective Date, the SA Reorganized Debtors shall execute the Management Agreements.  On the Effective Date or as soon thereafter as practicable, the applicable boards of directors of the SA Reorganized Debtors shall adopt the Management Equity Plan.

(g)     *Corporate Action.*

(i)     On the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended and restated in substantially the forms set forth in the Plan Supplement.

(ii)    Any action under the Plan to be taken by or required of the Debtors, including, without limitation, the adoption or amendment of certificates of incorporation and by-laws or the issuance of securities and instruments, shall be authorized and approved in all respects, without any requirement of further action by any of the Debtors' or SA Reorganized Debtors' board of directors as applicable.

(iii)   The Debtors and SA Reorganized Debtors shall be authorized to execute, deliver, file, and record such documents (including the Plan Documents), contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.  In addition, the selection of the persons who will serve as the initial directors and officers of the SA Reorganized Debtors as of the Effective Date shall be deemed to have occurred and be effective on the Effective Date without any requirement of further action by the board of directors or stockholders of the applicable SA Reorganized Debtor.  On the Effective Date, the New Common Stock, to the extent applicable under the Plan, will be transferred to the Disbursing Agent and the Disbursing Agent will hold the New Common Stock until distributions of same are made.

(h)    *New Stockholders and Registration Rights Agreement.*  Upon receipt of its respective Pro Rata Share of the New Common Stock under the Plan, each holder of the First Lien Lender Claims shall be deemed to have executed, as of the Effective Date, the New Stockholder and Registration Rights Agreement and such agreement shall be valid, binding and enforceable in accordance with its terms and each holder of a First Lien Lender Claim deemed party thereto shall be bound thereby without the need for any further actions, including the execution of such agreement by such party.  If pursuant to the Management Equity Plan any officers or directors of the SA Reorganized Debtors receive any portion of the New Common Stock on the Effective Date, each such officer and/or director shall be deemed, as of such date, to have executed the New Stockholder and Registration Rights Agreement.

## ARTICLE VIII.

## DISTRIBUTIONS

### 8.1.    *Distributions.*

The Disbursing Agent shall make all distributions to the appropriate holders of Allowed Claims, free and clear of all Liens, claims and encumbrances, except as otherwise set forth in the Plan.  A PED Debtor acting as the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

### 8.2.    *No Postpetition Interest on Claims.*

Unless otherwise specifically provided for herein, in the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Commencement Date.

### 8.3.    *Date of Distributions.*

Unless otherwise provided herein, any distributions and deliveries to be made hereunder shall be made on the Effective Date or as soon thereafter as is practicable, provided that the Disbursing Agent may utilize periodic distribution dates to the extent appropriate.  In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 8.4.    *Distribution Record Date.*

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each of the Classes, as maintained by the Debtors, the PED Debtors, the DIP Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent, or their respective agents, shall be deemed closed.  The Debtors, the PED Debtors, the DIP Agent, the First Lien Administrative Agent, the Second Lien Administrative Agent and their respective agents as applicable, shall have no obligation to (but may in their sole discretion) recognize any

transfer of Claims occurring after the close of business on the applicable Distribution Record Date. Additionally, with respect to payment of any Cure Amounts or any Cure Disputes in connection with the assumption and/or assignment of the Debtors' executory contracts and leases, the PED Debtors shall have no obligation to recognize or deal with any party other than the non-Debtor party to the underlying executory contract or lease, even if such non-Debtor party has sold, assigned or otherwise transferred its Claim for a Cure Amount.

### 8.5. *Surrender of Cancelled Instruments or Securities.*

As a condition precedent to any holder of an Allowed Claim receiving any Plan Distribution on account of such Allowed Claim, unless waived in writing by the Disbursing Agent, the holder of such Allowed Claim shall have properly tendered to the Disbursing Agent for cancellation, any notes or other form of securities evidencing the right to payment pursuant to this Plan.

### 8.6. *Failure to Surrender Cancelled Instruments.*

Except as may otherwise be agreed by the Disbursing Agent, if the holder of a Claim has not surrendered, or been deemed to have surrendered, any securities required to be tendered pursuant to Section 8.5 of the Plan within one year after the Effective Date, such holder of a Claim shall have its Claim or Interest discharged and shall be forever barred from asserting any such Claim against the Debtors or their property. In such cases, any distribution on account of such Claim or Interest shall be disposed of pursuant to the provisions set forth below in Section 8.8 of the Plan.

### 8.7. *Delivery of Distribution.*

On or as promptly as practicable after the Effective Date, the Disbursing Agent will issue, or cause to be issued, and authenticate, as applicable, the applicable Plan Consideration, and subject to Bankruptcy Rule 9010, except as may otherwise be provided in Section 8.1 of this Plan, make all distributions or payments to any holder of an Allowed Claim at (a) the address of such holder on the books and records of the Debtors or their agents, or (b) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any filed proofs of Claim. In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder shall be made unless and until the applicable Disbursing Agent has been notified of the then current address of such holder, at which time or as soon as reasonably practicable thereafter such distribution shall be made to such holder without interest; *provided, however,* such distributions or payments shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of the later of one year from (a) the Effective Date and (b) the date such holder's Claim is Allowed.

### 8.8. *Unclaimed Property.*

One year from the later of (a) the Effective Date, and (b) the date a Claim is first Allowed, all unclaimed property or interests in property on account of such Claim shall revert to the PED Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and, forever barred. The PED Debtors and the Disbursing Agent shall have no

obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records, or proofs of Claim filed against the Debtors.

**8.9.   *Satisfaction of Claims*.**

Unless otherwise provided herein, any distributions and deliveries to be made on account of Allowed Claims hereunder shall be in complete settlement, satisfaction and discharge of such Allowed Claims.

**8.10.   *Manner of Payment Under Plan*.**

Except as specifically provided herein, at the option of the Disbursing Agent, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

**8.11.   *Fractional Shares*.**

No fractional shares of New Common Stock or any other form of security shall be distributed. When any distribution would otherwise result in the issuance of a number of shares of New Common Stock or another security that is not a whole number, the shares of the New Common Stock or such other security subject to such distribution will be rounded to the next lower whole number. The total number of shares of New Common Stock or other security to be distributed on account of Allowed Claims will be adjusted as necessary to account for the rounding provided for in the Plan. No consideration will be provided in lieu of fractional shares that are rounded down. The Disbursing Agent shall not have any obligation to make a distribution that is less than one (1) share of New Common Stock or other securities. Fractional shares of New Common Stock or other securities that are not distributed in accordance with this Section 8.11 shall be returned to the PED Debtors, and cancelled.

**8.12.   *De Minimis Payments and Distributions*.**

Notwithstanding any other provision of the Plan, the Disbursing Agent shall not have any obligation to make a distribution less than $100 on account of any Allowed Claim; such amounts not distributed shall be returned to, and become the proceeds of the PED Debtors. Further, if the final amount to be distributed is less than $5,000, the Liquidating Debtors may, at the conclusion of the Reorganization Cases, donate such amounts to a charity or charities designated by the Liquidating Debtors.

**8.13.   *No Distribution in Excess of Amount of Allowed Claim*.**

Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a Plan Distribution (of a value set forth herein) in excess of the Allowed amount of such Claim plus postpetition interest on such Claim, to the extent provided in Section 8.2 herein. Further, if the Sale Transactions are not implemented, notwithstanding anything herein to the contrary, the holder of an Allowed Claim shall only be entitled to a single recovery or such other Plan Distribution as provided herein on account of such Claim, such that upon satisfaction of such Claim against one Debtor all guarantees or co-liability of another Debtor of the payment, performance or collection against the first Debtor

with respect to such Claim shall be deemed eliminated and cancelled and shall not entitle the holder of such Claim to a recovery or Plan Distribution as against any other Debtor.

### 8.14. *Exemption from Securities Laws*.

The issuance of the New Common Stock to holders of Claims pursuant to this Plan shall be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the maximum extent permitted thereunder, and subject to the transfer restrictions contained in the Amended Certificates and, if the Sale Transactions are not implemented, the New Stockholder and Registration Rights Agreement, such New Common Stock may be resold by the holders thereof without restriction, except to the extent that any such holder is deemed to be an "underwriter" as defined in section 1145(b)(1) of the Bankruptcy Code. The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable U.S. federal securities laws shall not be a condition to the occurrence of the Effective Date of the Plan.

### 8.15. *Setoffs and Recoupments*.

The Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off and/or recoup against any Allowed Claim, and the distributions to be made pursuant to this Plan on account of such Allowed Claim, any and all claims, rights and Causes of Action that a Debtor or PED Debtor or its successors may hold against the holder of such Allowed Claim after the Effective Date; *provided, however,* that neither the failure to effect a setoff or recoupment nor the allowance of any Claim hereunder will constitute a waiver or release by a Debtor or PED Debtor or its successor of any and all claims, rights and Causes of Action that a Debtor or PED Debtor or its successor may possess against such holder.

### 8.16. *Rights and Powers of the Disbursing Agent*.

The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan, (ii) make all applicable distributions or payments contemplated hereby, (iii) employ professionals to represent it with respect to its responsibilities, and (iv) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date), pursuant to this Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

### 8.17. *Expenses Incurred by the Disbursing Agent.*

Except as otherwise ordered by the Bankruptcy Court, and subject to the written agreement of the PED Debtors the amount of any reasonable fees and expenses incurred by the Disbursing Agent, on or after the Effective Date (including, without limitation, taxes) and any reasonable compensation and expense reimbursement claims (including, without limitation, reasonable attorney and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the PED Debtors.

### 8.18. *Withholding and Reporting Requirements.*

In connection with this Plan and all distributions thereunder, the Disbursing Agent and the PED Debtors shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all distributions, including with respect to the Distributable Sale Proceeds, the Trade Payments, and the Lump Sum Payments hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent and the PED Debtors shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements, including, without limitation, liquidating a portion of any Plan Distribution to generate sufficient funds to pay applicable withholding taxes or establishing any other mechanisms the Debtors, the Disbursing Agent and the PED Debtors believe are reasonable and appropriate, including requiring a holder of a Claim to submit appropriate tax and withholding certifications pursuant to any procedures adopted by the Disbursing Agent and the PED Debtors prior to or after the Effective Date and/or as approved by the Bankruptcy Court. Notwithstanding any other provision of this Plan, (a) each holder of an Allowed Claim that is to receive a distribution under this Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding and other tax obligations on account of such distribution, and (b) no Plan Distributions shall be required to be made to or on behalf of such holder pursuant to this Plan unless and until such holder has made arrangements satisfactory to Disbursing Agent or the PED Debtors for the payment and satisfaction of such tax obligations or has, to the satisfaction of the Disbursing Agent and the PED Debtors established an exemption therefrom.

### 8.19. *Cooperation with Disbursing Agent.*

The PED Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent with the amount of Claims and the identity and addresses of holders of Claims, in each case, as set forth in the Debtors' and/or PED Debtors' books and records. The PED Debtors will cooperate in good faith with the Disbursing Agent to comply with the reporting and withholding requirements outlined in Section 8.18 hereof.

### 8.20. *Hart-Scott-Rodino Antitrust Improvements Act.*

Any New Common Stock to be distributed under the Plan to an entity required to file a Premerger Notification and Report Form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, shall not be distributed until the notification and waiting periods applicable under such Act to such entity shall have expired or been terminated. In the event any applicable notification and waiting periods do not expire without objection, the Debtors or their agent shall, in their sole discretion, be entitled to sell such entity's shares of New Common Stock that were to be distributed under the Plan to such entity, and thereafter shall distribute the proceeds of the sale to such entity.

### 8.21. *Investments by the Liquidating Debtors.*

All Cash held by the Liquidating Debtors, including cash held pursuant to Section 8.8, shall be invested in accordance with section 345 of the Bankruptcy Code, or as otherwise

permitted by a Final Order of the Bankruptcy Court during the Reorganization Cases and as deemed appropriate by the Liquidating Debtors or the Chief Wind Down Officer. The earnings on such investments shall be included in the Wind-Down Reserve.

**8.22. *Time Bar to Cash Payments by Check.*** Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for the reissuance of any check that becomes null and void pursuant to this Section 8.22 of the Plan may be made directly to the Disbursing Agent by the holder of the Allowed Claim to whom the check was originally issued. Any Claim in respect of such voided check must be made in writing on or before the later of the first anniversary of the Effective Date and the six (6) month anniversary of the date on which the Distribution was made. After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall be deemed Unclaimed Property in accordance with section 347(b) of the Bankruptcy Code and be distributed as provided in Section 8.8 herein.

## ARTICLE IX.

## PROCEDURES FOR RESOLVING CLAIMS

### 9.1. *Objections to Claims.*

Other than with respect to Fee Claims, only the PED Debtors shall be entitled to object to Claims after the Effective Date. Any objections to those Claims (other than Administrative Expense Claims) that have been filed on or before the Bar Date, shall be served and filed on or before the later of: (a) ninety (90) days after the Effective Date; or (b) such other date as may be fixed by the Bankruptcy Court, whether fixed before or after the date specified in clause (a) hereof. Any Claims filed after the Bar Date or Administrative Expense Bar Date, as applicable, shall be deemed disallowed and expunged in their entirety without further order of the Bankruptcy Court or any action being required on the part of the Debtors, or the PED Debtors unless the Person or entity wishing to file such untimely Claim has received prior Bankruptcy Court authority to do so. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the claimant if the objecting party effects service in any of the following manners: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on the signatory on the proof of claim as well as all other representatives identified in the proof of claim or any attachment thereto; or (c) by first class mail, postage prepaid, on any counsel that has appeared on the claimant's behalf in the Reorganization Cases (so long as such appearance has not been subsequently withdrawn). From and after the Effective Date, the PED Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. Within fifteen (15) days of the end of each calendar quarter, the PED Debtors shall provide the Disbursing Agent with, and file with the Bankruptcy Court, a written report identifying all Disputed Claims that have been settled and become Allowed Claims during the preceding quarter. Such report will identify the Claim with specificity, the amount of the Disputed Claim as asserted and the amount of the Claim as Allowed. Upon request of the applicable Disbursing Agent, the PED Debtors shall provide documentation, if any, supporting the settlement.

### 9.2. *Disputed Claims.*

(a)     No Distributions or Payments Pending Allowance.

Except as provided in this Section 9.2 of the Plan, Disputed Claims shall not be entitled to any Plan Distributions unless and until such Claims become Allowed Claims.

(b)     Plan Distributions to Holders of Subsequently Allowed Claims.

On each Quarterly Distribution Date, the Disbursing Agent will make distributions or payments (i) on account of any Disputed Claim that has become an Allowed Claim during the preceding calendar quarter, and (ii) on account of previously Allowed Claims of property that would have been distributed or paid to the holders of such Claims on the dates distributions previously were made to holders of Allowed Claims in such Class had the Disputed Claims that have become Disallowed Claims been Disallowed Claims on such dates. The Disbursing Agent shall distribute in respect of such newly Allowed Claims the Plan Consideration as to which holders of such Claims would have been entitled under this Plan if such newly Allowed Claims were fully or partially Allowed, as the case may be, on the Effective Date, less direct and actual expenses, fees, or other direct costs of maintaining Plan Consideration on account of such Disputed Claims. The PED Debtors shall maintain the Disputed Claims Reserves on account of the Disputed Claims. The Disputed Claims Reserves may be adjusted from time to time, and funds previously held in such reserve on account of Disputed Claims that have subsequently become Disallowed Claims shall be released from such reserve and used to fund the other reserves and Distributions under this Plan.

### 9.3. *Estimation of Claims.*

Any Debtor, PED Debtor or holder of a Claim may request that the Bankruptcy Court estimate any Claim pursuant to section 502(c) of the Bankruptcy Code for purposes of determining the Allowed amount of such Claim regardless of whether any Person has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim for purposes of determining the allowed amount of such Claim at any time. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim for allowance purposes, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, any objecting party may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the objection, estimation, settlement, and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another.

### 9.4. *No Recourse.*

Notwithstanding that the Allowed amount of any particular Disputed Claim is reconsidered under the applicable provisions of the Bankruptcy Code and the Bankruptcy Rules or is Allowed in an amount for which after application of the payment priorities established by this Plan there is insufficient value to provide a recovery equal to that received by other holders of Allowed Claims in the respective Class, no holder of a Claim shall have recourse against the Debtors, the Disbursing Agent, the Chief Wind Down Officer, the PED Debtors, or any of their

respective professionals, consultants, attorneys, advisors, officers, directors, or members or their successors or assigns, or any of their respective property. However, nothing in the Plan shall modify any right of a holder of a Claim under section 502(j) of the Bankruptcy Code. THE BANKRUPTCY COURT'S ENTRY OF AN ORDER ESTIMATING CLAIMS MAY LIMIT THE DISTRIBUTION TO BE MADE ON SUCH DISPUTED CLAIM, REGARDLESS OF THE AMOUNT FINALLY ALLOWED ON ACCOUNT OF SUCH DISPUTED CLAIM.

### 9.5. *Preservation of Insurance.*

The discharge and release of the Debtors as provided in this Plan, and the revesting of property in the PED Debtors, shall not diminish or impair the enforceability of any insurance policies that may cover Claims against any Debtor or other Person.

## ARTICLE X.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 10.1. *Treatment of Executory Contracts if Sale Transactions are Implemented.*

If the Sale Transactions are implemented, (a) to the extent not previously assumed, assumed and assigned, or rejected, as of and subject to the occurrence of the Effective Date and the payment of the applicable Cure Amount, the executory contracts and unexpired leases to be assumed and assigned to the Purchaser, as shall be set forth in the Purchase Agreement, shall be deemed assumed and assigned as of the Effective Date to the Purchaser; and (b) as of the date of entry of the Confirmation Order, but subject to the occurrence of the Effective Date, all executory contracts and unexpired leases to which any Debtor is a party that are not to be assumed and assigned to the Purchaser shall be deemed rejected. Notwithstanding the foregoing, any executory contracts or unexpired leases that: (i) are designated specifically or by category as a contract or lease that the Debtors are not seeking to assume or reject at this time, if any (the "**Liquidating Debtors' Contracts**") shall remain property of the Estate and subject to assumption, assumption and assignment or rejection; or (ii) are the subject of a separate motion to assume, assume and assign, or reject under section 365 of the Bankruptcy Code pending on the Effective Date and shall be governed by the order approving such motion.

### 10.2. *Treatment of Executory Contracts if Sale Transactions are not Implemented.*

If the Sale Transactions are not implemented, as of and subject to the occurrence of the Effective Date and the payment of the applicable Cure Amount, all executory contracts and unexpired leases to which any Debtor is a party shall be deemed assumed or assumed and assigned (as applicable), except for any executory contracts or unexpired leases that: (a) previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy Court; (b) are designated specifically or by category as a contract or lease to be rejected on the Schedule of Rejected Contracts and Leases, if any; or (c) are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy Code pending on the Effective Date. If the Sale Transactions are not implemented, on or before one (1) business day prior to the Confirmation Hearing, the Debtors shall file the Schedule of Rejected Contracts and Leases setting forth each executory contract or unexpired lease to be rejected pursuant to this Section 10.2 of the Plan. As

of and subject to the occurrence of the Effective Date, all contracts identified on the Schedule of Rejected Contracts and Leases shall be deemed rejected. If the Sale Transactions are not implemented, subject to the occurrence of the Effective Date and payment of any Cure Amount, if applicable, each executory contract and unexpired lease assumed pursuant to this Section 10.2 shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, or any order of the Bankruptcy Court authorizing and providing for its assumption or applicable federal law.

**10.3.** ***Claims Based on Rejection of Executory Contracts or Unexpired Leases.***

All Claims arising from the rejection of executory contracts or unexpired leases, if any, will be treated as General Unsecured Claims. Pursuant to Section 5.6 hereof, all such Claims shall to the fullest extent permitted by applicable law be discharged on the Effective Date, and shall not be enforceable against the PED Debtors or their respective properties or interests in property. Any party that fails to object to the rejection of its executory contract or file a proof of claim in accordance with the terms of the Bar Date Order, shall be forever barred, estopped and enjoined from disputing the rejection and/or from asserting any claim against such applicable Debtor arising under section 365 of the Bankruptcy Code.

**10.4.** ***Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.***

(a)     Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Sections 10.1 and 10.2 of the Plan, any monetary amounts by which each executory contract and unexpired lease to be assumed or assumed and assigned pursuant to the Plan is in default for the period prior to the Effective Date shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code by payment of such "**Cure Amount**" in Cash (1) if the Sale Transactions are implemented, in accordance with the terms of the Purchase Agreement; (2) within thirty (30) days after the later of (i) the Effective Date or (ii) the date on which the Cure Amount has been resolved (either consensually or through judicial decision); or (3) on such other less favorable terms to the non-Debtor party as the parties to such executory contracts or unexpired leases may otherwise agree.

(b)     The Cure Procedures Order shall govern the rights of the non-Debtor parties to the executory contracts and unexpired leases to object to the Cure Amounts, the assumption, and/or the assumption and assignment of its executory contract or unexpired lease

**10.5.** ***Indemnification of Certain Directors, Officers and Employees.***

(a)     If the Sale Transactions are not implemented, for purposes of the Plan, the obligation of a Debtor to indemnify and reimburse any Person or entity serving at any time on or after the Commencement Date as one of its directors, officers or employees by reason of such Person's or entity's service in such capacity, or as a director, officer or employee of any other corporation or legal entity, to the extent provided in such Debtor's constituent documents, a written agreement with the Debtor, in accordance with any applicable law, or any combination of the foregoing (each, an "**Indemnification Agreement**") shall with respect to Claims concerning such Person's or Entity's acts or omissions: (i) survive confirmation of the Plan and the Effective

Date; (ii) become obligations of the SA Reorganized Debtors, and such obligations shall continue in full force and effect (and not be modified, amended or terminated in any manner adverse to any Indemnitee without the written consent of the affected Indemnitee) for a period of not less than six years following the Effective Date; and (iii) not be discharged in accordance with section 1141 of the Bankruptcy Code, irrespective of whether indemnification or reimbursement is owed in connection with an event occurring before, on, or after the Commencement Date. Notwithstanding anything to the contrary herein, the Indemnification Agreements shall not be subject to the requirements of Section 10.2, and failure to include the Indemnification Agreements on any schedule of executory contracts to be assumed or assumed and assigned, (as applicable) by the Debtors shall not affect the rights of Indemnitees provided by this Section 10.5.

(b)      Notwithstanding the foregoing, the indemnification described in paragraph (a) of this Section 10.5 shall not apply to any Claims or Entities to the extent described on the Indemnification Exclusion Schedule.

## ARTICLE XI.

## CONDITIONS PRECEDENT TO
## CONFIRMATION AND CONSUMMATION OF THE PLAN

**11.1.   *Conditions Precedent to Confirmation.***

Confirmation of this Plan is subject to:

(a)      if the Sale Transactions are implemented, the Successful Bidder shall have submitted a bid containing a Purchase Price sufficient to satisfy the Allowed DIP Lender Claims and Allowed First Lien Lender Claims in full in Cash, or the Required First Lien Lenders shall have otherwise consented to the consummation of the Sale Transactions;

(b)      if the Stand Alone Transactions are implemented, the proposed Purchase Price in the highest and/or best bid submitted for the purchase of the Debtors' business shall not have been $295 million or more in Cash consideration, or the Court shall have otherwise denied approval of the Sale Transaction;

(c)      if the Stand Alone Transactions are implemented, reasonable, customary and appropriate severance and other compensation agreements covering the period commencing on the Effective Date of the Plan, and lasting for a period of not less than one year, being negotiated and agreed upon among CCS and those current officers of CCS that will continue with Reorganized CCS, and each such agreement being satisfactory to the Required First Lien Lenders;

(d)      the Disclosure Statement having been approved by the Bankruptcy Court as having adequate information in accordance with section 1125 of the Bankruptcy Code;

(e)      entry of the Confirmation Order in form and substance satisfactory to the Debtors and the Required Lenders; and

(f)     the material Plan Documents having been filed in substantially final form prior to the Confirmation Hearing.

**11.2.    *Conditions Precedent to the Effective Date*.**

The occurrence of the Effective Date is subject to:

(a)     subject to Section 6.5 of this Plan, the Confirmation Order with respect to each Debtor having been entered by the Bankruptcy Court, being in full force and effect and not subject to any stay or injunction, and being in form and substance reasonably satisfactory to the Debtors and the Required Lenders;

(b)     the Plan Documents, to the extent applicable to the transactions to be consummated pursuant to the Confirmation Order, being executed and delivered, and any conditions (other than the occurrence of the Effective Date or certification by the Debtors that the Effective Date has occurred) contained therein having been satisfied or waived in accordance therewith, including, but not limited to:

(i)     if the Sale Transactions are to be consummated, (A) each of the conditions to Closing (as defined in the Purchase Agreement) under the Purchase Agreement shall have been satisfied or waived in accordance with the provisions thereof; and (B) the Debtors shall have sufficient Cash on hand to fund the Wind-Down Reserve; or

(ii)     if the Stand Alone Transactions are to be consummated, (A) the Reorganized First Lien Term Loan Facility (including the DIP Roll Option, if applicable), the Reorganized Second Lien Term Loan Facility, and all documents ancillary thereto, each in form and substance reasonably satisfactory to the Debtors and the Required First Lien Lenders; (B) if the DIP Roll Option has not been elected pursuant to Section 3.1 hereof, the New Revolving Credit Facility (1) shall have closed on substantially the terms and conditions set forth on <u>Exhibit D</u> to the Plan and/or such other terms as shall be mutually acceptable to the Debtors and the Required First Lien Lenders; and (2) shall be in full force and effect; (C) the amended and restated certificate of incorporation and by-laws of the Reorganized Debtors (which documents shall comply with the requirements of Plan confirmation under the Bankruptcy Code), each in form and substance reasonably satisfactory to the Required First Lien Lenders and the Debtors; (D) the New Stockholder and Registration Rights Agreement in form and substance satisfactory to the Required First Lien Lenders and the Debtors; and (E) if the DIP Roll Option is not elected, the Debtors shall have Cash on hand and/or availability under the New Revolving Credit Agreement as of the Effective Date of at least $25 million.

(c)     all material governmental, regulatory and third party approvals, waivers and/or consents in connection with the restructuring contemplated by this Plan, if any, shall have been obtained and shall remain in full force and effect, and there shall exist no claim, action, suit, investigation, litigation or proceeding, pending or threatened in any court or before any arbitrator or governmental instrumentality, which would prohibit the transactions contemplated herein; and

(d)     no law or order shall be in effect which has the effect of making illegal or otherwise restricting, preventing or prohibiting consummation of the Plan.

### 11.3.    *Waiver of Conditions Precedent and Bankruptcy Rule 3020(e)*.

The Debtors and the Required Lenders shall have the right to jointly waive one or more of the conditions precedent set forth in Sections 11.1 (b), (c) and (f) of this Plan at any time without leave of or notice to the Bankruptcy Court and without formal action other than proceeding with confirmation of the Plan.

The Debtors and Required Lenders shall have the right to jointly waive the conditions precedent set forth in Sections 11.2 (a) and (b) of this Plan at any time with respect to any Debtor without leave of or notice to the Bankruptcy Court and without any formal action other than proceeding with consummation of this Plan. Further, this Plan shall be deemed a request for a waiver of the stay of the Confirmation Order, pursuant to Bankruptcy Rule 3020(e), and such stay shall be waived by the Confirmation Order.

If any condition precedent to the Effective Date is waived pursuant to this Section 11.3 and the Effective Date occurs, the waiver of such condition shall benefit from the "mootness doctrine," and the act of consummation of this Plan shall foreclose any ability to challenge this Plan in any court.

### 11.4.    *Effect of Failure of Conditions*.

If all of the conditions to effectiveness and the occurrence of the Effective Date have not been satisfied or duly waived on or before the first Business Day that is more than 60 days after the Confirmation Date, or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, then upon motion by the applicable Debtor(s) made before the time that all of the conditions have been satisfied or duly waived, the Confirmation Order shall be vacated by the Bankruptcy Court as to such Debtors(s). Notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if all of the conditions to consummation set forth in Section 11.2 of this Plan are either satisfied or duly waived before the Bankruptcy Court enters an order granting the relief requested in such motion. If the Confirmation Order is vacated pursuant to this Section 11.4, this Plan shall be null and void in all respects as to such Debtor(s), and nothing contained in this Plan shall:  (a) constitute a waiver or release of any Claims against or Interests in the applicable Debtors; (b) prejudice in any manner the rights of the holder of any Claim or Interest in the applicable Debtors; or (c) constitute an admission, acknowledgment, offer or undertaking by the applicable Debtors or any other entity with respect to any matter set forth in the Plan.

# ARTICLE XII.

## EFFECT OF CONFIRMATION

### 12.1. *Binding Effect.*

This Plan shall be binding and inure to the benefit of the Debtors, all holders of Claims and Interests, and their respective successors and assigns.

### 12.2. *Vesting of Assets.*

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, the property of each Estate shall vest in the PED Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided herein, the Purchase Agreement, or in the Confirmation Order. Each Debtor shall have the right to have any of its Assets vest on the Effective Date in another Reorganized Debtor. The PED Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise or settle any Claims (including any Administrative Expense Claims) and causes of action without supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by this Plan or the Confirmation Order and in all respects as if there were no pending case under any chapter or provision of the Bankruptcy Code, except as provided herein or therein. Without limiting the foregoing, the PED Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses or related support services without application to the Bankruptcy Court.

### 12.3. *Discharge of Claims Against and Interests in the Debtors.*

Upon the Effective Date and in consideration of the distributions to be made hereunder, to the fullest extent permitted by applicable law, except as otherwise provided herein or in the Confirmation Order, each Person that is a holder (as well as any trustees and agents on behalf of such Person) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date. Except as otherwise provided herein, upon the Effective Date, all such holders of Claims and Interests and their affiliates shall be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor.

### 12.4. *Term of Pre-Confirmation Injunctions or Stays.*

Unless otherwise provided herein, all injunctions or stays arising prior to the Confirmation Date in accordance with sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date and thereafter to the extent permitted under applicable law.

### 12.5. *Injunction Against Interference With Plan.*

Upon the entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former affiliates, employees, agents, officers, directors, or principals, shall be enjoined from taking any actions to interfere with the implementation or consummation of this Plan.

**12.6.** *Injunction.*

(a) *Except as otherwise provided in this Plan or the Confirmation Order, as of the Confirmation Date, but subject to the occurrence of the Effective Date, all Persons who have held, hold or may hold Claims against or Interests in the Debtors or the Estates are, with respect to any such Claims or Interests, permanently enjoined after the Confirmation Date from: (i) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the PED Debtors, the Estates or any of their property, the Purchaser, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree or order against the Debtors, the PED Debtors, or the Estates or any of their property, the Purchaser, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons, or any property of any such transferee or successor; (iii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the PED Debtors, or the Estates or any of their property, the Purchaser, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Persons; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of this Plan to the fullest extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of this Plan; provided, however, that nothing contained herein shall preclude such persons from exercising their rights pursuant to and consistent with the terms of this Plan.*

(b) *Each holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth herein.*

**12.7.** *Releases.*

(a) <u>*Releases by the Debtors.*</u> *Except as otherwise provided in this Plan or the Confirmation Order, as of the Effective Date, each Debtor, in its individual capacity and as a debtor in possession, shall be deemed to forever release, waive and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action and liabilities (other than the rights of the Debtors to enforce this Plan and the contracts, instruments, releases, credit facilities and other agreements or documents delivered thereunder) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act, omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the parties released pursuant to*

*this Section 12.7, the Reorganization Cases, this Plan or the Disclosure Statement, and that could have been asserted by or on behalf of the Debtors or their Estates, whether directly, indirectly, derivatively or in any representative or any other capacity, against any Released Party; provided, however, that (i) the releases set forth in this Section 12.7(a) shall not release any Debtor's claims, rights, or causes of action for money borrowed from or owed to a Debtor or its Subsidiary by any of its directors, officers or former employees as set forth in such Debtors' or Subsidiary's books and records, and (ii) in no event shall anything in this Section 12.7(a) be construed as a release of any Person's fraud, gross negligence or willful misconduct for matters with respect to the Debtors and their Subsidiaries and/or affiliates*

(b)     *Releases by Holders of Claims and Interests. Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, to the fullest extent permissible under applicable law, as such law may be extended or interpreted subsequent to the Effective Date, all holders of Claims and Interests, in consideration for the obligations of the Debtors under this Plan, the Plan Consideration, the New Common Stock and other contracts, instruments, releases, agreements or documents executed and delivered in connection with this Plan, and each entity (other than a Debtor) that has held, holds or may hold a Claim or Interest, as applicable, will be deemed to have consented to this Plan for all purposes and the restructuring embodied herein and deemed to forever release, waive and discharge all claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan), including, without limitation, any claims for any such loss such holder may suffer, have suffered or be alleged to suffer as a result of the Debtors commencing the Reorganization Cases or as a result of this Plan being consummated, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganization Cases, this Plan or the Disclosure Statement against any Released Party; provided, however, that in no event shall anything in this Section 12.7(b) be construed as a release of any Person's fraud or willful misconduct for matters with respect to the Debtors and their Subsidiaries and/or affiliates (the "**Third Party Release**").*

(c)     Notwithstanding the foregoing, the releases contained in paragraph (a) and (b) of this Section 12.7 shall not apply to any Claims or Entities to the extent described in the Release and Claim Exclusion Schedule.

(d)     Entry of the Confirmation Order will constitute the Bankruptcy Court's approval pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 of the Third Party Release, which includes by reference each of the related provisions and definitions contained herein, and further, will constitute the Bankruptcy Court's finding that such release is (i) in exchange for the good and valuable consideration provided by the Debtors and the other Released Parties, representing good faith settlement and compromise of the claims released herein; (ii) in the best interests of the Debtors and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) approved after due notice and opportunity for hearing; and (v) a bar to any of the holders of Claims and Interests against or in the Debtors asserting any claim released pursuant to this Section 12.7.

**12.8.  *Exculpation and Limitation of Liability*.**

   *None of the Exculpated Parties shall have or incur any liability to any holder of any Claim or Interest for any act or omission in connection with, or arising out of the Debtors' restructuring, including without limitation the negotiation and execution of this Plan, the Reorganization Cases, the Disclosure Statement, the solicitation of votes for and the pursuit of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, including, without limitation, all documents ancillary thereto, all decisions, actions, inactions and alleged negligence or misconduct relating thereto and all prepetition activities leading to the promulgation and confirmation of this Plan except fraud, gross negligence, or willful misconduct as determined by a Final Order of the Bankruptcy Court. The Exculpated Parties shall be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.*

**12.9.  *Injunction Related to Releases and Exculpation*.**

   *The Confirmation Order shall permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action or liabilities released or exculpated pursuant to this Plan, including but not limited to the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released in Sections 12.7, 12.8, and 12.12 of this Plan.*

**12.10.  *Termination of Subordination Rights and Settlement of Related Claims*.**

   (a) Except as provided herein, the classification and manner of satisfying all Claims and Interests and the respective distributions and treatments under the Plan take into account or conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code or otherwise, and any and all such rights are settled, compromised and released pursuant to the Plan. The Confirmation Order shall permanently enjoin, effective as of the Effective Date, all Persons and Entities from enforcing or attempting to enforce any such contractual, legal and equitable rights satisfied, compromised and settled pursuant to this Plan.

   (b) Pursuant to Bankruptcy Rule 9019 and in consideration of the distributions and other benefits provided under this Plan, the provisions of this Plan will constitute a good faith compromise and settlement of all claims or controversies relating to the subordination rights that a holder of a Claim or Interest may have or any distribution to be made pursuant to this Plan on account of such Claim or Interest. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors and their Estates, and holders of Claims and Interests, and is fair, equitable and reasonable.

**12.11.  *Retention of Causes of Action/Reservation of Rights*.**

Subject to Sections 12.7 and 12.12 herein, nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims or causes of action, rights of setoff, or other legal or equitable defenses that the Debtors had immediately prior to the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable non-bankruptcy law. The PED Debtors shall have, retain, reserve, and be entitled to assert all such claims, causes of action, rights of setoff, or other legal or equitable defenses as fully as if the Reorganization Cases had not been commenced, and all of the Debtors' legal and/or equitable rights respecting any Claim left unimpaired, as set forth in Section 4.2 herein, may be asserted after the Confirmation Date to the same extent as if the Reorganization Cases had not been commenced. For the avoidance of doubt, nothing in this Section 12.11 shall modify or affect the obligations of the PED Debtors set forth in Section 10.5 herein.

**12.12.** *Avoidance Actions.*

Subject to the occurrence of the Effective Date and except as provided on Schedule 12.12, neither the Debtors nor any other party in interest shall assert any Avoidance Action not asserted by a Debtor prior to the Effective Date, *provided*, *however*; that nothing herein shall prohibit the Debtors or the PED Debtors from challenging the validity, priority, perfection or extent of any lien, mortgage or security agreement or, subject to Section 9.1 hereof, objecting to any Claim. All such rights, Claims and Causes of Action shall be released and waived by the Debtors and their Estates under the Plan on the Effective Date. Notwithstanding anything to the contrary contained herein, nothing contained in this Plan shall prejudice any rights or defenses the Debtors may have under section 502(d) of the Bankruptcy Code or from otherwise retaining such Claims and/or Causes of Action for the purposes of defending any Claim brought against the Debtors or their Estates.

# ARTICLE XIII.

## RETENTION OF JURISDICTION

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in, arising under, or related to the Reorganization Cases for, among other things, the following purposes:

(a) To hear and determine applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of Claims resulting therefrom;

(b) To determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c) To ensure that distributions to holders of Allowed Claims or Allowed Interests are accomplished as provided herein;

(d) To consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, Administrative Expense Claim, or Interest;

(e)     To enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)     To hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)     To hear and determine all Fee Claims;

(i)     To resolve disputes concerning any reserves with respect to Disputed Claims, Cure Disputes, or the administration thereof;

(j)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan, the Confirmation Order, any transactions or payments contemplated hereby, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(k)     To take any action and issue such orders, including any such action or orders as may be necessary after occurrence of the Effective Date and/or consummation of the Plan, as may be necessary to construe, enforce, implement, execute, and consummate this Plan, including any release or injunction provisions set forth herein, or to maintain the integrity of this Plan following consummation;

(l)     To determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)     To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(n)     To hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(o)     To resolve any disputes concerning whether a Person or entity had sufficient notice of the Reorganization Cases, the Disclosure Statement Hearing, the Confirmation Hearing, any applicable Bar Date, or the deadline for responding or objecting to a Cure Amount, for the purpose of determining whether a Claim or Interest is discharged or barred hereunder, or for any other purpose;

(p)     To hear and determine any matters relating to implementation of the Sale Transactions, including arising out of or in connection with the Purchase Agreement or the Chief Wind Down Officer Agreement, and any ancillary agreement thereto.

(q)     To recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)     To enter a final decree closing the Reorganization Cases.

## ARTICLE XIV.

## MISCELLANEOUS PROVISIONS

**14.1.     *Critical Vendor and Other Payments*.**

Notwithstanding the contents of the Schedules, Claims listed therein as undisputed, liquidated and not contingent shall be reduced by the amount, if any, that was paid by one or more of the Debtors pursuant to an order of the Bankruptcy Court. To the extent such payments are not reflected in the Schedules, such Schedules are hereby amended and reduced to reflect that such payments were made. Nothing in this Plan shall preclude the PED Debtors from paying Claims that the Debtors were authorized to pay pursuant to any Final Order entered by the Bankruptcy Court prior to the Confirmation Date.

**14.2.     *Exemption from Certain Transfer Taxes*.**

To the fullest extent permitted by applicable law, any transfer or encumbrance of Assets or any portion(s) of Assets pursuant to, or in furtherance of, or in connection with this Plan shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to transfer, stamp or similar taxes. Without limiting the foregoing, the Sale Transactions and all asset sales pending as of the Confirmation Hearing or set forth in the applicable Debtors' post-Confirmation business plan, shall constitute a "transfer under a plan" to the fullest extent permitted by applicable law.

**14.3.     *Disallowance of Existing Stock Interests and Other Existing Interests*.**

All Existing Stock Interests and Other Existing Interests shall be deemed disallowed and expunged in their entirety under and pursuant to this Plan without further order of the Bankruptcy Court or any action being required on the part of the Debtors.

**14.4.     *Dissolution of Second Lien Lender Committee*.**

The Second Lien Lender Committee shall be automatically dissolved on the Effective Date and all members, employees or agents thereof shall be released and discharged from all rights and duties arising from, or related to, the Reorganization Cases.

**14.5.     *Termination of Professionals*.**

On the Effective Date, the engagement of each Professional retained by the Debtors and the Second Lien Lender Committee shall be terminated without further order of the Bankruptcy Court or act of the parties.

**14.6.     *Access*.**

From and after the Effective Date, the PED Debtors shall make available, to the extent such PED Debtor has access, to any Person that served as a director or officer of a Debtor at any time prior to the Effective Date (collectively, the "**Accessing Parties**"), such information documents, books, records or information relating to the Debtors' activities prior to the Effective Date, that such Accessing Party may reasonably require relating to any action taken in connection with such Accessing Party's role as a director or officer of a Debtor or any action taken in connection with the negotiation, execution and implementation of this Plan, and the Reorganization Cases.

### 14.7. *Amendments.*

(a)     *Plan Modifications.* This Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code, or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Court may otherwise direct. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Claims or Interests pursuant to this Plan, the Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in this Plan, the Plan Documents and/or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of this Plan.

(b)     *Other Amendments.* Prior to the Effective Date the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court, *provided, however,* that, such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests.

### 14.8. *Revocation or Withdrawal of this Plan.*

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date in their sole and absolute discretion. If the Debtors take such action, this Plan shall be deemed null and void.

### 14.9. *Confirmation Order.*

The Confirmation Order shall, and is hereby deemed to, ratify all transactions effected by the Debtors during the period commencing on the Commencement Date and ending on the Confirmation Date.

### 14.10. *Substantial Consummation.*

On the Effective Date, the Plan shall be deemed to be substantially consummated pursuant to section 1101 of the Bankruptcy Code.

### 14.11. *Allocation of Plan Distributions Between Principal and Interest.*

To the extent that any Allowed Claim entitled to a distribution under the Plan consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such

distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**14.12.** *Severability.*

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, Impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**14.13.** *Governing Law.*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent a Plan Document provides otherwise, the rights, duties, and obligations arising under this Plan and the Plan Documents shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

**14.14.** *Section 1125(e) of the Bankruptcy Code.*

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and the Debtors (and their affiliates, agents, directors, officers, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance, sale, and purchase of the securities offered and sold under this Plan, and therefore are not, and on account of such offer, issuance, sale, solicitation, and/or purchase will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or offer, issuance, sale, or purchase of the securities offered and sold under this Plan.

**14.15.** *Time.*

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

**14.16.** *Notices.*

In order to be effective, all notices, requests, and demands to or upon the Debtors, or the PED Debtors shall be in writing (including by facsimile transmission) and, unless

otherwise provided herein, shall be deemed to have been duly given or made only when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows (or to such alternative address as the PED Debtors may subsequently) file with the Bankruptcy Court:

> CCS Medical Inc.
> 14255 49th Street North, Suite 301
> Clearwater, Florida 33762
> Attn:   Stephen M. Saft, Chief Financial Officer
> Telephone:     (727) 507-2756
> Facsimile:     (727) 507-2757
>
> -and-
>
> Willkie Farr & Gallagher LLP
> 787 Seventh Avenue
> New York, New York  10019-6099
> Attn:   Michael J. Kelly, Esq.
>         Lauren C. Cohen, Esq.
> Telephone:  (212) 728-8000
> Facsimile:  (212) 728-8111
>
> -and-
>
> Young Conaway Stargatt & Taylor, LLP
> The Brandywine Building
> 1000 West Street, 17th Floor
> Wilmington, Delaware 19801
> Attn:   Robert Brady, Esq.
>         Matthew B. Lunn, Esq.
> Telephone:  (302) 571-6600
> Facsimile:  (302) 571-1253

**14.17.  *Payment of Statutory Fees*.**

All fees payable pursuant to section 1930 of title 28 of the United States Code, due and payable through the Effective Date shall be paid by the Debtors on or in connection with the Effective Date and amounts due thereafter shall be paid by the Debtors in the ordinary course until the entry of a final decree closing the Reorganization Cases.  Any deadline for filing Administrative Expense Claims shall not apply to fees payable pursuant to section 1930 of title 28 of the United States Code.

**14.18.  *Reservation of Rights*.**

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order.  None of the filing of this Plan, any statement or provision contained herein, or the taking of any action by the Debtors with respect

to this Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtors with respect to the holders of Claims or Interests prior to the Effective Date.

## ARTICLE XV.

## SECOND LIEN GROUP SETTLEMENT

In full and final settlement of all outstanding claims and matters by and between the Second Lien Group and the First Lien/Debtor Parties, the Settlement Parties agree as follows:

**15.1.  *Allowance and Treatment of the Second Lien Lender Claims.***

(a)     Allowance:  On the Effective Date, the Second Lien Lender Claims shall be deemed Allowed Claims in the aggregate amount of $110,000,000 and as set forth on Schedule 15.1; provided, however, if an objection to the allowance of one or more of the individual Claims listed on Schedule 15.1 is filed with the Bankruptcy Court by the holder of a Second Lien Claim and received by the Debtors within 10 days' of notice of the filing of Schedule 15.1, the allowance of such Claim shall be determined by the Bankruptcy Court.  The only ground(s) for denying the allowance of any such Claim shall be that the holder of a Claim on Schedule 15.1 is not the holder of record thereof and/or that the objecting party is a beneficial holder of a Second Lien Lender Claim and such party's holdings are not accurately reflected on Schedule 15.1.

(b)     Treatment:

(i)       The Second Lien Lender Claims shall be treated as Class 6 General Unsecured Claims pursuant to Section 5.6 of the Plan for all purposes under the Plan and shall be entitled to receive Cash in the amount of the Lump Sum Payment.

(ii)      The Lump Sum Payment that otherwise would be payable pursuant to the Plan to the Highland Entities on account of their Allowed Second Lien Lender Claims shall be distributed on a pro rata basis to each member of the Second Lien Group on account of its Allowed Second Lien Lender Claim.

**15.2.  *Substantial Contribution Claim.***

The Second Lien Group shall have an Allowed Administrative Expense Claim pursuant to section 503(b)(3)(D) of the Bankruptcy Code in the amount of $900,000 minus the amounts paid to the Second Lien Group pursuant to Section 15.1 (a) and (b) of the Plan, resolving any and all claims that have been or may be asserted by the Second Lien Group and/or its Representatives pursuant to section 503 of the Bankruptcy Code.  Such Administrative Expense Claim shall be paid in accordance with Section 3.2(b) of the Plan.  If it is determined by the Bankruptcy Court that the Second Lien Group does not hold at least the amount of the Second Lien Claims set forth on Schedule 15.1, then the amount that would otherwise be allowed pursuant to the first sentence of this Section 15.2 of the Plan shall be reduced by an amount equal to the difference between the Lump Sum Payment that would have been payable

on account of the Second Lien Lender Claims listed on Schedule 15.1 for the Second Lien Group and the Lump Sum Payment payable on account of the Second Lien Claims determined by the Bankruptcy Court to be owned by the Second Lien Group.

**15.3.   *Releases By and Among the Settlement Parties.***

(a)   ***Releases By the Second Lien Group****:  On* the *Effective Date, each member of the Second Lien Group will be deemed to have consented to this Plan for all purposes and the Plan shall constitute a release, waiver and discharge of all Claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) that any member of the Second Lien Group may have relating to the Debtors or the Reorganization Cases, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date against any or all of the First Lien/Debtor Parties and any of their Representatives.  For the avoidance of doubt, such release shall include a release of any claims previously allowed by the Bankruptcy Court.*

(b)   ***Releases By the First Lien/Debtor Parties****:  On the Effective Date, each of the First Lien/Debtor Parties will be deemed to have consented to this Plan for all purposes and the Plan shall constitute a release, waiver and discharge of all Claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) that any such party may have relating to the Debtors or the Reorganization Cases, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date against any or all of the members of the Second Lien Group and their Representatives.  For the avoidance of doubt, the First Lien/Debtor Parties shall be deemed to have released any and all claims against the Second Lien Group and its Representatives under the Intercreditor Agreement.*

(c)   ***Releases By the Debtors and the Highland Entities of Wachovia as the Former Second Lien Administrative Agent****:  On the Effective Date, the Debtors and the Highland Entities will be deemed to have consented to this Plan for all purposes and the Plan shall constitute a release, waiver and discharge of all Claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) that any such party may have relating to the Debtors or the Reorganization Cases, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date against Wachovia in its capacity as the Second Lien Administrative Agent or any of its Representatives.*

(d) ***Releases by Wachovia, as the Former Second Lien Administrative Agent, of the Debtors and the Highland Entities:*** *On the Effective Date, Wachovia, in its capacity as the former Second Lien Administrative Agent, will be deemed to have consented to this Plan for all purposes and the Plan shall constitute a release, waiver and discharge of all Claims, demands, debts, rights, causes of action or liabilities (other than the right to enforce the obligations of any party under this Plan and the contracts, instruments, releases, agreements and documents delivered under or in connection with this Plan) that Wachovia has or may have as the former Second Lien Administrative Agent relating to the Debtors or the Reorganization Cases, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part on any act or omission, transaction, event or other occurrence taking place on or prior to the Effective Date against any or all of the Debtors, the Highland Entities and/or any of their Representatives.*

(e) Notwithstanding paragraphs (a) or (b) hereof, the releases set forth herein shall not release (1) any Claims by and among any of the First Lien Lenders or Wachovia as First Lien Administrative Agent that are intended to survive confirmation of the Plan pursuant to Section 7.4 of the Plan or (2) Allowed First Lien Lender Claims or Allowed Second Lien Lender Claims.

(f) ***Further Assurances.*** Each of the Settlement Parties agrees to take such action as may be reasonably requested by another settlement party to ensure the settlement embodied in this Article XV is effectuated. Without limiting the foregoing, each Settlement Party shall vote its claims under the First Lien Credit Agreement and/or the Second Lien Credit Agreement, as applicable, in a manner that shall bind the other parties to such agreements to the releases herein.

### 15.4. *Representations Respecting Claims Holdings.*

The Second Lien Group and the Highland Entities represent and warrant that as of March 29, 2010 each of such parties hold, and as of the Effective Date each of such parties will hold, the Claims set forth on the schedule of claims delivered by such entities to the Debtors on March 29, 2010.

Dated: March 31, 2010
      Wilmington, Delaware

                              Respectfully submitted,

                              CCS MEDICAL, INC., on behalf of itself and its
                              affiliated debtors and debtors-in-possession


                        By: _Stephen Saft_____
                              Stephen Saft
                              Chief Financial Officer

Counsel:

**Willkie Farr & Gallagher LLP**          **Young Conaway Stargatt & Taylor, LLP**
787 Seventh Avenue                        The Brandywine Building
New York, New York 10019-6099             1000 West Street, 17th Floor
(212) 728-8000                            Wilmington, Delaware 19899-0391
                                          (302) 571-6600

      *Co-Counsel to the Debtors and Debtors in Possession*